**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

EX PARTE APPLICATION OF
KUWAIT PORTS AUTHORITY FOR AN
ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. §1782

Case No. _____

**MEMORANDUM OF LAW IN SUPPORT OF KUWAIT PORTS AUTHORITY'S *EX PARTE* APPLICATION FOR AN ORDER TO OBTAIN DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ............................................................................... 5

    A.  Parties ........................................................................................................... 5

        1.   KPA .................................................................................................... 5

        2.   The Port Fund ................................................................................... 5

        3.   KGLI .................................................................................................. 7

        4.   Port Link ........................................................................................... 7

        5.   The Fund Manager ........................................................................... 7

III.   MISCONDUCT AT ISSUE IN THE IMPENDING CAYMAN LITIGATION ............... 7

    A.  The Port Fund Schemes ............................................................................. 7

        1.   Key Individuals ................................................................................ 7

        2.   The Port Fund's Investment in Clark Global City ........................ 8

    B.  KPA Kickback Scheme ............................................................................. 12

IV.   REQUESTED DISCOVERY .............................................................................. 13

    A.  Discovery Relating to the Port Fund ...................................................... 13

    B.  Discovery Relating to the KPA Kickback Scheme ................................. 13

V.    IMPENDING CAYMAN LITIGATION ............................................................. 13

VI.   ARGUMENT ..................................................................................................... 14

    A.  Legal Framework ...................................................................................... 14

    B.  KPA Has Satisfied The Statutory Requirements Under Section 1782 For The Issuance Of The Subpoenas ................................................................................. 16

        1.   The Banks Are "Found" in the Southern District ................................... 16

        2.   The Discovery Sought is "For Use" in a Foreign Proceeding ............. 17

        3.   Applicant is an "Interested Person" ...................................................... 19

    C.  The Discretionary Factors of Section 1782 Weigh in Favor of KPA's Application ... 19

        1.   The Banks Will Not Be A Party To The Impending Cayman Litigation ............. 19

        2.   The Cayman Islands Court Would Be Receptive To Assistance ......................... 19

        3.   The Application Does Not Attempt To Circumvent Cayman Proof-Gathering Restrictions ................................................................................. 20

        4.   The Requested Discovery Is Not Unduly Intrusive Or Burdensome ................... 21

VII.  CONCLUSION .................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Accent Delight Int'l Ltd.*,
    869 F.3d 121 (2d Cir. 2017)........................................................................................18

*In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*,
    121 F.3d 77 (2d Cir. 1997)......................................................................................16, 21

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
    785 F. Supp. 2d 434 (S.D.N.Y. 2011).........................................................................18

*Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*,
    2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017)..............................................................17

*In re Bayer AG*,
    146 F.3d 188 (3d Cir. 1998).........................................................................................21

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
    673 F.3d 76 (2d Cir. 2012).................................................................................. *passim*

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014).....................................................................................................17

*In re Edelman*,
    295 F.3d 171 (2d Cir. 2002).........................................................................................16

*Euromepa S.A. v. R. Esmerian, Inc.*,
    51 F.3d 1095 (2d Cir. 1995)....................................................................................16, 20

*In re Grupo Qumma, S.A. de C.V.*,
    2005 WL 937486 (S.D.N.Y. Apr. 22, 2005)...............................................................15

*Gushlak v. Gushlak*,
    486 F. App'x 215 (2d Cir. 2012) ..............................................................................1, 18

*In re Hornbeam Corp.*,
    722 F. App'x 7 (2d Cir. 2018) .....................................................................................18

*In re IJK Palm LLC*,
    2019 WL 2191171 (D. Conn. Jan. 30, 2019).........................................................18, 20

*Intel Corp. v. Advanced Micro Devices, Inc.*,
    542 U.S. 241 (2004)............................................................................................ *passim*

*In re Mangouras*,
  2017 WL 4990655 (S.D.N.Y. Oct. 30, 2017) ...........................................................................17

*Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*,
  2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) ............................................................................17

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015) ...................................................................................................17

*In re Platinum Partners Value Arbitrage Fund L.P.*,
  583 B.R. 803 (Bankr. S.D.N.Y. 2018) ....................................................................................20

*Sandra Holding Ltd. v. Al Saleh*,
  2019 WL 3072197 (D. Mass. July 15, 2019) ...........................................................................20

**Statutes**

28 U.S.C. § 1782 ............................................................................................................ *passim*

## I.      INTRODUCTION

The Kuwait Ports Authority ("**KPA**" or the "**Applicant**") respectfully files this *ex parte*[1] application (the "**Application**") for judicial assistance pursuant to 28 U.S.C. § 1782 ("**Section 1782**").  This Application arises from fraud and other wrongdoing related to KPA's investments in and business dealings with: (1) KGL Investment Company KSCC ("**KGLI**"); and (2) the private equity fund, The Port Fund L.P. (the "**Port Fund**").  Hundreds of millions of dollars that rightfully belong to KPA and the Port Fund's other limited partners are unaccounted for, under circumstances that are currently shrouded in mystery.  KPA, as the largest limited partner in the Port Fund, is entitled to the return of its funds.  The discovery sought herein will provide documents for use in impending litigation by KPA in the Cayman Islands ("**Impending Cayman Litigation**") pursuing its missing funds.

