**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

EX PARTE APPLICATION OF
KUWAIT PORTS AUTHORITY FOR AN
ORDER TO OBTAIN DISCOVERY FOR
USE IN FOREIGN PROCEEDINGS
PURSUANT TO 28 U.S.C. §1782

Case No. _____

**DECLARATION OF YOUSEF AL SABAH**

Yousef Al Sabah, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as

follows:

1.  I am the Director-General of the Kuwait Ports Authority (**"KPA"**), one of the limited

partners in The Port Fund L.P. ("**Port Fund**").

2.  I submit this declaration in support of the *ex parte* application submitted by the KPA

for an order under 28 U.S.C. § 1782 ("**Section 1782**") permitting the KPA to take discovery

from (a) Citibank, N.A. ("**Citibank**"); and (b) E-Trade Financial Corporation ("**E-Trade**") in

the Southern District of New York ("**Application**").

3.  KPA seeks narrow and limited discovery from two New York banks believed to

possess documents relevant to an apparent fraud committed against KPA, whereby USD 200

million or more of the proceeds from a Port Fund investment appear to have been embezzled

or otherwise illegally diverted from the KPA and the Port Fund's other limited partners, and

kickbacks were paid in connection with a related scheme to induce former officials of the

KPA to make certain improper payments.

4.  As Director-General of the KPA in this matter, I am familiar with the information set

forth in this declaration from (a) personal knowledge; and (b) documents I have prepared

and/or reviewed.  Because I submit this declaration specifically in support of the Application,

it does not contain each and every fact within my knowledge regarding the topics discussed herein.[1]

### Contemplated Parties, and Key Individuals and Entities

5.  KPA is an instrumentality of the Government of the State of Kuwait, charged with administering Kuwait's commercial ports, and is financed by Kuwaiti public funds.

6.  The Port Fund is an exempted limited partnership organized under the laws of the Cayman Islands in 2007 for the purpose of making private equity investments.

7.  KPA is the largest limited partner in the Port Fund, having invested a total of USD 85 million.

8.  KGL Investment Company KSCC ("**KGLI**"), an investment shareholding company organized under the laws of the State of Kuwait, is the sponsor of and the placement agent for the Port Fund.

9.  Port Link GP Ltd. ("**Port Link**"), a Cayman Islands exempted limited company, is the Port Fund's general partner.

10. The Port Fund's limited partners and Port Link executed an Amended Limited Partnership Agreement, dated July 2008 (the "**LPA**", Ex. 1).

11. Emerging Markets PE Management Ltd. ("**EMPEML**"), formerly known as KGL Investment Cayman Ltd., is a Cayman Islands exempted limited company and serves as the investment manager of the Port Fund pursuant to an Investment Management Agreement dated June 28, 2007 (*see* Ex. 2 at p. 2, DIFC Claim Form stating that EMPEML entered into an Investment Management Agreement).  It was also previously a wholly owned subsidiary of KGLI.

---

[1] I certify that the exhibits attached hereto are true and correct copies of the original documents.  The translations provided are as a courtesy and have not been certified.

12. Marsha Lazareva ("**Lazareva**") is the Vice Chairman and Chief Executive Officer of KGLI and is a former director of both Port Link and EMPEML.  On November 11, 2019, Lazareva was convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds.  On January 20, 2020, Ms Lazareva was also convicted by a Kuwait court and sentenced to 7 years imprisonment in connection with alleged embezzlement from KPA accounts.

13. Saeed Dashti ("**Dashti**") was the Chairman of the KGL Group of Companies and serves on Port Link's Board of Directors.  On November 11, 2019, Dashti was convicted by a Kuwaiti court and sentenced to imprisonment for 15 years in connection with misappropriation of public funds.  On January 20, 2020, Mr Dashti was also convicted by a Kuwait court and sentenced to 10 years imprisonment in connection with alleged embezzlement from KPA accounts

14. Mark Williams ("**Williams**") is KGLI's Investment Director, the Chief Executive Officer of KGLI subsidiary KGL Investment Company Asia, and the President of Global Gateway Development Corporation ("**GGDC**"), one of the special purpose vehicles created by the Port Fund for its investment in the Philippines.

15. Abdullah Bader Mohammed Al Shamali ("**Abdullah Al Shamali**") was KPA's Director of Finance.  After being convicted of embezzlement from KPA in June 2018, alongside Lazareva and Dashti, among others, Abdullah Al Shamali fled Kuwait and remains a fugitive.

