# EXHIBIT 14
# Part 1

**JUDICIAL ADMINISTRATION**

Date Received: 9^(Th) April 2020

Time Received: 4:25pm

1. The Defendants
2. Andrew J.Childe
3. First Affidavit
4. Exhibit AC-1
5. 9 April 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION**

**CAUSE NO. 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF
THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

**PLAINTIFF**

**AND:**

**(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD.**

**DEFENDANTS**

---

## FIRST AFFIDAVIT OF ANDREW JOSEPH CHILDE

---

I, **ANDREW JOSEPH CHILDE**, of FFP (Directors) Limited, 2nd Floor, Harbour Centre, 42
North Church Street, George Town, Grand Cayman, Cayman Islands, being duly sworn
**MAKE OATH AND SAY** as follows:

### Introduction

1.      I am one of the Directors of Port Link GP Ltd. (the "**GP**"), which acts as the general
        partner of The Port Fund L.P. (the "**Fund**"). I am duly authorised to swear this Affidavit
        on behalf of the GP and the Fund (together, the "**Defendants**").

2.      I make this Affidavit in support of the Defendants' opposition to the application filed by
        the Kuwait Ports Authority (the "**Plaintiff**") for information from the Defendants
        pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) (the
        "**ELP Law**") in respect of the Fund (the "**S.22 Proceedings**").

3.      On 27 January 2020, Yousef Al Sabah ("**Mr Al Sabah**"), the Director General of the
        Plaintiff, swore an affidavit in support of the Plaintiff's request for information in the

1

S.22 Proceedings ("**Al Sabah 1**") with its respective exhibit ("**YAS1**")[1]. In paragraphs (a) to (w) of the Schedule to Al Sabah 1, the Plaintiff has set out its extensive requests for information and documentation to be provided by the Defendants (the "**Plaintiff's Information Requests**").

4.      This Affidavit will, broadly speaking, deal with the following key issues:

(a)      the background to the S.22 Proceedings (**paragraphs 9 to 29**);

(b)      the disclosure provided by the Defendants to date and responses to the Plaintiff's Information Requests, including requests which do not fall within Section 22 of the ELP Law or the terms of the amended and restated limited partnership agreement dated 14 July 2008 (the "**LPA**") (**Tab 1**) (**paragraphs 30 to 58**);

(c)      the CIDL Application (as defined below) (**paragraphs 59 to 61**); and

(d)      the misleading and inaccurate statements made in Al Sabah 1 (**paragraphs 62 to 85**).

5.      Produced to me at the time of swearing this Affidavit and marked "**AC-1**" is a bundle of true copy documents referred to in this Affidavit. A reference to a tab and page number in this Affidavit is a reference to the corresponding tab and page number of the exhibit. Where documents have been exhibited to Al Sabah 1 and referred to herein, I have not included such documents in AC-1 but have instead referred to such documents as they appear within the exhibit to Al Sabah 1.

6.      Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in the above capacities, except where I state that I am relying on information from others. The content of this Affidavit is true to the best of my knowledge, information and belief.

7.      In circumstances where I have only recently been appointed as a Director of the GP, a final draft of this Affidavit has been carefully reviewed by Abdulghfoor M A Alwadhi, who has acted as a Director of the GP since 2010. Following such review, Mr Alwadhi has sworn an affidavit confirming that he considers the facts deposed herein to be

---

[1] A reference in this affidavit to YAS1/XXX is a reference to the tab number under which a specific document is located within YAS1.

accurate and a true, full and frank account of the dealings of the Defendants (see **Tab 2**).

8.    For the avoidance of doubt, nothing in this Affidavit is intended to waive privilege in respect of any matter referred to and privilege is not being waived.

**Background to the S.22 Proceedings**

9.    The Fund was registered as a Cayman Islands exempted limited partnership under the ELP Law on 21 March 2007 with registration number 19582.

10.   The GP is an exempted limited company incorporated under the laws of the Cayman Islands and has acted as the general partner of the Fund since 2007 to date.

11.   The Fund provided investors with an opportunity to invest in the port management industry.  The Fund raised US$188,152,000 from the limited partners of the Fund, the majority of whom were based in Kuwait, between 2007 and 2013.

12.   Emerging Markets PE Management Limited (formerly known as KGL Investment Cayman Ltd) (**"EMPEML"**), an exempted limited company incorporated under the laws of the Cayman Islands, acted as the investment manager of the Fund.

13.   KGL Investment Company K.S.C.C. (**"KGLI"**), a company incorporated under the laws of the State of Kuwait, acted as the sponsor and placement agent of the Fund at the establishment of the Fund in 2007.

14.   Two of the investments made by the Fund resulted in successful exits for the Fund, which ultimately enabled the Fund to make significant distributions to the limited partners.  The Fund made its first distribution of approximately US$30,000,000 to investors in October 2016 following the sale of one of the Fund's investments.  The Fund subsequently made a second and final distribution of approximately US$305,000,000 to investors in February 2019 and, accordingly, distributed a total sum of US$335,000,000 to investors (representing a significant positive return for investors with reference to their total capital commitments to the Fund).

15.   Notwithstanding the successful performance of the Fund during a difficult economic climate, in or around September 2019 I am informed by counsel to KGLI and verily believe that the Defendants became aware that certain third parties, who had no financial interest in the Fund, were attempting to persuade the limited partners of the Fund that there had been serious mismanagement relating to the Fund.

3

16. I understand from my discussions with counsel to KGLI that the Defendants' concerns in this regard arose as a result of being provided with a copy of an email that appears to have been sent by Bader Abdulmohsen El-Jeaan ("**Mr El-Jeaan**") to a number of investors in the Fund in or around June 2019 (the "**El-Jeaan Email**") (**Tab 3**).  Mr El-Jeaan is a partner at Meysan Partners, a law firm based in the State of Kuwait, and is currently instructed by two other limited partners of the Fund, Gulf Investment Corporation ("**GIC**") and General Retirement and Social Insurance Authority ("**GRSIA**"), in separate proceedings issued by GIC pursuant to section 22 of the ELP Law (the "**GIC and GRSIA Proceedings**").  I note that the information being requested by GIC and GRSIA in the GIC and GRSIA Proceedings is almost identical to the Plaintiff's Information Requests.  Counsel for KGLI has also informed me that Mr El-Jeaan previously worked as in-house legal counsel for Agility Public Warehouse Company in Kuwait ("**Agility**") prior to joining Meysan Partners.

17. Notwithstanding the positive performance of the Fund and the significant distributions made by the Fund to limited partners following the exit of the Fund's investments, the El-Jeaan Email made a number of unsubstantiated allegations regarding the purported mismanagement of the Fund and the alleged risk of the dissipation of the Fund's assets. By way of example, and as described in further detail at paragraph 2.3 of the Disclosure Letter (as defined below at **paragraph 30** (see **page 2 of Tab 5**), the El-Jeaan Email made the following misleading and inaccurate statements:

"*As I indicated to Tarek, based on my review of this matter, there is a critical need to protect the LPs' investment in the Port Fund. I must emphasize the need for speed on this matter in order to ensure that the assets of the Port Fund are not lost. It is imperative that they move quickly.*"

"*Despite the near USD 1 billion reported sale price for GGDH, Lazareva first attempted to evade the Port Fund's limited partners of all Port Fund exit monies by claiming that the Fund had exited all of its investments at a complete loss.*"

"*On information and belief, realizing that such a brazen fraud would be uncovered, the Port Fund and its executives subsequently accounted for the Clark Project exit in varying amounts.*"

18. As at the date of swearing this Affidavit, the Plaintiff has not provided any evidence to substantiate the serious allegations made in the El-Jeaan Email and those made in Al Sabah 1 regarding the Plaintiff's belief that a significant fraud has been committed

4

resulting in the misappropriation of several hundred million dollars, as well as other wrong doing (including potential kickbacks) (detailed further below and at section 2 of the Disclosure Letter (as defined below and found at **page 2 of Tab 5**)).

19.    I further note that there are multiple references in the El-Jeaan Email to discussions with "Tarek". I am informed by counsel to KGLI and verily believe that such references are to Tarek Sultan, who is the Chief Executive Officer and Vice-Chairman of Agility (see **Tab 4** for a copy of Tarek Sultan's biography).

20.    I understand from my discussions with counsel to KGLI that Agility is a major commercial rival to the KGL Group in Kuwait and competes directly with the KGL Group for US government defence contracts. The KGL Group refers to a group of companies in Kuwait with regional interests in transportation, logistics and supply chain management. I am informed by counsel to KGLI that representatives of KGLI consider that the El-Jeaan Email, as well as other steps taken by Agility and its representatives in Kuwait in connection with the Kuwaiti Criminal Proceedings (as defined below at **paragraph 68**), demonstrate that Agility and its associates have been pursuing a strategy of seeking to damage the interests of the KGL Group (and by extension the Defendants) in order to further their own commercial interests and agendas.

21.    The Plaintiff wrote to Crowell & Moring LLP ("**Crowell**"), the Fund's US legal counsel, in a letter dated 8 October 2019 (**YAS1/190**). The Plaintiff stated in this letter that they "*wish to raise a number of issues of grave concern*" to the Plaintiff and requested that the Fund provide the Plaintiff with an exhaustive list of documentation and information on a range of issues. However, the letter failed to particularise the nature and source of the Plaintiff's concerns and, furthermore, had been signed by Mr Al Sabah in his capacity as the Director General of the Plaintiff.

22.    Accordingly, Walkers wrote to the Minister of State for Services Affairs (formerly known as the Minister of Communications), in his capacity as the chairman of the board of directors of the Plaintiff, on 22 October 2019 (**YAS1/194**) to express the Fund's concerns that Mr Al Sabah does not have the requisite authority to represent the Plaintiff and instruct attorneys on the Plaintiff's behalf and that, given this, the views set out in the letter of 8 October 2019 (**YAS1/190**) do not necessarily represent the views of the board of directors of the Plaintiff.

23.   Walkers received two further letters from Mr Al Sabah on 31 October 2019 (**YAS1/208 and YAS1/217**) in response to the letter sent to the Minister of State for Services Affairs.

24.   In the first letter from Mr Al Sabah dated 31 October 2019 (**YAS1/208**), Mr Al Sabah referred to a number of Ministerial Decrees as evidence for his authority to represent the views of the Plaintiff.

25.   In a second letter from Mr Al Sabah dated 31 October 2019 (**YAS1/217**), Mr Al Sabah set out his alleged concerns with respect to the management of the Fund and his request for information and documentation on various issues.

26.   On 27 January 2020, the same day that the Plaintiff initiated the S.22 Proceedings, the Plaintiff filed an *ex parte* application in the United States District Court for the Southern District of New York (the **"US Court"**) seeking an order to conduct discovery against Citibank, N.A. and E-Trade Financial Corporation concerning information relating to the Fund for use in contemplated litigation in the Cayman Islands pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 34, and 45 (the "**1782 Proceedings**"). In circumstances where the 1782 Proceedings appear to be directly based on, and the result of, the unsubstantiated allegations set out in the El-Jeaan Email, the Defendants were disappointed that the Plaintiff considered it appropriate and necessary to commence an additional set of information gathering proceedings in another jurisdiction without providing any prior notice to the Defendants. It was particularly surprising that the Plaintiff considered it appropriate to commence the 1782 Proceedings in circumstances where it also commenced the S.22 Proceedings in which it is seeking extensive disclosure from the Defendants.

27.   Having reviewed the application and evidence filed by Plaintiff in the 1782 Proceedings, it is clear that there is overlap and duplication with the information being sought from the Fund and the GP in the S.22 Proceedings. To the extent that there are additional information and documentation requests in the 1782 Proceedings, it is not clear to the Defendants why the Plaintiff has not sought such information and documentation directly from the Fund or the GP in the S.22 Proceedings. As a consequence of the Plaintiff's premature decision to commence the 1782 Proceedings, the Defendants were left with no choice but to instruct US legal counsel in connection with the 1782 Proceedings, which has already resulted in the Fund incurring unnecessary costs and expenses.

6

28.     In light of the Plaintiff's actions in initiating two sets of proceedings in different jurisdictions that are ultimately seeking the provision of substantially similar information, on 29 January 2020, the GP appointed myself and Christopher Rowland of FFP (Directors) Limited to the board of directors of the GP to assist the Fund in responding to such proceedings (the "**Independent Directors**"). The Independent Directors, who now constitute a majority of the directors appointed to the board, have a wealth of experience in providing independent directorships to entities in the Cayman Islands. Importantly, we each have specific experience in dealing with vehicles involved in litigation and contentious issues comparable to those currently faced by the Defendants. On 4 February 2020, the Defendants wrote to all limited partners informing them of the appointment of the Independent Directors (**Tab 6**).

29.     Following our appointment, Mr Rowland and myself have fully familiarised ourselves with the Fund's affairs, including the present proceedings and the information requests made by the Plaintiff. We have also familiarised ourselves with the broader context in which those requests have been made. We are satisfied that the Fund's response to those requests, as described in this Affidavit, is appropriate and in line with the legal duties and obligations of the Fund and the GP.

**The Defendants' responses to the Plaintiff's Information Requests**

30.     The Defendants substantively responded to each request set out in the Plaintiff's Information Requests in a letter dated 6 March 2020 (the "**Disclosure Letter**"). The Defendants also sought, where possible, to respond to the Plaintiff's information requests made in the 1782 Proceedings in the Disclosure Letter. See **Tab 5** for a copy of the Disclosure Letter and its enclosures.

31.     The Defendants do not propose to repeat their substantive responses to the Plaintiff's Information Requests as set out in the Disclosure Letter in this Affidavit. However, in order to assist this Honourable Court's review of the evidence, the Defendants have summarised the responses that have been provided to the Plaintiff's Information Requests and provided a cross-reference to the relevant section and paragraph in the Disclosure Letter.

*Fund Payments*

32.     The below table sets out the information requested by the Plaintiff at paragraphs (a) to (w) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

7

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (a) | Complete copies of the bank account statements for the bank account which the Fund held with Noor Bank in Dubai (the **"Noor Account"**) into which the proceeds of the sale of the Clark City (as defined in Al Sabah 1) asset (the **"496 Million"**) were deposited from inception to date. | See paragraph 3.11 of the Disclosure Letter at **pages 6 to 10 of Tab 5**. |
| (b) | The identities of all parties who received disbursements from the Noor Account, the amount and date of such disbursement, and the bank account details for such disbursements | See paragraph 3.11 of the Disclosure Letter at **pages 6 to 10 of Tab 5**. |
| (c) | The legal basis upon which each and every payment above was made to such parties | See section 3 of the Disclosure Letter at **pages 4 to 13 of Tab 5**. |
| (d) | Details of the third party to whom payment was made in order to secure release of the 496 Million from Dubai, and all information and documents held by the Defendants pertaining to the interactions with such third party, including but not limited to any written agreements, and all correspondence | See section 3 of the Disclosure Letter at **pages 4 to 13 of Tab 5**. |

33.    As noted above and in the Disclosure Letter, the Defendants have responded to substantively all of the Plaintiff's Information Requests as set out in paragraphs (a) to (d) of the Schedule to Al Sabah 1. In particular, representatives and advisors of the Fund prepared a detailed summary and breakdown of the vast majority of the payments made from the Noor Account, which is set out in the tables at paragraphs 3.11 and 3.12 of the Disclosure Letter (**pages 6 to 12 of Tab 5**).

34.    The Defendants have not provided copies of the Noor Bank account statements or the bank account details of the third party recipients of payments made by the Fund from the Noor Account as such information is confidential and the Defendants are not at liberty to disclose such details without the permission of such third parties. In any event, the Defendants do not see the relevance of the bank account details of these third parties to the purported concerns of the Plaintiff as set out in Al Sabah 1.

35.     As noted in paragraph 3.13 of the Disclosure Letter (**page 12 of Tab 5**), representatives and advisors of the Fund have informed me that there have been occasions where service providers of the Fund have been subject to malicious persecution from the authorities in Kuwait in order to deter other parties from assisting the Fund and have been threatened by such authorities in relation to the same.

36.     By way of example, on 17 August 2019, the Plaintiff issued a press release in the form found at **Tab 7**. Upon clicking the Plaintiff's home page on its official website address, this press release automatically appears as the first content available on its web page and remains so as at the date of swearing this Affidavit (the "**Plaintiff's Press Release**"). On page 2 of the Plaintiff's Press Release, the Plaintiff has stated the following:

"*The Kuwait Port Authority further warned any advisors engaged by KGL or its former executives—including Crowell & Moring LLP and Marathon Strategies—that, to the extent they claim to be engaged by The Port Fund or have received payments from assets rightfully belonging to The Port Fund, no such engagement was approved by the investors of The Port Fund, and such investors will seek to hold responsible those receiving such monies unlawfully from assets belonging exclusively to The Port Fund.*"

37.     It appears from this excerpt of the Plaintiff's Press Release that the Plaintiff is publicly and openly suggesting the Fund has illegally engaged its service providers and the Plaintiff will be pursuing such service providers for receiving such monies unlawfully. As is typical with a Cayman Islands exempted limited partnership, the governing documents of the Fund do not require the Fund to obtain the consent of the limited partners prior to engaging service providers to the Fund. The terms of the LPA specifically provide the GP with the requisite authority and power to engage service providers on behalf of the Fund without requiring prior investor consent to do so.

38.     Accordingly, this statement, which has been made publicly by the Plaintiff, is plainly inaccurate and misleading. The Defendants note that the Plaintiff, having reviewed and signed a copy of the LPA, would have been aware of its provisions.

39.     However, perhaps more concerning to the Defendants than the misleading statement regarding investor consent, is the clear and public threat to any service provider of the Fund. I have been informed by representatives of the Fund that multiple service providers engaged by the Fund have expressed their concerns with respect to the threats made by the Plaintiff in the Plaintiff's Press Release.

9

40.     For example, in a letter dated 19 August 2019 (**Tab 8**), Neil Bush Global Advisors, one of the Fund's service providers, wrote to the Plaintiff expressing concerns in relation to the Press Release and described it as a "*disturbing development...that threatens members of the international defense team with baseless criminal charges in connection with their legal defense of their clients*" and is "*an appalling attempt to intimidate the international legal counsel and advisors*". Neil Bush Global Advisors also wrote to the Plaintiff on 5 September 2019 urging the Plaintiff that "*any further threats against our United States and international legal team, whose members are providing legal services to their clients in a completely professional and lawful manner, could result in a more serious diplomatic situation.*" (**Tab 9**).

41.     Accordingly, in circumstances where the disclosure of the identity of service providers to the Fund would, in all likelihood, lead to adverse and wholly unjust consequences for such parties, the Defendants have not included details of those transfers in the tables set out in the Disclosure Letter.

*Preferred Return Amount*

42.     The below table sets out the information requested by the Plaintiff at paragraphs (e) to (g) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (e) | Confirmation and itemisation of the capital commitments and contributions made by each limited partner at the commencement of the Port Fund and in each calendar year since that commencement, together with (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. | See paragraph 4.2 of the Disclosure Letter at **page 13 of Tab 5**. |
| (f) | Confirmation of the respective ownership percentages of the | See paragraph 4.3 of the Disclosure Letter at **pages 13 to 14 of Tab 5**. This information has already been disclosed to the Plaintiff in the |

| | | | |
|---|---|---|---|
| | limited partners since the commencement of the Fund. | audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |
| (g) | The capital account statement in respect of the Plaintiff covering each calendar year since commencement of the Port Fund. Such capital account statements should show the capital contributions made by and distributions made to the Plaintiff, any adjustments made to the Plaintiff's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period. | See paragraph 4.3 of the Disclosure Letter at **pages 13 to 14 of Tab 5**. This information has already been disclosed to the Plaintiff in the audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |

43. With respect to the information request at paragraph (e) of the Schedule to Al Sabah 1 and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to obtain copies of bank statements itemising the capital contributions made by each limited partner of the Fund or a breakdown of precisely how the Fund's capital has been applied to the various investments made by the Fund.

*Comingling of funds*

44. Paragraph 31 (b) of Al Sabah 1 states that the following "*administrative issues*" have exacerbated certain issues raised by the Plaintiff:

"*The Defendants failed to properly segregate the accounts of the Port Fund from those of Port Link [(its general partner)]* ".

45. Accordingly, the Plaintiff has requested the following information at paragraph (h) of the Schedule to Al Sabah 1:

"*Any and all correspondence relating to, (i) the opening of the Noor Account and (ii) the rationale for the USD 496 million being deposited into the Noor Account rather than any of the bank accounts that had historically been utilised in the name of the Port Fund (for example Al Ahli Bank of Kuwait or HSBC Kuwait)*"

11

46.     As further detailed on pages 13 and 15 of the Disclosure Letter at **Tab 5**, the Defendants note that the Fund cannot hold property in its own right given it is a Cayman Islands exempted limited partnership and has no separate legal personality. Accordingly, it was entirely appropriate for the Fund's bank account to be registered in the name of GP.  In my experience, this is entirely standard practice.  The Plaintiff's attempt to characterise such an arrangement as amounting to an improper segregation and commingling of bank account monies demonstrates a failure to appreciate the law which applies to exempted limited partnerships and how they are required to operate as a matter of Cayman Islands law.  It appears to also demonstrate a desire and intent to seek to attack the Fund and the GP through any means possible, notwithstanding that there is in fact no foundation for the allegation made.

*Carry Entitlement*

47.     The below table sets out the information requested by the Plaintiff at paragraphs (i) and (j) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (i) | Any and all underlying spreadsheets (including any distribution waterfall calculations prepared pursuant to the LPA) explaining how the quantum of each distribution to limited partners was quantified. | See paragraph 6.8 of the Disclosure Letter at **page 16 of Tab 5**. |
| (j) | All information held by the Defendants in connection with any loans and/or any other liabilities of the Port Fund that were paid as part of exit proceeds from the Clark City investment. | See section 3 of the Disclosure Letter at **pages 4 to 13 of Tab 5**. |

48.     With respect to the information request set out at paragraph (i) of the Schedule to Al Sabah 1 and without waiving privilege in any way, I am informed that the Plaintiff is not entitled to this documentation which effectively comprise the internal working papers of the management of the Fund.