Established in 2007 for investments in port-related assets, the Port Fund is a Cayman Islands exempted limited partnership for which KGLI was the Placement Agent.  Emerging Markets PE Management Limited[2] (the "**Fund Manager**"), the Port Fund's investment manager and a wholly owned subsidiary of KGLI, initially sought to raise USD 500 million, but raised far less than that amount.  The Port Fund only made five investments in total, three of which lost money.  Clark Global City, a major greenfield airport infrastructure site in the Philippines (the "**Clark Asset**") was indeed, one of only two investments that made money.[3]

---

[1] This Court routinely entertains *ex parte* applications pursuant to Section 1782.  *See Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("[I]t is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  This is because an opposing party may move to quash a subpoena issued pursuant to a Section 1782 application, thereby preserving its due process rights.  *See id.*

[2] The Fund Manager was formerly known as KGL Investment Cayman Ltd.

[3] Relatedly, the Port Fund also made an investment in a Philippines shipping company, however, that investment is not a focus of this Application.

The Port Fund's sale of the Clark Asset in November 2017 is at the core of this dispute. According to financial filings in the Philippines, the sale price was nearly *USD 1 billion*, but the publicly reported exit amount was only *USD 496 million*.  Further, the Port Fund's principals initially claimed the sale was for far less than even that amount.  To date, neither KGLI nor the Port Fund has explained or acknowledged this vast discrepancy.

Further, following the sale, even the publicly reported USD 496 million sales proceeds did not correspond to the much smaller sum—USD 305 million—which the Port Fund attempted to distribute.  While the proceeds should have been transferred to the Port Fund's regular bank accounts with HSBC Kuwait or Al Ahli Bank of Kuwait, instead, without KPA's knowledge, they were transferred to an account at Noor Bank in Dubai.  Further, inexplicably, they were not transferred to a Port Fund bank account.  Instead, the Noor Bank account was in the name of the Port Fund's general partner, Port Link (GP) Limited ("**Port Link**").  The Port Fund and KGLI have not provided any bank statements or other documentation to ensure that funds belonging to the Port Fund were not improperly taken by Port Link, nor have they provided any visibility (despite repeated queries) into the reasons for the commingling of Port Fund monies in the name of Port Link, and what internal controls were in place to ensure proper segregation of client funds.

The money was frozen by the UAE Central Bank upon its arrival in Dubai under suspicion of money laundering or other illicit activity.  The funds remained frozen until February 2019 when some (not all) of the funds were distributed to the Port Fund's limited partners.  But nearly a year later, the Port Fund has only sought to distribute USD 305 million (approximately 61% of the total amount) to the Port Fund's limited partners.

KPA and the Port Fund's other limited partners are entitled to answers regarding: (i) the USD 500 million differential between the reported amounts for the sale of the Clark Asset (roughly

USD 1 billion) and the amount that was ultimately transferred to Noor Bank (USD 496 million); and (ii) why the Port Fund has only sought to distribute USD 305 million of the USD 496 million the limited partners.

An important subplot and additional item of damage to KPA involves a kickback scheme to Abdullah Bader Mohammed Al Shamali ("**Abdullah Al Shamali**"), a now disgraced former KPA Director of Finance.  KPA's original investment in the Port Fund occurred in July 2010 (at the behest of the now disgraced former official).  In total, KPA invested USD 85 million.  Six weeks after this original investment, Abdullah Al Shamali authorized KPA to make an extraordinary payment of KD 2 million to KGLI, followed by a further payment of KD 2 million in October 2010.  Neither of these payments appear to have been made in consideration for any actual work or services performed by KGLI, nor did these payments constitute capital contributions by the KPA towards its investment in the Port Fund.  Of this KD 4 million, KGLI subsequently transferred KD 1 million (USD 3.3 million), via a transaction designed to obfuscate its nature, to an E-Trade account in the United States held by Abdullah Al Shamali's brother, Khalid Al Shamali.

Following a Kuwaiti investigation and criminal proceedings, Abdullah Al Shamali was convicted, alongside KGLI principals Marsha Lazareva and Saeed Dashti, for having engaged in fraudulent schemes to embezzle public funds.[4]  Abdullah Al Shamali fled Kuwait after his conviction was announced and remains a fugitive.  This kickback scheme, which was unknown to KPA

---

[4] While those convictions were vacated earlier this year on procedural grounds, the defendants are currently being retried.

at the time, is just one of a number of self-dealing schemes that form the basis for additional causes of action that will be pursued in the Impending Cayman Litigation.[5]

In addition, KPA has uncovered evidence regarding the misappropriation of Port Fund assets used to fund payments to a score of public relations and lobbying firms in the United States who were hired in the name of the Port Fund, Port Link, or KGLI without the knowledge or consent of the Port Fund's limited partners, to specifically disparage the reputation of the State of Kuwait in order to secure the release from prison of Marsha Lazareva and Saeed Dashti.  On information and belief, these improper lobbying fees originated from the same Noor Bank account that received the proceeds of the sale of the Clark Asset, and were transferred through Citibank N.A. ("**Citibank**"), one of the banks that is the subject of this Application.  (Sabah Decl. ¶ 45).