16. Khalid Al Shamali is the brother of Abdullah Al Shamali.

**Misconduct Concerning the Port Fund**

17. The Port Fund made just two investments that generated sufficient profits to allow for any distributions to the Port Fund's limited partners. (*See* Bortman Decl., Ex. N[2], November 22, 2019 Letter from Port Fund to LPs, noting only two distributions from the Port Fund).

18. These investments were in Clark Global City, a greenfield airport infrastructure site in the Philippines ("**Clark Asset**"), and Negros Navigation Co., Inc., a Philippine shipping company. At various times the Clark Asset has also been referred to as the Sabah Al-Ahmad Global Gateway Logistics City and Clark Global City.

19. KPA has obtained evidence from public sources regarding multiple acts of malfeasance related to the Port Fund. These include:

> a) discrepancies regarding the Clark Asset, including amount invested, ownership structure, and sale valuation;
>
> b) a suspicious payment made in the United States to the brother of KPA's former Director of Finance, Khalid Al Shamali.
>
> c) the engagement of lobbying and public relations firms by the Port Fund, without the knowledge or consent of the Port Fund's limited partners.

20. In addition, there are multiple indicia suggesting that the Port Fund's operations more generally have involved unlawful conduct detrimental to the Port Fund's investors, including KPA (as set forth more fully in the GIC Application). KPA shares the concerns and questions raised by GIC with respect to those acts, which include:

> a) inexplicable favorable treatment of a party related to KGLI under a loan agreement related to the Port Fund's unprofitable investment in Damietta, Egypt (Bortman Decl., ¶¶ 26-29);

---

[2] The "**Bortman Decl.**" refers to the Declaration of Nicholas Bortman, filed as ECF No. 7 in a separate Section 1782 application by another limited partner of the Port Fund, Gulf Investment Corporation ("**GIC**"), *titled In re: Ex Parte Application of Gulf Investment Corporation*, Case No. 1:19-mc-00593 (the "**GIC Application**").

b) litigation in Dubai that resulted in an uncontested USD 57 million judgment against the Port Fund and Port Link (Bortman Decl., ¶¶ 30-33); and

c) the Port Fund's engagement of a non-arm's length financial advisor, Apache Asia Limited, purportedly to assist with transactions relating to several of its investments (Bortman Decl., ¶¶ 34-35).

**Sale of the Clark Asset**

21. In April 2008, the Port Fund invested in the Clark Asset.

22. To make this investment the Port Fund created a Cayman company, GGDC.

23. The value of the Port Fund's investment in the Clark Asset is unclear. According to a 2012 report, the Port Fund had invested USD 200 million in the Clark Asset and planned to invest an additional USD 500 million. (*See* Aquino welcomes global logistics group's plan to invest $500M, InterAksyon (Jan. 9, 2012), *available at* https://ppp.gov.ph/in_the_news/aquino-welcomes-global-logistics-groups-plan-to-invest-500m/). A 2014 press release states that the Port Fund had invested USD 100 million, while pledging an additional USD 150 million by the end of 2015. (*See* Press Release, GGDC assumes $3-billion Clark project (Sept. 8, 2014), *available at* https://www.sunstar.com.ph/article/365697).

24. On information and belief, however, the Port Fund's investment was USD 79 million, significantly lower than all reported figures.

25. In April 2014, the Port Fund transferred its interest in the Clark Asset to a third party. Thereafter, Williams (acting as the President of GGDC) sent a letter to Peregrine Development Inc. ("**Peregrine**"), a developer on the Clark Asset, asserting that the Port Fund was no longer the majority owner of the Clark Asset. (*See* Ex. 3**,** April 14, 2014 Letter from Williams to Peregrine**).** We have not identified any contemporaneous evidence that the Port Fund announced it had sold its interest in the Clark Asset. Through a number of complex,

undisclosed transactions, the Port Fund apparently regained control of the Clark Asset by

October 19, 2017, the same date that it was disclosed that the Port Fund had sold the Clark

Asset to a subsidiary of Philippine holding company Udenna Development Corporation

called Clark Global City Corporation (**"CGCC"**).  (*See* Ex. 4, Commission-Decision-No.-27-

M-035-2017, noting the approval of the sale of GGDC's shares to CGCC).

26. According to CGCC's audited financial statements for the year ended December 31,

2017, CGCC paid PHP 50.179 billion (approximately USD 959 million) for the Clark Asset.