*The DIFC Claim*

49.   The below table sets out the information requested by the Plaintiff at paragraphs (k) to
      (p) of the Schedule to Al Sabah 1, along with the Defendants' responses to such
      information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (k) | All information and documents held by the Defendants pertaining to KGLI's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale. | See paragraphs 6.2 and 6.3 of the Disclosure Letter at **page 15 of Tab 5**. |
| (l) | All written communication from EMPEML received by Port Link, including but not limited to demand notices and correspondence relating to the investment management agreement. | See paragraph 6.4 of the Disclosure Letter at **page 15 of Tab 5**. |
| (m) | Any information and documents pertaining to the DIFC claim brought by EMPEML against the Port Fund and Port Link (the "**DIFC Proceedings**"), including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not to file a defence and any other material relevant to that claim | See paragraphs 6.5 and 6.6 of the Disclosure Letter at **page 15 of Tab 5**. |
| (n) | All information and documents (including documentary evidence and relevant agreements) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's claim of 8% penalty compound interest on delays in paying the | See paragraphs 6.7 and 6.8 of the Disclosure Letter at **pages 15 to 16 of Tab 5**. |

| | | Carry and Management Fees (as such terms are defined in the LPA). | |
|---|---|---|---|
| (o) | | All information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000. | See paragraphs 6.7 and 6.8 of the Disclosure Letter at **pages 15 to 16 of Tab 5**. |
| (p) | | All information and documents pertaining to the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of and justifications for those distributions. | See paragraphs 6.9 and 6.10 of the Disclosure Letter at **page 16 of Tab 5**. |

50. As set out in paragraphs 6.1 to 6.10 of the Disclosure Letter (**pages 15 to 16 of Tab 5**), the Defendants have substantively responded to the vast majority of the information requests relating to the DIFC Proceedings.

51. With respect to the information request made by the Plaintiff at paragraph (k) of the Schedule to Al Sabah 1, as noted at paragraph 6.3 of the Disclosure Letter (**page 15 of Tab 5**), EMPEML is a third party who provided services to the Fund. It has never been owned or controlled by the Fund. Given this, it is unclear on what basis the Plaintiff is relying in requesting this information. In any event, the Defendants are not in possession of any documentation or information relating to the sale of EMPEML and are therefore not in a position to disclose such information.

52. With respect to the request made by the Plaintiff at paragraph (m) of the Schedule to Al Sabah 1, and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to copies of the legal advice provided to the Fund in connection with the DIFC Proceedings.

14

*The Damietta Loan*

53.   The below table sets out the information requested by the Plaintiff at paragraphs (q) to (s) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (q) (i) | The original executed loan agreement between the Port Fund and the borrower and any subsequent modifications to this loan agreement. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |
| (q) (ii) | All loan statements prepared by the lender and provided to the borrower from the date of drawdown of the Damietta Loan, to the date of any subsequent write-off in 2014 and in the absence of any such statements, any and all correspondence between the parties showing the level of the borrower's indebtedness to the Port Fund. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |
| (q) (iii) | Details of any placement fee paid by the Port Fund to the borrower, including (but not limited to) the date and amount of any such fee. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |
| (q) (iv) | Any and all correspondence regarding the Damietta loan relating to the waiver of the lender's entitlement to interest and confirmation provided by the Port Fund to the borrower that the loan principal had been repaid. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |
| (r) (i) – (iii) | Internal documentation (including (but not limited to) board minutes, meeting notes and correspondence) setting out the rationale and approval process of any decision taken by the Port Fund in respect of: | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |

| | | |
|---|---|---|
| | (i) any waiver by the Port Fund of its entitlement to interest on the Damietta loan; (ii) the rationale for any decision of the Port Fund to write off the Damietta Loan; and (iii) the rationale for any decision of the Port Fund not to convert the Damietta Loan (and accrued interest) into shares in the Borrower. | |
| (s) | Documentation relating to the Port Fund's analysis of impairment disclosure requirements relating to the Damietta loan as required by IFRS 7 for the years 2013 and 2014. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab 5**. |

54.  As set out in paragraphs 7.1 to 7.10 of the Disclosure Letter (**pages 16 to 17 of Tab 5**), the Defendants have substantively responded to the vast majority of the information requests relating to the Fund's investment in the Damietta International Port Company in Egypt ("**DIPCO**") through the convertible loan agreement entered into with KGL Ports dated 22 August 2007 whereby the Fund provided a US$20 million loan to KGL Ports (the "**DIPCO Loan**") with an option to be converted into equity in DIPCO at a later date (the "**DIPCO Loan Agreement**").

55.  With respect to the request made by the Plaintiff at paragraph (r) of the Schedule to Al Sabah 1, and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to copies of the internal working papers of the Fund (including board minutes, meeting notes and correspondence) in connection with the DIPCO Loan and/or the DIPCO Loan Agreement.

*The Port Fund's Audited Financial Statements*

56.  The below table sets out the information requested by the Plaintiff at paragraphs (t) and (v) of the Schedule to Al Sabah 1, along with the Defendants' response to such information requests:

| Al Sabah 1 Schedule | Plaintiff's Information Request | Defendants' Response |
|---|---|---|

16

| Paragraph Reference | | |
|---|---|---|
| (t) | A full accounting of the process used to reach the purported ownership percentages of the limited partners and general partner of the Port Fund as stated in the 2015 and 2016 audited financial accounts. | See paragraphs 9.1 to 9.7 of the Disclosure Letter at **pages 19 to 20 Tab 5**. |
| (u) | Full details of the investments (if any) made by KGLI into the Port Fund. | See paragraphs 9.1 to 9.7 of the Disclosure Letter at **pages 19 to 20 of Tab 5**. |
| (v) | A full account or explanation of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts. | See paragraphs 9.1 to 9.7 of the Disclosure Letter at **pages 9 to 20 of Tab 5**. |

57.   The Fund has already provided an explanation with respect to the delay in finalising and issuing the audited accounts for 2017 - 2019. As noted in letters to all limited partners dated on or around 3 October 2019, as a result of unsubstantiated allegations in connection with the management and affairs of the Fund made by third parties whose interests are adverse to those of the Fund, the GP has encountered difficulties in instructing external auditors for the financial years ending 2017, 2018 and for part of the year ending 2019. This letter was couriered to the KPA.

*Port Link*

58.   The below table sets out the information requested by the Plaintiff at paragraph (w) of the Schedule to Al Sabah 1, along with the Defendants' response to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (w) | Details of Port Link's ownership and connections to KGLI. | See paragraph 10.1 of the Disclosure Letter at **page 20 of Tab 5**. |

17

**The CIDL Application**

59.   As set out in the Disclosure Letter, there are certain categories of documents and information, which have been requested by the Plaintiff, that are subject to stringent confidentiality obligations arising under contracts entered into with third parties (the "**Confidential Information**").

60.   Notwithstanding the stringent confidentiality obligations owed by the Fund to third parties, the Defendants would like to provide the Plaintiff with copies of the Confidential Information. Accordingly, the Defendants have filed a substantive application seeking appropriate relief pursuant to section 4 of the Confidential Information Disclosure Law, 2016 (the "**CIDL Application**") in order to provide the Confidential Information to the Plaintiff without breaching their existing third party confidentiality obligations and thereby potentially exposing the Fund to significant liability in damages.

61.   The CIDL Application is listed for hearing on 17 April 2020. On the assumption that the Defendants obtain the relief sought in the CIDL Application, the Defendants intend to file and serve supplementary evidence following the hearing in order to provide the Plaintiff with copies of the Confidential Information in accordance with the terms of any order made by the Court.

**Misleading and inaccurate statements made in Al Sabah 1**

62.   Having reviewed the contents of Al Sabah 1 and the documents exhibited thereto, the Defendants note that there are a number of misleading and inaccurate statements made in Al Sabah 1. Of particular concern to the Defendants is the allegation made at paragraph 11 of Al Sabah 1 that "*significant fraud has been committed by, inter alia, Port Link, KGLI, and individuals associated with KGLI, which has resulted in the misappropriation of assets belonging to the Port Fund, in the order if several hundred million dollars, as well as other wrongdoing (including potential kickbacks)*". Despite the seriousness of this allegation, the Plaintiff has failed to provide any evidence to substantiate it.

*Investments made by the Fund*

63.     Paragraph 16 of Al Sabah 1 states that "*the Port Fund made only five investments*". This is incorrect. While the former management of the Fund considered a number of potential investments, the Fund only made four investments during its term.

*The DIFC Claim*

64.     Paragraph 26 of Al Sabah 1 states that "*a claim was filed against the Port Fund by the Investment Manager in Dubai...*" and paragraph 27 of Al Sabah 1 states that "*Port Link appears simply to have filed an admission...*". I refer to **pages 14 to 16** of the Disclosure Letter at **Tab 5** which explains how the Fund engaged DIFC legal counsel to represent the Fund in connection with those proceedings.

*Criminal Proceedings in Kuwait*

65.     In paragraph 29 of Al Sabah 1, the Defendants note that Mr Al Sabah states that the Plaintiff is concerned by "*Ms Lazareva and Mr Dashti were each convicted by a Kuwaiti court and sentenced to the imprisonment for 15 years in connection with misappropriation of public funds*". However, the Plaintiff fails to provide any details relating to the judgment in Kuwait and notably omits to mention that Ms Lazareva and Mr Dashti have filed an appeal against such convictions as described in further detail below.

66.     The Fund attracted investment from a number of Kuwaiti based investors, including the Plaintiff and the Public Institution for Social Security ("**PIFSS**"), both of whom are considered extensions of the government of the State of Kuwait. The Fund and its former management team were investigated by the Public Prosecution of the State of Kuwait (the "**Kuwaiti Prosecutor**") who alleged that the capital commitments of the Plaintiff and PIFSS, considered to be 'public' or 'state' funds as a matter of Kuwaiti law, had been embezzled by members of the management team of the Fund.

67.     I am informed by counsel to KGLI and verily believe that such investigations originated from complaints first made by Ms Mona Abdul Wahab in or around June 2012 (also noted in the 15 November 2019 Case Update (defined and further described below) at **pages 10 and 11 of Tab 10**). Ms Wahab was a disgruntled employee of Ms Lazareva in Kuwait who, following her termination on 30 March 2010, "*forged Ms Lazareva's identity and stole more than USD 500,000 from Ms Lazareva's personal bank account*"

(**page 10 and 11 of Tab 10**).  Ms Wahab was consequently convicted on charges of embezzlement and sentenced to three years imprisonment on 30 May 2016.

68.     Following such investigations, the Kuwaiti Prosecutor commenced criminal proceedings in felony number 1496/2012 (computation of public funds), listed under No. 23/2015 Criminal Felonies Investigations (the "**Kuwaiti Criminal Proceedings**"). The allegations made by the Kuwaiti Prosecutor in the Kuwaiti Criminal Proceedings were made against the following individuals:

(a)     Maria Lazareva (the "**First Defendant**");

(b)     Saeed Ismail Dashti (the "**Second Defendant**"); and

(c)     Mohamed Abdul Muhsen Abdullatif Al Asfour (the "**Third Defendant**"),

        (together, the "**Kuwait Defendants**")

69.     The Kuwaiti Prosecutor alleged in the Kuwaiti Criminal Proceedings that the First Defendant and Second Defendant, who also acted as Directors of the GP between 2007 and 2018, committed crimes of embezzling public funds and related money laundering offences when they acted as directors of the GP.  I am informed by counsel to KGLI and verily believe that:

(a)     the charges made by the Kuwaiti Prosecutor related to 167 separate transactions made, the vast majority of which were in connection with the business of the Fund (the "**167 Transactions**"); and

(b)     the First Defendant and Second Defendant were directors of the GP at the time the 167 Transactions took place.

70.     The purported embezzlement of Kuwaiti state funds related to the capital commitments of the Plaintiff and PIFSS, which had been invested in the Fund between 2007 and 2013.  As explained above, the alleged crimes were considered the embezzlement of 'public funds' as a consequence of the Plaintiff's and PIFSS' statuses as arms of the government of the State of Kuwait.

71.     In connection with the Kuwaiti Criminal Proceedings, the Kuwaiti Prosecutor filed a bill of indictment dated 26 April 2017 setting out details of the 167 Transactions along with supporting evidence, which provided an explanation as to why the Kuwaiti Prosecutor believed such transactions amounted to criminal offences under Kuwaiti law (the

"**Accusation Report**").    A copy of the Accusation Report along with a certified translation is at **Tab 11**.

*The Baker Tilly Report*

72.    Following the filing of the Accusation Report and the commencement of the Kuwaiti Criminal Proceedings, one of the limited partners of the Fund, PetroLink Holding Company K.S.C.C. ("**PetroLink**"), appointed Baker Tilly Consulting Company WLL ("**Baker Tilly**") as an independent third party financial advisor to review the evidence provided in the Accusation Report relating to the 167 Transactions and provide a report of their findings to PetroLink.

73.    Baker Tilly issued their report on 11 December 2018 (the "**Baker Tilly Report**"), which examined each of the 167 Transactions in detail, including reviewing the relevant transfer documentation, the underlying contractual agreements between the parties and the key governing documents of the Fund including the LPA and the offering memorandums of the Fund (**page 5 of Tab 12**). The Baker Tilly Report ultimately concluded that there was no evidence of the embezzlement of public funds and all of the transactions listed in the Accusation Report were valid transactions and in accordance with the constitutional documents of the Fund and commercial agreements between the relevant parties. A copy of the Baker Tilly Report is at **Tab 12**.

74.    The Fund has extracted the Summary of the Final Opinion issued by Baker Tilly in the Baker Tilly Report (my <u>emphasis added</u>) (**page 5 of Tab 12**):

*"1.7 Summary of the Final Opinion*

*In light of our review of the Fund's Private Placement Memorandum (PPM), the Limited Partnership Agreement (LPA), the Incorporation Agreement of the General Partner, the resolutions issued by the General Partner, the supporting documents to the Fund's accounting records, the list of confirming evidence and other documents, below are the conclusions of our findings:*

a)    *<u>The Port Fund's money has been used toward its investments and transactions made in line with the Fund's provisions and documents, PPM, LPA, as well as the Incorporation Agreement of the General Partner and the resolutions issued by the General Partner. They did not involve any suspicion of facilitating embezzlement and did not involve any suspicion of embezzlement.</u>*

21

b) The Port Fund has successfully exited its investment in Negros Navigation in the Philippines during 4Q2016 where the fund distributed USD 30 million to Port Fund's investors including Kuwait Port Authority "KPA" (which received USD 11,222,152.44 – i.e., 13.2% of total capital commitment) and Public Institution for Social Security "PIFSS" (which received USD 7,684,540.56 -- i.e., 19.2% of the total capital commitment). All the above mentioned amounts, including Negros Navigation exit proceeds, were recorded in the audited financial statement of the Fund.

c) All the Port Fund's financial information and statements prove that Sabah Al Ahmad Logistics City was owned by the Fund. In November 2017, the Fund successfully exited that investment and transferred the proceeds to the Fund's bank account. The Fund advised its limited partners about the distribution of more than USD 300 million (i.e., more than double the capital commitments). Therefore, there is no suspicion of facilitating embezzlement or suspicion of unlawful embezzlement or damaging the public funds.

d) All the transactions listed in the bill of indictment have been conducted in accordance with the Fund's PPM, LPA, Incorporation Agreement of the General Partner and the resolutions issued by the General Partner, as well as other valid legal documents. Such transactions did not involve any suspicion of facilitating embezzlement or any suspicion of unlawful embezzlement, as detailed in this report.

e) The amounts reported in the supporting documents conform to the Fund's accounting records and were reflected in the Fund's audited financial statements in accordance with accounting standards."

75. Following an extensive and detailed review of each transaction and all supporting documentation, Baker Tilly reached an unqualified conclusion that there was no evidence that any of the 167 Transactions constituted embezzlement as alleged in the Accusation Report and the Kuwaiti Criminal Proceedings.

76. I am informed by counsel to KGLI and verily believe that the Baker Tilly Report was submitted into evidence in the Kuwaiti Criminal Proceedings by Kuwaiti legal counsel for the Kuwait Defendants in such proceedings.

*11 November Judgment*

77.     Notwithstanding the filing of robust evidence by the Kuwait Defendants (including the
        Baker Tilly Report), which demonstrated that all of the 167 Transactions were in fact
        legitimate transactions pursuant to legal, valid and binding agreements between the
        parties, the Kuwaiti Court of First Instance in the Kuwaiti Criminal Circuit (the "**Kuwait
        Court of First Instance**") delivered its verdict in the Kuwaiti Criminal Proceedings on
        11 November 2019 and found the Kuwait Defendants guilty on one charge of
        embezzling or facilitating the embezzlement of public funds and one charge of money
        laundering (the "**11 November Judgment**"). A copy of the 11 November Judgment is
        exhibited at **Tab 13**, along with a certified English translation at **Tab 14.**

78.     In the 11 November Judgment, the Kuwait Court of First Instance found that 165 of the
        167 Transactions were legitimate transactions in connection with the business of the
        Fund and did not constitute the embezzlement of public funds or money laundering as
        a matter of Kuwaiti law. However, the Kuwait Court of First Instance found that two of
        the 167 Transactions were not legitimate transactions and constituted the
        embezzlement of 'public' funds as matter of Kuwaiti law.

*Reliability of evidence relied upon by the Kuwait Court of First Instance in making its judgment*

79.     I am informed by counsel to KGLI and verily believe that significant concerns arise with
        regards to the reliability of the evidence the Kuwait Court of First Instance relied upon
        in making its findings that the Disputed Payments were illegal.

80.     I am informed by counsel to KGLI and verily believe that on 23 May 2019 international
        counsel for Ms Lazareva submitted a petition to the UN Working Group on Arbitrary
        Detention (the "**UN Working Group**") complaining that the State of Kuwait was
        arbitrarily detaining Ms Lazareva in breach of its obligations under international law
        (notably Articles 9 and 14 of the International Covenant on Civil and Political Rights).
        In the most recent case update to the UN Working Group dated 15 November 2019,
        Ms Lazareva's counsel provided an analysis with respect to the lack of reasoning and
        clear contradictions in the 11 November Judgment (the "**15 November 2019 Case
        Update**") (**Tab 10**).

81.     In the 15 November 2019 Case Update, it is noted that:

        (a)     when convicting Ms Lazareva, the Court expressly relied on the testimony of
                Hamad Al-Allayan who had prepared three "Expert Reports" for the Kuwaiti

Prosecutor and provided witness evidence in the Kuwaiti Criminal Proceedings. However, in other proceedings in Kuwait against Ms. Lazareva, Mr Al-Allayan submitted forged evidence which initially led to Ms Lazareva's conviction. Such conviction was overturned and Mr Al-Allayan has since been convicted for forging those very documents and sentenced to six months' imprisonment (**page 11 and 12 of Tab 10**). Strangely, the Kuwait Court of First Instance explicitly and repeatedly dismissed Mr Al-Allayan's testimony (see **page 12 of Tab 10**) but also inexplicably and in clear contrast with the rest of the 11 November Judgment relied on Mr Al-Allayan's statement that the two transactions (i.e. the Disputed Payments) were illegal. Neither Mr Al-Allayan nor the Kuwait Court of First Instance provided any further particulars as to why these transfers where unlawful (**page 12 of Tab 10**); and

(b)     as noted above at paragraph 67, the investigations into the Kuwait Defendants followed complaints made by Mona Abdul Wahab. Ms Wahab was convicted and sentenced for three years imprisonment for embezzlement in Kuwait after forging Ms Lazareva's identity and steeling over US$500,000 from Ms Lazareva's personal bank account (see **pages 10 to 11 of Tab 10**). Despite this, Ms Wahab provided witness evidence in the Kuwaiti Criminal Proceedings for the Kuwaiti Prosecutor. Similarly as above, the Kuwait Court of First Instance both recognised the unreliability of Ms Wahab's testimony in other sections of the 11 November Judgment but relied on such testimony in finding that the Disputed Payments were illegal (see **page 11 of Tab 10**). The 15 November 2019 Case Update also states that Ms Wahab's statement "*amounted to little more than a bare assertion that Ms Lazareva was guilty of criminal conduct, without any particulars or explanation. She did not set out any account of the facts that could form the basis of a conviction by any court acting reasonably. It is therefore, perhaps unsurprising that the Court failed to give any reason for its reliance on Ms Wahab's testimony, let alone an explanation of how it enabled the Court to overcome the doubt established by the defence evidence*" (**see page 11 of Tab 10**).

82.     I am informed by counsel to KGLI and verily believe that the Kuwait Defendants have filed an appeal of the 11 November Judgment with the Court of Appeal in the Kuwaiti Criminal Circuit – Case No. 3065/2019 (the "**Kuwait Appeal Proceedings**"), which is expected to be heard during the course of this year.

*Lobbying Fees*

83.   In paragraph 29 of Al Sabah 1, the Plaintiff expresses concerns that a number of public relations and lobbying firms have been engaged by the Fund "*in order to seek to exert pressure on the Government of Kuwait to release from prison Ms Lazareva and Mr Dashti*". As set out in detail in more detail in paragraphs 11.1 to 11.3 of the Disclosure Letter (**pages 20 to 21 of Tab 5**), the $496 Million was frozen by Noor Bank for a total of 14 months between November 2017 and February 2019. During this period, the Defendants became aware that the Kuwaiti authorities were attempting to persuade the Dubai authorities to instruct Noor Bank to transfer the vast majority of the $496 Million from the Noor Account to two limited partners in Kuwait, a request that the Defendants believed would amount to an illegal expropriation of the Fund's monies. I refer in this respect to paragraphs 3.5 to 3.10 of the Disclosure Letter (**pages 4 to 6 of Tab 5**) and the correspondence exhibited at Schedule 2 (**pages 28 to 69 of Tab 5**) to that letter.

84.   In such circumstances, I suggest that it is entirely understandable and reasonable that the Defendants took all available steps to try and obtain the release of the $496 Million wired to Noor Bank so that the Fund could settle its liabilities and make final distributions to its investors. Accordingly, a number of firms were engaged by the Defendants to assist with such efforts in the US, Kuwait and elsewhere.