In short, KPA is the victim of egregious frauds directed by KGLI and its principals who managed the Port Fund, and who diverted hundreds of millions of dollars of Port Fund assets that should have flowed to the Port Fund's limited partners, including KPA, the Port Fund's largest investor.  Accordingly, KPA brings this Application seeking permission to subpoena documents and information for use in the Impending Cayman Litigation from two non-party U.S. financial institutions located in the Southern District of New York ("**Southern District**"): (1) Citibank; and (2) E-Trade Financial Corporation ("**E-Trade**") (collectively, the "**Banks**").  Through its proposed subpoenas (see the Declaration of Jonathan C. Cross dated January 27, 2020 (the "**Cross Declaration**"), Exhibits 1-2, annexed hereto), KPA seeks the following from Respondents:

---

[5] These schemes included: a sham litigation in Dubai instituted by the Fund Manager against the Port Fund that resulted in an uncontested award of USD 57 million to the Fund Manager within two weeks of the original filing and which was deliberately concealed from the Port Fund's limited partners; inexplicable favorable treatment of a party related to KGLI under a loan agreement related to the Port Fund's unprofitable investment in Damietta, Egypt; and the Port Fund's engagement of a non-arm's length financial advisor, Apache Asia Limited, purportedly to assist with transactions relating to several of its investments.  (*See* Declaration of Yousef Al Sabah, dated January 27, 2020 ¶ 20) ("Sabah Decl.").

- Documents and information from Citibank about certain USD transactions at issue in the Impending Cayman Litigation, including (i) transactions relating to the USD 496 million deposit to Port Link's account with Noor Bank following the sale of the Clark Asset[6]; and (ii) details regarding all disbursements made from the Noor Bank account.  KPA's investigation to date indicates that these U.S. correspondent banks would have processed any such USD transactions.

- Documents and information from E-Trade related to an account held by Khalid Al Shamali, the brother of disgraced former KPA Director of Finance, Abdullah Al Shamali, including an approximate USD 3.3 million incoming transfer that occurred on or around September 2, 2010.

(collectively, the "**Requested Discovery**").

As set forth below, KPA meets every statutory and discretionary factor considered by this Court in deciding whether to grant relief under Section 1782.  Indeed, these are precisely the circumstances Section 1782 was designed to assist.  Accordingly, the Application should be granted.

## II.   FACTUAL BACKGROUND

### A.   Parties

#### 1.   KPA

KPA is a Kuwait state-owned enterprise charged with administering Kuwait's three commercial ports, and is financed by Kuwaiti public funds.  (Sabah Decl. ¶ 5).

#### 2.   The Port Fund

The Port Fund is an exempted limited partnership organized under the laws of the Cayman Islands in 2007 for the purpose of making private equity investments.  (*Id.* ¶ 6).  KPA is

---

[6] These transactions may include the purported settlement of working capital adjustments and other liabilities such as transactional expenses, sums due and payable to the Fund Manager and a reserve.

the largest limited partner in the Port Fund.  (*Id.* ¶ 7).  Specifically, KPA invested a total of USD 85 million into the Port Fund.  (*Id.*).

Pursuant to the terms of an Amended Limited Partnership Agreement, dated July 14, 2008 (the "**LPA**"), Port Link was to provide each of the Port Fund's limited partners, including KPA, with (1) on an annual basis, a report from the Port Fund's auditor setting out, among other things (i) the Port Fund's balance sheet; (ii) a statement of the Port Fund's net profit or net loss for the year; and (iii) a statement of changes in the Port Fund's financial position or a cash flow statement; and (2) on a quarterly basis, a summary review of investments that the Port Fund had made and exited and financial information relating to the activities of the Port Fund.  (*Id.* ¶ 10 Ex. 1 at 22).

The LPA also sets forth an order and process that the Port Fund was required to follow when making distributions from each of its exited investments:  (1) <u>return of capital</u>:  first, the Port Fund would return any capital contributions made by its limited partners; (2) <u>preferred return</u>:  second, the Port Fund would pay the limited partners an 8% annual return on their respective capital contributions; (3) <u>investment manager catch-up</u>:  third, the Port Fund would pay its investment manager 20% of the preferred return amounts paid to the limited partners; and (4) finally, the Port Fund would split any funds remaining after the first three distributions with 80% going to its limited partners and 20% going to its investment manager (the latter portion being referred to as the "Carry").  (*Id.* Ex. 1 at 17).

### 3.     KGLI

KGLI, a company organized under the laws of the State of Kuwait, is the sponsor of and the placement agent for the Port Fund.  (*Id.* ¶ 8).

### 4.     Port Link

Port Link, a Cayman Islands exempted limited company, is the Port Fund's general partner. (*Id.* ¶ 9).

### 5.     The Fund Manager

The Fund Manager was known as KGL Investment Cayman Ltd. until at least August 2017.[7]  It is a Cayman Islands exempted limited company and serves as the investment manager of the Port Fund pursuant to an Investment Management Agreement, dated June 28, 2007 (the "**IMA**"). It was also previously a wholly owned subsidiary of KGLI.  (*Id.* ¶ 11).