(*See* Ex. 5 at p. 6, CGCC's financial statements for the year ended December 31, 2017).

27. On November 14, 2017, in an undisclosed transaction, Philippine bank BDO Unibank

transferred approximately USD 496 million to Port Link's account at Dubai's state-owned

Noor Bank in connection with the sale of the Clark Asset.  (*See* Bortman Decl., Ex. S, Swift

Receipt at p. 3, November 2017).  As part of this transfer, the funds passed through an

account at Citibank, which acted as a U.S. intermediary for the transfer.  (*See id.*).

Immediately upon arrival in Dubai, however, these funds were frozen by the UAE Central

Bank under suspicion of money laundering.

28. On November 22, 2017, the Port Fund wrote to its limited partners saying (a) the

"*Port Fund successfully exited its investments in Sabah Al-Ahmad Global Gateway Logistics

City (GGDC) in November 2017*"; (b) "*[w]ith the completion of the sale of GGDC, The Port

Fund has exited all of its investments*"; and (c) in addition to an earlier October 2016

distribution of USD 30 million to the Port Fund's limited partners, the Port Fund was now

intending to distribute approximately USD 340 million to its limited partners by the end of

2017, resulting in USD 370 million in total distributions to the limited partners.  (*See*

Bortman Decl., Ex. N, November 2017 correspondence from Port Fund to its limited

partners).

29. On November 29, 2017, the Port Fund issued a press release announcing the "successful exit of [its] investments doubling its Fund's capital from USD 188 million to USD 380 million and generating an annual return of 10 percent over 10 years." (*See* Press Release, Port Fund, The Port Fund achieves success despite challenges (Nov. 29, 2017), *available at* https://news.kuwaittimes.net/website/port-fund-achieves-success-despite-challenges/).

30. To date, there has been no acknowledgement or satisfactory explanation by the Port Fund regarding the discrepancy between:

      (a) the USD 496 million transferred to Port Link's account and the near USD 1 billion sale figure for the Clark Asset reported in the Philippines; or

      (b) the USD 496 million transferred to Port Link's account and the Port Fund's announcement that it planned to distribute USD 340 million to its limited partners from the sale of the Clark Asset.

31. Although the USD 496 million of acknowledged Port Fund monies relating to the sale of the Clark Asset were unfrozen in February 2019, to date, the Port Fund has only sought to distribute USD 305 million in exit proceeds to its limited partners. (Bortman Decl., Ex. T at p. 2, September 23, 2019 letter from Walkers). This is despite the fact that financial statements show a sale price for the Clark Asset of approximately USD 1 billion. (Ex. 5 at p. 6, CGCC's financial statements for the year ending in December 31, 2017).

32. On February 6, 2019, Port Link attempted to distribute KPA's portion of the distribution—USD 125 million—to KPA.

33. However, KPA was informed by its external auditors that it should not accept these distributions without further information as to the nature and purpose of the commingling of assets between Port Fund and Port Link. (*See* Ex. 6, letter from KPA's external auditors).

34. Even if KPA were able to accept this USD 125 million, that amount conflicts with EMPEML's own distribution calculations as set forth in a Dubai lawsuit against the Port Fund, and it fails to account for KPA's pro rata share of the remaining USD 200 million of the USD 496 million total that was admittedly received, that rightfully belongs to the limited partners, and that has yet to be distributed or acknowledged by Port Link and KGLI.

35. There is a legitimate concern among certain of the limited partners of the Port Fund (including KPA) that the remainder of the USD 200 million has been distributed improperly to unknown third parties.  In the GIC Application, made by GIC—a supranational entity owned by the member-states of the Gulf Cooperation Council and also a limited partner in the Port Fund—GIC cites and exhibits a letter from Walkers Dubai LLP (**"Walkers"**), counsel to the Port Fund, dated November 4, 2019, in which Walkers, in attempting to explain the whereabouts of the missing USD 200 million, makes the cryptic statement that, "*the Fund was only able to secure the release of the frozen funds by agreeing to meet certain conditions imposed on the Fund by third parties . . . . The Fund considers that the payment pursuant to such conditions was a necessary expense or liability of the Fund . . . .*"  (*See* GIC Application, ECF No. 5, Declaration of Kristin N. Tahler, Exhibit J).  Remarkably, in their letter, Walkers failed to provide any explanation as to the identities of the third parties, the nature of the conditions imposed, or the amounts associated with such conditions.  Moreover, to date, to my knowledge, the fact of this payment was not disclosed to any limited partner other than GIC.  As a result, KPA is left to speculate as to what lawful, reasonable conditions could possibly require the payment of USD 200 million, and be of such a nature as to require concealment from the limited partners, either at the time they were complied with or now.