85.   Some of the firms engaged by the Fund to assist with the unfreezing of the $496 Million were also assisting the former directors of the GP in relation to the ongoing criminal proceedings in Kuwait. In circumstances where (i) such criminal proceedings directly related to the legitimacy of payments made by the Fund; and (ii) the Fund was on notice of contingent indemnity claims from the former directors of the GP with respect to defending such proceedings, the Fund was clearly interested in such payments and the outcome of the criminal proceedings in Kuwait. The Defendants were provided with certain reports relating to the payments made by the Fund the subject of the allegations in the criminal proceedings in Kuwait, and on such evidence, it appears clear that the former directors of the GP took the view that the payments were legitimate payments in connection with the business of the Fund and the allegations in the Kuwaiti criminal proceedings were without merit. Accordingly, the Defendants considered it appropriate for the firms engaged by the Fund to provide assistance to the former directors of the GP in relation to the criminal proceedings in Kuwait.

## Conclusion

86.   As set out in this Affidavit, the Defendants have substantively responded to the Plaintiff's Information Requests in the Disclosure Letter and pursuant to the terms of the CIDL Application. To the extent that the Defendants have not responded to a limited number of the Plaintiff's Information Requests, the Defendants note that the Plaintiff is not entitled to such information under the ELP Law or the LPA and such matters will be dealt with in detail during legal submissions.

Sworn by the said **ANDREW JOSEPH CHILDE** )

at                                                                    )

on the     day of April 2020                       )   **ANDREW JOSEPH CHILDE**

Before me:                                                  )


_____

Notary Public

**THIS AFFIDAVIT** is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law

26

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO. 13 OF 2020 (RJP)

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF
THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

KUWAIT PORTS AUTHORITY

**PLAINTIFF**

**AND:**

(1) THE PORT FUND L.P.
(2) PORT LINK GP LTD.

**DEFENDANTS**


THIS IS EXHIBIT "**AC-1**" TO THE FIRST AFFIDAVIT OF

**ANDREW JOSEPH CHILDE**

SWORN BEFORE ME THIS    DAY OF APRIL 2020


_____
NOTARY PUBLIC


27



1. Abdulghfoor M A
   Alawadhi
2. First Affidavit
3. The Defendants
4. 9 April 2020
5. Exhibit "AA-1"

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD 13 OF 2020 (RJP)

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

BETWEEN:

**KUWAIT PORTS AUTHORITY**

**PLAINTIFF**

**AND**

(1)   **THE PORT FUND L.P.**
(2)   **PORT LINK GP LTD.**

**DEFENDANTS**

**FIRST AFFIDAVIT OF ABDULGHFOOR M A ALAWADHI**

I, **ABDULGHFOOR M A ALAWADHI**, of Plot 326, Block 5, Meshref, Kuwait, being duly sworn **MAKE OATH AND SAY** as follows:

1. I am one of the Directors of Port Link GP Ltd. (the **"GP"**), who acts as the general partner of the Port Fund L.P. (the **"Fund"**). I am duly authorised to swear this Affidavit on behalf of the GP and the Fund.

2. I make this Affidavit in support of the Defendants' opposition to the application filed by the Plaintiff for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) in respect of the Fund (the **"S.22 Proceedings"**).

3. Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in my capacity as a Director of the GP since 2010, except where I state that I am relying on information from others. The content of this Affidavit is true to the best of my knowledge, information and belief.

9649440.3T5138.D08984

4.  Now produced and shown to me and marked **"AA-1"** is a copy of the substantively final draft of the affidavit of Andrew Joseph Childe, which is intended to be sworn in support of the Defendants' opposition to the S.22 Proceedings (**"Childe 1"**).

5.  I have carefully reviewed Childe 1 and its exhibit and consider the facts deposed therein to be accurate and a true, full and frank account of the dealings of the Fund and the GP.

Sworn by **Abdulghfoor M A Alawadhi**              )
at Kuwait City, Kuwait                                      )
on the  9 day of April 2020                              )          Abdulghfoor M A Alawadhi
Before me:                                                      )

_____

Lawyer

Address: _____  24th Floor - Kuwait Building - Fahad Al salem St.
Kuwait City

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 13 OF 2020 (   )

IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE
EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)

BETWEEN:

KUWAIT PORTS AUTHORITY

**Plaintiff**

AND:

(1)   THE PORT FUND L.P.
(2)   PORT LINK GP LTD.

**Defendants**

THIS IS EXHIBIT "AA-1" TO THE FIRST AFFIDAVIT OF

**ABDULGHFOOR M A ALAWADHI**

SWORN BEFORE ME THIS 9 DAY OF APRIL 2020

9649440.3T5138.D08984

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 13 OF 2020 (    )**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

<u>**Plaintiff**</u>

**AND:**

        **(1)   THE PORT FUND L.P.**
        **(2)   PORT LINK GP LTD.**

<u>**Defendants**</u>

THIS IS EXHIBIT "**AA-1**" TO THE FIRST AFFIDAVIT OF

**ABDULGHFOOR M A ALAWADHI**

SWORN BEFORE ME THIS 9 DAY OF APRIL 2020

_Bader n almutairat_
_law firm_

9649440.3T5138.D08984

1

1. The Defendants
2. Andrew J.Childe
3. First Affidavit
4. Exhibit AC-1
5. 9 April 2020

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

<u>**PLAINTIFF**</u>

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

<u>**DEFENDANTS**</u>

_____

**FIRST AFFIDAVIT OF ANDREW JOSEPH CHILDE**
_____

I, **ANDREW JOSEPH CHILDE**, of FFP (Directors) Limited, 2nd Floor, Harbour Centre, 42 North Church Street, George Town, Grand Cayman, Cayman Islands, being duly sworn **MAKE OATH AND SAY** as follows:

**Introduction**

1.      I am one of the Directors of Port Link GP Ltd. (the "**GP**"), which acts as the general partner of The Port Fund L.P. (the "**Fund**").  I am duly authorised to swear this Affidavit on behalf of the GP and the Fund (together, the "**Defendants**").

2.      I make this Affidavit in support of the Defendants' opposition to the application filed by Kuwait Ports Authority (the "**Plaintiff**") for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) (the "**ELP Law**") in respect of the Fund (the "**S.22 Proceedings**").

3.      On 27 January 2020, Yousef Al Sabah ("**Mr Al Sabah**"), the Director General of the Plaintiff, swore an affidavit in support of the Plaintiff's request for information in the

2

S.22 Proceedings ("**Al Sabah 1**") with its respective exhibit ("**YAS1**")[1].  In paragraphs (a) to (w) of the Schedule to Al Sabah 1, the Plaintiff has set out its extensive requests for information and documentation to be provided by the Defendants (the "**Plaintiff's Information Requests**").

4.      This Affidavit will, broadly speaking, deal with the following key issues:

(a)      the background to the S.22 Proceedings (**paragraphs [X] to [X]**);

(b)      the disclosure provided by the Defendants to date and responses to the Plaintiff's Information Requests, including requests which do not fall within Section 22 of the ELP Law or the terms of the amended and restated limited partnership agreement dated 14 July 2008 (the "**LPA**") (**Tab [X]**) (**paragraphs [X] to [X]**);

(c)      the CIDL Application (as defined below) (**paragraphs [X] to [X]**); and

(d)      the misleading and inaccurate statements made in Al Sabah 1 (**paragraphs [X] to [X]**).

5.      Produced to me at the time of swearing this Affidavit and marked "**AC-1**" is a bundle of true copy documents referred to in this Affidavit.  A reference to a tab and page number in this Affidavit is a reference to the corresponding tab and page number of the exhibit. Where documents have been exhibited to Al Sabah 1 and referred to herein, I have not included such documents in AC-1 but have instead referred to such documents as they appear within the exhibit to Al Sabah 1.

6.      Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in the above capacities, except where I state that I am relying on information from others.  The content of this Affidavit is true to the best of my knowledge, information and belief.

7.      In circumstances where I have only recently been appointed as a Director of the GP, a final draft of this Affidavit has been carefully reviewed by Abdulghfoor M A Alwadhi, who has acted as a Director of the GP since 2010.  Following such review, Mr Alwadhi has sworn an affidavit confirming that he considers the facts deposed herein to be

---

[1] A reference in this affidavit to YAS1/XXX is a reference to the tab number under which a specific document is located within YAS1.

accurate and a true, full and frank account of the dealings of the Defendants (see **tab [X]**).

8.    For the avoidance of doubt, nothing in this Affidavit is intended to waive privilege in respect of any matter referred to and privilege is not being waived.

**Background to the S.22 Proceedings**

9.    The Fund was registered as a Cayman Islands exempted limited partnership under the ELP Law on 21 March 2007 with registration number 19582.

10.   The GP is an exempted limited company incorporated under the laws of the Cayman Islands and has acted as the general partner of the Fund since 2007 to date.

11.   The Fund provided investors with an opportunity to invest in the port management industry.  As noted in paragraph 9 of Al Sabah 1, the Fund raised US$188,152,000 from the limited partners of the Fund, the majority of whom were based in Kuwait, between 2007 and 2013.

12.   Emerging Markets PE Management Limited (formerly known as KGL Investment Cayman Ltd) ("**EMPEML**"), an exempted limited company incorporated under the laws of the Cayman Islands, acted as the investment manager of the Fund.

13.   KGL Investment Company K.S.C.C. ("**KGLI**"), a company incorporated under the laws of the State of Kuwait, acted as the sponsor and placement agent of the Fund at the establishment of the Fund in 2007.

14.   Two of the investments made by the Fund resulted in successful exits for the Fund, which ultimately enabled the Fund to make significant distributions to the limited partners.  The Fund made its first distribution of approximately US$30,000,000 to investors in October 2016 following the sale of one of the Fund's investments.  The Fund subsequently made a second and final distribution of approximately US$305,000,000 to investors in February 2019 and, accordingly, distributed a total sum of US$335,000,000 to investors (representing a significant positive return for investors with reference to their total capital commitments to the Fund).

15.   Notwithstanding the successful performance of the Fund during a difficult economic climate, in or around September 2019 I am informed by counsel to KGLI and verily believe that the Defendants became aware that certain third parties, who had no

3

financial interest in the Fund, were attempting to persuade the limited partners of the Fund that there had been serious mismanagement relating to the Fund.

16.     I understand from my discussions with counsel to KGLI that the Defendants' concerns in this regard arose as a result of being provided with a copy of an email that appears to have been sent by Bader Abdulmohsen El-Jeaan ("**Mr El-Jeaan**") to a number of investors in the Fund in or around June 2019 (the "**El-Jeaan Email**") (**Page [X] of Tab [X]**).  Mr El-Jeaan is a partner at Meysan Partners, a law firm based in the State of Kuwait, and is currently instructed by two other limited partners of the Fund, Gulf Investment Corporation ("**GIC**") and General Retirement and Social Insurance Authority ("**GRSIA**"), in separate proceedings issued by GIC pursuant to section 22 of the ELP Law (the "**GIC and GRSIA Proceedings**"). Counsel for KGLI has also informed me that Mr El-Jeaan previously worked as in-house legal counsel for Agility Public Warehouse Company in Kuwait ("**Agility**") prior to joining Meysan Partners.

17.     Notwithstanding the positive performance of the Fund and the significant distributions made by the Fund to limited partners following the exit of the Fund's investments, the El-Jeaan Email made a number of unsubstantiated allegations regarding the purported mismanagement of the Fund and the alleged risk of the dissipation of the Fund's assets. By way of example, and as described in further detail at paragraph 2.3 of the Disclosure Letter (as defined below at paragraph [**40**] (**page [X] of Tab [X]**), the El-Jeaan Email made the following misleading and inaccurate statements:

"*As I indicated to Tarek, based on my review of this matter, there is a critical need to protect the LPs' investment in the Port Fund. I must emphasize the need for speed on this matter in order to ensure that the assets of the Port Fund are not lost. It is imperative that they move quickly.*"

"*Despite the near USD 1 billion reported sale price for GGDH, Lazareva first attempted to evade the Port Fund's limited partners of all Port Fund exit monies by claiming that the Fund had exited all of its investments at a complete loss.*"

"*On information and belief, realizing that such a brazen fraud would be uncovered, the Port Fund and its executives subsequently accounted for the Clark Project exit in varying amounts.*"

18.     As at the date of swearing this Affidavit, the Plaintiff has not provided any evidence to substantiate the serious allegations made in the El-Jeaan Email and those made in Al Sabah 1 regarding the Plaintiff's belief that a significant fraud has been committed

resulting in the misappropriation of several hundred million dollars, as well as other wrong doing (including potential kickbacks) (detailed further below and at section 2 of the Disclosure Letter (as defined below and found at **Tab [5]**)).

19.    I further note that there are multiple references in the El-Jeaan Email to discussions with "Tarek".  I am informed by counsel to KGLI and verily believe that such references are to Tarek Sultan, who is the Chief Executive Officer and Vice-Chairman of Agility (see **Tab [X]** for a copy of Tarek Sultan's biography).

20.    I understand from my discussions with counsel to KGLI that Agility is a major commercial rival to the KGL Group in Kuwait and competes directly with the KGL Group for US government defence contracts.  The KGL Group refers to a group of companies in Kuwait with regional interests in transportation, logistics and supply chain management.  I am informed by counsel to KGLI that representatives of KGLI consider that the El-Jeaan Email, as well as other steps taken by Agility and its representatives in Kuwait in connection with the Kuwaiti Criminal Proceedings (as defined below at **paragraph [X]**), demonstrate that Agility and its associates have been pursuing a strategy of seeking to damage the interests of the KGL Group (and by extension the Defendants) in order to further their own commercial interests and agendas.

21.    The Plaintiff wrote to Crowell & Moring LLP ("**Crowell**"), the Fund's US legal counsel, in a letter dated 8 October 2019 (**YAS1/[190]**).  The Plaintiff stated in this letter that they "*wish to raise a number of issues of grave concern*" to the Plaintiff and requested that the Fund provide the Plaintiff with an exhaustive list of documentation and information on a range of issues.  However, the letter failed to particularise the nature and source of the Plaintiff's concerns and, furthermore, had been signed by Mr Al Sabah in his capacity as the Director General of the Plaintiff.

22.    Accordingly, Walkers wrote to the Minister of State for Services Affairs  (formerly known as the Minister of Communications), in his capacity as the chairman of the board of directors of the Plaintiff, on 22 October 2019 (**YAS1/[194]**) [to express the Fund's concerns that Al Sabah does not have the requisite authority to represent the Plaintiff and instruct attorneys on the Plaintiff's behalf with respect to the 1783 Proceedings (as defined below at **paragraph [X]**) and] the views set out in the letter of 8 October 2019 (**page [X] of Tab [X]**) do not necessarily represent the views of the board of directors of the Plaintiff.

23.     Walkers received two further letters from Mr Al Sabah on 31 October 2019 (**YAS1/[208] and YAS1/[217]**) in response to the letter sent to the Minister of State for Services Affairs.

24.     In the first letter from Mr Al Sabah dated 31 October 2019 (**YAS1/[208]**), Mr Al Sabah referred to a number of Ministerial Decrees as evidence for his authority to represent the views of the Plaintiff.

25.     In a second letter from Mr Al Sabah dated 31 October 2019 (**YAS1/[217]**), Mr Al Sabah set out his alleged concerns with respect to the management of the Fund and his request for information and documentation on various issues.

26.     On 27 January 2020, the same day that the Plaintiff initiated the S.22 Proceedings, the Plaintiff filed an *ex parte* application in the United States District Court for the Southern District of New York (the "**US Court**") seeking an order to conduct discovery against Citibank, N.A. and E-Trade Financial Corporation concerning information relating to the Fund for use in contemplated litigation in the Cayman Islands pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 34, and 45 (the "**1782 Proceedings**"). In circumstances where the 1782 Proceedings appear to be directly based on, and the result of, the unsubstantiated allegations set out in the El-Jeaan Email, the Defendants were disappointed that, the Plaintiff considered it appropriate and necessary to commence an additional set of information gathering proceedings in another jurisdiction without providing any prior notice to the Defendants. It was particularly surprising that the Plaintiff considered it appropriate to commence the 1782 Proceedings in circumstances where it also commenced the S.22 Proceedings in which it is seeking extensive disclosure from the Defendants.

27.     Having reviewed the application and evidence filed by Plaintiff in the 1782 Proceedings, it is clear that there is overlap and duplication with the information being sought from the Fund and the GP in the S.22 Proceedings. To the extent that there are additional information and documentation requests in the 1782 Proceedings, it is not clear to the Defendants why the Plaintiff has not sought such information and documentation directly from the Fund or the GP in the S.22 Proceedings. As a consequence of the Plaintiff's premature decision to commence the 1782 Proceedings, the Defendants were left with no choice but to instruct US legal counsel in connection with the 1782 Proceedings, which has already resulted in the Fund incurring unnecessary costs and expenses.

28.     In light of the Plaintiff's actions in initiating two sets of proceedings in different jurisdictions that are ultimately seeking the provision of substantially similar information, on 29 January 2020, the GP appointed myself and Chris Rowland ("**Mr Roawland**") of FFP (Cayman) Limited to the board of directors of the GP to assist the Fund in responding to such proceedings (the "**Independent Directors**"). The Independent Directors, who now constitute a majority of the directors appointed to the board, have a wealth of experience in providing independent directorships to entities in the Cayman Islands. Importantly, we each have specific experience in dealing with vehicles involved in litigation and contentious issues comparable to those currently faced by the Defendants. On 4 February 2020, the Defendants wrote to all limited partners informing them of the appointment of the Independent Directors (**Tab [4]**).

29.     Following our appointment, Mr Rowland and myself have fully familiarised ourselves with the Fund's affairs, including the present proceedings and the information requests made by the Plaintiff.  We have also familiarised ourselves with the broader context in which those requests have been made.  We are satisfied that the Fund's response to those requests, as described in this Affidavit, is appropriate and in line with the legal duties and obligations of the Fund and the GP.

**The Defendants' responses to the Plaintiff's Information Requests**

30.     The Defendants substantively responded to each request set out in the Plaintiff's Information Requests in a letter dated 6 March 2020 (the "**Disclosure Letter**").  The Defendants also sought, where possible, to respond to the Plaintiff's information requests made in the 1782 Proceedings in the Disclosure Letter.  See **Tab [5]** for a copy of the Disclosure Letter and its enclosures.

31.     The Defendants do not propose to repeat their substantive responses to the Plaintiff's Information Requests as set out in the Disclosure Letter in this Affidavit.  However, in order to assist this Honourable Court's review of the evidence, the Defendants have summarised the responses that have been provided to the Plaintiff's Information Requests and provided a cross-reference to the relevant section and paragraph in the Disclosure Letter.

*Fund Payments*

32.     The below table sets out the information requested by the Plaintiff at paragraphs (a) to (w) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (a) | Complete copies of the bank account statements for the bank account which the Fund held with Noor Bank in Dubai (the "**Noor Account**") into which the proceeds of the sale of the Clark City (as defined in Al Sabah 1) asset (the "**496 Million**") were deposited from inception to date. | See paragraph 3.11 of the Disclosure Letter (**pages 6 to 10 of Tab [X]**). |
| (b) | The identities of all parties who received disbursements from the Noor Account, the amount and date of such disbursement, and the bank account details for such disbursements | See paragraph 3.11 of the Disclosure Letter at (**pages 6 to 10 of Tab [X]**). |
| (c) | The legal basis upon which each and every payment above was made to such parties | See section 3 of the Disclosure Letter (**pages 4 to 13 of Tab [X]**). |
| (d) | Details of the third party to whom payment was made in order to secure release of the 496 Million from Dubai, and all information and documents held by the Defendants pertaining to the interactions with such third party, including but not limited to any written agreements, and all correspondence | See section 3 of the Disclosure Letter (**pages 4 to 13 of Tab [X]**). |

33. As noted above and in the Disclosure Letter, the Defendants have responded to substantively all of the Plaintiff's Information Requests as set out in paragraphs (a) to (d) of the Schedule to Al Sabah 1. In particular, representatives and advisors of the Fund prepared a detailed summary and breakdown of the vast majority of the payments made from the Noor Account, which is set out in the tables at paragraphs 3.11 and 3.12 of the Disclosure Letter (**pages 6 to 12 of Tab [X]**).

34. The Defendants have not provided copies of the Noor Bank account statements or the bank account details of the third party recipients of payments made by the Fund from the Noor Account as such information is confidential and the Defendants are not at liberty to disclose such details without the permission of such third parties. In any event, the Defendants do not see the relevance of the bank account details of these third parties to the purported concerns of the Plaintiff as set out in Al Sabah 1.

35.     As noted in paragraph 3.13 of the Disclosure Letter (**page 12 of Tab [5]**), representatives and advisors of the Fund have informed me that there have been occasions where service providers of the Fund have been subject to malicious persecution from the authorities in Kuwait in order to deter other parties from assisting the Fund and have been threatened by such authorities in relation to the same.

36.     By way of example, on 17 August 2019, the Plaintiff issued a press release in the form found at **Tab [6]**.  Upon clicking the Plaintiff's home page on its official website address, this press release automatically appears as the first content available on its web page and remains so as at the date of swearing this Affidavit (the "**Plaintiff's Press Release**"). On page 2 of the Plaintiff's Press Release, the Plaintiff has stated the following:

        "*The Kuwait Port Authority further warned any advisors engaged by KGL or its former executives—including Crowell & Moring LLP and Marathon Strategies—that, to the extent they claim to be engaged by The Port Fund or have received payments from assets rightfully belonging to The Port Fund, no such engagement was approved by the investors of The Port Fund, and such investors will seek to hold responsible those receiving such monies unlawfully from assets belonging exclusively to The Port Fund.*"

37.     It appears from this excerpt of the Plaintiff's Press Release that the Plaintiff is publicly and openly suggesting the Fund has illegally engaged its service providers and the Plaintiff will be pursuing such service providers for receiving such monies unlawfully. As is typical with a Cayman Islands exempted limited partnership, the governing documents of the Fund do not require the Fund to obtain the consent of the limited partners prior to engaging service providers to the Fund. The terms of the LPA specifically provide the GP with the requisite authority and power to engage service providers on behalf of the Fund without requiring prior investor consent to do so.

38.     Accordingly, this statement, which has been made publicly by the Plaintiff, is plainly inaccurate and misleading. The Defendants note that the Plaintiff, having reviewed and signed a copy of the LPA, would have been aware of its provisions.

39.     However, perhaps more concerning to the Defendants than the misleading statement regarding investor consent, is the clear and public threat to any service provider of the Fund. I have been informed by representatives of the Fund that multiple service providers engaged by the Fund have expressed their concerns with respect to the threats made by the Plaintiff in the Plaintiff's Press Release.