## III.    MISCONDUCT AT ISSUE IN THE IMPENDING CAYMAN LITIGATION

### A.     The Port Fund Schemes

#### 1.     Key Individuals

Marsha Lazareva ("**Lazareva**") is the Vice Chairman and Chief Executive Officer of KGLI and is a former director of both Port Link and The Fund Manager.  On November 11, 2019, Lazareva was convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds arising from her dealings with KGLI and the Port Fund. She is also facing separate criminal charges in connection with alleged embezzlement from KPA related to an advisory services contract between KPA and KGLI.  (*Id.* ¶ 12).

Saeed Dashti ("**Dashti**") was the Chairman of the KGL Group of Companies and serves on Port Link's Board of Directors.  On November 11, 2019, Dashti was convicted by a Kuwaiti court

---

[7] It subsequently and inexplicably changed its name to Emerging Markets PE Management Limited.

and sentenced to imprisonment for 15 years in connection with misappropriation of public funds. He is also facing separate criminal charges in connection with alleged embezzlement from KPA related to an advisory services contract between KPA and KGLI.  (*Id.* ¶ 13).

Mark Williams ("**Williams**") is KGLI's Investment Director, the Chief Executive Officer of KGLI subsidiary KGL Investment Company Asia, and the President of Global Gateway Development Corporation ("**GGDC**"), one of the special purpose vehicles created by the Port Fund for its investment in the Philippines.  (*Id.* ¶ 14).

Abdullah Al Shamali was KPA's Director of Finance.  After being convicted of embezzlement from KPA in June 2018, alongside Lazareva and Dashti, among others, Abdullah Al Shamali fled Kuwait and remains a fugitive.  (*Id.* ¶ 15).

Khalid Al Shamali is the brother of Abdullah Al Shamali.  (*Id.* ¶ 16).

### 2.    The Port Fund's Investment in Clark Global City

#### a)    Background

In April 2008, the Port Fund invested in the Clark Asset.  (*Id.* ¶ 21).  In November 2017, the Port Fund exited the investment for nearly USD 1 billion according to Philippines corporate filings.  (*Id.* ¶ 26).  The Port Fund meanwhile reported an exit figure of USD 496 million, which was transferred from a bank in the Philippines to an account held by the Port Fund's general partner at Noor Bank in Dubai.  (*Id.* ¶ 27, 30-31).  Immediately upon arrival in Dubai, the money was frozen by the UAE Central Bank under suspicion of money laundering or other illicit activity.  (*Id.* ¶ 27).  The Port Fund has never acknowledged, let alone explained, the apparent sale price identified clearly in the official audited accounts filed in the Philippines.  (*Id.* ¶ 30-31).

Although these monies were ultimately unfrozen, KGLI, Port Link and their principals have refused to provide KPA what it deserves: a precise accounting for the USD 496 million, as well as an explanation of the USD 500 million discrepancy from the announced transaction value.

(*Id.*).  Further, to date, the Port Fund has only sought to distribute USD 305 million in proceeds from the Clark Asset to its limited partners.  (*Id.* ¶ 31).  KGLI, Port Link and their principals have refused to provide any information regarding the whereabouts of the remaining USD 200 million which rightfully belong to the Port Fund's limited partners.  (*Id.* ¶ 34).

### b)      Structure

The Port Fund created a Cayman company, Global Gateway Development Corporation ("**GGDC**") in 2008 for the investment in the Clark Asset.  (*Id.* ¶ 14).  The value of the Port Fund's investment in the Clark Asset is unclear.  (*Id.* ¶ 23)  According to a 2012 report, the Port Fund had invested USD 200 million in the Clark Asset and planned to invest an additional USD 500 million. (*Id.*).  A 2014 press release states that the Port Fund had invested USD 100 million, while pledging an additional USD 150 million by the end of 2015.  (*Id.*).  On information and belief, however, according the Port Fund's investment was USD 79 million, significantly lower than all reported figures.  (*Id.* ¶ 24).

### c)      2014 Divestment of the Clark Asset

In a series of opaque transactions in 2014 involving Cayman shell companies, the Port Fund transferred its interest in the Clark Asset to a third party.  Thereafter, Williams (acting as the President of GGDC) sent a letter to Peregrine Development Inc., a developer on the Clark Asset, asserting that the Port Fund was no longer the majority owner of the Clark Asset.  (*Id.* ¶ 25).  We have not identified any contemporaneous evidence that the Port Fund announced it had sold its interest in the Clark Asset.  (*Id.*)  Through a number of complex, undisclosed transactions, the Port Fund apparently regained control of the Clark Asset by October 19, 2017, the same date that it was disclosed that the Port Fund had sold the Clark Asset to a subsidiary of Philippine holding company

Udenna Development Corporation called Clark Global City Corporation (**"CGCC"**). (*Id.*) According to CGCC's audited financial statements for the year ended December 31, 2017, CGCC paid PHP 50.179 billion (approximately USD 959 million) for the Clark Asset. (*Id.* ¶ 26).

### (1)     Sale and Promises of Distribution

On November 14, 2017, in an undisclosed transaction, Philippine bank BDO Unibank transferred approximately USD 496 million to Port Link's account at Dubai's state-owned Noor Bank in connection with the sale of the Clark Asset. (*Id.* ¶ 27). As part of this transfer, the funds passed through an account at Citibank, which acted as a U.S. intermediary for the transfer. (*Id.*). Immediately upon arrival in Dubai, however, these funds were frozen by the UAE Central Bank under suspicion of money laundering. (*Id.*).