**Kickback Scheme**

36. KGLI has alleged that, pursuant to a proposal dated March 30, 2010, KGLI would also provide consultancy services to KPA.  KGLI's proposal (1) outlined certain advisory

services related to a "Logistics Gateway" in Kuwait ("**Project**"); (2) set the Project value at

KD 9.725 million over a period of one year; and (3) included payment terms that required

KD 2.025 million upfront followed by 11 monthly installments of KD 700,000 (a total of 12

payments) (*see* Ex. 7 pp. 2-3, October 23, 2019 letter from KPA to Kuwait Attorney General

setting forth payment amounts).

37. KGLI made three further extraordinary payment requests to KPA totaling KD 8

million.  Notwithstanding a finding by a Kuwait court that Lazareva did not sign the requests,

KD 4 million was nevertheless paid to KGLI pursuant to two transfers.  Of this KD 4 million,

KGLI—acting on instruction from Lazareva—ultimately transferred KD 1 million (~USD 3.3

million) to Khalid Al Shamali through of a series of transfers:

38. *First*, on August 30, 2010, KD 2 million was transferred from KPA's account at

Commercial Bank of Kuwait to the account of KGLI at Al Ahli Bank of Kuwait.  (*See* Ex. 8).

Lazareva and Dashti are signatories on KGLI's account.

39. *Second*, on September 2, 2010, KD 1 million was transferred from KGLI's account to

the account of Capital Link Holding Company K.S.C. ("**Capital Link**"), account no. ****-

*****1-001 also at Al Ahli Bank.  (*See* Ex. 9).  Capital Link is a subsidiary of KGLI, and

Lazareva is a signatory on Capital Link's account.

40. *Finally*, on September 2, 2010, the same day, Lazareva instructed Al Ahli Bank to

transfer KD 1 million from Capital Link's account to the account of Khalid Al Shamali at

The Bank of New York, numbered ******6256.  The account name is given as "E*TRADE

Securities, Inc." (*See* Ex. 10).

### Improper Lobbying Fees

41. In 2018, without the consent of its limited partners, the Port Fund paid five lobbying

firms over USD 2.7 million to (allegedly) lobby for the release of the Port Fund monies that

were frozen in Dubai.  (*See* Bill Lambrecht, A Bush, a Yeltsin and a Blair turn up heat on

Kuwait over CEO's imprisonment, Houston Chronicle (May 16, 2019), *available at* https://www.houstonchronicle.com/news/politics/texas/article/A-Bush-a-Blair-and-a-Yeltsin-turn-up-heat-on-13848339.php).

42. However, four of the five firms then proceeded to register on behalf of KGLI, to lobby for, among other things, the imposition of sanctions against members of the Kuwaiti government and the release from criminal prosecution of Lazareva and Dashti.

43. Indeed, on August 1, 2019, public relations firm Tricuro LLC ("**Tricuro**") sent an engagement letter to public relations firm Sanglier Media ("**Sanglier**"), saying that Tricuro "ha[d] been appointed to support [Sanglier] in [its] work for The Port Fund … and the campaign for Ms. Marsha Lazareva."  (*See* FARA Registration Statement, Exhibit A, filed by Tricuro on behalf of Lazareva (via subcontract with Sanglier) on Oct. 4, 2019, *available at* https://efile.fara.gov/docs/6285-Exhibit-AB-20191004-5.pdf).

44. The engagement letter notes that messaging for the campaign will focus on: (a) "[t]he staggering injustice of the [Lazareva's and Dashti's] arrests and continued detentions"; and (b) [t]he significant damage this is doing to Kuwait's international reputation among foreign investors," (*see id.*), leading to concerns that Port Fund monies may have been expended as part of a campaign that had nothing to do with the Port Fund.

45. On information and belief, these improper lobbying fees originated from the same Noor Bank account that received the proceeds of the sale of the Clark Asset, and were transferred through Citibank.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

27 January 2020

Executed on ___ in Kuwait

_____

Yousef Al Sabah

Sworn at Kuwait City
On 27 January 2020

Madhurima Basu

**Madhurima Basu**
Solicitor of the Senior Courts of England & Wales
Holding a Valid Practicing Certificate(SRA559140)

11