40.     For example, in a letter dated 19 August 2019 (**Tab [7]**), Neil Bush Global Advisors, one of the Fund's service providers, wrote to the Plaintiff expressing concerns in relation to the Press Release and described it as a "*disturbing development…that threatens members of the international defense team with baseless criminal charges in connection with their legal defense of their clients*" and is "*an appalling attempt to intimidate the international legal counsel and advisors*". Neil Bush Global Advisors also wrote to the Plaintiff on 5 September 2019 urging the Plaintiff that "*any further threats against our United States and international legal team, whose members are providing legal services to their clients in a completely professional and lawful manner, could result in a more serious diplomatic situation.*" (**Tab [8]**).

41.     Accordingly, in circumstances where the disclosure of the identity of service providers to the Fund would, in all likelihood, lead to adverse and wholly unjust consequences for such parties, the Defendants have not included details of those transfers in the tables set out in the Disclosure Letter.

*Preferred Return Amount*

42.     The below table sets out the information requested by the Plaintiff at paragraphs (e) to (g) of Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (e) | Confirmation and itemisation of the capital commitments and contributions made by each limited partner at the commencement of the Port Fund and in each calendar year since that commencement, together with (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. | See paragraph 4.2 of the Disclosure Letter (**page 13 of Tab [X]**). |
| (f) | Confirmation of the respective ownership percentages of the | See paragraph 4.3 of the Disclosure Letter at (**pages 13 to 14 of Tab [X]**). This information has already been disclosed to the Plaintiff in the |

| | limited partners since the commencement of the Fund. | audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |
|---|---|---|
| (g) | The capital account statement in respect of the Plaintiff covering each calendar year since commencement of the Port Fund. Such capital account statements should show the capital contributions made by and distributions made to the Plaintiff, any adjustments made to the Plaintiff's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period. | See paragraph 4.3 of the Disclosure Letter at (**pages 13 to 14 of Tab [X]**). This information has already been disclosed to the Plaintiff in the audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. |

43.    With respect to the information request at paragraph (e) of the Schedule to Al Sabah 1 and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to obtain copies of bank statements itemising the capital contributions made by each limited partner of the Fund or a breakdown of precisely how the Fund's capital has been applied to the various investments made by the Fund.

*Comingling of funds*

44.    Paragraph 31 (b) of Al Sabah 1 states that the following "*administrative issues*" have exacerbated certain issues raised by the Plaintiff:

"*The Defendants failed to properly segregate the accounts of the Port Fund from those of Port Link [(its general partner)]* ".

45.    Accordingly, the Plaintiff has requested the following information at paragraph (h) of the Schedule to Al Sabah 1:

"*Any and all correspondence relating to, (i) the opening of the Noor Account and (ii) the rationale for the USD 496 million being deposited into the Noor Account rather than any of the bank accounts that had historically been utilised in the name of the Port Fund (for example Al Ahli Bank of Kuwait or HSBC Kuwait)*"

9896982.2 T5138.D08984

46. As further detailed on pages 13 and 15 of the Disclosure Letter at **Tab 5**, the Defendants note that the Fund cannot hold property in its own right given it is a Cayman Islands exempted limited partnership and has no separate legal personality. Accordingly, it was entirely appropriate for the Fund's bank account to be registered in the name of GP. In my experience, this is entirely standard practice. The Plaintiff's attempt to characterise such an arrangement as amounting to an improper segregation and commingling of bank account monies demonstrates a failure to appreciate the law which applies to exempted limited partnerships and how they are required to operate as a matter of Cayman Islands law. It appears to also demonstrate a desire and intent to seek to attack the Fund and the GP through any means possible, notwithstanding that there is in fact no foundation for the allegation made.

*Carry Entitlement*

47. The below table sets out the information requested by the Plaintiff at paragraphs (i) and (j) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (i) | Any and all underlying spreadsheets (including any distribution waterfall calculations prepared pursuant to the LPA) explaining how the quantum of each distribution to limited partners was quantified. | See paragraph 6.8 of the Disclosure Letter (**page 16 of Tab [X]**). |
| (j) | All information held by the Defendants in connection with any loans and/or any other liabilities of the Port Fund that were paid as part of exit proceeds from the Clark City investment. | See section 3 of the Disclosure Letter at (**pages 4 to 13 of Tab [X]**). |

48. With respect to the information request set out at paragraph (i) of the Schedule to Al Sabah 1 and without waiving privilege in any way, I am informed that the Plaintiff is not entitled to this documentation which effectively comprise the internal working papers of the management of the Fund.

12

*The DIFC Claim*

49.    The below table sets out the information requested by the Plaintiff at paragraphs (k) to (p) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (k) | All information and documents held by the Defendants pertaining to KGLI's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale. | See paragraphs 6.2 and 6.3 of the Disclosure Letter (**page 15 of Tab [X]**). |
| (l) | All written communication from EMPEML received by Port Link, including but not limited to demand notices and correspondence relating to the investment management agreement. | See paragraph 6.4 of the Disclosure Letter (**page 15 of Tab [X]**). |
| (m) | Any information and documents pertaining to the DIFC claim brought by EMPEML against the Port Fund and Port Link (the "**DIFC Proceedings**"), including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not to file a defence and any other material relevant to that claim | See paragraphs 6.5 and 6.6 of the Disclosure Letter (**page 15 of Tab [X]**). |
| (n) | All information and documents (including documentary evidence and relevant agreements) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's claim of 8% penalty compound interest on delays in paying the | See paragraphs 6.7 and 6.8 of the Disclosure Letter (**pages 15 to 16 of Tab [X]**). |

|  | Carry and Management Fees (as such terms are defined in the LPA). |  |
|---|---|---|
| (o) | All information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000. | See paragraphs 6.7 and 6.8 of the Disclosure Letter (**pages 15 to 16 of Tab [X]**). |
| (p) | All information and documents pertaining to the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of and justifications for those distributions. | See paragraphs 6.9 and 6.10 of the Disclosure Letter (**page 16 of Tab [X]**). |

50.    As set out in paragraphs 6.1 to 6.10 of the Disclosure Letter (**pages 15 to 16 of Tab [X]**), the Defendants have substantively responded to the vast majority of the information requests relating to the DIFC Proceedings.

51.    With respect to the information request made by the Plaintiff at paragraph (k) of the Schedule to Al Sabah 1, as noted at paragraph 6.3 of the Disclosure Letter (**page 15 of Tab [X]**), EMPEML is a third party who provided services to the Fund. It has never been owned or controlled by the Fund. Given this, it is unclear on what basis the Plaintiff is relying in requesting this information. In any event, the Defendants are not in possession of any documentation or information relating to the sale of EMPEML and are therefore not in a position to disclose such information.

52.    With respect to the request made by the Plaintiff at paragraph (m) of the Schedule to Al Sabah 1, and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to copies of the legal advice provided to the Fund in connection with the DIFC Proceedings.

*The Damietta Loan*

53.    The below table sets out the information requested by the Plaintiff at paragraphs (q) to (s) of the Schedule to Al Sabah 1, along with the Defendants' responses to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (q) (i) | The original executed loan agreement between the Port Fund and the borrower and any subsequent modifications to this loan agreement. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |
| (q) (ii) | All loan statements prepared by the lender and provided to the borrower from the date of drawdown of the Damietta Loan, to the date of any subsequent write-off in 2014 and in the absence of any such statements, any and all correspondence between the parties showing the level of the borrower's indebtedness to the Port Fund. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |
| (q) (iii) | Details of any placement fee paid by the Port Fund to the borrower, including (but not limited to) the date and amount of any such fee. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |
| (q) (iv) | Any and all correspondence regarding the Damietta loan relating to the waiver of the lender's entitlement to interest and confirmation provided by the Port Fund to the borrower that the loan principal had been repaid. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |
| (r) (i) – (iii) | Internal documentation (including (but not limited to) board minutes, meeting notes and correspondence) setting out the rationale and approval process of any decision taken by the Port Fund in respect of: | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |

| | | |
|---|---|---|
| | (i) any waiver by the Port Fund of its entitlement to interest on the Damietta loan; (ii) the rationale for any decision of the Port Fund to write off the Damietta Loan; and (iii) the rationale for any decision of the Port Fund not to convert the Damietta Loan (and accrued interest) into shares in the Borrower. | |
| (s) | Documentation relating to the Port Fund's analysis of impairment disclosure requirements relating to the Damietta loan as required by IFRS 7 for the years 2013 and 2014. | See section 7 of the Disclosure Letter at **pages 16 to 17 of Tab [X]**. |

54.    As set out in paragraphs 7.1 to 7.10 of the Disclosure Letter (**pages 16 to 17 of Tab 5**), the Defendants have substantively responded to the vast majority of the information requests relating to the Fund's investment in the Damietta International Port Company in Egypt ("**DIPCO**") through the convertible loan agreement entered into with KGL Ports dated 22 August 2007 whereby the Fund provided a US$20 million loan to KGL Ports (the "**DIPCO Loan**") with an option to be converted into equity in DIPCO at a later date (the "**DIPCO Loan Agreement**").

55.    With respect to the request made by the Plaintiff at paragraph (r) of the Schedule to Al Sabah 1, and without waiving privilege in any way, I am advised that the Plaintiff is not entitled to copies of the internal working papers of the Fund (including board minutes, meeting notes and correspondence) in connection with the DIPCO Loan and/or the DIPCO Loan Agreement.

*The Port Fund's Audited Financial Statements*

56.    The below table sets out the information requested by the Plaintiff at paragraphs (t) and (v) of the Schedule to Al Sabah 1, along with the Defendants' response to such information requests:

| Al Sabah 1 Schedule | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| | | |

| Paragraph Reference | | |
|---|---|---|
| (t) | A full accounting of the process used to reach the purported ownership percentages of the limited partners and general partner of the Port Fund as stated in the 2015 and 2016 audited financial accounts. | See paragraphs 9.1 to 9.7 of the Disclosure Letter (**pages 19 to 20 Tab [X]**). |
| (u) | Full details of the investments (if any) made by KGLI into the Port Fund. | See paragraphs 9.1 to 9.7 of the Disclosure Letter (**pages 19 to 20 of Tab [X]**). |
| (v) | A full account or explanation of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts. | See paragraphs 9.1 to 9.7 of the Disclosure Letter (**pages 9 to 20 of Tab [X]**). |

57.   The Fund has already provided an explanation with respect to the delay in finalising and issuing the audited accounts for 2017 - 2019. As noted in letters to all limited partners dated 3 October 2019, as a result of unsubstantiated allegations in connection with the management and affairs of the Fund made by third parties whose interests are adverse to those of the Fund, the GP has encountered difficulties in instructing external auditors for the financial years ending 2017, 2018 and for part of the year ending 2019 (**Tab 9**).

*Port Link*

58.   The below table sets out the information requested by the Plaintiff at paragraph (w) of the Schedule to Al Sabah 1, along with the Defendants' response to such information requests:

| Al Sabah 1 Schedule Paragraph Reference | Plaintiff's Information Request | Defendants' Response |
|---|---|---|
| (w) | Details of Port Link's ownership and connections to KGLI. | See paragraph 10.1 of the Disclosure Letter (**page 20 of Tab [X]**). |

**The CIDL Application**

59.    As the Defendants have noted in previous correspondence and as described in further detail above at paragraphs [**X**] to [**X**], there are certain categories of documents and information, which have been requested by the Plaintiff, that are subject to stringent confidentiality obligations arising under contracts entered into with third parties (the "**Confidential Information**").

60.    Notwithstanding the stringent confidentiality obligations owed by the Fund to third parties, the Defendants would like to provide the Plaintiff with copies of the Confidential Information.  Accordingly, the Defendants have filed a substantive application seeking appropriate relief pursuant to section 4 of the Confidential Information Disclosure Law, 2016 (the "**CIDL Application**") in order to provide the Confidential Information to the Plaintiff without breaching their existing third party confidentiality obligations and thereby potentially exposing the Fund to significant liability in damages.

61.    The CIDL Application is listed for hearing on [17 April 2020].  On the assumption that the Defendants obtain the relief sought in the CIDL Application, the Defendants intend to file and serve supplementary evidence following the hearing in order to provide the Plaintiff with copies of the Confidential Information in accordance with the terms of any order made by the Court.

**Misleading and inaccurate statements made in Al Sabah 1**

62.    Having reviewed the contents of Al Sabah 1 and the documents exhibited thereto, the Defendants note that there are a number of misleading and inaccurate statements made in Al Sabah 1.  Of particular concern to the Defendants is the allegation made at paragraph 11 of Al Sabah 1 that "*significant fraud has been committed by, inter alia, Port Link, KGLI, and individuals associated with KGLI, which has resulted in the misappropriation of assets belonging to the Port Fund, in the order if several hundred million dollars, as well as other wrongdoing (including potential kickbacks)*".  Despite the seriousness of this allegation, the Plaintiff has failed to provide any evidence to substantiate it.

*Investments made by the Fund*

63.   Paragraph 16 of Al Sabah 1 states that "*the Port Fund made only five investments*". This is incorrect. While the former management of the Fund considered a number of potential investments, the Fund only made four investments during its term.

*The DIFC Claim*

64.   Paragraph 26 of Al Sabah 1 states that "*A claim was filed in Dubai against the Port Fund by the Investment Manager…*" and paragraph 27 of Al Sabah 1 states that "*Port Link appears simply to have filed an admission…*".  I refer to **pages 14 to 16** of the Disclosure Letter at **Tab 5** which explains how the Fund engaged DIFC legal counsel to represent the Fund in connection with those proceedings.

*Criminal Proceedings in Kuwait*

65.   In paragraph 29 of Al Sabah 1, the Defendants note that Mr Al Sabah states that the Plaintiff is concerned by "*Ms Lazareva and Mr Dashti were each convicted by a Kuwaiti court and sentenced to the imprisonment for 15 years in connection with misappropriation of public funds*".  However, the Plaintiff fails to provide any details relating to the judgment in Kuwait and notably omits to mention that Ms Lazareva and Mr Dashti have filed an appeal against such convictions as described in further detail below.

66.   The Fund attracted investment from a number of Kuwaiti based investors, including the Plaintiff and the Public Institution for Social Security ("**PIFSS**"), both of whom are considered extensions of the government of the State of Kuwait.  Notwithstanding the successful performance of the Fund during a difficult economic climate, the Fund and its former management team were investigated by the Public Prosecution of the State of Kuwait (the "**Kuwaiti Prosecutor**") who alleged that the capital commitments of the Plaintiff and PIFSS, considered to be 'public' or 'state' funds as a matter of Kuwaiti law, had been embezzled by members of the management team of the Fund.

67.    I am informed by counsel to KGLI and verily believe that such investigations originated from complaints made by Ms Mona Abdul Wahab (also noted in the 15 November 2019 Case Update (defined and further described below) at **page [X] of tab [X]**). Ms Wahab was a disgruntled employee of Ms Lazareva in Kuwait who, following her termination, "*forged Ms Lazareva's identity and stole more than USD 500,000 from Ms Lazareva's*

*personal bank account*" (**page [X] of tab [X]**).  Ms Wahab was consequently convicted on charges of embezzlement and sentenced to three years imprisonment.

68.  Following such investigations, the Kuwaiti Prosecutor commenced criminal proceedings in felony number 1496/2012 (computation of public funds), listed under No. 23/2015 Criminal Felonies Investigations (the "**Kuwaiti Criminal Proceedings**"). The allegations made by the Kuwaiti Prosecutor in the Kuwaiti Criminal Proceedings were made against the following individuals:

(a)  Maria Lazareva (the "**First Defendant**");

(b)  Saeed Ismail Dashti (the "**Second Defendant**"); and

(c)  Mohamed Abdul Muhsen Abdullatif Al Asfour (the "**Third Defendant**"),

(together, the "**Kuwait Defendants**")

69.  The Kuwaiti Prosecutor alleged in the Kuwaiti Criminal Proceedings that the First Defendant and Second Defendant, who also acted as Directors of the GP between 2007 and 2018, committed crimes of embezzling public funds and related money laundering offences when they acted as directors of the GP.  I am informed by Ms Lazareva and verily believe that:

(a)  the charges made by the Kuwaiti Prosecutor related to 167 separate transactions made, the vast majority of which were in connection with the business of the Fund (the "**167 Transactions**"); and

(b)  the First Defendant and Second Defendant were directors of the GP at the time the 167 Transactions took place.

70.  The purported embezzlement of Kuwaiti state funds related to the capital commitments of the Plaintiff and PIFSS, which had been invested in the Fund between 2007 and 2013.  As explained above, the alleged crimes were considered the embezzlement of 'public funds' as a consequence of the Plaintiff's and PIFSS' statuses as arms of the government of the State of Kuwait.

71.  In connection with the Kuwaiti Criminal Proceedings, the Kuwaiti Prosecutor filed a bill of indictment dated 26 April 2017 setting out details of the 167 Transactions along with supporting evidence, which provided an explanation as to why the Kuwaiti Prosecutor believed such transactions amounted to criminal offences under Kuwaiti law (the

"**Accusation Report**").   A copy of the Accusation Report along with a certified translation is at **tab [X]**.

*The Baker Tilly Report*

72.   Following the filing of the Accusation Report and the commencement of the Kuwaiti Criminal Proceedings, one of the limited partners of the Fund, PetroLink Holding Company K.S.C.C. ("**PetroLink**"), appointed Baker Tilly Consulting Company WLL ("**Baker Tilly**") as an independent third party financial advisor to review the evidence provided in the Accusation Report relating to the 167 Transactions and provide a report of their findings to PetroLink.

73.   Baker Tilly issued their report on 11 December 2018 (the "**Baker Tilly Report**"), which examined each of the 167 Transactions in detail, including reviewing the relevant transfer documentation, the underlying contractual agreements between the parties and the key governing documents of the Fund including the LPA and the offering memorandums of the Fund (**page [5] of tab [X]**). The Baker Tilly Report ultimately concluded that there was no evidence of the embezzlement of public funds and all of the transactions listed in the Accusation Report were valid transactions and in accordance with the constitutional documents of the Fund and commercial agreements between the relevant parties. A copy of the Baker Tilly Report is at **tab [X]**.

74.   The Fund has extracted the Summary of the Final Opinion issued by Baker Tilly in the Baker Tilly Report (my <u>emphasis added</u>) (**page [5] of tab [X]**):

*"1.7 Summary of the Final Opinion*

*In light of our review of the Fund's Private Placement Memorandum (PPM), the Limited Partnership Agreement (LPA), the Incorporation Agreement of the General Partner, the resolutions issued by the General Partner, the supporting documents to the Fund's accounting records, the list of confirming evidence and other documents, below are the conclusions of our findings:*

*a)   <u>The Port Fund's money has been used toward its investments and transactions made in line with the Fund's provisions and documents, PPM, LPA, as well as the Incorporation Agreement of the General Partner and the resolutions issued by the General Partner. They did not involve any suspicion of facilitating embezzlement and did not involve any suspicion of embezzlement.</u>*

b) *The Port Fund has successfully exited its investment in Negros Navigation in the Philippines during 4Q2016 where the fund distributed USD 30 million to Port Fund's investors including Kuwait Port Authority "KPA" (which received USD 11,222,152.44 – i.e., 13.2% of total capital commitment) and Public Institution for Social Security "PIFSS" (which received USD 7,684,540.56 – i.e., 19.2% of the total capital commitment). All the above mentioned amounts, including Negros Navigation exit proceeds, were recorded in the audited financial statement of the Fund.*

c) *All the Port Fund's financial information and statements prove that Sabah Al Ahmad Logistics City was owned by the Fund. In November 2017, the Fund successfully exited that investment and transferred the proceeds to the Fund's bank account. The Fund advised its limited partners about the distribution of more than USD 300 million (i.e., more than double the capital commitments). Therefore, there is no suspicion of facilitating embezzlement or suspicion of unlawful embezzlement or damaging the public funds.*

d) *All the transactions listed in the bill of indictment have been conducted in accordance with the Fund's PPM, LPA, Incorporation Agreement of the General Partner and the resolutions issued by the General Partner, as well as other valid legal documents. Such transactions did not involve any suspicion of facilitating embezzlement or any suspicion of unlawful embezzlement, as detailed in this report.*

e) *The amounts reported in the supporting documents conform to the Fund's accounting records and were reflected in the Fund's audited financial statements in accordance with accounting standards."*

75.    Following an extensive and detailed review of each transaction and all supporting documentation, Baker Tilly reached an unqualified conclusion that there was no evidence that any of the 167 Transactions constituted embezzlement as alleged in the Accusation Report and the Kuwaiti Criminal Proceedings.

76.    I am informed by counsel to KGLI and verily believe that the Baker Tilly Report was submitted into evidence in the Kuwaiti Criminal Proceedings by Kuwaiti legal counsel for the Kuwait Defendants in such proceedings.

*11 November Judgment*

77. Notwithstanding the filing of robust evidence by the Kuwait Defendants (including the Baker Tilly Report), which demonstrated that all of the 167 Transactions were in fact legitimate transactions pursuant to legal, valid and binding agreements between the parties, the Kuwaiti Court of First Instance in the Kuwaiti Criminal Circuit (the "**Kuwait Court of First Instance**") delivered its verdict in the Kuwaiti Criminal Proceedings on 11 November 2019 and found the Kuwait Defendants guilty on one charge of embezzling or facilitating the embezzlement of public funds and one charge of money laundering (the "**11 November Judgment**"). A copy of the 11 November Judgment is exhibited at **tab [X]**, along with a certified English translation at **tab [X].**

78. In the 11 November Judgment, the Kuwait Court of First Instance found that 165 of the 167 Transactions were legitimate transactions in connection with the business of the Fund and did not constitute the embezzlement of public funds or money laundering as a matter of Kuwaiti law. However, the Kuwait Court of First Instance found that two of the 167 Transactions were not legitimate transactions and constituted the embezzlement of 'public' funds as matter of Kuwaiti law.

*Reliability of evidence relied upon by the Kuwait Court of First Instance in making its judgment*

79. I am informed by counsel to KGLI and verily believe that significant concerns arise with regards to the reliability of the evidence the Kuwait Court of First Instance relied upon in making its findings that the Disputed Payments were illegal.