In November 2017, the Port Fund wrote to its limited partners to inform them that (a) the "Port Fund successfully exited its investments in Sabah Al-Ahmad Global Gateway Logistics City (GGDC) in November 2017"; (b) "[w]ith the completion of the sale of GGDC, The Port Fund has exited all of its investments"; and (c) in addition to an earlier October 2016 distribution of USD 30 million to the Port Fund's limited partners stemming from an exit from a different investment in the Philippines (the "first tranche payment"), the Port Fund was now intending to distribute approximately USD 340 million to its limited partners (the "second tranche payment") by the end of 2017, resulting in a total distributions of USD 370 million to the limited partners. (*Id.* ¶ 28). This amount is in sharp contrast to (i) the approximately USD 1 billion reported in the Philippines corporate filings; (ii) the USD 496 million acknowledged by the Port Fund as the returned amount; and (iii) the USD 305 million the Port Fund actually sought to distribute. (*Id.* ¶ 30-31).

On November 29, 2017, the Port Fund issued a press release announcing the "successful exit of [its] investments doubling its Fund's capital from USD 188 million to USD 380 million and generating an annual return of 10 percent over 10 years." (*Id.* ¶ 29). To date, there has been no

acknowledgement or satisfactory explanation by the Port Fund regarding the discrepancy between: (a) the USD 496 million transferred to Port Link's account and the near USD 1 billion sale figure for the Clark Asset reported in the Philippines; or (b) the USD 496 million transferred to Port Link's account and the Port Fund's announcement that it planned to distribute USD 340 million to its limited partners from the sale of the Clark Asset.  (*Id.* ¶ 30).

Importantly for purposes of the instant Application, the USD 496 million was transferred in November 2017 from the Philippines to Noor Bank in Dubai.  (*Id.* ¶ 27).  The funds passed through an account at Citibank.  (*Id.*).  The money was subsequently frozen in Dubai by the UAE Central Bank on suspicions of money laundering or other elicit activity.  (*Id.*).

### d)   The Port Fund's Distributions to its Limited Partners, including KPA

On February 6, 2019, Port Link attempted to distribute an amount of USD 125 million to KPA, again from an account held in its name rather than from any of the previous accounts held in the name of the Port Fund with HSBC Kuwait and Al Ahli Bank.  On April 25, 2019, KPA's external auditors informed it that, without further information as to the nature and purpose of the commingling of assets between the Port Fund and Port Link, KPA should not accept these distributions.  (*Id.* ¶ 33, Ex. 6).  Even if KPA were able to accept this USD 125 million, that amount conflicts with the Fund Manager's own distribution calculations as set forth in a Dubai lawsuit against the Port Fund, and it fails to account for KPA's pro rata share of the remaining USD 200 million of the USD 496 million total that was admittedly received, that rightfully belongs to the limited partners, and that has yet to be distributed or acknowledged by Port Link and KGLI.  (*Id.* ¶ 34).

### B.     KPA Kickback Scheme

KGLI has asserted that, pursuant to a proposal dated March 30, 2010, it entered into a consultancy contract with KPA. KGLI's proposal (1) outlined certain advisory services related to a "Logistics Gateway" in Kuwait ("**Project**"); (2) set the Project value at KD 9.725 million over a period of one year; and (3) included payment terms that required KD 2.025 million upfront followed by 11 monthly installments of KD 700,000 (a total of 12 payments).  (*Id.* ¶ 36).  Above and beyond these consultancy payments, there were three extraordinary payment requests totaling KD 8 million, of which KD 4 million was paid in two transfers.  (*Id.* ¶ 37).  Documents submitted anonymously to KPA evidence that KGLI—acting on instruction from Lazareva—paid a KD 1 million kickback to Khalid Al Shamali (comprising 50% of the first extraordinary payment of KD 2 million on August 30, 2010).  (*Id.* ¶¶ 37-40).  This kickback was executed by way of the following transactions:

- August 30, 2010: KD 2 million is transferred from KPA's account at the Commercial Bank of Kuwait to the account of KGLI at Al Ahli Bank of Kuwait.[8]  (*Id.* ¶ 38).

- September 2, 2010: two days later, KD 1 million is transferred from KGLI's account to the account of Capital Link Holding Company K.S.C ("Capital Link"), account no. ****-*****1-001 also at Al Ahli Bank. Capital Link is a subsidiary of KGLI.[9]  (*Id.* ¶ 39).

- September 2, 2010: the same day, Lazareva instructs Al Ahli Bank to transfer KD 1 million from Capital Link's account to the account of Khalid Al Shamali at The Bank of New York, numbered ******6256.  The account name is given as "E*TRADE Securities, Inc." and appears to be a brokerage facility.  (*Id.* ¶ 40).

---

[8]   Lazareva and Dashti are signatories on KGLI's account. (*Id.* ¶ 38).

[9]   Lazareva is a signatory on Capital Link's account.  (*Id.* ¶ 39).