80. I am informed by counsel to KGLI and verily believe that on 23 May 2019 international counsel for Ms Lazareva submitted a petition to the UN Working Group on Arbitrary Detention (the "**UN Working Group**") complaining that the State of Kuwait was arbitrarily detaining Ms Lazareva in breach of its obligations under international law (notably Articles 9 and 14 of the International Covenant on Civil and Political Rights). In the most recent case update to the UN Working Group dated 15 November 2019, Ms Lazareva's counsel provided an analysis with respect to the lack of reasoning and clear contradictions in the 11 November Judgment (the "**15 November 2019 Case Update**") (**tab [X]**).

81. In the 15 November 2019 Case Update, it is noted that:

(a)    when convicting Ms Lazareva, the Court expressly relied on the testimony of Hamad Al-Allayan who had prepared three "Expert Reports" for the Kuwaiti Prosecutor and provided witness evidence in the Kuwaiti Criminal Proceedings. However, in other proceedings in Kuwait against Ms. Lazareva, Mr Al-Allayan submitted forged evidence which initially led to Ms Lazareva's conviction. Such conviction was overturned and Mr Al-Allayan has since been convicted for forging those very documents and sentenced to six months' imprisonment (**page [11] and [12] of tab [X]**). Strangely, the Kuwait Court of First Instance explicitly and repeatedly dismissed Mr Al-Allayan's testimony (see **page [12] of tab [X]**) but also inexplicably and in clear contrast with the rest of the 11 November Judgment relied on Mr Al-Allayan's statement that the two transactions (i.e. the Disputed Payments) were illegal. Neither Mr Al-Allayan nor the Kuwait Court of First Instance provided any further particulars as to why these transfers where unlawful (**page [12] of tab [X]**); and

(b)    as noted above at paragraph [X], the investigations into the Kuwait Defendants followed complaints made by Mona Abdul Wahab. Ms Wahab was convicted and sentenced for three years imprisonment for embezzlement in Kuwait after forging Ms Lazareva's identity and steeling over US$500,000 from Ms Lazareva's personal bank account (**see pages [10 - 11] of tab [X]**). Despite this, Ms Wahab provided witness evidence in the Kuwaiti Criminal Proceedings for the Kuwaiti Prosecutor. Similarly as above, the Kuwait Court of First Instance both recognised the unreliability of Ms Wahab's testimony in other sections of the 11 November Judgment but relied on such testimony in finding that the Disputed Payments were illegal (**see page [11] of tab [X]**). The 15 November 2019 Case Update also states that Ms Wahab's statement "*amounted to little more than a bare assertion that Ms Lazareva was guilty of criminal conduct, without any particulars or explanation. She did not set out any account of the facts that could form the basis of a conviction by any court acting reasonably. It is therefore, perhaps unsurprising that the Court failed to give any reason for its reliance on Ms Wahab's testimony, let alone an explanation of how it enabled the Court to overcome the doubt established by the defence evidence*" (**see page [11] of tab [X]**).

82.    I am informed by counsel to KGLI and verily believe that the Kuwait Defendants have filed an appeal of the 11 November Judgment with the Court of Appeal in the Kuwaiti

Criminal Circuit – Case No. 3065/2019 (the "**Kuwait Appeal Proceedings**"), which is expected to be heard during the course of this year.

*Lobbying Fees*

83.  In paragraph 29 of Al Sabah 1, the Plaintiff expresses concerns that a number of public relations and lobbying firms have been engaged by the Fund "*in order to seek to exert pressure on the Government of Kuwait to release from prison Ms Lazareva and Mr Dashti*".  As set out in detail in more detail in section 3 of the Disclosure Letter (**Tab 5**), the $496 Million was frozen by Noor Bank for a total of 14 months between November 2017 and February 2019. During this period, Kuwaiti authorities were attempting to persuade the Dubai authorities to instruct Noor Bank to transfer the vast majority of the $496 Million from the Noor Account to two limited partners in Kuwait, a request that the Defendants believed would amount to an illegal expropriation of the Fund's monies. I refer in this respect to paragraphs 3.5 to 3.10 of the Disclosure Letter (**pages [X] to [X] of Tab [X]**) and the correspondence exhibited at Schedule 2 (**pages [X] to [X] of Tab [X]**) to that letter.

84.  In such circumstances, I suggest that it is entirely understandable and reasonable that the Defendants took all available steps to try and obtain the release of the $496 Million wired to Noor Bank so that the Fund could settle its liabilities and make final distributions to its investors.  Accordingly, a number of firms were engaged by the Defendants to assist with such efforts in the US, Kuwait and elsewhere.

85.  Some of the firms engaged by the Fund to assist with the unfreezing of the $496 Million were also assisting the former directors of the GP in relation to the ongoing criminal proceedings in Kuwait.  In circumstances where (i) such criminal proceedings directly related to the legitimacy of payments made by the Fund; and (ii) the Fund was on notice of contingent indemnity claims from the former directors of the GP with respect to defending such proceedings, the Fund was clearly interested in such payments and the outcome of the criminal proceedings in Kuwait.  I am informed by Ms Lazareva and verily believe that that the Defendants at the time carefully considered the substance of the allegations in the criminal proceedings in Kuwait relating to the payments made by the Fund and ultimately took the view that such payments were legitimate payments in connection with the business of the Fund and the allegations in the Kuwaiti criminal proceedings were without merit.  Accordingly, the Defendants considered it appropriate for the firms engaged by the Fund to provide assistance to the former directors of the GP in relation to the criminal proceedings in Kuwait.

**Conclusion**

86.   As set out in this Affidavit, the Defendants have substantively responded to the Plaintiff's Information Requests in the Disclosure Letter and pursuant to the terms of the CIDL Application. To the extent that the Defendants have not responded to a limited number of the Plaintiff's Information Requests, the Defendants note that the Plaintiff is not entitled to such information under the ELP Law or the LPA and such matters will be dealt with in detail during legal submissions.

Sworn by the said **ANDREW JOSEPH CHILDE** )

at                                                                             )   _____

on the      day of April 2020                                 )   **ANDREW JOSEPH CHILDE**

Before me:                                                           )

_____

Notary Public

**THIS AFFIDAVIT** is filed by Walkers, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Defendants whose address for service is care of its said Attorneys-at-Law

9896982.2 T5138.D08984

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

<u>**PLAINTIFF**</u>

**AND:**

**(1) THE PORT FUND L.P.**
**(2) PORT LINK GP LTD.**

<u>**DEFENDANTS**</u>

THIS IS EXHIBIT "**AC-1**" TO THE FIRST AFFIDAVIT OF

**ANDREW JOSEPH CHILDE**

SWORN BEFORE ME THIS    DAY OF APRIL 2020

_____
NOTARY PUBLIC

27



# THE PORT FUND L.P.

**(A Cayman Islands Exempted Limited Partnership)**

## AMENDED AND RESTATED

## LIMITED PARTNERSHIP AGREEMENT

**DATED July 14th, 2008**



the **PORT FUND**

"**Bankruptcy**" has the meaning set out in Clause 8.5(a);

"**Basis**" means, in the case of any asset of the Partnership, its acquisition cost reduced by any Write-Down Amount as adjusted from time to time by the depreciation or amortization allocated with respect to such asset as if such depreciation or amortization were calculated using the Basis;

"**Business Day**" means each day which is a normal business day for commercial banks in the Cayman Islands, the United States and Kuwait;

"**calendar**" means the Gregorian calendar;

"**Call Amounts**" has the meaning given in Clause 4.1(d);

"**Call Notice**" has the meaning given in Clause 4.1(d);

"**Capital Account**" has the meaning given in Clause 4.2;

"**Capital Commitment**" in respect to each Partner means the aggregate amount of cash (or other assets in the sole discretion of the General Partner) agreed to be contributed as capital to the Partnership by such Partner as specified in the Subscription Agreement and/or Schedule 1 as the same may be modified from time to time under the terms of this Agreement;

"**Capital Contribution**" means, with respect to each Partner, the amount of cash (or in specie contribution if approved by the General Partner) contributed by such Partner to the capital of the Partnership from time to time pursuant to Clause 4.1 (other than any Interest Payment) and not refunded pursuant to Clause 4.1(j) or (k);

"**Commitment Period**" means the period commencing on (and including) the Initial Closing Date and expiring on the earliest of (i) 31 December following the third anniversary of the Initial Closing Date; (ii) the date when all of the Capital Commitments have been called and paid but not refunded pursuant to Clause 4.1(j); and (iii) the date on which the General Partner notifies the Limited Partners that, in its judgement, no further Investments (other than Investments in existing Portfolio Companies or their Affiliates) should be made;

"**Confidential Information**" has the meaning given in Clause 7.3;

"**Consenting Partner**" has the meaning set out in Clause 8.1;

"**Currency Gain**" means, with respect to any period, the gains realized during such period by the Partnership less any losses realized during such period by the Partnership, in connection with converting or exchanging US$ or any local currency into or for US$ or any other local currency;

"**Currency Loss**" means, with respect to any period, the losses realized during such period by the Partnership less any gains realized during such period by the Partnership, in connection with converting or exchanging US$ or any local currency into or for US$ or any other local currency;

"**Current Income**" means (i) all interest, dividend and other income (including original issue discount and other non-cash income, but excluding Realized Investment Gains) of the Partnership plus (ii) any Currency Gains not included in the definition of Realized Investment Gain or Realized Investment Loss, minus (iii) any Currency Loss not included in the definition of Realized Investment Gain or Realized Investment Loss;

"**Custodian**" means the duly appointed custodian of the Partnership;

"**Defaulting Partner**" has the meaning given in Clause 4.1(i);

"**Disposition**" means (i) a sale, amortization, principal payment, refinancing, recapitalisation, redemption, repayment, exchange, extraordinary distribution or other similar transaction with respect to an Investment, but (except as may otherwise be determined by the General Partner, in

2





the PORT FUND

its sole discretion) only to the extent that the proceeds thereof to the Partnership are cash or (ii) the distribution of such Investment, in whole or part, by the Partnership to the Partners, pursuant to Clause 4.3.   In the event of a partial Disposition (including a recapitalisation, refinancing or principal payment with respect thereto) of an Investment, the General Partner shall determine, for all purposes of this Agreement, in an equitable manner, the portion of such Investment that has been disposed of and the Capital Contributions made by the Partners with respect to such portion of such Investment;

"**Distribution**" means, with respect to any Investment (or portion thereof), the excess, if any, of (i) the sum of (x) all cash received by the Partnership in connection with such Investment (or portion thereof), including, but not limited to, interest, dividends, and the net cash proceeds of any Disposition of such Investment (or portion thereof), and (y) the Fair Value of such Investment (or portion thereof) that consists of non cash assets that the General Partner determines, in its sole discretion, to distribute to the Partners pursuant to Clause 4.3 (in either case, to the extent such cash and the Fair Value of such non cash assets have not previously been distributed pursuant to Clause 4.3), over (ii) the Partnership's cash expenses paid or then due and payable (including Management Fees) and a reasonable reserve, as determined by the General Partner in its sole discretion, for accrued or anticipated future expenses and contingent liabilities of the Partnership arising generally or in connection with Management Fees or pending Investments (to the extent such expenses and reserves have not been paid or provided for from amounts otherwise distributable pursuant to Clause 4.3);

"**Fair Value**" means (a) in the case of Securities which are listed on a national securities exchange or on a national automated inter-dealer quotation system shall be valued at the average of the published closing bid prices or, if no sale occurred on any date, at the last bid price thereon, during the 10 Business Days immediately prior to the date of determination and (b) in the case of all other assets the value determined by the General Partner using the Accounting Principles;

"**Final Closing Date**" means the date 12 months from the Initial Closing Date or such later or earlier date as determined by the General Partner;

"**Fiscal Year**" means each fiscal year of the Partnership (or portion thereof), which shall end on 31 December with the first fiscal year being in respect of the period commencing on the date of establishment of the Partnership and ending on 31 December 2008; provided, however, that upon termination of the Partnership, "Fiscal Year" shall mean the period from 1 January immediately preceding such termination to the date of such termination;

"**Fund Investment**" means any direct Investment or Investments in a Portfolio Company through the purchase of equity (or its equivalents) in such Portfolio Company;

"**General Partner**" means Port Link GP Ltd, a Cayman Islands exempted limited liability company, or any successor General Partner appointed under Clause 8.5(a);

"**Initial Closing Date**" means July 31ˢᵗ, 2007 or such earlier or later date as determined by the General Partner;

"**Interest**" means, with respect to any Limited Partner other than a Defaulting Partner, as of any date, the interest of a Limited Partner in the Partnership, which may, where the context requires, be expressed as a percentage, the numerator of which is such Limited Partner's Capital Contribution and the denominator of which is the sum of the Capital Contribution of all Limited Partners other than Defaulting Partners.  The "Interest" of a Limited Partner that is a Defaulting Partner, as of any date, shall be zero;

"**Interest Payment**" has the meaning given in Clause 4.1(b);

"**Investment**" means any kind of Investment of the Fund in any kind of Security, including Fund Investments;

"**Investment Committee**" means the investment committee of the Partnership which, inter alia, will review the Partnership's investment performance and recommend to the Investment Manager



3



the PORT FUND

any appropriate changes in investment policies in light of evolving market circumstances, and which also must approve all investment and divestment decisions with respect to the Partnership;

"**Investment Management Agreement**" means the agreement between the Investment Manager and the Partnership pursuant to which the Investment Manager provides certain advisory and management services to the Partnership;

"**Investment Manager Giveback**" means any payment required to be made by the Investment Manager pursuant to Clause 4.3(f);

**Investment Manager** means KGL Investment Cayman Ltd, a Cayman Islands exempted company, or any entity wholly owned thereby;

"**LIBOR**" means the London Inter Bank Offered Rate;

"**Liabilities**" has the meaning specified in Clause 5.4(a);

"**Limited Partners**" shall mean each person whose name is listed on Schedule 1 under the heading "Limited Partners," any Additional Limited Partners and any substituted Limited Partners admitted to the Partnership pursuant to Clause 8.2, for so long as such Person continues to be a limited partner hereunder;

"**Management Fee(s)**" has the meaning set out in Clause 3.7(a);

"**Net Loss**" for any period of determination means the excess, if any, of all the Partnership's Realized Investment Losses and the Partnership's expenses and liabilities for such period over all of the Partnership's Current Income and Realized Investment Gains for such period;

"**Net Profit**" for any period of determination means the excess, if any, of all of the Partnership's Current Income and Realized Investment Gains for such period over all of the Partnership's Realized Investment Losses and the Partnership's expenses and liabilities for such period;

"**Organisational Expenses**" means organisational and offering expenses of the Partnership (including, but not limited to, fees and expenses of legal counsel to and accountants for the Partnership and the General Partner, travel expenses of personnel of the General Partner and its advisors, and other expenses, in each case, incurred in connection with the formation of the Partnership, the preparation of this Agreement, compliance with applicable laws or regulations and the offering of Partnership Interests);

"**Other Distributions**" means the excess, if any, of (i) the sum of all cash received by the Partnership in connection with the activities or operations of the Partnership (other than Capital Contributions, Released Equity and amounts taken into account in determining Distribution from Investments) over (ii) the Partnership's cash expenses paid or then due and payable (including Management Fees) and a reasonable reserve, as determined by the General Partner in its sole discretion, for accrued or anticipated future expenses and contingent liabilities of the Partnership arising generally in or in connection with Management Fees or pending Investments (to the extent such expenses and reserves have not been paid or provided for from amounts otherwise distributable pursuant to Clause 4.3 or from Capital Contributions);

"**Partners**" means the General Partner and the Limited Partners, and "**Partner**" shall mean any of the Partners;

"**Partnership**" means the Cayman Islands exempted limited partnership created by this Agreement;

"**Partnership Law**" means the Exempted Limited Partnership Law (2003 Revision) of the Cayman Islands, as amended from time to time;

"**Performance Fee**" has the meaning set out in Clause 4.3;



4



**"Private Placement Memorandum"** means the Private Placement Memorandum dated April 2007, as amended or supplemented from time to time;

**"Portfolio Company"** means a corporation or other issuer, any of whose Securities are beneficially owned by the Partnership and any Subsidiary of such corporation or other issuer;

**"Proposed Transfer"** has the meaning set out in Clause 7.3;

**"Protected Person"** means (i) the General Partner, the Investment Manager and the members of the Investment Committee and Advisory Board; (ii) the Affiliates of the General Partner or the Investment Manager, (iii) any officer, director, partner, member, employee, shareholder or Specified Agent of the General Partner or the Investment Manager or the Affiliates of the General Partner or the Investment Manager, and (iv) any Person who serves at the written request of the General Partner or the Investment Manager (which written request expressly designates such Person as a "Protected Person") hereunder on behalf of the Partnership as an officer, director, partner, member or employee of any other Person, including, without limitation, any Portfolio Company;

**"Realized Investment Gain"** means (i) the excess, if any, of the proceeds from the sale of Investments over the Basis of such Investments and (ii) the excess, if any, of the Fair Value of any Investments distributed to the Partners over the Basis of such Investments, in each case increased by any Currency Gains and decreased by any Currency Losses attributable to such proceeds or Investments;

**"Realized Investment Loss"** means (i) the deficiency, if any, of the proceeds from the sale of Investments as compared to the Basis of such Investments, (ii) the deficiency, if any, of the Fair Value of any Investments distributed to the Partners as compared to the Basis of such Investments and (iii) the Write-Down Amount with respect to any Investments, in each case increased by any Currency Losses and decreased by any Currency Gains attributable to such proceeds or Investments;

**"Representatives"** has the meaning set out in Clause 7.3;

**"Securities"** means shares or stock (whether ordinary, common or preferred), partnership interests, limited liability company interests or similar securities, warrants, rights and options relating to any of the foregoing acquired primarily for their equity value, interests in a loan and any other security acquired in connection with the acquisition of an equity, quasi equity, equity related or debt security, subscriptions, notes, bonds, debentures, claims and other causes of action, matured or unmatured, contingent or otherwise, of creditors and/or equity holders of any person, or against any person and other instruments or evidences of indebtedness and all warrants, rights and options relating to any of the foregoing (including, without limitation, put and call options and rights) and other property or interests commonly regarded as securities, or any form of interest or participation therein;

**"Specified Agent"** means any agent of any person that is designated in writing by the General Partner as a "Specified Agent" of the Partnership entitled to the protection of Clauses 5.3 and 5.4;

**"Subscription Agreement"** means each subscription agreement between the Partnership and each of the Limited Partners;

**"Subsequent Closing"** means any date subsequent to the Initial Closing Date and up until the Final Closing Date on which the General Partner admits an Additional Limited Partner or as of which date the General Partner or, with the consent of the General Partner, any Limited Partner increases its Capital Commitment, in each case, pursuant to Clause 4.1(b);

**"Subsidiary"** of any person means (i) a corporation 50% or more of the outstanding voting capital of which is owned, directly or indirectly, by such person and/or by one or more other Subsidiaries of such person, or (ii) any other juridical person (including a corporation) in which such person, and/or one or more other Subsidiaries of such person, directly or indirectly, has a majority ownership or the power to control (as defined in the definition of Affiliate) such other person;

5





the **PORT FUND**

"Third Party Advisory and Investment Banking Fees" has the meaning given in Clause 3.6(c);

"Transfer" has the meaning set out in Clause 8.2(a);

"Unfunded Commitment" means, with respect to each Limited Partner at any time, the amount of its Capital Commitment which, at such time, has not been called by the General Partner and remains available to be called from such Limited Partner by the General Partner;

"United States" or "US" means the United States of America, its territories, possessions and all areas subject to its jurisdiction (including the Commonwealth of Puerto Rico);

"Withdrawing Limited Partner" has the meaning set out in the recitals;

"Write-Down Amount" means the amount by which an Investment has permanently declined in value as compared to the Basis of such Investment, as determined in accordance with the Accounting Principles.

1.2   In this Agreement, a reference to:

    (a)   a document in the "agreed form" is a reference to a document in a form approved and for the purposes of identification signed by or on behalf of each party;

    (b)   a statutory provision includes a reference to the statutory provision as modified or re-enacted or both from time to time whether before or after the date of this Agreement and any subordinate legislation made under the statutory provision whether before or after the date of this Agreement;

    (c)   a person includes a reference to an individual, a corporation, a company, a voluntary association, a partnership, a joint venture, a limited liability company, a trust, an estate, an unincorporated organization, a governmental authority or other entity;

    (d)   a person includes a reference to that person's legal personal representatives, successors and lawful assigns;

    (e)   a Clause or Schedule, unless the context otherwise requires, is a reference to a clause of or schedule to this Agreement; and

    (f)   a document is a reference to that document as from time to time supplemented or varied.

## 2.   GENERAL PARTNERSHIP MATTERS

2.1   **Name**

    (a)   The name of the Partnership is "The Port Fund L.P.". The Partnership's business may be conducted under any other name or names deemed advisable by the General Partner; provided however, that (i) the words "Limited Partnership" or the abbreviation "L.P." shall be included in the name where necessary to comply with the laws of any jurisdiction that so requires and (ii) the name shall not contain any word or phrase indicating or implying that it is organised other than for a purpose stated herein. The General Partner shall give prompt notice of any name change to each Limited Partner.

    (b)   Following the termination and dissolution of the Partnership, all right and interest in and to the use of the name "The Port Fund L.P. " and any variation thereof, including any name to which the name of the Partnership is changed, shall become the sole property of the General Partner, and the Limited Partners shall have no right and no interest in and to the use of any such name.



6



**the PORT FUND**

**2.2     Registered Office and Principal Office**

(a)     The Partnership shall have its registered office in the Cayman Islands at Walkers SPV Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002, Cayman Islands, or at such other place in the Cayman Islands as may from time to time be designated by the General Partner, at which shall be kept the records required to be maintained under the Partnership Law and at which the service of process on the Partnership may be made and to which all notices and communications may be addressed.

(b)     The Partnership may maintain a principal office anywhere the General Partner determines at which the books and records of the Partnership shall be kept.

(c)     The General Partner shall give prompt notice to each Limited Partner of any change in the location of the Partnership's registered office or principal office.

**2.3     Registration as Exempted Limited Partnership**

The General Partner shall make such filings with the Registrar of Exempted Limited Partnerships in the Cayman Islands as are necessary to continue the registration of the Partnership as an exempted limited partnership under the Partnership Law.

**2.4     Term**

The Partnership shall continue until December 31 following the 5th anniversary of the Initial Closing Date, unless: (a) extended at the discretion of the General Partner for up to two consecutive additional one year periods from and after such date to permit orderly dissolution; or (b) terminated in accordance with the terms of this Agreement.