## IV.     REQUESTED DISCOVERY

### A.     Discovery Relating to the Port Fund

As set forth in detail herein, through this Application, KPA seeks documents and information from Citibank about certain USD transactions at issue in the Impending Cayman Litigation, including (i) transactions relating to the USD 496 million deposit to Port Link's account with Noor Bank following the sale of the Clark Asset[10]; and (ii) details regarding all disbursements made from the Noor Bank account.  (Fox Decl.[11] ¶ 14).   KPA's investigation to date indicates that these U.S. correspondent banks would have processed any such USD transactions.

### B.     Discovery Relating to the KPA Kickback Scheme

As set forth in detail herein, KPA seeks documents and information from E-Trade related to an account held by Khalid Al Shamali, the brother of disgraced former KPA Director of Finance Abdullah Al Shamali, including an incoming transfer of approximately USD 3.3 million that occurred on or around September 2, 2010.  (*Id.* ¶ 15).

## V.     IMPENDING CAYMAN LITIGATION

Applicant will commence the Impending Cayman Litigation proceedings in the Cayman Islands in the form of a just and equitable winding up petition related to the Port Fund.  (*Id.* ¶ 2). The Port Fund is a Cayman Islands exempted limited partnership ("**ELP**"), registered in the Cayman Islands pursuant to the Exempted Limited Partnership Law (2018 Revision) ("**ELP Law**").  (*Id.* ¶ 6).  An ELP must have:  (i) one or more general partners, who are responsible for

---

[10] These transactions may include the purported settlement of working capital adjustments and other liabilities such as transactional expenses, sums due and payable to the Fund Manager and a reserve.  For example, we have reason to believe that the Port Fund engaged a Hong Kong-based financial advisor, Apache Asia, to assist with the sale of at least two of the investments.  Evidence suggests that Apache Asia was not conducting business on an arm's-length basis.  KGLI registered Apache Asia's web site even before the company was incorporated.  After the company was incorporated, the website was transferred to and hosted on a server owned by Matthew Williams – the brother of a Port Fund principal, Mark Williams.  Throughout the web site's existence, the domain has been administered by KGLI's IT infrastructure manager.

[11] Cites to the "Fox Decl." refer to the Declaration of Jennifer Fox, dated January 27, 2020.

the conduct of the business of the ELP and are liable for the debts and obligations of the ELP in the event that the assets of the ELP are inadequate; and, (ii) one or more limited partners, who are not permitted to take part in the conduct of the business of the ELP and are not liable for the debts and obligations of the partnership save as provided for in the partnership agreement.  (*Id.*). In the case of the Port Fund, the sole general partner is Port Link, and KPA is one of eleven limited partners.  (*Id.*).

Cayman law provides for the judicial winding up of companies and associations, that: "[a] company may be wound up by the Court if . . . the Court is of the opinion that it is just and equitable that the company should be wound up."  (*Id.* ¶ 8).  If KPA is successful in both the Application and the Impending Cayman Litigation, the Cayman court will appoint independent insolvency practitioners as official liquidators over Port Link for the purpose of winding up the Port Fund.  (*Id.* ¶ 11).  The official liquidators will then take control of the Port Fund from the directors of Port Link and the Port Fund's investment manager, and will have extensive powers under Cayman law to investigate the Port Fund's business and affairs, and to bring claims on behalf of the Port Fund against Port Link and/or any third parties who may have been involved with or benefitted from the fraud, breach of duty or mismanagement.  (*Id.*).  As the burden of proof will be on KPA with respect to this wind up petition, KPA will need the Requested Discovery to persuade the Cayman court that winding up the Port Fund is the just and equitable result.  (*Id.* ¶ 9).

## VI.   ARGUMENT

### A.   Legal Framework

Section 1782 states in pertinent part:

"The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for

use in a proceeding in a foreign or international tribunal . . . . The order may be made pursuant to . . . the application of any interested person . . . ."

28 U.S.C. § 1782(a).  "Section 1782 is the product of congressional efforts, over the span of nearly 150 years, to provide federal-court assistance in gathering evidence for use in foreign tribunals." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247 (2004).  "A request for discovery under [Section] 1782 presents two inquiries: first, whether the district court is authorized to grant the request; and second, if so, whether the district court should exercise its discretion to do so.  *In re Grupo Qumma, S.A. de C.V.*, 2005 WL 937486, at *2 (S.D.N.Y. Apr. 22, 2005).

The district court is authorized to grant a Section 1782 application when the three statutory factors are met: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or any interested person."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).

After determining that the statutory factors are met, the district court must consider the four discretionary factors that the Supreme Court has identified when ruling on a Section 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoenas contain unduly intrusive or burdensome requests.  *See Intel*, 542 U.S. at 264-65.

Section 1782 requests are evaluated "in light of the statute's twin aims of providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts . . . ." *Euromepa S.A. v. R. Esmerian*, *Inc.*, 51 F.3d 1095, 1097 (2d Cir. 1995) (internal quotations omitted); *In re Application for an Order Permitting Metallgesellschaft AG to Take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997).   Both the Supreme Court and the Second Circuit have acknowledged a Congressional intent to provide a liberal avenue to discovery in aid of foreign and international proceedings. *See, e.g.*, *Intel*, 542 U.S. at 247-48; *Brandi-Dohrn*, 673 F.3d at 80 ("[T]he statute has, over the years, been given increasingly broad applicability."); *In re Edelman*, 295 F.3d 171, 179-80 (2d Cir. 2002) ("In sum, Congress has expressed as its aim that the statute be interpreted broadly . . . .").