**2.5     Purpose**

The Partnership is organized for the principal purposes of (i) investing in a wide range of equity, quasi equity and equity related investments relating to port management, operations and businesses, as well as in other sectors which are compatible with the Partnership's investment objective, including, but not limited to the logistics, technology and shipping sectors, as described in the Private Placement Memorandum; (ii) managing and supervising such investments and (iii) engaging in such other activities incidental or ancillary thereto as the General Partner deems necessary or advisable, including, without limitation, to admit persons as Limited Partners on or prior to the date hereof and to admit persons as additional Limited Partners and permit Partners to increase their Capital Commitments in accordance with the terms of this Agreement, and in connection therewith, to enter into and to carry out the terms of Subscription Agreements and similar documents and instruments (including any agreements to induce any person to purchase interests in the Partnership or to increase its Capital Commitment), all without any further act, approval, consent or vote of any Partner; provided, that the Partnership shall not undertake business with the public in the Cayman Islands other than so far as may be necessary for carrying on the activities of the Partnership exterior to the Cayman Islands.

**2.6     Currency**

The currency unit applicable to all aspects of the Partnership will be the USD.



7



**the PORT FUND**

3.    **MANAGEMENT, LIABILITY OF PARTNERS AND EXPENSES**

3.1    **Rights and Duties of the General Partner: Investment Limitations**

    (a)    Except as otherwise expressly provided in this Agreement, the management and operation of the Partnership shall be vested exclusively in the General Partner, who shall have the power on behalf and in the name of the Partnership to carry out any and all of the purposes of the Partnership and to perform all acts and enter into and perform all contracts and other undertakings that it may deem necessary or advisable or incidental thereto.

    (b)    Except as otherwise expressly provided in this Agreement, the General Partner has and shall have full authority in its discretion to exercise, on behalf of and in the name of the Partnership, all rights and powers of a general partner of a limited partnership under the Partnership Law necessary or convenient to carry out the purposes of the Partnership. Without limiting the foregoing the General Partner is hereby authorised and empowered in the name of and on behalf of the Partnership:

        (i)    to purchase, acquire, hold, sell, exchange and dispose of Securities and rights to Securities and to execute and deliver in the Partnership name any and all instruments necessary to effectuate such transactions;

        (ii)   to set aside funds for reserves, anticipated contingencies and working capital;

        (iii)  to employ or consult such persons as it shall deem advisable for the operation and management of the Partnership, including, without limitation, brokers, investment managers, sub-advisors, accountants, attorneys, actuaries, consultants or specialists in any field of endeavor whatsoever, including such persons who may be Limited Partners or Affiliates thereof or Affiliates of the General Partner;

        (iv)   to deposit the funds of the Partnership in the Partnership name in any bank or trust company and to entrust to such bank or trust company any of the Securities, monies, documents and papers belonging to or relating to the Partnership or to deposit in and entrust to any brokerage firm that is a member of any national securities exchange any of said funds, Securities, monies, documents and papers belonging to or relating to the Partnership;

        (v)    to possess, transfer, or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Securities or other property held or owned by the Partnership;

        (vi)   to sue, prosecute, settle or compromise all claims against third parties, to compromise, settle or accept judgment in respect of claims against the Partnership and to execute all documents and make all representations, admissions and waivers in connection therewith;

        (vii)  to deposit, withdraw, invest, pay, retain and distribute the Partnership's funds in a manner consistent with the provisions of this Agreement;

        (viii) to take all action which may be necessary or appropriate for the continuation of the Partnership's valid existence as an exempted limited partnership under the Partnership Law and of each other jurisdiction in which such action is necessary to protect the limited liability of the Limited Partners or to enable the Partnership, consistent with such limited liability, to conduct the business in which it is engaged;

        (ix)   to enter into, make and perform all contracts, agreements, instruments and other undertakings and pay all Partnership expenses as the General Partner may



8



the **PORT FUND**

determine to be necessary, advisable or incidental to the carrying out of the purposes of the Partnership;

(x)    to provide, or arrange for the provision of, managerial assistance to Portfolio Companies and any Affiliates thereof;

(xi)    to borrow money or enter into transactions having a similar leveraging effect from any source or with any person (or cause or permit any entity in which the Partnership has a direct or indirect interest to do so), or guarantee obligations of entities in which the Partnership has a direct or indirect interest, upon such terms and conditions as the General Partner may deem advisable and proper, execute promissory notes, guarantees, drafts and other similar instruments and secure the payment thereof by mortgages, pledges or assignments of or security interests in assets of the Partnership (including the obligations of the Partners to make Capital Contributions) or in any entities in which the Partnership has a direct or indirect interest, and refinance, recast, modify or extend any of such obligations and the instruments securing or evidencing the same; and

(xii)    to retain the Investment Manager and any sub-advisors to provide management, advisory and related services to the Partnership.

(c)    Whenever in this Agreement or elsewhere it is provided that consent is required of, or a demand shall be made by, or an act or thing shall be done by or at the direction of, the Partnership, or whenever any words of like import are used, all such consents, demands, acts and things are to be made, given or done by the consent of the General Partner or person acting under the authority of the General Partner, unless a contrary intention is expressly indicated.

(d)    No person dealing with the Partnership, or its assets, whether as lender, assignee, purchaser, lessee, grantee, or otherwise, shall be required to investigate the authority of the General Partner in dealing with the Partnership or any of its assets, nor shall any person entering into a contract with the Partnership or relying on any such contract or agreement be required to inquire as to whether such contract or agreement was properly approved by the General Partner. Any such person may conclusively rely on a certificate of authority signed by the General Partner and may conclusively rely on the due authorisation of any instrument signed by the General Partner in the name and on behalf of the Partnership or the General Partner.

### 3.2    Investment Opportunities; Affiliated Transactions; Limited Partner Co-Investment

(a)    Except as provided in this Clause 3.2, nothing in this Agreement or otherwise shall require any Limited Partner, the General Partner, or any of their respective Affiliates to offer the Partnership any investment opportunity or otherwise limit or restrict any of them from buying, selling, investing in or otherwise dealing with any Securities or other investments, or from engaging in business with, having investment responsibilities for, rendering investment banking, commercial banking or investment or other advisory services to, performing other services for or collecting fees from, any person.

(b)    To the extent that any Partner or any of its Affiliates enters into any transaction with the Partnership or a Portfolio Company, the terms and conditions of such transaction shall, in the good faith judgement of that Partner, and of the General Partner on behalf of the Partnership, be no less favorable to the Partnership or such Portfolio Company than those that could have been obtained for comparable products or services from an unaffiliated third party with similar expertise and experience. Provided this Clause 3.2(b) is complied with, the fact that any Partner or any Affiliate of a Partner, or any employee, partner, member, officer, or director of either a Partner or an Affiliate of a Partner, is employed by, or is directly or indirectly interested in or connected with, or is, a person employed by the Partnership or any Affiliate of the Partnership to render or perform a service, shall not prohibit the Partnership or any Affiliate of the Partnership from engaging in any transaction with such person, and neither the Partnership nor any other Partner

9



**thePORT FUND**

shall have any right in or to any income or profits derived from such transaction by such Partner or person.

(c) The General Partner may, in its sole discretion, offer to Limited Partners whose Capital Commitments are $15 million or more ("**Core Investors**"), the opportunity to co-invest with the Partnership (directly or indirectly through one or more of its Affiliates) in Securities issued by a Portfolio Company or prospective Portfolio Company in which the Partnership has invested or may invest, in each case on such terms as the General Partner shall determine in its sole discretion. In the event one or more Limited Partners declines any co-investment opportunity (or subsequently unsubscribes) the portion declined may be re-offered, at the sole discretion of the General Partner, to any other person, including the Core Investors that have elected to participate in such co-investment and/or the other Limited Partners, provided, that if it is re-offered to the Core Investors, it shall be re-offered to those Core Investors that have elected to fully participate in such co-investment opportunity in proportion to such Core Investors' commitments. Any Limited Partner choosing to co-invest with the Fund shall not be charged Management Fees with respect to such co-investment.

(d) Each co-investment with the Partnership may be made through an investment vehicle established and controlled by the General Partner, the Investment Manager or their Affiliates (a "**Co-Investment Vehicle**"). To the extent such Co-Investment Vehicle receives the same interests in an Investment, the terms and conditions thereof will be no more favourable than those obtained by the Partnership and such Co-Investment Vehicle will be entitled to dispose of such co-investments only in conjunction with the Partnership and on terms and conditions no more favourable than those granted to the Partnership.

(e) The Investment Manager or one of its Affiliates may co-invest with the Partnership in each Fund Investment on the same terms and conditions as the Partnership, and not exceeding 10% of the value of the Fund Investment.

3.3 **Rights of the Limited Partners**

Limited Partners shall have no right to, and shall not, take part in the management or control of the Partnership's business or act for or bind the Partnership provided that the Limited Partners shall have all of the rights, powers and privileges granted to the Limited Partners in this Agreement and, where not inconsistent with the terms of this Agreement, under the Partnership Law.

3.4 **Investment Committee**

(a) The General Partner or its duly authorised delegate for such purposes shall establish an investment committee of the Partnership which shall generally serve for a period of twelve (12) months and consist of up to seven (7) suitably qualified persons appointed from time to time by the Investment Manager in accordance with the Private Placement Memorandum (the "**Investment Committee**").

(b) The Investment Manager shall be entitled to remove from time to time and without giving reasons any member of the Investment Committee by not less than 14 days notice.

(c) The Investment Committee shall meet with the Investment Manager at such times as may be requested by the Investment Manager, in each case, at a time and place designated by the Investment Manager upon reasonable prior notice to the members of the Investment Committee.

(d) Except as otherwise expressly provided in this Agreement, all action taken by the Investment Committee shall be by a majority vote of the members present at the meeting thereof. Meetings of the Investment Committee may be held in person, by telephone or other electronic device.

10





**the PORT FUND**

(e) In addition to providing any consent or approval required by this Agreement or the Private Placement Memorandum, the functions of the Investment Committee will be to provide such advice and counsel as is requested by the Investment Manager or its delegates in connection with the Partnership's investments, valuations and other matters affecting the interests of the Partnership and to approve or disapprove of all investments and disposals.

(f) Members of the Investment Committee may receive compensation in connection with their services as such (including reimbursement for reasonable out-of-pocket expenses), in amounts to be determined by the Investment Manager or its duly authorised delegate.

(g) The Investment Committee shall establish its own terms of reference to be approved by the General Partner.

## 3.5 Advisory Board

(a) The General Partner shall establish an advisory board of the Partnership which shall generally serve for a period of twelve (12) months and shall consist of up to nine (9) qualified individuals, appointed from time to time by the General Partner in its sole discretion (the "**Advisory Board**").

(b) The General Partner shall be entitled to remove from time to time and without giving reasons any member of the Advisory Board by not less than 7 days notice.

(c) The Advisory Board shall meet with the General Partner and the Investment Manager a minimum of two times per year, and, in each case, at a time and place designated by the General Partner upon reasonable prior notice to the members of the Advisory Board.

(d) Except as otherwise expressly provided in this Agreement, all action taken by the Advisory Board shall be by a vote of a majority of the members present at the meeting thereof. Meetings of the Advisory Board may be held in person, by telephone or other electronic device.

(e) The functions of the Advisory Board will be to provide such advice and counsel as is requested by the General Partner and the Investment Manager in connection with all matters relating to investing in the sectors relating to the Partnership, provided, however, that the Advisory Board shall not have any power to approve or disapprove of investments or disposals or to manage the Partnership or perform any functions or duties in connection with the conduct the business of the Partnership for the purposes of the Partnership Law.

(f) The recommendations of the Advisory Board shall be advisory only and shall not obligate the General Partner or Investment Manager to act in accordance therewith.

(g) Members of the Advisory Board may receive compensation in connection with their services as such (including reimbursement for reasonable out-of-pocket expenses), in amounts to be determined by the General Partner.

## 3.6 Expenses

*Organisational Expenses*

(a) The Partnership shall pay all Organisational Expenses.

*Transaction Expenses*

(b) The Investment Manager shall be responsible for and pay all costs and expenses incurred in respect of any investment or divestment proposal which is not given approval by the Investment Committee and the Partnership shall not be obligated to pay such costs and expenses from the assets of the Partnership or otherwise.

11



the PORT FUND

(c)     Without prejudice to Clause 3.6(b) above, the Investment Manager shall be at liberty to charge any Portfolio Company advisory and investment banking fees ("**Third Party Advisory and Investment Banking Fees**") in relation to any restructuring of, or other activities taken in relation to, the same in connection with any transaction or activity taken at the instruction of, or on behalf of, the Partnership without, in either case, accounting to the Partnership for any such Third Party Advisory and Investment Banking Fees. The extent of any such Third Party Advisory and Investment Banking Fees shall be agreed from time to time between the Investment Manager and the relevant Portfolio Company without reference to the Partnership.

*Other and Operating Expenses*

(d)     Save as otherwise expressly provided by this Agreement, the Investment Manager shall pay, without reimbursement by the Partnership, all of its own ordinary administrative and overhead expenses, including all costs and expenses on account of rent, travel and entertainment (to the extent not reimbursed by a Portfolio Company or any other person), salaries, wages, bonuses and other employee benefits and the Investment Manager shall pay all costs and expenses incurred in the management of the investments of the Partnership.

(e)     Except for the expenses referred to in Clauses 3.6(b) and (d) for which the Investment Manager is responsible, the Partnership shall also pay, or reimburse the General Partner for its payment of, to the extent not paid by any Portfolio Company or other person:

(i)     all costs and expenses attributable to holding the Partnership's investments (including, without limitation, interest on money borrowed by the Partnership or the General Partner on behalf of the Partnership, brokerage, finders', custodial and other fees);

(ii)    all costs and expenses incurred in connection with all consummated and unconsummated transactions

(iii)   legal, accounting, auditing, consulting, insurance and other fees and expenses (including administration and custodian fees);

(iv)    expenses of the Investment Committee and Advisory Board;

(v)     costs, expenses and liabilities of the Partnership (including, without limitation, litigation and indemnification costs and expenses, judgements and settlements);

(vi)    the Management Fee and the Performance Fee;

(vii)   any taxes, fees and other governmental charges levied against the Partnership; and

(viii)  other expenses of the Partnership but not including ordinary overhead and administrative expenses of the Investment Manager which are payable by the Investment Manager.

(f)     Notwithstanding any other provision of this Agreement, each Partner agrees to pay on demand all reasonable losses, costs and expenses incurred by or on behalf of the Partnership (including, without limitation, legal fees and expenses as incurred), if any, in connection with the enforcement of this Agreement against such Partner sustained as a result of a default by such Partner; it being understood that no such payment shall reduce such Partner's Unfunded Commitment (or increase such Partner's Capital Contribution) and any such payment shall be payable without regard to such Partner's Unfunded Commitment.



12



the PORT FUND

3.7    **Management Fees**

(a)    The Partnership shall pay the following management fees to the Investment Manager (the "Management Fee"):

(i)    from the Initial Closing Date until 31 December following the fifth anniversary of the Fund, an annual management fee equal to 2% of the Partnership's aggregate Capital Commitments; and

(ii)    from January 1 following the fifth anniversary of the Fund, until the termination of the Partnership for any subsequent period, an annual management fee equal to 1.5% of the Partnership's aggregate Capital Commitments.

(b)    The Management Fee shall be paid quarterly in advance and shall be borne by the Limited Partners pro rata to their Capital Commitments with appropriate adjustments being made to each Limited Partner's Capital Account.

*owned by the Fund*

3.8    **Other Fees**

(a)    The General Partner, the Investment Manager and their respective Affiliates may provide other services (including investment banking services) to Portfolio Companies on an arm's length basis consistent with prevailing market rates for similar services from third parties and such fees will not be credited against the Management Fees.

4.    **CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNTS, DISTRIBUTIONS, ALLOCATIONS**

4.1    **Capital Contributions**

(a)    Each Partner shall be required to contribute cash to the Partnership up to an aggregate amount set out in Schedule 1 and equal to each Partner's Unfunded Commitment from time to time, as provided in this Clause 4.1. Except as provided in Clause 4.1(c), no Partner may make, or shall be obligated to make, any further contributions to the capital of the Partnership in excess of such Partner's Unfunded Commitment. Except as provided in Clause 4.1(c), no Partner shall be entitled to interest on its Capital Contributions. All payments by the Partners to the Partnership pursuant to this Clause 4.1 shall be made in immediately available funds, as directed by the General Partner. The Partnership shall be entitled to use all Capital Contributions made by the Partners immediately following their payment, as directed by the General Partner.

(b)    On each Subsequent Closing, each Additional Limited Partner and each Limited Partner that is increasing its Unfunded Commitment shall contribute to the Partnership, the sum of:

(i)    (as its initial Capital Contribution or additional Capital Contribution, as the case may be) an amount equal to the proportionate share of its new or increased Capital Commitment corresponding to all Capital Contributions previously made by the Limited Partners to the Partnership, including the initial Capital Contributions of any Limited Partners and any Capital Contributions made in response to Call Notices subsequent to such initial Capital Contributions, whether in respect of Investments or Partnership expenses (against which shall be chargeable an amount equal to the Management Fee payable pursuant to Clause 3.7(a)(i) in respect of the new or increased Capital Commitment), provided that a proportionate reduction shall be made in relation to any prior Capital Contribution made in respect of an Investment that has been disposed of by the Partnership prior to the time of such Subsequent Closing, and the Limited Partner participating in the Subsequent Closing shall not share in any Distribution from Investment in respect of any such Investment (but, for the avoidance of doubt, such Limited Partner will share in any Distribution from Investment, and will bear any Net Loss, in respect of any Investment still held by the Partnership at the time of such Subsequent Closing and subsequently thereto, in both cases

13



the PORT FUND

proportionately with the other Limited Partners and in accordance with this Agreement); and

(ii) an amount calculated in the manner of interest (the **"Interest Payment"**), equal to 3-month LIBOR plus 2.0% per annum on the amount referred to in (i) above from the Initial Closing Date (or such other date which the General Partner has determined for payment of Initial Capital Contributions) to the date of such Subsequent Closing (which amount shall not constitute a Capital Contribution and, consequently, shall not reduce such Partner's Unfunded Commitment or increase such Partner's Capital Account).

(c) Promptly following each Subsequent Closing, each of the existing Partners as determined immediately prior to such Subsequent Closing shall be entitled to receive (with no effect on the amount of its Capital Contributions, Capital Account or Unfunded Commitment), its proportionate share (determined in proportion to Capital Contributions immediately prior to such Subsequent Closing) of the Interest Payment made on such Subsequent Closing.

(d) The balance of each Partner's Unfunded Commitment shall be paid to the Partnership to fund Investments, or to pay or provide for fees, expenses, liabilities and obligations of the Partnership (including, without limitation, the expenses described in Clause 3.6), from time to time as calls are made by the General Partner upon the Partners, in such amounts (the **"Call Amounts"**) and on such dates as shall be specified by the General Partner upon at least 30 calendar days' prior written notice (the **"Call Notice"**) by the General Partner.

(e) Notwithstanding the foregoing, after the end of the Commitment Period, each Partner shall be released from any further obligation with respect to its Unfunded Commitment and shall not be required to pay any Call Amount except to the extent necessary (subject, in all cases, to a maximum amount for each Partner equal to its Unfunded Commitment) to:

(i) pay or provide for fees, expenses, liabilities and obligations of the Partnership (including, without limitation, the expenses described in Clause 3.6(e)) throughout the term of the Partnership; and

(ii) complete Investments by the Partnership which have been approved but not consummated by the end of the Commitment Period.

(f) Each Call Notice with respect to Call Amounts related to Investments shall set out :

(i) the anticipated closing date of such Investment;

(ii) the date by which the Partnership anticipates that it will fund the Investment; and

(iii) a description of the Investment to be made (which description shall include the name of the proposed Portfolio Company, a brief description of its business and the terms of the proposed Investment),

provided, that the General Partner may keep confidential any information concerning such Investment or the related Portfolio Company, that it, in its discretion, deems necessary or reasonable. In the event the proposed use of a Call Amount related to an Investment shall materially change, the General Partner shall give written notice thereof to each Partner setting forth the anticipated closing date of such Investment and a description of the changes in such Investment (subject to the confidentiality restrictions described the proviso above); provided, however, that neither the sending nor receiving of such notice is required prior to the funding of any such Investment.

(g) Each Call Notice with respect to the payment (or anticipated payment) or reimbursement of expenses related to an Investment or Partnership expenses shall designate such

14





the **PORT FUND**

expense; provided, however, that neither the sending nor receiving of such notice is required prior to the funding of any such Investment or Partnership expense.

(h) Each Partner shall be required to contribute to the aggregate Call Amount in proportion to its Unfunded Commitment and the amount of each Partner's contribution shall be set out in the Call Notice given to such Partner.

(i) Upon failure of a Limited Partner to pay when due any portion of its Capital Contribution to an Investment called for by the General Partner, its share of the Management Fee or Fund expenses, or any other payment called for pursuant hereto when due, such Limited Partner will be in default (each such Limited Partner, a "**Defaulting Partner**").

(j) In such circumstances, the General Partner will have the right, in addition to all other available remedies, at the General Partner's sole and absolute discretion:

    (i) to require the Defaulting Partner to forego future gains or income (and distributions in respect thereof) on Investments made prior to its default, but continue to be subject to losses or reductions in value on such Investments;

    (ii) to require the Defaulting Partner to transfer, effective immediately upon written notice, the Defaulting Partner's Interest, in which event the Defaulting Partner will be required to transfer its Interest at a transfer price equal to 50 percent of (A) the total Capital Contributions made by the Defaulting Partner less (B) any expenses, deductions or losses allocated to the Defaulting Partner (which Interest will be offered to the other Limited Partners on a pro rata basis);

    (iii) to cancel all or any portion of the Defaulting Partner's Unfunded Commitment;

    (iv) to require the withdrawal of the Defaulting Partner;

    (v) to cause the Defaulting Partner to lose any right to vote its Interest;

    (vi) require the Defaulting Party to pay to the Partnership for the benefit of the non-Defaulting Partners an amount estimated by the General Partner to be the damages suffered by the Partnership as a result of the breach; and/or

    (vii) to cause the Defaulting Partner to pay interest at a rate equal to the lesser of fourteen percent or the maximum legal rate on the defaulted amount; provided that, other than following a transfer of all of a Defaulting Partner's Interest pursuant to (ii) or the withdrawal of a Limited Partner pursuant to (iv) above, a Defaulting Partner shall, in each case, remain fully liable (to the extent permitted by law) with respect to its obligations under the Partnership Agreement as if such default had not occurred.