### B.   KPA Has Satisfied The Statutory Requirements Under Section 1782 For The Issuance Of The Subpoenas

Applicant satisfies the three statutory requirements of section 1782: (1) the Banks are "found" in the Southern District; (2) the requested information is for use in a foreign proceeding; and (3) Applicant is an "interested person" as the putative plaintiff in a foreign proceeding.

#### 1.   The Banks Are "Found" in the Southern District

The Banks can both be "found" in the Southern District of New York.  Indeed, Citibank is headquartered at 388 Greenwich St., New York, NY 10013,[12] and E-Trade is headquartered at 1271 Ave. of the Americas, 14th Fl., New York, NY 10020.[13]

---

[12] Sec. Exch. Comm., Citigroup Filing, *available at*
https://www.sec.gov/Archives/edgar/data/831001/000095010319017478/0000950103-19-017478-index.htm; Sec. Exch. Comm., Citigroup Inc. Form 10-K
2018, *available at* https://www.sec.gov/Archives/edgar/data/831001/000083100119000027/c-12312018x10k.htm.
[13] Sec. Exch. Comm. E-Trade Filing, *available at*
https://www.sec.gov/Archives/edgar/data/1015780/000119312514067515/d680999d10k.htm.

A corporation resides in the Southern District if it is incorporated or headquartered in the Southern District. *See Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. §1782*, 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018) (noting that a corporation is found in the district where it is "essentially at home"); *Australia & New Zealand Banking Grp. Ltd. v. APR Energy Holding Ltd.*, 2017 WL 3841874, at *3 (S.D.N.Y. Sept. 1, 2017) ("[A] corporation is 'at home' for the purpose of constitutional due process only in a state that is the corporation's place of incorporation *or its principal place of business*.") (*quoting Daimler AG v. Bauman*, 571 U.S. 117, 139 n. 19 (2014)) (emphasis added).

### 2. The Discovery Sought is "For Use" in a Foreign Proceeding

As set forth below (1) the Impending Cayman Litigation constitutes a foreign proceeding under Section 1782; and (2) the Requested Discovery is for use in that foreign proceeding.

#### a) The Impending Cayman Island Proceeding is a Foreign Proceeding

Under Section 1782, the foreign proceeding must only be within *reasonable contemplation*; it does not need to be pending or imminent. In fact, in the Second Circuit, "[w]here an applicant has not yet initiated a foreign proceeding, [Section 1782] discovery is available when the materials may help the applicant either to plead or to prove the anticipated claims. Indeed, the foreign proceeding need not be pending, so long as it is within reasonable contemplation." *In re Mangouras*, 2017 WL 4990655, at *5 (S.D.N.Y. Oct. 30, 2017) (*citing Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015)) (internal citations and quotations omitted); *Intel*, 542 U.S. at 259 (foreign proceeding need not have actually commenced at the time when Section 1782 discovery is sought; it need only "be within reasonable contemplation.").

Here, KPA will use the Requested Discovery to support its forthcoming just and equitable winding up petition. (Fox Decl. ¶ 10). Specifically, KPA has taken the taken the following steps

establishing that its "foreign proceeding" is "within reasonable contemplation": (1) conducted an extensive and ongoing factual investigation; (2) retained Cayman counsel; and (3) Cayman counsel has reviewed the relevant documents and begun preparing the necessary pleadings. *See In re IJK Palm LLC*, 2019 WL 2191171, at *4 (D. Conn. Jan. 30, 2019) (holding impending lawsuits in the Cayman Islands constituted a reasonably contemplated foreign proceeding where the petitioner had hired attorneys and investigated parties as well as its own files); *In re Hornbeam Corp.*, 722 F. App'x 7, 9-10 (2d Cir. 2018) (summary order) (holding that the statutory requirement was satisfied where the applicant "represented that it intended to initiate further litigation," and "articulated a theory on which it intended to litigate . . . . ").

Finally, Cayman courts qualify as a "foreign or international tribunal." *See e.g.*, *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011); *Gushlak*, 486 F. App'x at 218.

### b)  The Requested Discovery is "For Use" in a Foreign Proceeding

The Requested Discovery is also for "use" in the Impending Cayman Litigation.  The Requested Discovery need not be discoverable or admissible in the Impending Cayman Proceeding. *Brandi-Dohrn*, 673 F.3d at 82 ("[A]s a district court should not consider the *discoverability* of the evidence in the foreign proceeding, it should not consider the *admissibility* of evidence in the foreign proceeding in ruling on a section 1782 application.").  Instead, need only have "the *practical ability* . . . to place a beneficial document—or the information it contains— before a foreign tribunal." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 131 (2d Cir. 2017).

As discussed above, the Requested discovery will support KPA's wind up petition which, in the context of an ELP, may be presented where possible fraud, mismanagement or breach of duty has been committed by the general partner or general partners.  (Fox Decl. ¶ 9).  As the burden

of proof for this wind up petition will be on KPA, KPA will need to adduce clear evidence to persuade the Cayman Court that it is just and equitable to wind up the ELP.  (*Id.*).