(k) The General Partner shall have the right, in its sole discretion, to offset amounts payable by any Defaulting Partner (including Defaulting Partners which are subsequently made to withdraw as Limited Partners or whose Interest is subsequently subject to a forced disposition) to the Fund (including, without limitation, Fund expenses and Management Fees) against amounts payable by the Fund to such Defaulting Partner.

(l) The General Partner may require a pro rata increase in Capital Contributions of other non-defaulting Limited Partners with respect to any Investment, but no Limited Partner will be required to fund amounts in excess of its Unfunded Commitment.

(m) Subject to the prior written consent of the General Partner a Limited Partner may be excused from making all or any part of its Call Amount in respect of a particular Investment if its participation in such Investment would be reasonably likely to violate any law, regulation or governmental order to which such Limited Partner is subject. Any Limited Partner seeking to be excused will be required to comply with certain procedures



15



**the PORT FUND**

specified by the General Partner.  If a Limited Partner exercises its excuse right, the General Partner may, in its discretion:

    (i)    make a Capital Contribution to the Partnership equal to all or any portion of the excused obligation; and/or

    (ii)    require each other Limited Partner who is able to participate in such Investment to make an additional pro rata Capital Contribution in respect of such Investment.

(n)    If on the Initial Closing Date the aggregate Capital Commitments received from investors is less than USD 300,000,000, the General Partner may, in its discretion: (a) elect not to proceed with the establishment of the Partnership, in which case all amounts received from investors will be returned without interest; or (b) establish the Partnership with less than USD 300,000,000 of Capital Commitments.

## 4.2    Capital Accounts

The Partnership shall maintain a **"Capital Account"** in US$ for each Limited Partner on the books of the Partnership in accordance with the following provisions:

(a)    A Limited Partner's Capital Contribution shall be added to its Capital Account when and as received by the Partnership.

(b)    The Net Profit attributable to any exited Fund Investment shall be allocated among the Limited Partners as follows:

    (i)    100% to all Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that each Limited Partner receives an amount equal to its Capital Contribution employed in that particular Fund Investment; then

    (ii)    100% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that each Limited Partner receives (pro rata on the basis of a 365 day year) a compounded 8% per annum return on its Capital Contribution employed in that particular Fund Investment; then

    (iii)    100% to the Investment Manager, until such time that the Investment Manager receives 20% of the amount allocated to the Limited Partners pursuant to (ii) above; then

    (iv)    80% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment and 20% to the Investment Manager.

(c)    Net Profit not attributable to exited Fund Investments shall be allocated as to 80% to all Limited Partners in proportion to their respective Capital Contributions and 20% to the Investment Manager.

(d)    Any Net Loss shall be allocated among the Limited Partners in proportion to their respective Capital Contributions and then deducted from each Limited Partner's Capital Account.

(e)    Any amount distributed to a Partner shall be debited against such Partner's Capital Account.

(f)    Except as otherwise provided in this Agreement, the General Partner shall normally adjust the Limited Partners' Capital Accounts at the end of each fiscal quarter of the Partnership, but the General Partner may adjust the Capital Accounts more often if a new



16



Partner is admitted to the Partnership or if, in the General Partner's good faith judgment, circumstances otherwise make it advisable to do so.

(g)     In the event any person becomes a substituted Limited Partner in accordance with the provisions of Clause 8.2, such substituted Limited Partner shall succeed to the Capital Account of the transferor Partner to the extent such Capital Account relates to the transferred Interest (or portion thereof).

## 4.3     Amounts and Priority of Distributions

(a)     Distributions may be made to Limited Partners in the General Partner's sole discretion.

(b)     Distributions from exited Fund Investments shall be distributed to the Partners in accordance with the following provisions:

    (i)     100% to all Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that each Limited Partner receives an amount equal to its Capital Contribution employed in that particular Fund Investment; then

    (ii)    100% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that each Limited Partner receives (pro rata on the basis of a 365 day year) a compounded 8% per annum return on its Capital Contribution employed in that particular Fund Investment; then

    (iii)   100% to the Investment Manager until such time that the Investment Manager receives 20% of the amount allocated to the Limited Partners pursuant to (ii) above; then

    (iv)    80% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment and 20% to the Investment Manager (the "Carry").

(c)     Other Distributions shall be made 80% to all Limited Partners in proportion to their respective Capital Contributions and 20% to the Investment Manager.

(d)     Distributions paid to the Investment Manager in accordance with this section are referred to as the "Performance Fee".

(e)     The General Partner shall use its good faith and commercially reasonable efforts to make distributions in cash or cash equivalents, however, if the General Partner determines in its absolute discretion that the distribution of Investments (in the form of marketable Securities) or the non-cash proceeds of Disposition of an Investment is necessary and appropriate or in the best interests of the Partners then the General Partner may distribute Investments (in the form of marketable Securities) or the non-cash proceeds of Disposition of an Investment.

(f)     Upon termination of the Partnership, if the Limited Partners have received back less than their Capital Contributions together with an amount equal to 8% per annum (compound interest) thereon from the drawdown of each Capital Contribution to the date such sums are returned, then the Investment Manager shall pay to each Limited Partner, out of any Carry received by the Investment Manager (but not otherwise), the lesser of:

    (i)     the sum of all of the Carry received by way of distribution to the Investment Manager; and

    (ii)    such amount as would return to each Limited Partner the aggregate of its Capital Contributions together with an amount equal to 8% per annum (compound interest) thereon from the date of drawdown to the date such sums are returned.

17



the PORT FUND

(g) The Partnership shall retain 10% of all Carry distributions to be made to the Investment Manager in accordance with Clause 4.3. Such amounts may be invested in money markets, fixed income and principal guaranteed instruments by the Investment Manager and the profit and loss derived therefrom will be specially allocated to the Investment Manager and the income and interest earned thereon will be distributed to the Investment Manager from time to time.

(h) The amounts referred to in Clause 4.3(g) will be retained by the Partnership in a segregated reserve account until the earlier of either:

    (i) the dissolution of the Partnership; or

    (ii) the termination of the Investment Manager as investment manager to the Partnership.

*IMA terminated?*

(i) In the event that the General Partner terminates the Investment Management Agreement without cause, then the amounts referred to in Clause 4.3(g) will be paid to the Investment Manager in accordance with Clause 4.3(k)

(j) In the event that the General Partner terminates the Investment Management Agreement for cause, then the amounts referred to in Clause 4.3(g) shall be retained by the Partnership until the dissolution of the Partnership, following which such amounts will be used to satisfy the Investment Manager's clawback obligations referred to in Section 4.3(f), if applicable after which any remaining amounts in such account shall be paid back to the Investment Manager.

(k) Subject to Clause 4(g) – 4(j), upon termination of the Investment Management Agreement, the Investment Manager shall be entitled to receive immediately all fees and other moneys accrued but not yet paid on a pro rata basis up to the date of such termination as provided in the Investment Management Agreement and shall repay on a pro rata basis fees and other moneys paid to it in respect of any period after the date of such termination. In addition to amounts payable under this clause, the Partnership shall also pay immediately to the Investment Manager expenses referred to in the Investment Management Agreement to the extent to which the Investment Manager is obliged to continue to make such payments for and on behalf of the Partnership beyond the date of termination of the Investment Management Agreement. In addition to the amounts payable under this clause, the Partnership shall also pay immediately a performance fee to the Investment Manager based on the accrued value of any Fund Investments which have not been disposed of (such value to be determined by an independent valuer being an independent international investment bank with the skills, reputation and experience to value such Fund Investments to be appointed by agreement between the Investment Manager and the General Partner, failing which the Auditor (as referred to in the Private Placement Memorandum) who shall make such appointment), to be calculated in accordance with the distribution methodology outlined above ("**Accrued Performance Fee**").

## 4.4 Timing of Distributions

(a) The General Partner intends to make distributions from exited Fund Investments within 60 calendar days from receipt of the proceeds from each exited Fund Investments, but in any event, they shall be made:

    (i) in the case of cash received by the Partnership, within 90 days of the receipt of such cash; and

    (ii) in the case of any proceeds other than cash or cash equivalents that the General Partner determines to distribute to the Partners, at such time as the General Partner determines.



18



the PORT FUND

(b)     Other Distributions from Investments shall be made at such time as the General Partner determines.

## 5.     LIABILITY: INDEMNIFICATION

### 5.1     Liability of Partners

(a)     The liability of the Limited Partners shall be limited as provided in the Partnership Law and as set out in this Agreement. Neither the General Partner nor any Limited Partner shall be obligated to restore by way of capital contribution or otherwise any deficits in its Capital Account or the Capital Account of any other Partner (if such deficits occur).

(b)     In accordance with the Partnership Law, a limited partner of a partnership may, under certain circumstances, be required to return to such partnership, for the benefit of partnership creditors, amounts previously distributed to such partner. To the extent that a Limited Partner may be required to return capital to the Partnership under the Partnership Law, it is the intent of the General Partner that any obligation to return any distributions made pursuant to Clauses 4.3 or 9 shall be deemed to be compromised by the consent of all Partners and the Limited Partner to whom any money or property is distributed shall not be required to return any such money or property to the Partnership or any creditor of the Partnership. However, if any court of competent jurisdiction or regulatory body with jurisdiction over the matter holds that, notwithstanding the provisions of this Agreement, any Limited Partner is obligated to return to the Partnership any amounts previously distributed to such Limited Partner, such obligation shall be the obligation of such Limited Partner and not of the General Partner.

### 5.2     Qualification

The General Partner shall use its best efforts to qualify the Partnership to do business or become licensed in each jurisdiction where the activities of the Partnership make such qualification or licensing necessary or where failure to so qualify or become licensed would have an adverse effect on the limited liability of the Limited Partners.

### 5.3     Liability to Partners

No Protected Person shall be liable to the Partnership or any Partner for:

(a)     any action taken or omitted to be taken by it or by any other Partner or other Person with respect to the Partnership, a Portfolio Company or any Subsidiary thereof, or the business of the Partnership, a Portfolio Company or any Subsidiary thereof, including, but not limited to, any negligent act or failure to act, except in the case of a liability resulting from such Protected Person's own fraud, wilful malfeasance, negligence or intentional breach of this Agreement; or

(b)     losses due to the negligence of brokers or other agents of the Partnership. Any Protected Person may consult with legal counsel and accountants with respect to Partnership affairs (including interpretations of this Agreement) and shall be fully protected and justified in any action or inaction which is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such counsel or accountants, provided they shall have been selected in good faith. In determining whether a Protected Person acted with the requisite degree of care, such Protected Person shall be entitled to rely on reports and statements of the directors, officers, employees and professional advisors of a Portfolio Company or the General Partner, provided, that no such Protected Person may rely upon such reports or statements if it believed that such written or oral reports or statements were materially false or misleading.

### 5.4     Indemnification and Contribution

(a)     To the fullest extent permitted by law, the Partnership shall indemnify, hold harmless, protect and defend each Protected Person against any losses, claims, damages or

19



the **PORT FUND**

liabilities, including without limitation reasonable legal fees or other expenses incurred in investigating or defending against any such losses, claims, damages or liabilities, and any amounts expended in settlement of any claims approved by the General Partner (collectively, "**Liabilities**"), to which any Protected Person may become subject

(i)     by reason of any act or omission or alleged act or omission performed or omitted to be performed on behalf of the General Partner, the Investment Manager, the Partnership, any Portfolio Company or any Subsidiary thereof or otherwise in connection with the business of the Partnership or its investment activities;

(ii)    by reason of the fact that it is or was acting in connection with the business of the Partnership or its investment activities as a partner, shareholder, director, officer, employee, Affiliate or Specified Agent of the Partnership, the General Partner or the Investment Manager, or their respective controlling entities, or that it is or was serving at the request of the Partnership as a partner, member, director, officer, employee or Specified Agent of any Person including any Portfolio Company; or

(iii)   by reason of any other act or omission or alleged act or omission arising out of or in connection with the Partnership, its business, or its investment activities,

unless, in each case, such Liability results from such Protected Person's own negligence, willful default, fraud or dishonesty. The Partnership shall promptly reimburse (and/or advance to the extent reasonably required) each Protected Person for reasonable legal or other expenses (as incurred) of each Protected Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Liabilities for which the Protected Person may be indemnified pursuant to this Clause 5.4; provided, that if it is finally judicially determined that such Protected Person is not entitled to the indemnification provided by this Clause 5.4, then such Protected Person shall promptly reimburse the Partnership for any reimbursed or advanced expenses. The provisions of this Clause 5.4 shall continue to afford protection to each Protected Person regardless of whether such Protected Person remains in the position or capacity pursuant to which such Protected Person became entitled to indemnification under this Clause 5.4 and regardless of any subsequent amendment to this Agreement; provided, that no such amendment shall reduce or restrict the extent to which these indemnification provisions apply to actions taken or omissions made prior to the date of such amendment; To the extent available on commercially reasonable terms, the General Partner or the Investment Manager may purchase, at its expense, insurance to cover Liabilities covered by the foregoing indemnification provisions and to otherwise cover Liabilities for any breach or alleged breach by any Protected Person of its duties in such amount and with such deductibles as the General Partner may determine in its discretion; the failure to obtain such insurance shall not affect the right to indemnification of any Protected Person under the indemnification provisions contained herein. If any Protected Person recovers any amounts in respect of any Liabilities from a Portfolio Company or from insurance coverage, then such Protected Person shall, to the extent that such recovery is duplicative, reimburse the Partnership for any amounts previously paid to it by the Partnership in respect of such Liabilities.

(b)     The Partnership shall, to the fullest extent permitted by law, indemnify, protect, hold harmless and defend any Limited Partner and its partners, members, stockholders, directors, officers, employees, Representatives and Affiliates against any losses, damages, liabilities or expenses for which such Person has not otherwise been reimbursed, actually incurred by such Person in connection with claims (including, without limitation, legal fees or other expenses reasonably incurred in investigating or defending against any such losses, claims, damages or liabilities), other than claims made on behalf of the Partnership or the General Partner with respect to a breach by such Limited Partner of its obligations under this Agreement, arising out of such Limited Partner's capacity as a Partner. Each Limited Partner by execution of this Agreement represents and warrants to every other Partner and to the Partnership that such Limited Partner will not take any action not provided for herein that would cause any Limited Partner to become liable for the obligations of the Partnership or otherwise cause any other Person



20



**thePORT FUND**

to reasonably believe that any such Limited Partner is a general partner of the Partnership. Any Limited Partner that takes any such action described in the preceding sentence shall not be entitled to the indemnification provided by this Clause 5.4.

(c)   At any time and from time to time prior to the second anniversary of the dissolution of the Partnership, the Partners shall be required to make Capital Contributions to the Partnership (or if such Capital Contributions are made subsequent to the dissolution of the Partnership, to the General Partner of the Partnership as if the Partnership had not been dissolved) upon the request of the General Partner to satisfy all or any portion of the obligations of the Partnership to make the indemnification payments pursuant to this Clause 5.4, whether such obligations arose before or after the dissolution of the Partnership; provided, however, that each Partner's liability to make Capital Contributions under this Clause 5.4 shall not exceed an amount equal to such Partner's Unfunded Commitment at the time such Capital Contribution is required to be made (or if the Partnership has been dissolved, at the time of such dissolution).

## 6.   CONSENTS: VOTING, MEETINGS

### 6.1   Method of Giving Consent

Any approval required by this Agreement may be given as follows:

(a)   by a written approval given by the Partner whose approval is solicited and obtained (the **"Consenting Partner"**) prior to or after the doing of the act or thing for which the approval is solicited; provided, that such approval has not subsequently been nullified by either:

    (i)    written notice to the General Partner by the Consenting Partner at or prior to the time of the doing of such act or thing; or

    (ii)   the negative vote by such Consenting Partner at a meeting, if any, held to consider the doing of such act or thing; or

    (iii)  written notice to the General Partner by the Consenting Partner prior to the doing of any act or thing, the doing of which is not subject to approval at any such meeting; or

(b)   by the affirmative vote by the Consenting Partner to the doing of the act or thing for which the approval is solicited at any meeting called and held to consider the doing of such act or thing.

### 6.2   Meetings

Any matter requiring the approval of any or all of the Limited Partners pursuant to this Agreement, other than approvals obtained in accordance with Clause 6.1(a), may be considered at a meeting of the Partners held not fewer than five nor more than 60 days after notice thereof shall have been given by the General Partner to all Partners. After the Final Closing Date, the General Partner shall cause a meeting of the Partners to be held not less often than once every Fiscal Year; provided, that no annual meeting of the Partnership shall be held in any year if the General Partner and 50% in Interest of the Limited Partners shall agree by written consent or otherwise not to hold a meeting during such year. Meetings of the Limited Partners may be held by telephone or other electronic device. Notice of the meetings of the Partners:

(a)   may be given by the General Partner, in its discretion, at any time; and

(b)   shall be given by the General Partner within 30 days after receipt by the General Partner of a request for such a meeting made by 75% in interest of the Limited Partners.

Any such notice shall state briefly the purpose, time, and place of the meeting. All such meetings shall be held at such reasonable place as the General Partner shall designate and during normal business hours. All expenses of attending the meetings shall be borne by the Partners attending

21



the PORT FUND

the same. A Limited Partner shall have the right to consult with the General Partner in respect of the matters proposed for the meeting at any time.

## 6.3   Record Dates

The General Partner may set in advance a record date for determining the Partners entitled to notice of and to vote at any meeting and to give any approval. Each such record date shall not be more than 60 days prior to the date of the meeting to which such record date relates and shall be stated in the notice with respect to such meeting provided for in Clause 6.2.

## 6.4   Submissions to Partners

The General Partner shall give each Partner notice of any proposal or other matter required by any provision of this Agreement or by law to be submitted for the consideration and approval of such Partner, provided that any matter that properly comes before any meeting of the Partners convened in accordance with Clause 6.2 may be acted upon. Such notice shall include any information required by the relevant provisions of this Agreement or by law.

## 6.5   Restriction on Voting

If, pursuant to any provision of this Agreement, any Limited Partner is not entitled to cast a vote, give a consent or provide or withhold any approval, the determination as to whether the matter under consideration has been approved or consented to shall be made without regard to the Interest, Capital Contribution or Unfunded Commitment of such Limited Partner in counting the necessary votes, consents or approvals.

## 7.   REPORTS TO PARTNERS

## 7.1   Books of Account

Appropriate records and books of account of the Partnership shall be kept by the Partnership at the principal place of business of the General Partner, and each Partner shall have access to the records and books of account and the right to receive copies thereof under such reasonable conditions and restrictions as the General Partner may prescribe.

## 7.2   Audit and Report

(a)   The books and records of the Partnership shall be audited using the Accounting Principles consistently applied as of the end of each Fiscal Year by any firm of independent firm of reputed auditors of international recognition and standing selected by the General Partner. As soon as reasonably practicable after the end of each Fiscal Year (but in any event no later than 90 calendar days thereafter) the General Partner shall cause to be prepared and mailed to each Limited Partner a report of such auditors, setting forth as at the end of such Fiscal Year:

(i)   a balance sheet of the Partnership;

(ii)   a statement of the Net Profit or Net Loss of the Partnership for such year;

(iii)   a statement of changes in financial position or a cash flow statement of the Partnership; and

(iv)   a supplemental statement of such Partner's Capital Account, including such Partner's allocations and share of Net Profit or Net Loss for such year.

(b)   The Administrator shall cause to be prepared and mailed to each Limited Partner as soon as reasonably practicable, on a quarterly basis during each Fiscal Year, a summary review of Investment valuations and financial information relating to the activities of the Partnership, subject in all cases to applicable confidentiality and securities law restrictions.



22



**the PORT FUND**

(c)   The General Partner will prepare and submit all necessary and required financial statements in accordance with International Accounting Standard principles with the exclusion of IAS 27.

(d)   Upon the reasonable request of the General Partner, each Limited Partner agrees to provide the Partnership with such information concerning the Limited Partner and its business so that the Partnership can comply, or determine its compliance, with any laws or regulations applicable to it

## 7.3   Confidentiality

Each of the Partners shall, and shall direct those of its directors, officers, partners, members, employees, attorneys, accountants, consultants and advisors (the "**Representatives**") who have access to Confidential Information to, keep confidential and not disclose any Confidential Information without the express consent, in the case of Confidential Information acquired from the Partnership, of the Partnership or, in the case of Confidential Information acquired from another Partner, such other Partner, unless (a) such disclosure shall be required by applicable law, governmental regulation or regulation, court order, administrative or arbitral proceeding or by any bank regulatory authority having jurisdiction over such Limited Partner, (b) such disclosure is reasonably required in connection with any litigation against or involving the Partnership or any Partner or (c) such disclosure is reasonably required in connection with any proposed assignment, sale or other disposition of all or any part of a Limited Partner's interest or a participation in the Partnership (a "**Proposed Transfer**"); provided, that with respect to the use of any Confidential Information in any Proposed Transfer, the General Partner may require any Proposed Transferee to enter into a confidentiality agreement with terms substantially similar to the terms of this Clause 7.3. Notwithstanding the foregoing, the General Partner may disclose the identity of the Partners to the extent reasonably calculated to advance or protect the interests of the Partnership. Such Confidential Information may be used by a Partner only in connection with Partnership matters; provided, that this sentence shall not prohibit any Partner from making other passive investments without disclosing to third parties such Confidential Information. "**Confidential Information**" shall mean any Information, including the identity of any Partner, that a Partner may acquire from the Partnership, any Portfolio Company or Subsidiary thereof or, as a consequence of being a Partner in the Partnership, from another Partner other than Information that (i) is already available through publicly available sources of information (other than as a result of disclosure by such Partner), (ii) was available to a Partner on a non-confidential basis prior to its disclosure to such Partner by the Partnership or (iii) becomes available to a Partner on a non-confidential basis from a third party, provided such third party is not known by such Partner to be bound by this Agreement or another confidentiality agreement with the Partnership or any Portfolio Company. Such Confidential Information may include, without limitation, information that pertains or relates to (A) the business and affairs of any other Partner, (B) any investments or proposed investments or (C) any other Partnership matters. In the event that any Partner or any Representative of such Partner is required to disclose any of the Confidential Information, such Partner will use commercially reasonable efforts to provide the Partnership with prompt written notice so that the Partnership or any Portfolio Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement, and such Partner will use commercially reasonable efforts to cooperate with the Partnership or any Portfolio Company in any effort any such Person undertakes to obtain a protective order or other remedy. In the event that such protective order or other remedy is not obtained, or that the Partnership waives compliance with the provisions of this Clause 7.3, such Partner and its Representatives will furnish only that portion of the Confidential Information which is required and will exercise all reasonable efforts to obtain reasonably reliable assurance that the Confidential Information will be accorded confidential treatment. Except with respect to Confidential Information pertaining to another Partner or to the business affairs of another Partner, the General Partner may agree to waive, in its sole discretion, any or all of the provisions of this Clause 7.3 with respect to any Limited Partner.