### 3.    Applicant is an "Interested Person"

KPA will be a party to the Impending Cayman Litigation and is therefore an "interested person" under Section 1782.  (*Id.* ¶ 10-11).  There is "[n]o doubt litigants are included among, and may be the most common example of, the interested person[s] who may invoke § 1782."  *Intel*, 542 U.S. at 256 (internal quotations omitted).

### C.    The Discretionary Factors of Section 1782 Weigh in Favor of KPA's Application

As all of the discretionary Section 1782 factors are met, the Court should consider the four discretionary "*Intel* factors" set forth above.   As set forth below, each *Intel* factor weighs in favor of granting the Requested Discovery.

### 1.    The Banks Will Not Be A Party To The Impending Cayman Litigation

Here, because the Banks will not be a party to the Impending Cayman Litigation, this factor weights in favor of granting discovery.  (Fox Decl. ¶ 12).  "[W]hen the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Intel*, 542 U.S. at 264.  Indeed, Cayman Courts would not have the power to compel discovery from the Banks in relation to the Impending Cayman Litigation.  (Fox Decl. ¶ 17).  This is a textbook instance of where granting Section 1782 discovery is appropriate.

### 2.    The Cayman Islands Court Would Be Receptive To Assistance

The Second Circuit has expressed a strong presumption that foreign tribunals will be receptive to assistance, holding that "[a]bsent specific directions to the contrary from a foreign forum, the statute's underlying policy should generally prompt district courts to provide some form

of discovery assistance." *Euromepa, S.A.*, 51 F.3d at 1102.  A court should deny discovery on the basis of lack of receptiveness only where it is provided with "*authoritative proof* that [the] foreign tribunal would reject evidence obtained with the aid of section 1782." *Id.* at 1100 (emphasis added).

This factor weighs in favor of granting the Application as Cayman courts are receptive to assistance from U.S. courts in terms of gathering relevant evidence for use in proceedings before them. (Fox Decl. ¶ 16).  *Sandra Holding Ltd. v. Al Saleh*, 2019 WL 3072197, at *4 (D. Mass. July 15, 2019) (finding Cayman Grand Court "receptive" to accepting discovery obtained pursuant to Section 1782); *In re IJK Palm LLC*,  2019 WL 2191171, at *6  (same); *In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018) (holding that "far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law.").  Indeed, there is no evidence whatsoever that Cayman courts would reject evidence collected pursuant to Section 1782.  (Fox Decl. ¶ 16).

### 3.    The Application Does Not Attempt To Circumvent Cayman Proof-Gathering Restrictions

The Application does not "attempt to circumvent" proof-gathering restrictions of Cayman courts.  (Fox Decl. ¶ 17); *In re IJK Palm LLC*, 2019 WL 2191171, at *6 (holding the third *Intel* factor favored granting discovery due to stringent pleading standard in actions brought in Cayman courts).  Indeed, the *Intel* Court expressly rejected the notion that Section 1782 requires that the evidence sought must be discoverable in the foreign proceeding itself, and the Second Circuit has added that the specific documents or testimony discovered need not be admissible abroad.  *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in

the foreign proceeding.  As in *Intel*, there is no statutory basis for any admissibility requirement.");

*Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar

to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection

to aid from United States federal courts.").  Nor is there any requirement that Applicant must

exhaust his remedies in the foreign court first.  *See Metallgesellschaft*, 121 F.3d at 79 ("a 'quasi-

exhaustion requirement[] finds no support in the plain language of the statute and runs counter to

its express purposes . . . .").

### 4.   The Requested Discovery Is Not Unduly Intrusive Or Burdensome

The standard for the fourth *Intel* factor is substantially identical to the requirements of the

Federal Rules of Civil Procedure.  "The reference in [Section] 1782 to the Federal Rules suggests

that under ordinary circumstances the standards for discovery under those rules should also apply

when discovery is sought under the statute." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

Here, the Requested Discovery is narrowly tailored, temporally limited, and directly

relevant to the issues in the Impending Cayman Litigation.  (Fox Decl. ¶ 14-15).  Whatever burden

the Banks may incur by producing the requested discovery, it is both modest and proportionate

given the circumstances.  KPA only seeks limited documents and information from Citibank that

bear directly on the transactions that will be at issue in the Impending Cayman Litigation.  (*Id.*).

In addition, KPA only seeks documents and information from E-Trade related to an individual's

account and certain transactions related to a kickback scheme involving KGLI, Abdullah Al

Shamali, and others.  (*Id.* ¶ 15).

## VII.   CONCLUSION

For the foregoing reasons, Applicant respectfully requests that the Court (1) grant the *Ex*

*Parte* Application for an Order to Conduct Discovery; (2) enter the Proposed Order attached to the

Cross Declaration as Exhibit 3; (3) authorize Applicant, pursuant to Section 1782, to serve the Subpoenas; and (4) grant any and all other relief to Applicant as deemed just and proper.

Dated:  January 27, 2020

Respectfully submitted,

*/s/ Joseph G. Falcone*
Joseph G. Falcone
Jonathan C. Cross
Steven B. Jacobs
HERBERT SMITH FREEHILLS
NEW YORK LLP
450 Lexington Avenue, 14th Floor
New York, NY 10017
T: 917-542-7600
joseph.falcone@hsf.com

*Attorneys for Applicant*
*The Kuwait Ports Authority*

22