23



8. **ADDITIONAL PARTNERS AND UNFUNDED COMMITMENT: TRANSFER: WITHDRAWAL**

8.1 **Additional Partners and Unfunded Commitment**

(a)   In addition to the authority of the General Partner described elsewhere in this Agreement, the General Partner shall have the full power and authority to admit Additional Limited Partners to the Partnership or to permit existing Partners to increase their Unfunded Commitment upon compliance with the following terms and conditions:

(i)   Subject to Clauses 4.1(i)-(k), Additional Limited Partners may be admitted to the Partnership, and existing Limited Partners may be permitted to increase their Unfunded Commitment only until the Final Closing Date.

(ii)   Each such Limited Partner or Additional Limited Partner shall execute such instruments as the General Partner may reasonably deem necessary or desirable to increase such Limited Partner's Unfunded Commitment or to admit such party as an Additional Limited Partner, including a Subscription Agreement and counterpart of, or an appropriate supplement to, this Agreement, pursuant to which such Limited Partner or Additional Limited Partner shall agree to be bound by and comply with all of the terms and provisions of this Agreement.

(iii)   Subject to Clause 4.1(g), each such Additional Limited Partner or Partner whose Unfunded Commitment is being increased shall be required to contribute cash to the capital of the Partnership as provided in Clause 4.1(b).

(iv)   No Limited Partner shall have any pre-emptive rights whatsoever to subscribe for any additional limited partnership interests subsequently issued by the Partnership.

(b)   Each of the Limited Partners hereby agrees and irrevocably consents to the admission of Additional Limited Partners or the increases in the Unfunded Commitment of existing Partners pursuant to this Clause 8.1, to the amendment of this Agreement (including Schedule 1) insofar as necessary to reflect such admission or increase and to any filings and other acts that may be necessary or desirable to give effect to such admission or increase.

8.2 **Transfer**

(a)   No sale, exchange, transfer, assignment, pledge or other disposition (herein collectively called a "**Transfer**") of all or any fraction of a Limited Partner's interest in the Partnership may be made without the prior written consent of the General Partner which consent may be granted or withheld, for any reason or for no reason, in the sole discretion of the General Partner.

(b)   Before the General Partner considers any request for a Transfer it may request that the transferring Limited Partner provide to the General Partner confirmation (including legal opinions and officers' certificates) in the form and substance acceptable to the General Partner that the Transfer:

(i)   complies with any applicable securities laws and with all other applicable laws;

(ii)   will not subject the Partnership to the registration or reporting requirements of any law in any jurisdiction to which the Partnership is not already subject;

(iii)   will not subject the Partnership, any Partner, the General Partner or any Affiliate of any of them to additional regulatory requirements.

(c)   If the General Partner consents to a Transfer, the transferee shall become a substituted Limited Partner and shall succeed proportionately to the Capital Account of its transferor

24





the PORT FUND

(and its transferor shall be relieved of further obligations under this Agreement) only upon compliance with the following additional conditions:

(i)    the General Partner shall have consented to such substitution, which consent may be granted or withheld, for any reason or for no reason, in the sole discretion of the General Partner;

(ii)    the proposed transferee shall have executed an amendment, counterpart or supplement to this Agreement, and shall have executed such other instruments as the General Partner may reasonably deem necessary or desirable to admit such transferee as a substituted Limited Partner and to evidence such substituted Limited Partner's agreement to be bound by and to comply with the terms and provisions of this Agreement; and

(iii)    the transferor shall have paid or caused to have been paid to the Partnership all of the Partnership's reasonable expenses connected with such Transfer and substitution (including, but not limited to, the reasonable legal and accounting expenses incurred by the Partnership).

(d)    Any person that acquires all or any part of the interest of a Limited Partner in the Partnership in a Transfer permitted under this Clause 8.2 shall be obligated to pay to the Partnership the appropriate portion of any amounts thereafter becoming due in respect of the Unfunded Commitment committed to be made by its predecessor in interest.

(e)    The General Partner has a pre-emptive right over the transfer or assignment of any interest of a Limited Partner in the Partnership to non-Affiliates.

(f)    Each Limited Partner agrees that, notwithstanding the Transfer of all or any part of its interest in the Partnership, as between it and the Partnership it will remain liable for its Unfunded Commitment and for all Capital Contributions required to be made by it (without taking into account the Transfer of all or a part of such interest in the Partnership), in each case prior to the time, if any, when the transferee of such interest in the Partnership, or portion thereof, is admitted as a substituted Limited Partner.

(g)    A person who is the transferee of all or any part of the interest of a Limited Partner in the Partnership as permitted by this Agreement but does not become a substituted Limited Partner and who desires to make a further Transfer of such interest in the Partnership, shall be subject to all of the provisions of this Clause 8.2 to the same extent and in the same manner as any Limited Partner desiring to make a Transfer of its interest in the Partnership.

(h)    The General Partner may not transfer all or any part of its interest in the Partnership or in this Agreement, except to another Affiliate of the Investment Manager, provided, however, for the avoidance of doubt, that the foregoing shall not preclude changes in the identity of the owners or the legal structure of the General Partner, to the extent that it remains an Affiliate of the Investment Manager.

(i)    Unless waived by the General Partner, any purported Transfer by any Limited Partner (including transferees thereof or substituted partners therefor) of any interest in the Partnership not made strictly in accordance with the provisions of this Clause 8.2 or otherwise not permitted by this Agreement shall be entirely null and void. Any purported Transfer by the General Partner (including any transferees thereof or substituted partners thereof) of its interest in the Partnership in violation of this Agreement shall be entirely null and void.

(j)    Unless named in this Agreement, or unless admitted to the Partnership as a Limited Partner as provided in this Agreement, no person shall be considered a Limited Partner. The Partnership and the General Partner shall not be required to recognize any person as a Limited Partner or otherwise merely because of the Transfer of all or part of a

25



the PORT FUND

Limited Partner's Interest in the Partnership to such person (including a Transfer thereof by reason of the death, incompetence, bankruptcy or liquidation of such Limited Partner).

(k)     Any substituted Limited Partner admitted to the Partnership in compliance with this Clause 8.2 shall succeed to all the rights and be subject to all the obligations of a Limited Partner in respect of the interest in the Partnership as to which it was substituted.

## 8.3     Death, Incompetence, Bankruptcy or Liquidation of a Limited Partner

In the event of the death, incompetence or bankruptcy of a Limited Partner, or the bankruptcy, termination, liquidation or dissolution of any partnership, trust, corporation or other entity which is a Limited Partner (a) no dissolution of the Partnership shall be effected thereby and the Partnership and its business shall be continued until the termination thereof as provided for in this Agreement and (b) upon satisfaction of the relevant provisions of Clause 8.2, the estate or successor in interest in the Partnership of such deceased, incompetent, bankrupt, terminated, liquidated or dissolved Limited Partner shall succeed to the interest of such Limited Partner and shall be deemed a Partner for any and all purposes hereunder.

## 8.4     Withdrawals

(a)     No Partner may withdraw from the Partnership prior to the dissolution and winding up of the Partnership, except in connection with a Transfer permitted by Clause 8.2 or a withdrawal permitted by Clause 8.5. Withdrawals by the General Partner or any Limited Partner of its Capital Account or any portion thereof shall not be permitted, except as provided in Clause 8.5.

(b)     The General Partner may require a Limited Partner to withdraw from the Partnership under certain limited circumstances. Subject to certain conditions, the General Partner may (or may be required to) permit a Limited Partner to withdraw from the Partnership under certain limited circumstances. The General Partner shall have "first right of refusal" over the transfer or assignment of Interests to non-Affiliates.

## 8.5     Withdrawal or Removal of the General Partner

(a)     Upon the occurrence of any of the events set out in Clause 9.1(a)(iii) with respect to the General Partner ("Bankruptcy") or in the event of the dissolution of the General Partner or the occurrence of any other circumstance constituting withdrawal of the General Partner, the Partnership shall be dissolved and its affairs shall be wound up pursuant to Clause 9.2(a); provided, however, that the Partnership shall not be dissolved and shall not be required to be wound up by reason of the General Partner's Bankruptcy, dissolution or other withdrawal if, within 90 days after the date of any such occurrence all of the Limited Partners agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of withdrawal of the General Partner, of one or more new general partners satisfying the requirements of the Partnership Law.

(b)     If the General Partner withdraws from the Partnership, the General Partner nonetheless shall remain liable for obligations and liabilities incurred by it as General Partner prior to the time of such withdrawal, but, from and after the time of such withdrawal it shall be free of any obligation or liability incurred on account of the activities of the Partnership and shall not be entitled to any fees or other remuneration otherwise payable to it under this Agreement (other than fees or other remuneration owed to the General Partner in respect of the period prior to such withdrawal).

26




the PORT FUND

### 9. TERMINATION: DISSOLUTION: LIQUIDATION

### 9.1 Dissolution

(a) The Partnership shall be dissolved upon the first to occur of the following:

    (i) upon the end of the term of the Partnership, as provided in Clause 2.4;

    (ii) subject to Clause 8.5, upon the dissolution or withdrawal of the General Partner;

    (iii) subject to Clause 8.5:

        (A) upon the commencement by the General Partner of any case, proceeding or other action:

            (1) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts; or

            (2) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets;

        (B) upon the General Partner making a general assignment for the benefit of its creditors;

        (C) at such time as any case, proceeding or other action of a nature referred to in (A) above against the General Partner:

            (1) results in the entry of an order for relief or any such adjudication or appointment; or

            (2) remains undismissed, undischarged or unbonded for a period of 120 days;

        (D) at such time as any case, proceeding or other action seeking issuance of a warrant of attachment, execution or similar process against all or any substantial part of the General Partner's assets, results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 120 days from the entry thereof;

        (E) upon the General Partner's consent to, approval of, or acquiescence in, any of the acts or relief described in (A) to (D) above; or

        (F) upon the General Partner generally not paying, or being unable to pay, or admitting in writing its inability to pay, its debts as they become due; or

    (iv) at any time upon the election of the General Partner, upon the Disposition by the Partnership of all or substantially all of the Investments it then owns provided, that:

        (A) all or substantially all of the Unfunded Commitment of the Partners has been contributed to the Partnership; or

        (B) the Commitment Period has terminated.

27



the**PORT FUND**

(v)    at any time upon the written consent of the General Partner and the majority of Limited Partners being provided.

(b)    Dissolution of the Partnership shall be effective on the day on which the event occurs giving rise to the dissolution, but the Partnership shall not terminate until the assets of the Partnership have been distributed as provided in Clause 9.2 and a notice of dissolution has been signed by the General Partner and filed in accordance with the Partnership Law.

## 9.2    Liquidation

(a)    Upon dissolution of the Partnership, the property and business of the Partnership shall be liquidated within a reasonable period of time by the General Partner, or, in the event of the unavailability of the General Partner, by a person designated by more than 50% in interest of the Limited Partners.  Subject to the requirements of applicable law and the further provisions of this Clause 9.2, and except to the extent cash is required in order to pay or otherwise satisfy the claims of Partnership creditors, the General Partner (or any other person conducting the liquidation of the Partnership's affairs) shall have absolute discretion in determining whether to sell or otherwise dispose of Partnership assets or to distribute the same in kind.

(b)    As soon as practicable after the effective date of dissolution of the Partnership, whether by expiration of its full term or otherwise, but in any event within one year after dissolution of the Partnership, after allocating all Net Profit, Net Loss and any other items of income, gain, loss or deduction required by this Agreement, the Partnership's assets (except for amounts received pursuant to Clause 9.3) shall be applied and distributed in the following manner and order of priority:

(i)     the claims of all creditors of the Partnership (including Limited Partners except to the extent not permitted by law) shall be paid and discharged other than liabilities for which reasonable provision for payment has been made;

(ii)    to the Limited Partners, other than a Defaulting Partner, in accordance with the positive balances of their respective Capital Accounts as such accounts have been adjusted to give effect to any and all Investment Manager Givebacks and as otherwise necessary to give effect to the terms of Clause 4.3;

(iii)    if not already paid, to the Defaulting Partners in accordance with Clause 4.1(k); and

(iv)    thereafter, 80% to the Limited Partners, other than a Defaulting Partner, in proportion to their Unfunded Commitment, and 20% to the Investment Manager.

(c)    When the General Partner or a liquidating trustee appointed pursuant to Clause 9.2(a) has complied with the liquidation plan described in this Clause 9.2, the Limited Partners shall cause to be filed in accordance with the Partnership Law a notice of dissolution signed by the General Partner or liquidating trustee.

## 9.3    Amounts Reserved and Pending Claims

(a)    If, upon the dissolution of the Partnership, there are any assets that, in the judgment of the General Partner, cannot be sold or distributed in kind without sacrificing a significant portion of the value thereof, such assets may be retained by the Partnership if the General Partner determines that the retention of such assets is in the best interests of the Limited Partners and such assets shall not be considered for purposes of computing Capital Accounts upon liquidation and amounts distributable pursuant to Clause 9.2(b). Upon the sale of such assets or a determination by the General Partner that circumstances no longer require their retention (but in no event more than two years after the dissolution of the Partnership), such assets (at their Fair Value) or the proceeds of their sale shall be taken into account in computing Capital Accounts on liquidation and



28



the PORT FUND

amounts distributable pursuant to Clause 9.2(b), and distributed in accordance with such value.

(b)     If there are any claims or potential claims (including potential Partnership expenses in connection therewith) against the Partnership (either directly or indirectly, including potential claims for which the Partnership might have an indemnification obligation) for which the probable loss cannot, in the judgment of the General Partner, be definitively ascertained, then such claims shall initially be taken into account in computing Capital Accounts upon liquidation and distributions pursuant to Clause 9.2(b) at an amount estimated by the General Partner to be sufficient to cover any potential loss or liability on account of such claims (including such potential Partnership expenses), and the Partnership shall retain funds equal to the estimated amount.  Upon final settlement of such claims (including such potential Partnership expenses) or a determination by the General Partner that the probable loss therefrom can be definitively ascertained, such claims (including such potential Partnership expenses) shall be taken into account in the amount at which they were settled or in the amount of the probable loss therefrom in computing Capital Accounts on liquidation and amounts distributable pursuant to Clause 9.2(b), and any excess funds retained shall be distributed.

10.     **AMENDMENTS: WAIVER: POWER OF ATTORNEY**

10.1    **Amendments: Waiver**

(a)     Except as otherwise expressly provided in this Agreement, any provision of this Agreement (other than this Clause 10.1) may be amended or waived by an instrument in writing executed by the General Partner and the Limited Partners holding 75% or more of the Interests; provided, however, that:

(i)      any amendment to or waiver of any provision of this Agreement that would increase or reduce the Unfunded Commitment, or the aggregate Call Amounts payable after the Commitment Period, or otherwise increase the liabilities or obligations of any Limited Partner shall require the written consent of such Limited Partner;

(ii)     any amendment to or waiver of any provision of this Agreement that would alter the allocations to Capital Accounts, the distributions from the Partnership or the amount of Management Fees payable by the Partnership shall require the written consent of each Limited Partner who would be adversely affected by such amendment; and

(iii)    any amendment to or waiver of any provision of this Agreement which would discriminate against any Limited Partner or would otherwise materially adversely affect the rights of any Limited Partner in relation to the other Limited Partners shall require the written consent of each Limited Partner who would be materially adversely affected by such amendment or waiver.

(b)     Notwithstanding the foregoing, the General Partner, without the consent of any Limited Partner, may amend or waive any provision of this Agreement (unless such amendment or waiver would have a material adverse effect on any of the Limited Partners) to reflect:

(i)      a change in the name of the Partnership or the location of the principal place of business or the registered office of the Partnership;

(ii)     the admission, substitution or withdrawal of Partners or a change in the Unfunded Commitment of any Partner in accordance with this Agreement;

(iii)    a change that is necessary to qualify the Partnership as a limited partnership in which the Limited Partners have limited liability under the laws of any jurisdiction or that is necessary or advisable in the opinion of the General Partner to ensure that the Partnership will not be taxable;

29



**the PORT FUND**

    (iv)    a change that is of an inconsequential nature or necessary or desirable to satisfy any requirements, conditions or guidelines of any regulatory or governmental body to which the Partnership or General Partner is subject;

    (v)    a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of the Partnership Law if the provisions of the Partnership Law are amended, modified or revoked so that the taking of such action is no longer required;

    (vi)    a change to add to the duties or obligations of the General Partner;

    (vii)    a change that is necessary in connection with the issuance of additional limited partnership interests pursuant to Clause 8.1;

    (viii)    a change that does not adversely affect the rights of the Limited Partners in any material respect (provided that written notice is provided to each Limited Partner at least 10 days prior to the effective date of such amendment);

    (ix)    a change clarifying any ambiguity, defect or inconsistency in this Agreement.

(c)    Within a reasonable period after any change or amendment or waiver in accordance with (b) above, the General Partner shall send a written notice to each Limited Partner describing such change or amendment or waiver in reasonable detail.

(d)    Any amendment with respect to the matters in this Clause 10.1 shall require the written consent of all of the Limited Partners.

### 10.2    Power of Attorney

(a)    Each Limited Partner and each Additional Limited Partner by its execution of the Subscription Agreement of the Partnership irrevocably makes, constitutes and appoints the General Partner as its true and lawful agent and attorney-in-fact, with full power of substitution to its Affiliates and full power and authority in its name, place and stead, to make, execute, sign, acknowledge, swear to, record and file:

    (i)    any amendment or waiver of any provision of this Agreement that has been adopted or made as herein provided;

    (ii)    all certificates and other instruments deemed advisable by the General Partner to comply with the provisions of this Agreement and applicable law or to permit the Partnership to become or to continue as a limited partnership or other entity wherein the Limited Partners have limited liability in each jurisdiction where the Partnership may be doing business;

    (iii)    all instruments that the General Partner deems appropriate to reflect a change or modification of this Agreement or the Partnership in accordance with this Agreement;

    (iv)    all conveyances and other instruments or papers deemed advisable by the General Partner, to effect the dissolution and termination of the Partnership pursuant to the provisions of this Agreement; and

    (v)    all other instruments or papers not inconsistent with the terms of this Agreement which may be required by law to be filed on behalf of the Partnership.

(b)    With respect to each Limited Partner and each Additional Limited Partner, the foregoing power of attorney:



30


the **PORT FUND**

(i)    is coupled with an interest, shall be irrevocable and shall survive the incapacity or Bankruptcy of such Limited Partner;

(ii)   may be exercised by the General Partner either by signing separately as attorney-in-act for such Limited Partner or, after listing all of the Limited Partners executing an instrument, by a single signature of the General Partner acting as attorney-in-fact for all of them; and

(iii)  shall survive the delivery of an assignment by such Limited Partner of the whole or any fraction of its interest; except that, where the assignee of the whole of such Limited Partner's interest has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, the power of attorney of the assignor shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, swear to, acknowledge and file any instrument necessary or appropriate to effect such substitution.

## 11.   MISCELLANEOUS

### 11.1   Successors and Assigns

This Agreement shall inure to the benefit of, and shall be binding upon, the successors and permitted assigns of the Partners.

### 11.2   No Waiver

The failure of any Partner to seek redress for violation, or to insist on strict performance, of any covenant or condition of this Agreement shall not prevent a subsequent act which would have constituted a violation from having the effect of an original violation.

### 11.3   Survival of Certain Provisions

Each of the Partners agrees that the covenants and agreements set out in Clauses 5.1, 5.3, 5.4, 7.3 and 9.3 shall survive the dissolution and termination of the Partnership.

### 11.4   Notices

All notices hereunder shall be in writing and shall be given by personal delivery, mailed by registered or certified mail or air courier service, or sent by telecopy or other electronic means, and addressed: if to the Partnership, at its principal office and, if to a Partner, to such Partner at its last known address as disclosed on the records of the Partnership. Notices shall be deemed to have been given as of the date delivered, telexed or telecopied, or if mailed, the fifth day after mailing. The Partnership and any Partner may change the address for notices by delivering or mailing as aforesaid, a notice stating the change and setting forth the changed address.

### 11.5   Severability

In case any provision in this Agreement shall be deemed to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired hereby.

### 11.6   Counterparts

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

### 11.7   Headings, Etc.

The headings in this Agreement are inserted for convenience of reference only and shall not control the interpretation of this Agreement.

31



**the PORT FUND**

### 11.8 Gender

As used herein, masculine pronouns shall include the feminine and neuter, neuter pronouns shall include the masculine and the feminine, and the singular shall be deemed to include the plural.

### 11.9 No Right to Partition

The Partners, on behalf of themselves and their shareholders, partners, successors and assigns, if any, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

### 11.10 Governing Law

This Agreement shall be construed in accordance with the laws of the Cayman Islands.

**EXECUTED AS A DEED** by the parties

General Partner:

Port Link GP Ltd

Witness: _Rania_

Rania ELShinnawy

By: _____

Name: Maria Lazareva   July 14, 2008
Title:   Director

Withdrawing Limited Partner:

Witness: _____

Roderick Palmer

Limited Partners:

Kuwait Ports Authority

Witness: _____

By: _____

Name: Abdullah Al-Shemali
Title:   Director Assistant

32



**the PORT FUND**

## SCHEDULE 1

### LIMITED PARTNERS AND CAPITAL COMMITMENTS

**Limited Partner Name:** Kuwait Ports Authority

**Capital Commitment:** USD$ 50,000,000/-