# EXHIBIT 14
# Part 2

1.  Abdulghfoor M A
    Alawadhi
2.  First Affidavit
3.  The Defendants
4.  9 April 2020
5.  Exhibit "**AA-1**"

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD 13 OF 2020 (RJP)**

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

**KUWAIT PORTS AUTHORITY**

<u>**PLAINTIFF**</u>

**AND:**

(1)  **THE PORT FUND L.P.**
(2)  **PORT LINK GP LTD.**

<u>**DEFENDANTS**</u>

---

**FIRST AFFIDAVIT OF ABDULGHFOOR M A ALAWADHI**

---

I, **ABDULGHFOOR M A ALAWADHI**, of Plot 326, Block 5, Meshref, Kuwait, being duly sworn **MAKE OATH AND SAY** as follows:

1.  I am one of the Directors of Port Link GP Ltd. (the "**GP**"), who acts as the general partner of the Port Fund L.P. (the "**Fund**"). I am duly authorised to swear this Affidavit on behalf of the GP and the Fund.

2.  I make this Affidavit in support of the Defendants' opposition to the application filed by the Plaintiff for information from the Defendants pursuant to Section 22 of the Exempted Limited Partnership Law (2018 Revision) in respect of the Fund (the "**S.22 Proceedings**").

3.  Save where otherwise indicated, the matters to which I depose are within my own knowledge acquired by me in my capacity as a Director of the GP since 2010, except where I state that I am relying on information from others. The content of this Affidavit is true to the best of my knowledge, information and belief.

9649440.3T5138.D08984

4.    Now produced and shown to me and marked "**AA-1**" is a copy of the substantively final draft of the affidavit of Andrew Joseph Childe, which is intended to be sworn in support of the Defendants' opposition to the S.22 Proceedings ("**Childe 1**").

5.    I have carefully reviewed Childe 1 and its exhibit and consider the facts deposed therein to be accurate and a true, full and frank account of the dealings of the Fund and the GP.

Sworn by **Abdulghfoor M A Alawadhi**      )

at Kuwait City, Kuwait                                   )

on the   9 day of April 2020                          )           Abdulghfoor M A Alawadhi

Before me:                                                       )

_____      *Bador Almutawa*

Lawyer

Address: _____  24th Floor - Kuwait Building - Fahad Alsalem st. Kuwait city

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD 13 OF 2020 (    )

**IN THE MATTER OF THE APPLICATION FOR INFORMATION UNDER SECTION 22 OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2018 REVISION)**

**BETWEEN:**

KUWAIT PORTS AUTHORITY

<u>Plaintiff</u>

**AND:**

(1)   THE PORT FUND L.P.
(2)   PORT LINK GP LTD.

<u>Defendants</u>

THIS IS EXHIBIT "**AA-1**" TO THE FIRST AFFIDAVIT OF

**ABDULGHFOOR M A ALAWADHI**

SWORN BEFORE ME THIS 9 DAY OF APRIL 2020

9649440.3T5138.D08984



I was provided your details by ████ and asked to reach out to you concerning the Port F.. .1d.

As I indicated to Tarek, based on my review of this matter, there is a critical need to prote: the LPs' investment in the Port Fund. I must emphasize the need for speed on this matter in order to ensure that the assets of the Port Fund are no lost. It is imperative that they move quickly.

The key facts as I know them are as follow:

## Initial Investment

- o One of the investments made by the Port Fund included the development of a 177 hectare property within the Clark Freeport Zone of the Philippines referred to as the Global Gateway Logistics City.
- o The Port Fund created a special purpose vehicle – Global Gateway Development Corporation ("GGDC") established in the Cayman Islands on April 14, 2008 – for its investment in the Clark Project.
- o The Port Fund seems to be evasive about the exact amount it invested in GGDC. Media reports on this investment vary: a 2012 report suggests that the Port Fund had already invested USD 200 million in the Clark P ject and planned to invest an additional USD 500 million; a pair of 2014 reports state that the Port Fund had already invested USD 100 mill on and pledged to invest an additional USD 150 million by the end of 2015.

## Suspicious Transfers

- o In a series of opaque transactions in 2014 involving Cayman shell companies, the Port Fund wrongfully transferred its interest in the Clark Project to an entity that it purported to not control.
- o In April 2014, two new Clark Project-related entities were established in the Cayman Islands: Clark Gateway GP was established on April 1, 2014, and Clark Gateway Investment Group LP ("CGIG") was established on April 3, 2014.
- o Dashti was the Director of Clark Gateway GP, which served as CGIG's General Partner, establishing that these new entities were far from independent of the Port Fund and KGLI, despite claims to the contrary.
- o On April 11, 2014, CGIG purchased 100% of the outstanding shares of GGDC.
- o Subsequently, Clark Gateway GP, acting as CGIG's General Partner reconstituted GGDC's Board of Directors, with Marsha Lazareva serving as a director – again, illustrating that these new entities were nothing but further extensions of the Port Fund and KGLI.

## GGDH Established and Sold to Udenna Subsidiary

- o In a further series of opaque transactions involving additional Cayman shell companies, the Port Fund "regained" control of the Clark Project before selling it to a developer for nearly USD 1 billion.
- o On January 27, 2015, a new Clark Project-related entity, GGDC Holdings ("GGDH"), was established in the Cayman Islands.
- o It is believed that GGDH (a) was controlled by the Port Fund; and (b) acquired majority ownership of CGDC from CGIG sometime between January 27, 2015 and October 19, 2017.
- o On October 19, 2017, the Philippines antitrust regulatory enforcement agency approved the sale of GGDH to Clark Global City Corp. ("CGCC"), a subsidiary of Philippine holding company Udenna Development Corp. ("Udenna"). Contemporaneous reporting on the sale noted that: (a) GGDH was the majority shareholder in GGDC; (b) "Udenna bought the project from Kuwaiti fund [KGLI]"; and (c) "[t]he project is estimated to be worth $1 billion."

- On November 14, 2017, when the sale of GGDH to Udenna (through CGCC) closed, contemporaneous reporting also noted that the Clark Project was worth USD 1 billion.
- CGCC's financial statements for the year ended December 31, 2017 state that it acquired all of GGDH's outstanding shares for shares for PHP 50,179,400,000 (at the time this would have equated to approximately USD 959 million).

## Transfer of USD 496 million to Port Link's Account at Noor Bank and Freezing of Those Funds

- Despite the near USD 1 billion reported sale price for GGDH, Lazareva first attempted to evade the Port Fund's limited partners of all Port Fund exit monies by claiming that the Fund had exited all of its investments at a complete loss.
- On information and belief, realizing that such a brazen fraud would be uncovered, the Port Fund and its executives subsequently accounted for the Clark Project exit in varying amounts.
- On November 22, 2017, the Port Fund wrote to KPA to inform it that (a) the "Port Fund successfully exited its investments in Sabah Al-Ahmad Global Gateway Logistics City (GGDC) in November 2017"; (b) "[w]ith the completion of the sale of GGDC, The Port Fund has exited all of its investments"; and (c) in addition to an earlier October 2016 distribution of USD 30 million to the Port Fund's limited partners (the "first tranche payment"), the Port Fund was now intending to distribute approximately USD 340 million to its limited partners (the "second tranche payment") by the end of 2017, resulting in a total distributions of USD 370 million to the limited partners.
- Days later, on November 29, 2017, the Port Fund issued a press release announcing the "successful exit of [its] investments doubling its Fund's capital from $188 million to $380 million and generating an annual return of %10 over 10 years."
- The truth was that on November 14, 2017, Philippines bank BDO Unibank had transferred USD 496,429,777 to Port Link's account at Dubai's state-owned Noor Bank. As part of this transfer, the funds passed through an account at Citibank.
- It was only after authorities in Dubai froze these funds on suspicions of money laundering – thereby exposing the wrongful nature of the numbers previously provided to KPA – that Lazareva claimed this USD 496 million amount belonged to the Port Fund, tweeting on May 21, 2018: "Noor Bank and Dubai seized the Port Fund and it's investors' money and refused to release it to them.".
- As part of an effort to secure the release of the Port Fund monies frozen in Dubai (now that such funds had been exposed), on June 2, 2018, Mark Williams posted a video message on Twitter directed at the Emir of Kuwait, asking him to intervene in securing the release of "$340 Millions of #Port_Fund Investors monies frozen by #Dubai Government." In a reply tweet, Williams stated "USD$500MM of an international private equity firm's monies wrongly frozen in Dubai because of false allegations coming out of Kuwait denying international and Kuwaiti investors of USD$340MM in net profits and returned capital."
- On February 5, 2019, the Port Fund issued a press release announcing that it had secured the release of USD 496 million "in investor funds that have been frozen at Noor Bank in Dubai," noting that the "money consist[ed] of proceeds earned by The Port Fund through the 2017 sale of a development project in the Philippines."

## Discrepancies between Sale of GGDH to Udenna and Statements Regarding Port Fund's Exit

- As set forth above, the Port Fund has failed to even acknowledge the nearly half billion dollars missing from the sale of its investment in the Philippines.
- LPs of the Port Fund should be entitled to understand the differential between the near USD 1 billion amount that CGCC reported it paid to acquire GGDH and the USD 496 million amount that the Port Fund has acknowledged receiving as the proceeds from the sale of the Clark Project.
- On March 8, 2019, MP Riyadh Al-Adsani asked questions about the discrepancies between (a) the near USD 1 billion figure that CGCC reported in its 2017 financial statements as having paid to acquire GGDH; (b) the USD 496 million figure that that the Port Fund represented were the proceeds of its "2017 sale of a development project in the Philippines"; and (c) the USD 380 million figure that the Port Fund had used when stating the amount at which it was exiting its investments.
- The Port Fund could not address these discrepancies, even in a press release it voluntarily issued in response to respond to MP Al-Adsani's inquires.
- On May 9, 2019, MP Abdullah Al-Kandari raised similar questions, asking Kuwait's Minister of Finance to (a) explain why the Port Fund and Williams had publicly stated three different amounts at which the Fund had exited its investments (USD 340 million, USD 380 million and USD 496 million); and (b) reconcile the differential between those amounts and the near USD 1 billion figure that CGCC reported in its 2017 financial statements as having paid to acquire GGDH.

## Distributions to Limited Partners

- On information and belief, to date, the Port Fund has only sought to distribute USD 296 million in proceeds from the Clark Project to its limited partners

**EMPEML Lawsuit**

### Background

- ○ KGL Investment Cayman Ltd. (now known as EMPEML), was established in the Cayman Islands on the same day (March 8, 2007) and by the same agent (Walkers Corporate Limited) as the Port Link, the Port Fund's General Partner.
- ○ Pursuant to the terms of the Private Placement Memorandum, KGL Investment Cayman Ltd. was to serve as the Port Fund's Investment Manager and have "responsibility to provide management and investment advisory services to the [Port] Fund pursuant to the terms of the investment management agreement between [Port Link] and the Investment Manager."
- ○ On June 28, 2007, Port Link and KGL Investment Cayman Ltd. executed an Investment Management Agreement ("IMA"), setting out the terms of the parties' relationship.
- ○ Sometime between June 28, 2007, and July 9, 2018, KGL Investment Cayman Ltd. Changed its name to EMPEML.
- ○ The Port Fund's charter documents contemplated that the Investment Manager would be paid an annual Management Fee equal to 2% of the Port Fund's aggregate Capital Commitments, and that if the Port Fund's initial five-year term was extended, the Management Fee would be reduced to an annual fee of 1.5% of the Port Fund's aggregate Capital Commitments.
- ○ The Port Fund's charter documents further specified the order that the Port Fund was to follow when making distributions from each of its exited investments, which is included, among other things, a 20% Carry for the Investment Manager on an any investment profits left after other required distributions had been made.

## EMPEML Institutes a Sham Lawsuit against Port Link and Port Fund

- ○ On July 9, 2018, EMPEML filed a claim ("Claim Form") against the Port Fund and Port Link in the Dubai International Financial Centre ("DIFC") Courts alleging that, pursuant to the terms of the IMA and near identical provisions within the LPA, it was owed over USD 57 million stemming from unpaid (a) Carry on the Port Fund's distributions; and (b) Management Fees. Despite the lack of any nexus to Dubai, and the speedy resolution of the matter, as detailed herein, EMPEML paid an exorbitant fee of USD 130,000 to file the Claim Form.
- ○ With regard to the unpaid Carry, EMPEML claimed that: (a) "[u]pon exiting fund investments, the LPA and the IMA require [Port Link] to distribute 20% of the exited fund investments to EMPEML, in its capacity as investment manager of the [Port Fund], as well as to distribute the remaining 80% to the [Port Fund's Limited Partners]"; (b) the Port Fund exited all of its investments in late 2017; (c) on November, 14, 2017, as a result of the Port Fund exiting its investments, "BDO Unibank wired the proceeds, being USD 496,429,777, to [Port Link's] account held with Noor Bank in Dubai, of which USD 45,462,000 was to be used to pay to EMPEML the Carry in accordance with the IMA and LPA"; (d) "in breach in breach of its obligations under the IMA, [Port Link] and/or the [Port Fund] failed to pay EMPEML the Carry"; (e) on June 16, 2018, "EMPEML sent a demand notice to [the Port Fund] request ng payment of the Carry of USD 45,462,000, i.e. 20% of distributions from exited [Port] Fund [i]nvestments"; and (f) compound interest on this unpaid Carry amount was accruing at a rate of 8% per year.
- ○ With regard to the unpaid Management Fees, EMPEML claimed that: (a) under the IMA and "a near identical provision" in the LPA, it was owed "an annual management fee equal to 1.5% of the [Port] Fund's aggregate Capital Commitments" that was "payable quarterly in advance ... on the first day of each calendar quarter"; (b) the Port Fund and Port Link had not paid the Management Fee to EMPEML since January 1, 2015; and (c) a "Management Fee of USD 8,106,386 is due and outstanding to EMPEML"; and (d) compound interest on this unpaid Management Fee amount was accruing at a rate of 8% per year.
- ○ Despite being Cayman entities without any ties to Dubai, the Port Fund and Port Link immediately consented to service of the Claim Form and to the jurisdiction of the DIFC Courts.
- ○ Worse yet, the Port Fund and Port Link then declined to even contest EMPEML's Claim Form, essentially handing EMPEML a default judgment on its claims. Less than three weeks after EMPEML filed its Claim Form, the Court granted a judgment in its favor against the Port Fund and Port Link.
- ○ On July 11, 2018 Port Link and the Port Fund filed an "Admission" acknowledging that they were jointly and severally liable to EMPEML for USD 56,808,005 (the "Admitted Amount"). In short, EMPEML's claims were conceded without any contest raising the question as to why – beyond attempting to add legitimacy to a wrongful transaction – a lawsuit even necessary.
- ○ On July 12, 2018, EMPEML filed a Request for Default Judgment for Admission (the "Request").
- ○ On July 25, 2018, the Court granted the Request, issuing a Judgment for EMPEML in the amount of USD 56,999,978, which was the Admitted Amount plus interest at 8% per year dating from July 9, 2018, the date that EMPEML filed its Claim Form.
- ○ As a result, Port Fund monies have been diverted from the limited partners to purport to satisfy this judgement – and, in fact, to self-deal to Port Fund and KGLI executives – in violation of the Port Fund's charter and applicable laws.

3. I believe that it is incumbent on LPs of the Port Fund to move quickly to protect their interests in this matter.

6/14/2019                                      Roundcube Webmail :: Attorney Client Privileged

As discussed with Tarek, at the least, we would recommend the following:

- Immediately instruct Cayman counsel, as well as forensic accountants and investigators in order to fully investigate this matter.
- Instruct Cayman counsel immediately apply to Cayman court to appoint a judicial protector to provide a full accounting of the Port Fund's assets in order to determine the true state of financial affairs of the Fund.
- Instruct Cayman counsel seek a worldwide freezing order over the Port Fund's assets.

I know this is quite a complicated chain of events, but there seems to be significant questionable transactions that require the immediate attention of the LPs of the Port Fund.

Should you wish to discuss, please do not hesitate to let me know.

Best regards,

**Bader Abdulmohsen El-Jeaan**

Senior Partner

**Meysan Partners**

P.O. Box 298, Safat 13003

Al Hamra Tower, 17th Floor, Al Shuhada Street, Sharq, Kuwait

Tel: +965 2205 1000, Fax: +965 2205 1001
M: +965 9111-8111 (Kuwait), M: +97152 999 9965 (UAE)

This message and any attachments may contain confidential and privileged information. If you are not the intended recipient, you have received this in error and any review, distribution or copying of this communication is strictly prohibited. In such an event, please notify us immediately by reply email or by phone (at +965-2205-1000) and immediately delete this message and all attachments. Cybercrime and fraud is on the increase. If you receive an email or other electronic communication purporting to be from this firm changing details of any account of ours to which monies are to be sent, it is unlikely to be genuine. Please do not act on the communication but contact us immediately at the telephone number or email address on our website.

4 -



# Tarek Sultan

HOME    PROFILES ⌄    CATEGORIES ⌄    AGILITY WEBSITE

## Biography



Tarek Sultan is the Chief Executive Officer and Vice Chairman of Agility, one of the world's leading providers of integrated logistics. It is a publicly traded company with ~ $5.1 billion in revenue, 26,000 employees, and offices in more than 100 countries.

Mr. Sultan assumed leadership of Agility in 1997, spearheading the company's expansion from a local Kuwaiti company into a business that has been described as a "global challenger" by the Boston Consulting Group and designated a 3PL industry leader by Gartner. Agility today has a market leading position in the Middle East and Asia, and a strong and growing presence in Latin America and Africa.

Mr. Sultan holds a MBA from the Wharton School at the University of Pennsylvania and Bachelors of Economics from Williams College. His past experience includes acting as the Managing Director of New York Associates, a Middle East investment banking firm, and an associate with Southport Partners, a U.S.-based corporate finance advisory firm specializing in the technology sector.

Mr. Sultan is married with three children. He enjoys playing tennis and golf.

**RECENT POST**

As COVID-19 disrupts the supply chain, we keep cargo moving

كورونا يهدد سلاسل الإمداد لكننا نحافظ على تسيير البضائع

Agility's latest report reviews that emerging markets are resilient, despite concerns of a recession

B-I-R-D: A digital technologies that can help supply chains take flight

Looking Back on 2019

**CATEGORIES**

Agility

Award

Business Wire

Corporate Social Responsibility

Emerging Markets

Events

Financial Results

General

Interview

Media

Pharma

Tease

Thisisarewa Magazine

Video

Powered by WordPress / Theme by Design Lab

## Board of Directors





BY EMAIL

6 March 2020                                                                   Our Ref: BG/LP/D08984

Ogier
89 Nexus Way
Camana Bay
Grand Cayman KY1-9009
Cayman Islands

**Attention: Jennifer Fox**

Dear Sirs

**KUWAIT PORTS AUTHORITY V THE PORT FUND L.P. (THE "FUND") AND PORT LINK GP LTD.
CAUSE NO. FSD 13 OF 2020 (THE "CAYMAN PROCEEDINGS")**

1.     **INTRODUCTION**

1.1    We refer to the Cayman Proceedings and the Originating Summons issued by the Kuwait Ports
       Authority (the "**KPA**") dated 29 January 2020 (the "**Summons**") against the Port Fund L.P. (the
       "**Fund**") and Port Link GP Ltd. (the "**GP**").

1.2    We also refer to the *ex parte* application filed by the KPA in the United States for an order to conduct
       discovery against Citibank, N.A. ("**Citibank**") and E-Trade Financial Corporation ("**E-Trade**")
       concerning information relating to the Fund for use in contemplated litigation in the Cayman Islands
       pursuant to 28 U.S.C. § 1782 and Federal Rules of Civil Procedure 26, 34, and 45 (the "**US
       Proceedings**" and together with the Cayman Proceedings, the "**Proceedings**").

1.3    By way of opening observation, we note that the evidence contained in the First Affidavit of Yousef
       Al Sabah ("**Mr Al Sabah**") dated 27 January 2020 and filed in support of the Summons ("**Al Sabah
       1**"), is selective and misleading.  Your client has made a number of serious allegations against the
       Fund, KGL Investment Company K.S.C.C. ("**KGLI Kuwait**") in its capacity as the sponsor and
       placement agent of the Fund, and the Fund's management team in the Proceedings.  For example,
       your client states in paragraph 11 of Al Sabah 1 that the KPA "*believes that a significant fraud has
       been committed by, inter alia, Port Link, KGLI, and individuals associated with KGLI, which has
       resulted in the misappropriation of assets belonging to the Port Fund, in the order of several
       hundred million dollars, as well as other wrongdoing (including potential kickbacks).*"  However, the
       KPA has yet to provide any credible evidence to substantiate these serious allegations.

1.4    On 29 January 2020, Andrew Childe and Christopher Rowland of FFP (Directors) Limited were
       appointed as independent directors on the board of the GP to assist the Fund and the GP with
       respect to the Proceedings and addressing the allegations made against the Fund and the GP (the
       "**Independent Directors**"). The Independent Directors will be in charge of matters going forward
       given their experience in dealing with vehicles involved in litigation and contentious issues
       comparable to those currently faced by the Fund. All of the Directors of the GP take the matters
       and allegations raised by the KPA very seriously and are investigating these matters very carefully.

1

**Walkers**

190 Elgin Avenue, George Town

Grand Cayman KY1-9001, Cayman Islands

T +1 345 949 0100  F +1 345 949 7886  www.walkersglobal.com

9748208.2 T5138.D08984

1.5    Given the nature of the allegations and matters raised by the KPA and the expenses that have been and will be incurred if litigation proceeds in multiple jurisdictions, the Fund and the GP have considered it appropriate to substantively respond to the matters raised in the Proceedings so that the issues in question can be narrowed (if not extinguished altogether).

## 2.    BACKGROUND TO THE PROCEEDINGS

2.1    In or around September 2019, the Fund became aware that third parties had contacted investors of the Fund in order to encourage investors to commence legal proceedings against the Fund based upon unsubstantiated allegations. The Fund's concerns in this regard arose as a result of our clients being provided with a copy of an email that appears to have been sent by Bader AbdulMohsen El-Jeaan ("**Mr El-Jeaan**") to a number of investors in the Fund in or around June 2019 (the "**El-Jeaan Email**"). As you will be aware, Mr El-Jeaan is a partner at Meysan Partners, a law firm based in the State of Kuwait, and is currently instructed by two other limited partners of the Fund, Gulf Investment Corporation ("**GIC**") and General Retirement and Social Insurance Authority, in separate proceedings issued by GIC pursuant to section 22 of the Exempted Limited Partnership Law (as amended).

2.2    Notwithstanding the positive performance of the Fund and the significant distributions made by the Fund to limited partners following the exit of the Fund's investments, the El-Jeaan Email made a number of unsubstantiated allegations regarding the purported mismanagement of the Fund and the alleged risk of the dissipation of the Fund's assets. The allegations set out in the El-Jeaan Email are wholly without any substance or merit and are, in many instances, defamatory to the Fund and its management team.

2.3    By way of an example, the El-Jeaan Email made the following misleading and inaccurate statements as part of Mr El-Jeaan's efforts to defame the Fund and its management team in order to encourage investors to commence legal proceedings against the Fund:

> "*As I indicated to Tarek, based on my review of this matter, there is a critical need to protect the LPs' investment in the Port Fund. I must emphasize the need for speed on this matter in order to ensure that the assets of the Port Fund are no lost. It is imperative that they move quickly.*"
>
> …
>
> "*Despite the near USD 1 billion reported sale price for GGDH, Lazareva first attempted to evade the Port Fund's limited partners of all Port Fund exit monies by claiming that the Fund had exited all of its investments at a complete loss.*"
>
> …
>
> "*On information and belief, realizing that such a brazen fraud would be uncovered, the Port Fund and its executives subsequently accounted for the Clark Project exit in varying amounts.*"

As will be described in further detail in this letter, such statements are misleading and inaccurate and appear to be nothing more than an attempt by Mr El-Jeaan and other third parties (who have no financial interest in the Fund) to cause disruption to the Fund and its management team.

<div align="center">2</div>

2.4    In addition to the defamatory allegations of fraudulent activity as set out in the El-Jeaan Email, it is of particular concern to our clients that there are multiple references in the El-Jeaan Email to discussions with "Tarek".    Representatives and advisors of the Fund have confirmed that such references are to Tarek Sultan, who is the Chief Executive Officer of Agility Public Warehouse Company in Kuwait ("**Agility**").  Further, we note that Mr El-Jeaan previously worked as in-house legal counsel for Agility prior to commencing his current employment with Meysan Partners in Kuwait.

2.5    As your client will be aware, Agility is a major commercial rival to the KGL Group in Kuwait and competes directly with the KGL Group for US government defence contracts.  The KGL Group refers to a group of companies in Kuwait with regional interests in transportation, logistics and supply chain management. The former Chairman of the KGL Group, Mr. Saeed Dashti, also served in his individual capacity as a director of KGLI Kuwait and the GP, and Ms. Maria (Marsha) Lazareva, a former KGL Group employee, served as a director of the GP and currently serves as the Vice Chairman and CEO of KGLI Kuwait (which was the parent company of the former investment manager of the Fund). Both Mr. Dashti and Ms. Lazareva were, to varying degrees, involved in the day-to-day management of the Fund. It is apparent from the El-Jeaan Email, as well as other steps taken by Agility and its representatives in Kuwait in connection with the criminal proceedings in Kuwait against Ms Lazareva and Mr Dashti, that Agility and its associates have pursued a transparent strategy of seeking to damage the interests of the KGL Group (and by extension the Fund) in order to further their own commercial interests and agendas.

2.6    Your client wrote to Crowell & Moring LLP ("**Crowell**"), the Fund's US legal counsel, in a letter dated 8 October 2019. The KPA stated in this letter that they "*wish to raise a number of issues of grave concern*" to the KPA and requested that the Fund provide the KPA with an exhaustive list of documentation and information on a range of issues.  However, the letter failed to particularise the nature and source of the KPA's concerns and, furthermore, had been signed by Mr Al Sabah in his capacity as the Director General of the KPA.

2.7    Without in any way waiving any privileges, Walkers is instructed that Mr Al Sabah does not have the requisite authority to represent the KPA and instruct attorneys on the KPA's behalf with respect to the Proceedings. We are further instructed that the Minister of State for Services Affairs for the State of Kuwait (formerly known as the Minister of Communications), in his capacity as the chairman of the board of directors of the KPA, has the sole authority to represent the KPA on any and all legal matters as well as matters relating to the KPA's arrangements with third parties. Accordingly, Walkers wrote to the Minister of State for Services Affairs on 22 October 2019 to express the Fund's concerns that the views set out in the letter of 8 October 2019 do not necessarily represent the views of the board of directors of the KPA.

2.8    Walkers received two further letters from Mr Al Sabah on 31 October 2019 in response to the letter sent to the Minister of State for Services Affairs. In the first letter dated 31 October 2019, Mr Al Sabah referred to a number of Ministerial Decrees as evidence for his authority to represent the views of the KPA.  Without waiving any privileges, we are instructed that Mr Al Sabah's letter was incorrect and misstated the position as a matter of Kuwaiti law with respect to Mr Al Sabah's purported authority to represent the KPA.  In the second letter from Mr Al Sabah dated 31 October 2019, Mr Al Sabah set out his alleged concerns with respect to the management of the Fund and his request for information and documentation on various issues.

2.9    In circumstances where the Proceedings appear to be directly based on, and the result of, the unsubstantiated allegations set out in the El-Jeaan Email, it is disappointing that your client has commenced costly legal proceedings that the Fund has been forced to respond to in multiple jurisdictions without prior notice of the same.

<div align="center">3</div>

9748208.2 T5138.D08984

2.10    Notwithstanding your client's premature decision to commence the Proceedings and without prejudice to the matters raised above and in previous correspondence regarding Mr Al Sabah's lack of authority to represent the KPA, our clients have, to the extent they are able to do so without breaching their confidentiality obligations to third parties, prepared responses to the numerous requests for information in the Proceedings which are set out in this letter.

2.11    We also **enclose** at Schedule 1 a table that consolidates all of your client's information requests in the Proceedings along with a corresponding paragraph reference to this letter where the Fund's response to each information request can be identified.

3.    **PAYMENTS RELATING TO THE SALE OF GGLC**

3.1    Between 2008 and 2017, the Fund developed a project in the Philippines to develop a logistics city which in 2012 was named Sabah Al Ahmed Global Gateway Logistics City ("**GGLC**"). The Fund's equity investment in this project was approximately US$100,000,000. The Fund structured its investment in GGLC by incorporating Global Gateway Development Corporation ("**Global Gateway**"), a Cayman Islands exempted company.  Global Gateway ultimately owned the underlying business assets in the Philippines and, in particular, entered into the lease agreement with Clark Civil Aviation Complex to develop GGLC.  The Fund later incorporated GGDC Holdings, a Cayman Islands exempted company, that acted as an intermediary company between the Fund and Global Gateway.  GGDC Holdings in turn owned the majority of the issued share capital of Global Gateway.

3.2    In July 2017, the Fund agreed to sell the entire issued share capital of GGDC Holdings to Udenna Development (UDEVCO) Corporation ("**Udenna**"), a company incorporated in the Philippines.  The transaction details are subject to non-disclosure obligations (as Udenna reaffirmed when the Fund asked Udenna for its consent to disclose such details in the past). Whilst the purchase price reported by Udenna in a regulatory filing in the Philippines was significantly higher than the net purchase price received by the Fund, any disclosure made by Udenna of the purchase price is not determinative of what was agreed with the Fund with regards to the sale of GGLC. What Udenna has stated in its regulatory filing is unrelated to and completely independent of the Fund and is a matter for Udenna to address. It is not up to the Fund to explain Udenna's regulatory filings.

3.3    As your client is aware, as part of the sales process, the Fund received a payment of US$496,429,767 (the "**$496 Million**") from Udenna in connection with the sale of GGDC Holdings. The $496 Million was transferred to Noor Bank PJSC ("**Noor**") for deposit into a bank account held in the name of the GP (the "**Noor Account**").

3.4    Following the receipt of the $496 Million by Noor but before the funds were deposited in the Noor Account, the UAE Central Bank and the Attorney General of Dubai (the "**Dubai AG**") instructed Noor to freeze the $496 Million. The monies remained frozen until February 2019. The Fund subsequently became aware that the lengthy freeze stemmed from attempts of the Attorney General of the State of Kuwait (the "**Kuwait AG**") to have the vast majority of the $496 Million transferred from the Noor Account to only two Kuwaiti limited partners (to the detriment of the other limited partners of the Fund).

3.5    The Fund has obtained copies of correspondence between the Dubai AG and the Kuwait AG (the "**Attorney General Correspondence**"), which explains why the $496 Million remained frozen from November 2017 to February 2019.  It is apparent from the Attorney General Correspondence that that the Kuwait AG sought to persuade the Dubai AG to transfer US$400 million of the $496 Million to your client, the KPA, and the Public Institution for Social Security ("**PIFSS**") on the unexplained

4

and unjustified grounds that such monies belonged to the State of Kuwait and were duly owed to PIFSS and the KPA (as further explained below).

3.6     A summary of the Attorney General Correspondence is set out below:

(a)     On 22 March 2018, a letter was sent from the UAE Judicial Authority (represented by the Public Prosecution of Dubai) to the Judicial Authority of the State of Kuwait in which it noted, *inter alia*, that (i) on 21 November 2017, a report was issued by Noor to the Public Prosecution of Dubai regarding the $496 Million as a possible money laundering transaction involving the GP and, accordingly, the Public Prosecution issued its resolution to freeze the Noor Account; (ii) on 22 November 2017, the UAE Central Bank informed its Kuwaiti counterpart of the allegedly suspicious transaction; and (iii) on 18 March 2018, the Public Prosecution of Dubai received a comprehensive report issued by the Dubai Police that found that the money was "*of a legal source*". In its letter of 22 March 2018, the Public Prosecution of Dubai specifically requested information relating to the wire transfer of the $496 Million and the relationship between the funds and the ongoing investigations in Kuwait against KGLI Kuwait, the Fund, Mr Dashti and Ms Lazareva;

(b)     it appears that a letter was sent from the Kuwait AG to the Dubai AG on 9 May 2018 in order to request that a sum of US$400 million should be transferred from the $496 Million to the KPA and PIFSS as such monies were claimed to be public funds and belonged to the KPA and PIFSS. No evidence or explanation appears to have been provided to support or justify the request that such sums should be transferred[1];

(c)     on 7 June 2018, a letter was sent from the Dubai AG to the Kuwait AG stating that in order to satisfy the request of the State of Kuwait, they will need to submit a court order to confiscate or freeze the US$400 million which the Kuwait AG had requested be transferred to the KPA and PIFSS;

(d)     on 18 September 2018, a letter was sent from the Kuwaiti Prime Minister to the Vice President and Prime Minister of the UAE and ruler of the Emirate of Dubai (the "**UAE Prime Minister**") noting that the Kuwait AG had consistently been seeking to ensure that the frozen funds were not sent to any entities outside the State of Kuwait but had not received a response to such requests;

(e)     on 16 October 2018, a further letter was sent from the Kuwait AG to the Dubai AG in which the Kuwait AG had significantly lowered its demands with respect to the transfer of monies to the KPA and PIFSS. Instead of requesting that US$400 million be transferred to the KPA and PIFSS as it appears to have done in May 2018, the Kuwait AG now requested that US$125,000,000 be transferred to the KPA's bank account and US$79,200,000 transferred to PIFSS' bank account from the $496 Million (the "**Final Kuwait AG Imposition**");

(f)     on 3 November 2018, the UAE Prime Minister responded to the 18 September 2018 letter confirming that discussions were ongoing between the respective judicial authorities in order to ensure no stakeholders are harmed;

---

[1]     The Fund has not been able to obtain a copy of this letter but is aware of its existence from the later letters between the Kuwait AG and the Dubai AG.

9748208.2 T5138.D08984

(g)  on 30 December 2018, a letter was sent by the Kuwait AG to the Dubai AG requesting the release of the $496 Million for deposit in the Noor Account so that funds could be distributed to the Kuwaiti governmental institutions and other stakeholders; and

(h)  on 13 January 2019, a letter was sent from the Dubai AG to the Kuwait AG noting that a decision had been made to release the $496 Million within two weeks.

Copies of the Attorney General Correspondence along with certified translations are **enclosed** for your information at Schedule 2.

3.7   We are instructed that the Final Kuwait AG Imposition was imposed on representatives of the Fund in October 2018. It was made clear to the representatives of the Fund that this was the final imposition and if the Fund did not accept the terms of the Final Kuwait AG Imposition there was no possibility of the $496 Million being released to the Fund.  Given that the Fund had no say on the terms of the Final Kuwait AG Imposition, and was simply the recipient of such impositions from the Kuwait AG, the Fund considered that at such point in time that it would cost more to continue fighting than to accede to this imposition for the benefit of all the limited partners and creditors of the Fund.

3.8   In circumstances where the $496 Million had already been frozen for 14 months and the Fund did not have any reason to believe that the funds were going to be released by the Dubai authorities given the diplomatic pressure being exerted by the Kuwait AG, we are instructed that the Fund ultimately acceded to the Final Kuwait AG Imposition in or around October 2018.

3.9   At the time that the Final Kuwait AG Imposition was communicated to representatives of the Fund in October 2018, acceding to such demands appeared to be the only realistic prospect of the Fund securing the release of the $496 Million that would enable the Fund to settle its liabilities and make returns to all investors, despite the Fund's belief that those demands constituted an illegal expropriation.

3.10  Further to the Final Kuwait AG Imposition, the KPA was unduly enriched as a consequence of it receiving an extra US$13,230,877 from the Fund at the demand of the Kuwait AG to the detriment of all other investors other than PIFSS.  In circumstances where the Fund was forced to pay the KPA and PIFSS more distribution proceeds than they were entitled to, so that the Fund could receive the remainder of the $496 Million to pay the other limited partners their distribution proceeds, the Fund is considering the availability of restitutionary and unjust enrichment actions against the KPA and PIFSS and expressly reserves all its rights in this regard.

3.11  Once the $496 Million had been released by Noor in February 2019, the GP took the necessary steps to settle all of the remaining liabilities of the Fund and make final distributions to the limited partners of the Fund.  Representatives and advisors of the Fund have provided a summary and breakdown of the vast majority of the payments made from the Noor Account from when the $496 Million was unfrozen up until all the monies in the account were transferred out of the account is set out below[2]:

---

[2]   The table does not include bank account maintenance, internal and transfer fees charged by Noor to the Fund or any credited or reversed transactions.

6

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| 1. | AL AHLEIA INSURANCE CO S A K | 5,266,179.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 2. | KUWAIT REINSURANCE COMPANY | 3,507,018.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 3. | PUBLIC INSTITUTION FOR SOCIAL | 79,201,193.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 4. | THIRD OF THE LATE YACOB | 1,759,160.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 5. | KUWAIT PORT AUTHORITY | 125,000,000.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 6. | GULF INVESTMENT CORPORATION | 25,366,019.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 7. | BEHBEHANI INVESTMENT COMPANY | 2,004,241.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 8. | GENERAL RETIREMENT AND SOCIAL | 17,282,345.00 | 5 Feb 2019 | Distribution to limited partner of the Fund. |
| 9. | PETROLINK HOLDING COMPANY K S C C | 5,266,180.00 | 6 Feb 2019 | Distribution to limited partner of the Fund. |
| 10. | MOHAMMED ALI AL NAKI | 5,266,179.00 | 6 Feb 2019 | Distribution to limited partner of the Fund. |
| 11. | GLOBAL ADVOCACY | 89,737.00 | 6 Feb 2019 | Legal fees paid to Global Advocacy & Legal Counsel for legal services provided to the Fund in respect of the DIFC |

7

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| | | | | Proceedings (as described below in section 6). |
| 12. | KGLI ASIA ROHQ | 973,976.32 | 6 Feb 2019 | Fees paid to KGLI Asia ROHQ for administrative and personnel services it provided to the Fund in 2018 – 2019 in respect of the sale of GGLC and the subsequent release of the monies frozen at Noor. |
| 13. | JIMENO COPE DAVID AND | 3,651,570.00 | 6 Feb 2019 | Fees paid to Jimeno Cope David & Associates Law Offices for legal services provided to the Fund for legal services it provided to the Fund between January 2017 – 31 October 2017 in connection with Philippines regulatory compliance relating to the sale of GGLC. |
| 14. | C AND M LLP DC IOLTA TRUST | 7,500,000.00 | 7 Feb 2019 | Retainer monies paid to Crowell for their legal fees and for disbursement on behalf of the Fund (see paragraph 3.12 below). |
| 15. | Payee designated by KGLI Kuwait, as limited partner in the Fund | 21,538,989.56 | 7 Feb 2019 | Amount paid to a payee on instruction from KGLI Kuwait to transfer KWD 6,432,834.621 reflecting a portion of the distribution proceeds that KGLI Kuwait was entitled to as a limited partner of the Fund. As converted by Noor at .2987, the US$ total was 21,538,989.56. |
| 16. | Payee designated by KGLI Kuwait, as limited partner in the fund | 5,022,433.54 | 7 Feb 2019 | Amount paid to a payee on instruction from KGLI Kuwait to transfer KWD 1,500,000 reflecting a portion of the distribution proceeds KGLI Kuwait was entitled to as a limited partner of the Fund.  As converted by Noor at .2987, the US$ total was 5,022,433.54. |
| 17. | KGL INVESTMENT COMPANY K S C C | 8,520,061.87 | 7 Feb 2019 | After accounting for the payments in #15 and #16 above, this amount reflects the balance of the remaining distributions proceeds owed to KGLI Kuwait as a limited partner of the Fund. |

8

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| 18. | Payee designated by EMPEML | 59,990,461.30 | 7 Feb 2019 | Payment of amount ordered by the DIFC Judgment to a payee designated by EMPEML (as described below at section 6). |
| 19. | MICHAEL V RUSSELL | 300,000.00 | 7 Feb 2019 | Payment by Fund to an employee retained to assist with the sale of GGLC. |
| 20. | UDENNA CORP | 55,343,116.00 | 10 Feb 2019 | Payment in connection with the sale of GGLC. |
| 21. | TMF MAURITIUS LIMITED | 10,000.00 | 10 Feb 2019 | Administration fees paid to TMF. |
| 22. | WALKERS DUBAI LLP | 83,973.76 | 10 Feb 2019 | Legal fees paid to Walkers. |
| 23. | WILFREDO A PLACINO | 2,720,000.00 | 10 Feb 2019 | Advisor fees paid in connection with sale of GGLC. |
| 24. | KGLI ASIA ROHQ | 975,000 | 10 Feb 2019 | Fees paid to KGLI Asia for administrative and personnel services it provided to the Fund in 2018 – 2019 in respect of the sale of GGLC and release of monies frozen with Noor. |
| 25. | GLOBAL ADVOCACY AND LEGAL | 10,260.82 | 10 Feb 2019 | Legal fees paid to Global Advocacy & Legal Counsel for legal services provided to the Fund in respect of the DIFC Proceedings – invoice dated 15 Jan 2019 for AED365,492.03.<br><br>As the Fund had already paid AED327,988.72 (see transfer 11 above), the remainder left to be settled was AED37,503.31 (which when converted by Noor was 10,260.82). |
| 26. | C AND M LLP DC IOLTA TRUST | 41,700,000.00 | 12 Feb 2019 | Retainer monies paid to Crowell for their legal fees and for disbursement on behalf of the Fund (see paragraph 3.12 below). |

9

9748208.2 T5138.D08984

| | Recipient | Sum Transferred (in US$) | Date of Transfer | Transaction Details |
|---|---|---|---|---|
| 27. | MISHCON DE REYA LLP | 6,272.89 | 18 Feb 2019 | Fees paid for services provided in connection with certain proceedings in Kuwait. |
| 28. | BAKER TILLY COMPANY | 100,312.98 | 18 Feb 2019 | Payment for a report commissioned in connection with the Kuwaiti proceedings that involved transactions made by the Fund. |
| 29. | GLOBAL ADVOCACY AND LEGAL | 9,941.95 | 6 March 2019 | Legal fees paid to Global Advocacy & Legal Counsel for legal services provided to the Fund in respect of the DIFC Proceedings. |
| 30. | TMF MAURITIUS LIMITED | 10,000 | 14 March 2019 | Administration fees paid to TMF in its capacity as the Fund's administrator. |
| 31. | WALKERS (DUBAI) LLP | 4,444.14 | 24 March 2019 | Legal fees paid to Walkers |
| 32. | C AND M LLP DC IOLTA TRUST | 1,500,000 | 30 March 2019 | Retainer monies paid to Crowell for their legal fees and for disbursement on behalf of the Fund (see paragraph 3.12 below). |
| 33. | KGL INVESTMENT COMPANY KSCC | 858,028.77 | 1 April 2019 | Reimbursement of documented expenses owed to KGLI in connection with its engagement of other service providers in Kuwait to assist the Fund in unfreezing the $496 Million held by Noor and maintaining the reputation of the Fund in Kuwait. |
| 34. | THE PORT FUND L P | 242,433.07 | 1 April 2019 | Transfer of the remaining balance in the Noor Account to the Fund's account in Kuwait. |

3.12    With respect to the sums transferred from the Noor Account to Crowell & Moring LLP ("**Crowell**") as retainer funds, the below table provided by Crowell provides a breakdown of further payments made by Crowell acting on the instructions of the board of directors of the Fund:

10

9748208.2 T5138.D08984

| | Recipient | Sum Transferred (in US$) | Transaction Details |
|---|---|---|---|
| 1. | Squire Patton Boggs LLP | 1,405,930.69 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 2. | Navigant Consulting, Inc. | 229,593.56 | Engaged to provide services in support of legal advice to the Fund and the GP. |
| 3. | Brownstein Hyatt Farber Schreck LLP | 561,500.00 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 4. | Marathon Strategies, LLC | 260,795.18 | Engaged to provide services to assist in Fund's efforts to unfreeze $496 Million held by Noor and protect the reputation of the Fund. |
| 5. | diGenova & Toensing, LLP | 23,875.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 6. | Fahmy Hudome International LLC | 565,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 7. | Neil Bush | 1,085,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 8. | Triple Canopy Media LLC | 135,000.00 | Engaged to provide services to the Fund in support of the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 9. | Laktineh & Co Ltd | 231,650.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor and general advice on UAE law. |
| 10. | Uzma Sarfraz dba Aurora International LLC | 60,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 11. | Walkers (Dubai) LLP | 1,500,000.00 | Engaged as Cayman Islands legal counsel to the Fund. |
| 12. | Apache Asia and payee designated by Apache Asia | 36,200,000.00 | Paid to Apache on behalf of the Fund for fees owed to Apache for advisory services it provided to the Fund in connection with the sale of GGLC, with a portion paid to a payee |

11

9748208.2 T5138.D08984

|  | Recipient | Sum Transferred (in US$) | Transaction Details |
|---|---|---|---|
|  |  |  | designated by Apache Asia based on documented contractual obligations. |
| 13. | American Continental Group | 80,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 14. | Covington & Burling LLP | 10,434.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 15. | Essex Court Chambers | 14,491.15 | Engaged to provide legal services to The Port Fund. |
| 16. | McCool Smith, A Professional Corporation | 85,641.54 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| 17. | Crowell & Moring | 2,576,349.69 | Engaged to provide legal and other services to the Fund and Port Link GP. |
| 18. | The Port Fund | 1,396,926.76 | Returned to the Fund bank account in Kuwait. |

3.13    The tables set out above provide details with respect to the vast majority of the transactions made by or on behalf of the Fund from the monies originating in the Noor Account following the release of the $496 Million. Representatives and advisors of the Fund have instructed us that there have been occasions where service providers of the Fund who are based in Kuwait have been subject to malicious persecution from the authorities in Kuwait in order to deter other parties from assisting the Fund.  Accordingly, in circumstances where the disclosure of the identity of service providers to the Fund would, in all likelihood, lead to adverse and wholly unjust consequences for such parties, we have not included details of those transfers in the tables above.  Our clients are open to discussing sufficient confidentiality protections that would allow for the disclosure of such information in order to ensure that that the information is only used for a proper purpose. Furthermore, your client is not entitled to receive bank account details for the third parties who received payments from the Noor Account and such information is confidential to such third parties.

3.14    We note that in the US Proceedings your client has requested the following information from Citibank:

(a)      "All documents and communications concerning the $496 Million Deposit, including all documents and communications concerning USD dollar clearing transactions and/or other funds transfers concerning the $496 Million Deposit, as well as copies of all SWIFT messages concerning the $496 Million Deposit"; and

(b)      "Documents and communications sufficient to show (i) the account number for the Citibank account that received the $496 Million Deposit; (ii) the account holder of the Citibank

12

*account that received the $496 Million Deposit; (iii) the precise amount of the $496 Million Deposit; (iv) the date of the $496 Million Deposit; (v) the originating account(s) for the $496 Million Deposit; (vi) the beneficial owner of the originating account(s); (vii) the intermediary bank(s) involved in the $496 Million Deposit; (viii) the stated purpose or reason for the $496 Million Deposit and any other details relating thereto; (ix) any special instructions concerning the $496 Million Deposit; (x) notify party for the $496 Million Deposit (if any); (xi) any other details concerning the $496 Million Deposit; (xii) other transactions from the Citibank account that received the $496 Million Deposit before and/or after the $496 Million Deposit."*

3.15    It is entirely standard practice and indeed a mandatory requirement that any transactions made in United States dollars between entities that are not located in the United States are routed through a US intermediary bank account.  In November 2017, Citibank acted as the US intermediary bank for the transaction between Udenna and the Fund with respect to the sale of GGLC.  Our clients have provided detailed information with respect to the transfers made by the Fund from the Noor Account following the release of the $496 Million.  Accordingly, our clients do not see the purpose of the KPA's requests for information relating to Citibank's role as the intermediary bank in the transaction between Udenna and the Fund.

3.16    As explained in the above tables, and upon advisement from representatives and advisors of the Fund, all of the payments made out of the Noor Account were valid payments to third parties pursuant to legal, valid and binding agreements between, on behalf, or for the benefit of the Fund, the GP, its management and such third parties (as applicable).  We trust that this provides your client with sufficient information with respect to the use of the proceeds of the sale of GGLC.

## 4.      PREFERRED RETURN AMOUNT

4.1     Your client has requested the following information:

(a)     confirmation and itemisation of the capital commitments and contributions made by each limited partner at the commencement of the Fund and in each calendar year since that commencement, together with (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Fund's investments the capital was received and applied towards;

(b)     confirmation of the respective ownership percentages of the limited partners since the commencement of the Fund; and

(c)     the capital account statement in respect of the KPA covering each calendar year since the commencement of the Fund that should show the capital contributions made by and distributions made to KPA, any adjustments made to the KPA's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period.

4.2     Your client is not entitled to obtain copies of bank statements itemising the capital contributions made by each limited partner of the Fund or a breakdown of precisely how the Fund's capital has been applied to the various investments made by the Fund.

4.3     The information requested by your clients at paragraph 5.1 (b) and (c) above has been disclosed to the limited partners of the Fund in the audited financial statements of the Fund for the period between 31 July 2007 and 31 December 2016. Copies of the financial statements have previously been provided to your client, but are **enclosed** herein as Schedule 3 for the sake of completeness.

13

9748208.2 T5138.D08984

Such information as it relates to the years ending 31 December 2017, 31 December 2018 and 31 December 2019 will be provided in due course (see paragraph 4.5 and section 9 below).

4.4    With respect to distributions made by the Fund to the KPA, our client had reasonably assumed that your client has maintained a record of the distributions made by the Fund to KPA. However, for the sake of completeness the distributions made by the Fund to KPA are summarised below:

    (a)    a distribution of US$11,222,152.64 from the Fund to the KPA in November 2016 following the Fund's exit of its investment in Negros Navigation (as defined below); and

    (b)    a distribution of US$125,000,000 from the Fund to the KPA on 5 February 2019 following the Fund's exit of its investment in GGLC.

(We **enclose** at Schedule 4 copies of the relevant correspondence and SWIFT transfer slips confirming that the above distributions were made to the KPA.)

4.5    Further to previous correspondence with respect to the audited financial statements of the Fund for the years ending 31 December 2017, 31 December 2018 and 31 December 2019 (the "**Outstanding Audited Accounts**"), the joint auditors of the Fund, BDO Al-Nisf & Partners and Moore Stephens Al-Bahar & Co (the "**Auditors**"), are in the process of preparing the Outstanding Audited Accounts.

## 5.    COMINGLING OF FUNDS

5.1    Your client has requested any and all correspondence relating to, (i) the opening of the Noor Account and (ii) the rationale for the $496 Million being deposited into the Noor Account in the name of the GP rather than any of the bank accounts that had historically been utilised in the name of the Fund (for example Al Ahli Bank of Kuwait or HSBC Kuwait).

5.2    We note that the above requests appear to be founded upon the apparent concern of your client as explained at paragraph 31(b) of Al Sabah 1:

"*the Defendants failed to properly segregate the accounts of Port Fund from those of Port Link by depositing the USD 496 million purported exit proceeds from the Clark Asset into the Noor Bank Account.*"

5.3    This demonstrates a basic and fundamental misunderstanding of the structure and operation of exempted limited partnerships as a matter of Cayman Islands law.  Unlike a Cayman Islands company, an exempted limited partnership (the Fund) is not an entity with separate legal personality.  As such, all letters, contracts, deeds, instruments or documents must be entered into by the GP for and on behalf of the Fund.  Another consequence of the lack of separate legal personality is that the Fund cannot own property in its own right.  The general statutory position is that the property of the Fund will be held on statutory trust by the GP under section 16(1) of the Exempted Limited Partnership Law (as amended). Accordingly, the GP opened the Noor Account in its name and held any monies on the account on trust for the Fund in accordance with Cayman Islands law.

5.4    In any event, your client is not entitled to documentation relating to the opening of the Noor Account and we do not see any relevance of this information to your client's limited partnership interest in the Fund. Without prejudice to the above, we are instructed that the Noor Account was a pre-existing and established account of the Fund. The Fund ultimately directed the $496 Million to be transferred to the Noor Account in the knowledge that Dubai was a reputable financial centre in the

14

9748208.2 T5138.D08984

Middle East and that the majority of the transfers from the Fund would be to recipients in the Gulf Region.

**6.    THE DIFC PROCEEDINGS AND CARRY ENTITLEMENT**

6.1    We note that your client has made a number of information requests in the Cayman Proceedings with respect to a claim filed by Emerging Markets PE Management Limited ("**EMPEML**") against the Fund for outstanding sums due and payable under the terms of an investment management agreement between EMPEML and the Fund dated 28 June 2007 (the "**DIFC Proceedings**").

6.2    In paragraph (k) of the Schedule to Al Sabah 1, your client has requested all information and documents held by the Fund and the GP pertaining to KGLI Kuwait's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale.

6.3    Notwithstanding that EMPEML provided investment management services to the Fund between 2007 and 2018, EMPEML is a third party entity that is not and has never been owned or controlled by the Fund or the GP.  Accordingly, your client is not entitled as a matter of Cayman Islands law to be provided with any information or documentation relating to the sale of EMPEML. In any event, we note that our clients (being the Fund and the GP) are not in possession of any documentation of information relating to the sale of EMPEML.

6.4    In paragraph (l) of the Schedule to Al Sabah 1, your client has requested all written communication from EMPEML received by the GP, including but not limited to demand notices and correspondence relating to the investment management agreement.  Without prejudice to the fact that your client is not entitled to such information as a matter of Cayman Islands law, in the interests of transparency we hereby **enclose** at Schedule 5 a copy of the demand letter dated 7 July 2018 issued by EMPEML's DIFC legal counsel, Clyde & Co LLP, to the Fund that ultimately formed the basis of EMPEML's claim in the DIFC Proceedings (the "**EMPEML Demand Letter**").

6.5    In paragraph (m) of the Schedule to Al Sabah 1, your client has requested any information and documents pertaining to the DIFC claim brought by EMPEML against the Fund and the GP, including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not file a defence and any other material relevant to the DIFC Proceedings.

6.6    Any legal advice provided to the Fund during the course of the DIFC Proceedings is subject to privilege and your client is plainly not entitled to be provided with such advice.  However, for the avoidance of doubt, we note that the Fund and EMPEML were represented by separate DIFC legal counsel in connection with the DIFC Proceedings. Without waiving any privileges, the Fund concluded that EMPEML's claims asserted in the DIFC Proceedings had merit and that the Fund was not in the positon, financially or otherwise, to engage in protracted and costly litigation without a sufficient expectation of a success.  In addition, the EMPEML judgment could not be satisfied unless and until Kuwait ceased its improper effort to expropriate the monies frozen in Dubai and supported the release of those monies back to the Fund (permitting distributions to all the Limited Partners), or, at a minimum, until Kuwait appeared before a Dubai court to justify its improper request to expropriate the frozen funds before satisfying the pre-existing EMPEML judgment issued in the Dubai courts.

6.7    In paragraph (n) and (o) of the Schedule to Al Sabah 1, your client has requested the following information:

15

(a)    information and documentation (including documentary evidence and relevant agreements) submitted in the DIFC Proceedings or otherwise relied upon in support of EMPEML's claim of 8% penalty compound interest on delays in paying the Carry and Management Fees (as such terms are defined in the LPA); and

(b)    all information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Proceedings or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000.

6.8    It is apparent from your client's evidence filed in the Cayman Proceedings that your client has obtained a copy of the documents that have been publicly filed in the DIFC Proceedings, including the claim form filed in the DIFC Proceedings (the "**Claim Form**") and the default judgment dated 25 July 2018 (the "**DIFC Judgment**").  The Claim Form and the EMPEML Demand Letter, both of which have been provided to your client, set out the basis upon which EMPEML calculated the sums claimed in the DIFC Proceedings.

6.9    In paragraph (p) of the Schedule to Al Sabah 1, your client has requested all information and documents pertaining to the Fund's settlement of the DIFC Proceedings judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of and justification for those distributions.

6.10   Your client is in possession of a copy of the DIFC Judgment which clearly states that EMPEML was the beneficiary of the judgment sum ordered to be paid by the Fund in accordance with the DIFC Judgment.  As set out in the table above at paragraph 3.11, the Fund made a payment of $59,990,461.30 to EMPEML in accordance with their instructions on 7 February 2019 in order to satisfy the Fund's obligations under the DIFC Judgment.

## 7.    THE DAMIETTA LOAN

7.1    Your client has issued an extensive list of questions relating to the Fund's convertible loan investment in the Damietta International Port Company in Egypt ("**DIPCO**") as set out in paragraphs (q) to (s) of the Schedule to Al Sabah 1.  However, we note that the evidence filed by your client in support of the Proceedings fails to articulate why it is necessary and proper to investigate the Fund's convertible loan investment in DIPCO and the arrangements between the Fund and KGL International for Ports, Warehousing and Transport K.S.C.C. ("**KGL Ports**").

7.2    Notwithstanding your client's failure to provide any evidence of misconduct or mismanagement with respect to the Fund's investment in DIPCO, our clients have, to the extent they are able to do so, provided a response to the KPA's extensive list of questions below.

7.3    As your client is aware, the Fund entered into a convertible loan agreement with KGL Ports dated 22 August 2007 whereby the Fund provided a US$20 million loan to KGL Ports (the "**DIPCO Loan**") with an option to be converted into equity in DIPCO at a later date (the "**DIPCO Loan Agreement**").  The DIPCO Loan Agreement contains confidentiality provisions that prevent the Fund from disclosing the agreement to any third parties without the prior written consent of KGL Ports.

7.4    This firm wrote to KGL Ports on behalf of the Fund in a letter dated 6 February 2020 in order to seek KGL Ports' consent to disclose the DIPCO Loan Agreement to your client in the course of the Proceedings.  KGL Ports responded to our letter on 12 February and noted that it expected the Fund to comply with the confidentiality provisions in the DIPCO Loan Agreement. Copies of the correspondence between Walkers and KGL Ports are **enclosed** at Schedule 6.

16

7.5    In its letter of 12 February 2020, KGL Ports provided an explanation as to why it is unwilling to release the Fund from its confidentiality obligations under the DIPCO Loan Agreement without sufficient restrictions being imposed on the disclosure of such information to your client:

"*In addition, a former in-house lawyer of one of KGL's main competitors in Kuwait has been representing GIC in these matters and, in fact, engaged in non-privileged communications with our competitor's CEO as part of a plan to encourage one or more of the Fund's limited partners to file a legal action in the Cayman Islands even though the competitor has no financial interest or legal standing in the matter. The same former in-house lawyer of our competitor has engaged in multiple lawsuits and complaints against KGL Logistics (one of the KGL group of companies and a major shareholder in KGLPI) with the Kuwait Capital Market Authorities. In addition, the KPA and our competitor maintain an unusually close relationship, including illegally terminating KGL's ability to work at the Kuwait Ports and transferring the work to our competitor. Given this track record, we are concerned that the KPA will use the confidential information for an improper purpose in Kuwait.*

*KGLPI will therefore require robust restrictions on the disclosure of confidential information and other protections that will prevent misuse of the confidential information by the KPA, our main competitor, and the lawyers with close ties to our competitor.*"

7.6    As your client may be aware, the Damietta Ports Authority (the "**DPA**"), an affiliate of the Egyptian Ministry of Transport, terminated the concession agreement it had entered into with DIPCO (the "**DIPCO Concession Agreement**").  As a result of the termination of the DIPCO Concession Agreement and the cancellation of the project, the Fund decided against converting the DIPCO Loan into equity and called for the repayment of the DIPCO Loan by KGL Ports.

7.7    KGL Ports failed to repay the DIPCO Loan plus accrued interest to the Fund and therefore the Fund filed a claim in the Kuwaiti Courts (claim no. 6582/2016) against KGL Ports seeking the recovery of the outstanding sums due under the DIPCO Loan Agreement (the "**DIPCO Claim**").  The DIPCO Claim remains ongoing in the Kuwaiti Courts.  A copy of the DIPCO Claim along with a certified translation is **enclosed** at Schedule 7.

7.8    Your client may also be aware that DIPCO filed a claim against the DPA in the International Court of Arbitration with respect to the DPA's unilateral termination of the DIPCO Concession Agreement (the "**DIPCO Arbitration**"). The Fund has been informed that the International Court of Arbitration in Paris recently issued an award in favour of DIPCO that requires the DPA to pay significant damages to DIPCO (the "**DIPCO Award**").  In circumstances where KGL Ports is a significant shareholder in DIPCO, the board of directors of the Fund is closely monitoring the situation and considering next steps with respect to the recovery of the DIPCO Loan plus accrued interest from KGL Ports.

7.9    Your client has also requested internal documentation (including board minutes, meeting notes and correspondence) relating to the DIPCO Loan Agreement and the DIPCO Loan.  Your client is not entitled to be provided with the internal working papers of the Fund, and in any event, the provision of such documentation would cause the Fund to breach its confidentiality provisions to KGL Ports under the DIPCO Loan Agreement.

7.10   Your client has also queried the rationale for the Fund's decision to record a provisional loss of the DIPCO Loan in its audited financial statements for the year ending 31 December 2014.  In circumstances where there is uncertainty as to the prospects of recovery for outstanding sums, it is entirely standard practice to treat such amounts as provisional losses for the purposes of the accounting records of the Fund.  As noted above, the Fund is continuing to take all necessary steps to recover the DIPCO Loan and any accrued interest from KGL Ports.

17

9748208.2 T5138.D08984

8.      **NEGROS NAVIGATION**

8.1     We note that at paragraph 24 of Al Sabah 1 your client states that:

"*the sale of Negros Navigation had resulted in proceeds for the Port Fund of USD 120 million but an amount of circa USD 61.9 million had been used to settle "a loan outstanding for Global Gateway Development Corporation and other liabilities of the Fund." No explanation has ever been given as to what this loan was or what "other liabilities" of the Port Fund were discharged (if any).*"

8.2     The Fund prepared a detailed exit report relating to the Fund's sale of its stake in Negros Navigation and the use of the sale proceeds dated in or around November 2016 (the "**Negros Exit Report**"). A copy of the Negros Exit Report was provided to all limited partners in 2016 and this report provides a detailed breakdown of the sale of the Fund's stake in Negros Navigation. For the sake of good order, we have **enclosed** a copy of the Negros Exit Report at Schedule 8.

8.3     In the Negros Exit Report, it was explained to your client that the Fund exited its investment in Negros Navigation for a gross sale price of US$120,000,000. This figure was gross of the settlement of liabilities as stated in the Negros Exit Report. Such liabilities were:

| **Gross Sales Price** | **US$120,000,000** |
|---|---|
| Settlement of NNC transaction related liabilities | (US$1,431,145) |
| Settlement of loan for subscription in capital increase of 2 GO group | (US$20,148,203) |
| Transaction advisory and professional fees | (US$6,480,024) |
| **Net Sales Proceeds** | **US$91,940.628.** |

8.4     Usage of the Net Sales Proceeds is set out below:

| **Net Sales Proceeds** | **US$91,940.628.** |
|---|---|
| Final Payment of MPC GMO | (US$3,200,000) |
| Loan paid on behalf of GGLC | (US$54,265,116) |
| Exit related expenses paid on behalf of GGLC | (US$2,434,500) |
| Distribution to limited partners | (US$30,000,000) |
| **Retained by the Fund for working capital and operation expenses** | US$2,041,012 |

18

9748208.2 T5138.D08984

8.5    On 28 December 2015, KGL Investment B.V., an entity used by the Fund to facilitate its investment in Negros Navigation (as described in further detail in the Negros Exit Report), entered into a loan agreement as borrower and Madison Pacific Trust Limited as agent and security agent (the "**Madison Loan**"). The amounts borrowed under the Madison Loan were used to service the Fund's investment in Negros Navigation and GGLC.

8.6    In 2016, KGL Investment B.V. was required to settle outstanding monies owed to lenders under the Madison Loan in the amount of US\$74,413,318.77. Accordingly, following receipt of the gross sales proceeds from the Negros exit, the Fund made the abovementioned loan payments of US\$54,265,116 and US\$20,148,203 which equal US\$74,413,319 in full settlement of the Madison Loan (see Schedule 9 **enclosed** for a copy of the pay-off letter with respect to the Madison Loan).

8.7    The other liabilities listed in the above tables (which are extracted from the tables set out in the Negros Exit Report) are self-explanatory. It is misleading for the KPA to say that the Fund has not provided information on the nature of the liabilities above in circumstances where the KPA was provided with the Negros Exit Report in 2016, which contains such figures and their corresponding descriptions.

8.8    Notwithstanding that the KPA received a copy of the Negros Exit Report in late 2016, the KPA has not raised any concerns with respect to the Fund's exit of its investment in Negros Navigation until the Proceedings. In any event, the KPA has failed to adequately explain its concern about the liabilities settled by the Fund in connection with the sale of Negros Navigation and articulate why the information sought by the KPA in this regard is necessary.

8.9    The Fund's investment in Negros Navigation resulted in a successful exit for the Fund and enabled the Fund to make significant distributions to the limited partners, including US\$11,222,152.64 to the KPA.

9.    **AUDITED FINANCIAL STATEMENTS**

9.1    In paragraphs (t), (u) and (v) of the Schedule to Al Sabah 1, your client has requested the following information:

(a)    A full accounting process used to reach the purported ownership percentages of the limited partners and GP of the Fund as stated in the 2015 and 2016 audited financial accounts;

(b)    Full details of the investments (if any) made by KGLI Kuwait into the Fund; and

(c)    A full accounting of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts.

9.2    With respect to paragraph 9.1(a), the Fund's financial statements for 2015 and 2016 were audited by professional audit companies and in accordance with International Financial Reporting Standards.

9.3    With respect to paragraph 9.1(b), KGLI Kuwait has not made any investments into the Fund save for its capital commitments in its capacity as a limited partner in the Fund and such commitments have been duly recorded in the audited financial statements for the Fund.

9.4    With respect to paragraph 9.1(c), the Fund made distributions to the limited partners in October and November 2016 in accordance with the provisions of the LPA.

19

9748208.2 T5138.D08984

9.5    As noted above at paragraph 4.5, the Auditors are in the process of finalising the Outstanding Audited Accounts and the Fund will provide these to all of the limited partners of the Fund as soon as they have been issued and released by the Auditors.

9.6    The Fund has already provided an explanation with respect to the delay in finalising and issuing the Outstanding Audited Accounts. As noted in letters to all limited partners dated 3 October 2019, as a result of unsubstantiated allegations in connection with the management and affairs of the Fund made by third parties whose interests are adverse to those of the Fund, the GP has encountered difficulties in instructing external auditors for the financial years ending 2017, 2018 and for part of the year ending 2019.

9.7    We trust the above responses fully address your client's queries with respect to the audited financial statements.

**10.    OWNERSHIP OF GP**

10.1   In paragraph (w) of the Schedule to Al Sabah 1, your client has requested details of the GP's ownership and connections to KGLI Kuwait. The entire issued share capital of the GP is held by Port Link Holdings USA Inc. ("**Port Link USA**"), a company incorporated pursuant to the laws of the State of Delaware. Port Link USA was incorporated on 29 May 2018 as part of the Fund's strategy to resist the Kuwait AG's efforts to persuade the Dubai authorities to transfer the vast majority of the $496 Million to your client and PIFSS. The incorporation of Port Link USA to hold the shares of the GP provided the Fund with access to an entity incorporated in the United States should it become necessary to initiate legal proceedings in the United States to protect the interests of the Fund and/or the GP.

**11.    PAYMENTS TO FIRMS WHO ASSISTED WITH THE UNFREEZING OF THE $496 MILLION**

11.1   As explained above, the $496 Million was frozen by Noor for a total of 14 months between November 2017 and February 2019. During this period, the Fund became aware that the Kuwaiti authorities were attempting to persuade the Dubai authorities to instruct Noor to transfer the vast majority of the $496 Million from the Noor Account to two limited partners in Kuwait, a request that the Fund believed would amount to an illegal expropriation of the Fund's monies.

11.2   In such circumstances, it is entirely understandable and reasonable that the Fund took all available steps to try and obtain the release of the $496 Million wired to Noor so that the Fund could settle its liabilities and make final distributions to its investors. Accordingly, a number of firms were engaged by the Fund to assist with such efforts in the US, Kuwait and elsewhere. Many advised the Fund that it was very unlikely that the Fund would ever recover the monies.

11.3   The vast majority of the firms engaged by the Fund to assist with the unfreezing of the $496 Million were engaged on a retainer basis with a further obligation to pay a success fee in the event that such firms were successful in securing the release of the $496 Million during the term of the relevant agreements. Some of the firms engaged by the Fund to assist with the unfreezing of the $496 Million were also assisting the former directors of the GP in relation to the ongoing criminal proceedings in Kuwait. In circumstances where (i) such criminal proceedings directly related to the legitimacy of payments made by the Fund; and (ii) the Fund was on notice of contingent indemnity claims from the former directors of the GP with respect to defending such proceedings, the Fund was clearly interested in such payments and the outcome of the criminal proceedings in Kuwait. The GP at the time carefully considered the substance of the allegations in the criminal proceedings in Kuwait relating to the payments made by the Fund and ultimately took the view that such payments were legitimate payments in connection with the business of the Fund and the

20

allegations in the Kuwaiti criminal proceedings were without merit.  Accordingly, the GP considered it appropriate for the firms engaged by the Fund to provide assistance to the former directors of the GP in relation to the criminal proceedings in Kuwait.

11.4    Details of the various payments made by the Fund to such firms are set out above in the tables at paragraphs 3.11 and 3.12.

## 12.    PAYMENTS TO APACHE ASIA LIMITED

12.1    We have been advised by representatives and advisors of the Fund that Apache Asia Limited ("**Apache**") was first engaged by the Fund in April 2015 to advise the Fund on its proposed exit from its investment in GGLC.  Apache played a key role in identifying potential buyers of GGLC, including Udenna, and advised the Fund on the negotiation and implementation of the transaction between April 2015 and late 2017.

12.2    Pursuant to the terms of the agreement between Apache and the Fund, Apache was not entitled to any retainer but was entitled to a success fee that was to be calculated with reference to the sales price of GGLC once this had been agreed with a potential buyer. Accordingly, upon the sale of GGLC to Udenna in late 2017, Apache was entitled to receive a total success fee of US$45,850,000.

12.3    With respect to the US$45,850,000 that the Fund owed to Apache once an agreement had been reached with Udenna for the sale of GGLC, the following payments were made by the Fund to Apache:

(a)    the Fund arranged payment of a total of US$9,650,000.00 to Apache during 2017 - 2018; and

(b)    Crowell on behalf of the Fund paid a total of US$36,200,000 to Apache and a payee designated by Apache on 12 February 2019 (see table above at paragraph 3.12).

## 13.    TRANSFER TO KHALID AL SHAMALI

13.1    In the US Proceedings, your client has requested disclosure of the following information and documentation:

(a)    "*Documents and information from E-Trade related to an account held by Khalid Al Shamali, the brother of disgraced former KPA Director of Finance, Abdullah Al Shamali, including an approximate USD 3.3 million incoming transfer that occurred on or around September 2, 2010*";

(b)    "*All documents and communications concerning a transfer to the Account (E-Trade account ending in 6256 in the name of Khalid Al Shamali) of approximately $3,300,000 on or around September 2, 2010 (the "Transfer"), including all documents and communications concerning any subsequent transfers of these funds*"; and

(c)    "*Documents and communications sufficient to show (i) the originating account(s) for the Transfer; (ii) the beneficial owner of the originating account(s); (iii) the intermediary bank(s) involved in the Transfer; (iv) the stated purpose or reason for Transfer and any other details relating thereto; (v) any special instructions concerning the Transfer; (vi) notify party for the Transfer (if any); and (vii) any other details concerning the Transfer.*"

21

13.2    The Fund was not a party to the purported transfer to Khalid Al Shamali and, accordingly, is not in possession of any documentation relating to this transaction. In circumstances where your client's own evidence states that the purported transfer to Khalid Al Shamali was made by KGLI Kuwait and therefore did not involve the Fund in any way, our client does not understand the relevance of the requests made by your client in the US Proceedings and considers such requests to be nothing more than a fishing expedition.

## 14.    NEXT STEPS

14.1    In light of the information and documentation provided in this letter, we invite your client to withdraw all of the misleading and defamatory statements made in the Proceedings by return.

14.2    Further, in circumstances where the Fund has now responded substantively to your client's material information requests in the Proceedings, we invite your client to withdraw the Cayman Proceedings and the US Proceedings to avoid the parties incurring any further unnecessary costs.

14.3    In the meantime, all of our clients' rights with respect to the Proceedings and potential restitutionary and unjust enrichment actions against the KPA are reserved to the fullest extent.

Yours faithfully

*Walkers*

**WALKERS**

Enc.

22

9748208.2 T5138.D08984

| Category | Proceeding | Request | The Fund and GP's Response |
|---|---|---|---|
| **Fund Payments Related to Clark Asset** | KPA Section 22 | Complete copies of bank account statements for the Noor Account into which the USD 496 million as deposited from inception to date. | See section 3 of the Walkers Letter dated 6 March 2020 (the "**Walkers Letter**"). |
| | | The identities of all parties who received disbursements from the Noor Account, the amount mid date of such disbursement, and the bank account details for such disbursements | See section 3 of the Walkers Letter. |
| | | The legal basis upon which each and every payment above was made to such parties | See section 3 of the Walkers Letter. |
| | | Details of the third party to whom payment was made in order to secure release of the USD 496 million from Dubai, and all information and documents held by the Defendants pertaining to the interactions with such third party, including but not limited to any written agreements, and all correspondence. | See section 3 of the Walkers Letter. |
| | KPA 1782 | All documents and communications concerning the $496 Million Deposit, including all documents and communications concerning USD dollar clearing transactions and/or other funds transfers concerning the $496 Million Deposit, as well as copies of all SWIFT messages concerning the $496 Million Deposit. | See section 3 of the Walkers Letter. |
| | | Documents and communications sufficient to show (i) the account number for the Citibank account that received the $496 Million Deposit; (ii) the account holder of the Citibank account that received the $496 Million Deposit; (iii) the precise amount of the $496 Million Deposit; (iv) the date of the $496 Million Deposit; (v) the originating account(s) for the $496 Million Deposit; (vi) the beneficial owner of the originating account(s); (vii) the intermediary bank(s) involved in the $496 Million Deposit; (viii) the stated purpose or reason for the $496 Million Deposit and any other details relating thereto; (ix) any special instructions concerning the $496 Million Deposit; (x) notify party for the $496 Million Deposit (if any); (xi) any other details concerning the $496 Million Deposit; (xii) other transactions from the Citibank account that received the $496 Million Deposit before and/or after the $496 Million Deposit. | See section 3 of the Walkers Letter. |

| | | All documents and communications concerning disbursements, transfers and/or payments made from the Port Link account that received the $496 Million Deposit after the $496 Million Deposit was made, including those concerning the ultimate destination of the funds from the $496 Million Deposit, and concerning USD clearing transactions or other funds transfers concerning the $496 Million Deposit. | See section 3 of the Walkers Letter. |
|---|---|---|---|
| **Preferred Return Amount** | KPA Section 22 | Confirmation and itemisation of the capital commitments and contributions made by each limited partner at the commencement of the Port Fund and in each calendar year since that commencement, together with (i) bank statements showing the capital contributions received, and (ii) an explanation of for which of the Port Fund's investments the capital was received and applied towards. | See section 4 of the Walkers Letter. |
| | | Confirmation of the respective ownership percentages of the limited partners since the commencement of the Fund. | See section 4 of the Walkers Letter. |
| | | The capital account statement in respect of the Plaintiff covering each calendar year since commencement of the Port Fund. Such capital account statements should show the capital contributions made by and distributions made to the Plaintiff, any adjustments made to the Plaintiff's capital account including an explanation of the nature of any adjustments, and the corresponding preferred return balance accrued to the capital account balance of the Plaintiff over that period. | See section 4 of the Walkers Letter. |
| **Commingling of funds** | KPA Section 22 | Any and all correspondence relating to, (i) the opening of the Noor Account and (ii) the rationale for the USD 496 million being deposited into the Noor Account rather than any of the bank accounts that had historically been utilised in the name of the Port Fund (for example Al Ahli Bank of Kuwait or HSBC Kuwait) | See section 5 of the Walkers Letter. |
| **Carry Entitlement** | KPA Section 22 | Any and all underlying spreadsheets (including any distribution waterfall calculations prepared pursuant to the LPA) explaining how the quantum of each distribution to limited partners was quantified. | See sections 4 and 6 of the Walkers Letter. |
| | | All information held by the Defendants in connection with any loans and/or any other liabilities of the Port Fund that were paid as part of exit proceeds from the Clark City investment. | See sections 3 and 6 of the Walkers Letter. |

| The DIFC Claim | KPA Section 22 | All information and documents held by the Defendants pertaining to KGLJ's sale of EMPEML, including but not limited to the sale purchase agreement (or equivalent) and any associated addenda including associated warranties and indemnities and any other material identifying the purchaser, the date and terms of sale. | See section 6 of the Walkers Letter. |
|---|---|---|---|
| | | All written communication from EMPEML received by Port Link, including but not limited to demand notices and correspondence relating to the investment management agreement. | See section 6 of the Walkers Letter. |
| | | Any information and documents pertaining to the DIFC claim brought by EMPEML against the Port Fund and Port Link, including all associated legal advice, received by any of the parties on matters including, but not limited to, their decisions to submit to service in the DIFC and not to file a defence and any other material relevant to that claim | See section 6 of the Walkers Letter. |
| | | All information and documents (including documentary evidence and relevant agreements) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's claim of 8% penalty compound interest on delays in paying the Carry and Management Fees (as such terms are defined in the LPA). | See section 6 of the Walkers Letter. |
| | | All information, analysis, accounts and other documents (including documentary evidence provided by way of disclosure) submitted in the DIFC Claim or otherwise relied upon in support of EMPEML's calculation of the Carry as USD 45,462,000. | See section 6 of the Walkers Letter. |
| | | All information and documents pertaining to the Port Fund's settlement of the DIFC Claim judgment debt with EMPEML, including the identity of all beneficiaries of that judgment debt, the dates of, amounts of and justifications for those distributions. | See section 6 of the Walkers Letter. |
| The Damietta Loan | KPA Section 22 | The original executed loan agreement between the Port Fund and the borrower and any subsequent modifications to this loan agreement. | See section 7 of the Walkers Letter. |
| | | All loan statements prepared by the lender and provided to the borrower from the date of drawdown of the Damietta Loan, to the date of any subsequent write-off in 2014 and in the absence of any such statements, any and all correspondence between the parties showing the level of the borrower's indebtedness to the Port Fund. | See section 7 of the Walkers Letter. |

9742508.2 T5138.D08984

| | | Details of any placement fee paid by the Port Fund to the borrower, including (but not limited to) the date and amount of any such fee. | See section 7 of the Walkers Letter. |
|---|---|---|---|
| | | Any and all correspondence regarding the Damietta loan relating to the waiver of the lender's entitlement lo interest and confirmation provided by the Port Fund to the borrower that the loan principal had been repaid. | See section 7 of the Walkers Letter. |
| | | Internal documentation (including (but not limited to) board minutes, meeting notes and correspondence) setting out the rationale and approval process of any decision taken by the Port Fund in respect of: (i) any waiver by the Port Fund of its entitlement to interest on the Damietta loan; (ii) the rationale for any decision of the Port Fund to write off the Damietta Loan; and (iii) the rationale for any decision of the Port Fund not to convert the Damietta Loan (and accrued interest) into shares in the Borrower. | See section 7 of the Walkers Letter. |
| | | Documentation relating to the Port Fund's analysis of impairment disclosure requirements relating to the Damietta loan as required by IFRS 7 for the years 2013 and 2014. | See section 7 of the Walkers Letter. |
| **The Port Fund's Audited Financial Statements** | KPA Section 22 | A full accounting of the process used to reach the purported ownership percentages of the limited partners and general partner of the Port Fund as stated in the 2015 and 2016 audited financial accounts. | See section 9 of the Walkers Letter. |
| | | Full details of the investments (if any) made by KGLI into the Port Fund. | See section 9 of the Walkers Letter. |
| | | A full accounting of the process used to distribute funds following the completion of the 2015 and 2016 audited financial accounts. | See section 9 of the Walkers Letter. |
| **Transfer to Khalid Al Shamali** | KPA 1782 | Documents and information from E-Trade related to an account held by Khalid Al Shamali, the brother of disgraced former KPA Director of Finance, Abdullah Al Shamali, including an approximate USD 3.3 million incoming transfer that occurred on or around September 2, 2010. | See section 13 of the Walkers Letter. |
| | | All documents and communications concerning a transfer to the Account (E-Trade account ending in 6256 in the name of Khalid Al Shamali) of approximately $3,300,000 on or around September 2, 2010 (the "**Transfer**"), including all documents and communications concerning any subsequent transfers of these funds. | |

| | | | |
|---|---|---|---|
| | | Documents and communications sufficient to show (i) the originating account(s) for the Transfer; (ii) the beneficial owner of the originating account(s); (iii) the intermediary bank(s) involved in the Transfer; (iv) the stated purpose or reason for Transfer and any other details relating thereto; (v) any special instructions concerning the Transfer; (vi) notify party for the Transfer (if any); and (vii) any other details concerning the Transfer. | |
| **Port Link** | KPA Section 22 | Details of Port Link's ownership and connections to KGLI. | See section 10 of the Walkers Letter. |



حكومة دبي
GOVERNMENT OF DUBAI

النيابة العامة
PUBLIC PROSECUTION

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

وحدة التعاون القضائي الدولي

التاريخ: ٠٤ / رجب / ١٤٣٩ هـ
الموافق: ٢٢ / ٠٣ / ٢٠١٨ م

طلب مساعدة قضائية

في ملف غسل أموال رقم (٢٠١٧/٤)

| مقدم من : | السلطات القضائية بدولة الإمارات العربية المتحدة والمتمثلة في النيابة العامة لإمارة دبي |
|---|---|
| إلــى    : | السلطات القضائية المختصة في دولة الكويت الشقيقة |

تهدي السلطات القضائية بدولة الإمارات العربية المتحدة المتمثلة في النيابة العامة لإمارة دبي إلى السلطات القضائية المختصة في دولة الكويت الشقيقة أطيب تحياتها وتشيد بإستمرار التواصل والتعاون القضائي المشترك بين الدولتين .

نحن إسماعيل علي مدني – المحامي العام – رئيس وحدة التعاون القضائي الدولي للمكتب الفني لسعادة النائب العام لإمارة دبي – ومفوض من قبل سعادة النائب العام لتقديم طلب المساعدة القضائية الماثل .

في إطار التحقيق الذي تباشره النيابة العامة لإمارة دبي في ملف غسل أموال رقم (٢٠١٧/٤) بشأن تقرير معاملة مشبوهة من نور بنك رقم (٣٦٧٤) والمتعلقة بشركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) ، بشبهة " غسل الأموال " ، تتقدم النيابة العامة لإمارة دبي بطلب المساعدة القضائية الماثل إستناداً لإتفاقية تنفيذ الأحكام والإنابات والإعلانات القضائية بدول مجلس التعاون لدول الخليج العربية المصادق عليها من قبل الدولتين كأساس قانوني للطلب، وذلك على النحو المبين تفاصيله أدناه .



– ١ –

( وحدة التعاون القضائي الدولي ) طارق



R VISION: Supremacy of law with Excellent International Performance
71 4 3346666 - Fax : +971 4 3340514 - P.O. Box 2383 Dubai - U.A.E.









www.dxbpp.gov.ae

رؤيتنا: سيادة القانون بأداء متميز عالمياً
+٩٧١ ٤ ٣٣٤٦٦٦٦ – فاكس: +٩٧١ ٤ ٣٣٤٠٥١٤ – ص. ب: ٢٣٨٣، دبي، إ.ع.م.



GOVERNMENT OF DUBAI

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

النيابة العامة
PUBLIC PROSECUTION

<u>الوقائع</u>

تتلخص الوقائع في أنه بتاريخ ٢٠١٧/١١/١٥م تلقت إدارة الإستعلامات المالية بمصرف الإمارات العربية المتحدة المركزي تقرير معاملة مشبوهة رقم (٣٦٧٤) من نور بنك بشأن شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) بالمعلومات التالية :

<u>أولاً:</u> الشركة مرخصة في جزر الكايمان لمزاولة نشاط التطوير و الإستثمار في المشاريع والصناديق الإستثمارية ، و لها عنوان آخر للمراسلات الرسمية إضافة للعنوان المسجل في جزر الكايمان كما يلي (منطقة الشرق رقم ١٠ – مدينة مبارك الكبير ص.ب. ٩٠٣– دولة الكويت).

<u>ثانياً:</u> أسماء المدراء التنفيذيين للشركة :
١- المدعو/ سعيد إسماعيل علي دشتي .
٢- المدعوة/ لازريفا ماريا .
٣- المدعو/ عبدالغفور محمد أحمد العوضي .

<u>ثالثاً:</u> شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) مملوكة من قبل شركة (كي جي ال للإستثمار) المرخصة من قبل وزارة التجارة و الصناعة الكويتية في دولة الكويت برخصة رقم (١١٧٦٤٢) بتاريخ ٢٠٠٦/١١/٢٠م .

<u>رابعاً:</u> قامت شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) بفتح حساب مصرفي لدى نور بنك الإسلامي و بنك المشرق في دولة الإمارات العربية المتحدة ، وقام مجلس إدارة الشركة بتفويض المذكورين أدناه بالتوقيع في حساب الشركة لدى نور بنك الإسلامي :
١- المدعو/ عبدالله أكبر جبر أكبر .
٢- المدعو/ قاسم محمد حفيظ .

حيث بتاريخ ٢٠١٧/١١/١٥م وردت تحويلة مالية بمبلغ وقدره (٤٩٦,٤٢٩,٧٦٧) دولار أمريكي ما يعادل (١,٨٢٣,٠٠٠,٠٠٠) درهم إماراتي تقريباً لصالح شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) لدى نور بنك الإسلامي من بنك (Bnaco DE ORO – UniBank INC) في جمهورية






GOVERNMENT OF DUBAI



النيابة العامة
PUBLIC PROSECUTION

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

الفلبين عبر سيتي بنك (البنك المراسل) في نيويورك بالولايات المتحدة الأمريكية بتعليمات من شركة ( BDO TRUST AND INVESTMENT GROUP ) ، و على ضوء التعليمات الصادرة من مصرف الإمارات العربية المتحدة المركزي للمصارف التجارية العاملة في الدولة بتطبيق إجراءات على التحويلات المالية الواردة المشبوهة أو الكبيرة في قيمتها ، قام بنك نور الإسلامي بإجراء اللازم حول الحساب المصرفي وتبين الآتي :

١- المدراء التنفيذين للشركة كل من المدعو/ سعيد إسماعيل علي دشتي و المدعوة/ ماريا لازريفا و المدعو/ عبدالغفور محمد أحمد العوضي و آخرون يخضعون للتحقيقات من قبل السلطات القضائية في دولة الكويت بتهمة الإستيلاء على الأموال العامة .

٢- إدراج شركة كي جي ال للإستثمار في موقع البحث العالمي (WORLD CHECK) لصدور قرار تأديبي بحقها من قبل هيئة أسواق المال الكويتية في دولة الكويت .

٣- إدراج المدعوة/ لازريفا ماريا بموقع البحث العالمي (WORLD CHECK) كشخص منكشف سياسياً لكونها عضو مجلس إدارة شركة (EXPORT ANALYTICAL OF INTERREGIONAL) و المدير التنفيذي لها .

٤- هيكلة معقدة لملكية الشركات المملوكة من قبل شركة كي جي ال للاستثمار .

٥- عدم معرفة إسم المستفيد النهائي (المالك الحقيقي) لقيمة التحويلة المالية .

٦- إشتباه بأن الشركة تم تأسيسها في جزر الكايمان لغرض الولوج في عمليات غسل الأموال بتمويه مصدر الأموال عبر تأسيس الشركات الإستثمارية و إستغلال نظام الأسواق المفتوحة العالمية .

وعليه طلبت إدارة الإستعلامات المالية بمصرف الإمارات العربية المتحدة المركزي من النيابة العامة بدبي بمقتضى أحكام القانون الإتحادي رقم (٤) لسنة ٢٠٠٢ في شأن مكافحة غسل الأموال و تعديلاته لغاية ٢٠١٤ بإصدار قرار لتحديد كيفية التصرف بقيمة التحويلة المالية البالغة (٤٩٦,٤٣٩,٧٦٧) دولار أمريكي ، وكذلك قامت بتاريخ ٢٠١٧/١١/٢٢ بإخطار نظيرتها في دولة الكويت عن طريق التبادل التلقائي للمعلومات عبر موقع إجمونت بشأن تقرير المعاملة المشبوهة على شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD) .










---


GOVERNMENT OF DUBAI


النيابة العامة
PUBLIC PROSECUTION

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

تحويلها مجزءة على فترات زمنية لشركة واحدة فقط تدعى كابيتال لينك هولدنغ CAPITAL LINK
HOLDING KSCC في دولة الكويت ، يستشف من ذلك بأن الشركة تم تأسيسها فقط لغاية فتح
حساب مصرفي لها في الدولة، علاوة على أن شركة كي ال للإستثمار و صندوق الموانئ تواجهان
دعاوى قضائية في دولة الكويت من قبل مؤسسة الموانئ الكويتية المؤسسة العامة لتأمينات
الإجتماعية الكويتية بدليل الرسائل الموجهة للشاكيتين مذيلة بتوقيع المدعو/ عبدالغفور محمد أحمد
العوضي أحد المدراء التنفيذين لشركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD)
إضافة إلى إن كل من المدعو/ سعيد إسماعيل على دشتي و المدعوة/ لازريفا ماريا مقيد بحقهما
قضية رقم ١٤٩٦ / ٢٠١٧ – جناية٢ – نيابة الأموال بتهمة الإستيلاء على الأموال العامة ".

و أوصت اللجنة المشتركة في تقريرها أعلاه بطلب مساعدة قضائية من الجهات القضائية
المختصة في دولة الكويت بشأن التحويلة المالية المذكورة و علاقتها بالتحقيقات الجارية لديها بشأن
الدعاوى المرفوعة ضد شركة كي جي ال للإستثمار و صندوق الموانئ وكل من المدعو/ سعيد
إسماعيل على دشتي و المدعوة/ لازريفا ماريا .

## " الجريمة و المواد القانونية المنطبقة "

إن الواقعة على النحو السالف بيانها في محال وصف القانوني وفقاً للقوانين العقابية في دولة
الإمارات العربية المتحدة تشكل جريمة " غسل الأموال " المعاقب عليها بالمواد ( ٢، ٣، ١٣، ١٤، ١٥،
١٨) من قانون العقوبات الإتحادي رقم (٤) لسنة ٢٠٠٢ في شأن مواجهة جرائم غسل الأموال و مكافحة
تمويل الإرهاب و تعديلاته بالقانون الإتحادي رقم (٩) لسنة ٢٠١٤.

## " الأساس القانوني لطلب المساعدة القضائية "

تقدم السلطات القضائية في دولة الإمارات العربية المتحدة المتمثلة في النيابة العامة لإمارة دبي
إلى السلطات القضائية المختصة في دولة الكويت بطلبها الماثل إستناداً لأحكام المواد (١٣، ١٤/ب، ١٥،
١٦، ١٨) من إتفاقية تنفيذ الأحكام والإنابات والإعلانات القضائية بدول مجلس التعاون لدول الخليج
العربية المصادق عليها من قبل الدولتين كأساس قانوني للطلب .

( وحدة التعاون القضائي الدولي ) طارق










النيابة العامة
PUBLIC PROSECUTION

GOVERNMENT OF DUBAI

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

" النصوص القانونية المنطبقة "

مرفق بالطلب الماثل ملحق بنصوص المواد القانونية المنطبقة .

" مضمون المساعدة المطلوبة "

تلتمس السلطات القضائية في دولة الإمارات العربية المتحدة المتمثلة في النيابة العامة تنفيذ الطلب طبقاً للقوانين والأنظمة المعمول بها لدى دولة الكويت الشقيقة و المتمثل في تزويد النيابة العامة بالآتي :

١- معلومات عن تحويلة مالية بمبلغ وقدره (٤٩٦,٤٢٩,٧٦٧) دولار أمريكي لصالح شركة (بورت لينك – جي بي – ال تي دي PORT LINK GP LTD ) لدى نور بنك الإسلامي من بنك ( – Bnaco DE ORO UniBank INC ) في جمهورية الفلبين عبر سيتي بنك (البنك المراسل) في نيويورك بالولايات المتحدة الأمريكية بتعليمات من شركة ( BDO TRUST AND INVESTMENT GROUP ) و علاقتها بالتحقيقات الجارية لديها بشأن الدعاوى المرفوعة ضد شركة كي جي ال للإستثمار و صندوق الموانئ وكل من المدعو/ سعيد إسماعيل على دشتي و المدعوة/ لازريفا ماريا و أي متهمين آخرين .

٢- الأدلة القائمة بشأن تلك العلاقة و التي تثبت تواطؤهم أو تورطهم أو إرتباطهم بتلك المبالغ المالية المحولة آنفة البيان أعلاه و التهم الموجهة إلى المذكورين و أية أشخاص آخرين و ما وصلت إليه مرحلة التحقيق و في حالة ما إذا كانت الدعوى منظورة أمام المحكمة بيان ما آلت إليها الدعوى .

وختاماً تنتهز النيابة العامة لإمارة دبي هذه الفرصة لتقدم إحترامها وخالص تقديرها للسلطات المختصة في دولة الكويت الشقيقة .

وتفضلوا بقبول فائق التقدير والاحترام .

المستشار/ إسماعيل على مدني – المحامي العام
رئيس وحدة التعاون القضائي الدولي

للإستفسار والتواصل مع :
المستشار: إسماعيل على مدني – المحامي العام
رقم هاتف المكتب: +٩٧١٤٢٠٧٨٢١٦
البريد الإلكتروني: IMADANI@dxbpp.gov.ae

المرفقات : ١- ملحق بنصوص المواد القانونية المنطبقة
٢- التقرير الفني المشترك موضوع الطلب

( وحدة التعاون القضائي الدولي ) / طابق

IR VISION: Supremacy of law with Excellent International Performance
71 4 3346666 - Fax : +971 4 3340514 - P.O. Box 2383 Dubai - U.A.E.

رؤيتنـا: سيـادة القـانـون بـنـاء متـميـز عـالمـيـا
+٩٧١ ٤ ٣٣٤٦٦٦٦ – فـاكـس : +٩٧١ ٤ ٣٣٤٠٥١٤ – ص . ب : ٢٣٨٣ ، دبي – إ.ع.م

















النيابة العامة
PUBLIC PROSECUTION

GOVERNMENT OF DUBAI

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

## ملحق بالمواد القانونية المطبقة

القانون الاتحادي رقم (٤) لسنة ٢٠٠٢ م

في شأن مواجهة جرائم غسل الأموال ومكافحة تمويل الإرهاب

وتعديلاته بالقانون الاتحادي رقم (٩) لسنة ٢٠١٤م

### المادة (١)

في تطبيق أحكام هذا القانون يكون للكلمات والعبارات التالية المعاني المبينة قرين كل منها ما لم

يقض سياق النص بغير ذلك:

**الدولة:** الإمارات العربية المتحدة.

**الوزارة:** وزارة المالية.

**الوزير:** وزير المالية.

**المصرف المركزي:** مصرف الإمارات العربية المتحدة المركزي.

**الهيئة:** هيئة الأوراق المالية والسلع.

**المحافظ:** محافظ المصرف المركزي.

**اللجنة:** اللجنة الوطنية لمواجهة غسل الأموال ومكافحة تمويل الإرهاب.

**الأموال:** الأصول أيا كان نوعها مادية أو معنوية، منقولة أو ثابتة بما فيها العملة الوطنية والعملات

الأجنبية والمستندات أو الصكوك التي تثبت تملك تلك الأصول أو أي حق متعلق بها أيا كان شكلها بما

في ذلك الشكل الإلكتروني أو الرقمي.

**الوحدة:** وحدة المعلومات المالية لمواجهة غسل الأموال والحالات المشبوهة المنشأة بالمصرف

المركزي بموجب المادة (٧) من هذا القانون.

**الجهات الرقابية:** السلطات الاتحادية والمحلية التي تعهد إليها القوانين والأنظمة المختلفة بالرقابة

والترخيص على المنشآت المالية والمنشآت المالية الأخرى والتجارية والاقتصادية.

**غسل الأموال:** أي عمل من الأعمال المحددة في المادة ( ٢) من هذا القانون .

**المتحصلات:** أية أموال ناتجة بطريق مباشر أو غير مباشر من ارتكاب أية جناية أو جنحة.

– ٧ –















حكومة دبي
GOVERNMENT OF DUBAI

النيابة العامة
PUBLIC PROSECUTION

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

المعاملات المشبوهة: معاملات تتعلق بأموال تتوافر بشأنها أسباب معقولة للاشتباه في أنها متحصلة من أية جناية أو جنحة أو مرتبطة بتمويل الإرهاب أو تمويل التنظيمات غير المشروعة، سواء تم تنفيذها أو شرع في ذلك.

التنظيمات غير المشروعة: التنظيمات المجرم إنشاؤها أو أحد أنشطتها.

التجميد أو الحجز: الحظر المؤقت على نقل الأموال أو تحويلها أو التصرف فيها أو تحريكها أو تبديلها بأمر صادر من السلطة المختصة .

المصادرة: نزع ملكية الأموال الخاصة بصورة دائمة بموجب حكم صادر من محكمة مختصة .

الوسائط: أي شيء يستخدم أو يراد استخدامه بأي شكل في ارتكاب أية جناية أو جنحة.

المنشآت المالية: أي بنك أو شركة تمويل أو محل صرافة أو وسيط مالي أو نقدي أو أية منشأة أخرى مرخص لها من قبل المصرف المركزي أو الهيئة سواء كانت مملوكة ملكية عامة أو خاصة .

المنشآت المالية الأخرى والتجارية والاقتصادية: منشآت التي يتم ترخيصها ومراقبتها من قبل جهات أخرى غير المصرف المركزي أو الهيئة.

تمويل الإرهاب: تقديم أموال أو جمعها أو تأمين الحصول عليها أو نقلها بأية وسيلة بشكل مباشر أو غير مباشر لأية جمعية أو هيئة أو منظمة أو مركز أو جماعة أو عصابة أو أي أشخاص تنطبق عليهم أحكام القانون الإتحادي رقم (٧) لسنة ٢٠١٤ في شأن مكافحة الجرائم الإرهابية .

تمويل التنظيمات غير المشروعة: كل فعل مادي أو تصرف قانوني يراد به توفير المال لتنظيم غير مشروع أو لأحد أنشطته أو لأحد المنتمين أليه .

### المادة (٢)

١- يعد مرتكباً جريمة غسل الأموال كل من كان عالماً بأن الأموال متحصلة من جناية أو جنحة، و ارتكب عمداً أحد الافعال الآتية :

أ- حول أو نقل أو أودع أو حفظ أو استثمر أو استبدل المتحصلات أو قام بإدارتها بقصد إخفاء أو تمويه مصدرها غير المشروع .

ب- أخفى أو موه حقيقة المتحصلات، أو مصدرها، أو مكانها، أو طريقة التصرف فيها أو حركتها أو الحقوق المتعلقة بها أو ملكيتها .

ج- اكتسب أو حاز أو استخدم المتحصلات .



JR VISION: Supremacy of law with Excellent International Performance
971 4 3346666 - Fax : +971 4 3340514 - P.O. Box 2383 Dubai - U.A.E.

( وحدة التعاون القضائي الدولي ) طارق

رؤيتنا: سيادة القانون بأداء متميز عالمياً
+٩٧١ ٤ ٣٣٤٦٦٦٦ - فاكس: +٩٧١ ٤ ٣٣٤٠٥١٤ - ص. ب: ٢٣٨٣ دبي - إ.ع.م.









**GOVERNMENT OF DUBAI**



النيابة العامة
**PUBLIC PROSECUTION**

المكتب الفني للنائب العام
**TECHNICAL OFFICE OF THE ATTORNEY GENERAL**

٢- تعتبر جريمة غسل الأموال جريمة مستقلة و لا تحول معاقبة مرتكب الجرم الأصلي دون معاقبته على جريمة غسل الأموال .

٣- لا يشترط حصول الإدانة بارتكاب الجريمة لإثبات المصدر غير المشروع للمتحصلات .

### المادة (٣)

تكون المنشآت المالية و المنشآت المالية الأخرى والتجارية و الاقتصادية العاملة في الدولة مسؤولة جنائياً عن جريمة غسل الأموال أو تمويل الإرهاب أو تمويل التنظيمات غير المشروعة إذا ارتكبت باسمها أو لحسابها عمداً وذلك دون إخلال بالجزاءات الإدارية المنصوص عليها في القانون .

### المادة ( ١٣ )

١ - يعاقب كل من يرتكب أحد الأفعال المنصوص عليها في البند (١) من المادة (٢) من هذا القانون أو يشرع فيها بالحبس مدة لا تزيد على عشر سنوات وبالغرامة التي لا تقل عن (١٠٠,٠٠٠) مائة ألف درهم و لا تتجاوز (٥٠٠,٠٠٠) خمسمائة ألف درهم أو بإحدى هاتين العقوبتين .

٢ - يعاقب على تمويل الإرهاب بالعقوبات الواردة في القانون الاتحادي رقم(٧) لسنة ٢٠١٤ في شأن مكافحة الجرائم الإرهابية .

٣ - للمحكمة أن تقدر إعفاء الجاني في حال تعدد الجناة من عقوبة الحبس الواردة في البند(١) من هذه المادة إذا بادر بإبلاغ السلطات المختصة بمعلومات عن الجريمة وباقي الجناة قبل علم السلطات المختصة و أدى تبليغه إلى ضبط باقي الجناة أو الأموال محل الجريمة .

### المادة (١٤)

تعاقب بالغرامة التي لا تقل عن ( ٣٠٠,٠٠٠ ) ثلاثمائة ألف درهم و لا تزيد على (١,٠٠٠,٠٠٠) مليون درهم أية منشأة ارتكبت جريمة غسل الأموال أو تمويل الإرهاب أو تمويل التنظيمات غير المشروعة .



- ٩ -

**OUR VISION:** Supremacy of law with Excellent International Performance
+971 4 3346666 - Fax : +971 4 3340514 - P.O. Box 2383 Dubai - U.A.E.











**DUBAI**
www.dxbpp.gov.ae





النيابة العامة
PUBLIC PROSECUTION

المكتب الفني للنائب العام
TECHNICAL OFFICE OF THE ATTORNEY GENERAL

## المادة (١٥)

يعاقب بالحبس وبالغرامة التي لا تقل عن (٥٠,٠٠٠) خمسين ألف درهم و لا تجاوز(٣٠٠,٠٠٠) ثلاثمائة ألف درهم أو بإحدى هاتين العقوبتين رؤساء و أعضاء مجالس إدارة ومدراء وموظفو المنشآت المالية والمنشآت المالية الأخرى والتجارية والاقتصادية الذين علموا بأي فعل وقع في منشآتهم وكان متصلا بجريمة غسل الأموال أو تمويل الإرهاب أو تمويل التنظيمات غير المشروعة وامتنعوا عن إبلاغ وحدة المعلومات المالية .

## المادة (١٨)

يعاقب بالحبس وبالغرامة أو بإحدى هاتين العقوبتين كل من تعمد عدم الإفصاح أو امتنع عن تقديم المعلومات الإضافية عند الطلب منه، أو أخفى عمدا معلومات يجب الإفصاح عنها، أو قدم عمدا معلومات غير صحيحة، وذلك بالمخالفة للنظام المنصوص عليه في المادة (٦) من هذا القانون .







ــ ١٠ ــ










**Government of Dubai**                    **Public**

**Prosecution**

**Technical Office of The Attorney General**

<u>**International Cooperation Department**</u>
Date: 4 Rajab 1439
Corresponding:
22/3/2018

**Judicial Assistance Request**

<u>**Money Laundering File Number**</u>

<u>**(4/2017)**</u>

| Submitted by: | The UAE Judicial Authority, represented by the Public Prosecution of Dubai |
|---|---|
| To: | The Judicial Authority, the State of Kuwait |

The UAE Judicial Authority, represented by the Public Prosecution of Dubai, is pleased to extend its best regards to the competent judicial authorities in Kuwait and praise the continuous engagement and judicial cooperation between both countries.

I, Ismail Ali Madani, the Advocate-General, Head of the International Judicial Cooperation Unit in the Technical Office of the Attorney General, Dubai, who is authorized by the Attorney General to provide the judicial assistance.

As part of the investigations conducted by the Emirate of Dubai in Money Laundering File No. (4/2017) regarding Report No. (36674) issued by Noor Bank on "money laundering" suspicious transaction involving (Port Link GP LTD), the

1

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ،دبـي .أ.ع.م، ٧٧٩٤:ب.ص، ٢٢٨٣٦٧ :فاكس ،٢٢ Mob.: 050-6284563          Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com



Public Prosecution of Dubai hereby requests your judicial assistance pursuant to the GCC Convention for the Execution of Judgments, Delegations and Judicial

Notifications adopted by the two countries as a basis for that request as detailed below.

### The Incidents

The incidents are summarized as follows: on 15/11/2017, the Financial Intelligence Function at the Central Bank of the UAE received Report No. (36674) on a suspicious transaction from Noor Bank involving Port Link GP LTD including the following information:

**First**: The company is licensed in the Cayman Islands to practice development and investment activities in projects and investment funds. It has an alternate address for official correspondence in addition to its registered mailing address in the Cayman Islands, which is as follows: (Sharq, 10 – Mubarak Al-Kabeer City, P.O. Box 903, Kuwait).

**Second**: The names of the company's executive directors are:

1- Saeed Ismail Ali Dashti
2- Maria Lazareva
3- Abdul Ghafour Mohamed Ahmed Al-Awadhi

**Third**: Port Link GP LTD is owned by KGL Investment Company, which is licensed by the Ministry of Commerce and Industry in Kuwait, license number (117642) dated 20/11/2016.

**Fourth**: Port Link GP LTD opened a bank account at Noor Islamic Bank and Mashreq Bank in the UAE. The company's board of directors authorized the following signatories for the transactions executed at Noor Islamic Bank:

1- Abdullah Akbar Jabr Akbar.

2- Qassim Mohamed Hafez.

On 15/11/2017, a wire transfer in the amount of USD (496,429,767) equivalent to

2

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ،ص.ب: ٧٧٩٤ ، دبي. أ.ع.م. ، فاكس : ٢٢٨٣٦٧٨ ، ٢٢
Mob.: 050-6284563     Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com





AED (1,823,000,000) was sent to Port Link GP LTD as the beneficiary at Noor Islamic Bank from Bnaco DE ORO – UniBank INC in the Philippines through Citi Bank, New York, USA as the (corresponding Bank) as per instructions issued by BDO Trust and Investment Group. In light of the instructions issued by the Central Bank of the UAE to commercial banks working in the UAE to duly inspect suspicious and transfers of a large value, Noor Bank has conducted its investigations which revealed the following:

1- The company's executives, Saeed Ismail Ali Dashti, Maria Lazareva, Abdul Ghafour Mohamed Ahmed Al-Awadhi and others are being investigated by the Kuwaiti judicial authorities for the embezzlement of public funds.
2- KGL Investment (KGLI) is listed on World Check as a result of a disciplinary resolution issued by the Capital Markets Authority in Kuwait.
3- Maria Lazareva is listed on World Check as a Politically Exposed Person (PEP) as she is a board member and the CEO of Export Analytical of Interregional.
4- KGLI has a complex equity structure for its subsidiaries.
5- The final beneficiary (the actual owner) of the transfer is unknown.
6- The company is suspected to have been incorporated in the Cayman Islands for money laundering purposes in order to disguise the source of the funds through the establishment of investment companies and exploiting the international open markets system.

Based on the foregoing, the Financial Intelligence Function at the Central Bank of the UAE requested from the Public Prosecution in Dubai to provide instructions on how to deal with the wire transfer of USD (496,429,767), pursuant to Federal Law number (4) of 2002 Regarding Criminalization of Money Laundering and its amendments issued in 2014. Moreover, on 22/11/2017, it informed its Kuwaiti counterpart, through the Egmont Secure Web as to the suspicious transaction report made on Port Link GP LTD.

On 21/11/2017, a report was issued by Noor Bank to the Public Prosecution, Dubai regarding the transfer made to Port Link GP LTD bank account in the amount of USD (496,429,767). The report was listed by the Public Prosecution in Money Laundering File No. (4/2017). On 21/11/2017, the Public Prosecution issued its resolution to freeze Port Link GP LTD Company's bank account at Noor Bank and to form a joint committee comprising of various legal entities to prepare a joint

3

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E.
Mob.: 050-6284563   Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

Page 40



detailed technical report, pursuant to Federal Law No. (4) of 2002 Regarding the Criminalization of Money Laundering and Combating Terrorism Financing, as amended by Federal Law No.(9) of 2014.

On 18/03/2018, the Public Prosecution received the technical report issued by the competent department at Dubai Police related to the above-mentioned suspicious transaction report. The results were as follows:

"The amounts transferred from the Philippines to Port Link GP LTD were the result of the sale of its investment in Sabah Al-Ahmad Logistics City at Clark International Airport area through a bank syndicated loan made by a group of commercial banks working in the Philippines; therefore, this money is of a legal source. However, for unknown technical reasons, the money was transferred to the company's account in the country instead of being directly transferred from the Philippines to the inventors' bank accounts, the bank account through which the investors' money was initially received at the beginning of the subscription process, or KGLI Company's bank account in Kuwait.

Moreover, Port Link GP LTD requested from Noor Bank to transfer USD (94,613,499) to Ideal Gulf Holdings LTD, which is owned by one of the authorized signatories of Port Link GP LTD Company's bank account. This reflects the complex equity structure of the companies owned by KGLI. Through re-investigating the issue, it became clear that the establishing Ideal Gulf Holdings LTD in Ajman Free Zone in 2016 wasn't business related, as we couldn't locate on the data base any financial records for actual operations. The same is reflected through the company's bank account as there were no transactions except for one transaction in the amount of AED 3,622. As for the USD bank account, there were inward transfers for USD (3,151,328.14) which were transferred in installments over a period of time to one company named Capital Link Holding KSCC in Kuwait. This suggests that the company was only established in order to open a bank account in the country. Additionally, KGLI and the Port Fund are facing legal proceedings in Kuwait by KPA and PIFSS as indicated by the letters sent by the two complainants signed by Abdul Ghafour Mohamed Ahmed Al-Awadhi, one of Port Link's executives. Besides, Saeed Ismail Ali Dashti and Maria Lazareva are facing charges in case 1496/2017 criminal division 2 for the embezzlement of public funds

4





The committee recommended in its aforementioned report to seek judicial assistance from the competent authorities in Kuwait regarding the abovementioned bank transfers and their relations to the ongoing investigations conducted over there against KGLI, the Port Fund, Saeed Ismail Ali Dashti and Maria Lazareva.

## The Crime & Applicable Law

The incident as described above is classified by the UAE Penal Code as "Money Laundry" crime punishable by Articles (2, 3, 13, 14, 15 & 18) of Federal Law No. (4) of 2002 Regarding the Criminalization of Money Laundering and Combating Terrorism Financing, as amended by Federal Law No.(9) of 2014.

## The Legal Basis of Requesting Judicial Assistance

The judicial authorities in the UAE, represented by the Public Prosecution of Dubai Emirate, hereby request the judicial assistance from the State of Kuwait pursuant to Articles (13, 14/B, 15, 16 and 18) of the GCC Convention for the Execution of Judgments, Delegations and Judicial Notifications adopted by the two countries as a basis for that request.

## Applicable Articles of the Law

An annex containing the applicable legal articles is attached to this request.

### The Contents of the Requested Assistance

The judicial authorities in the UAE, **represented by the Public Prosecution of the Emirate of Dubai**, hereby request the State of Kuwait, pursuant to its applicable laws and regulations, to provide the Public Prosecution with the following:

1- Information on the USD (496,429,767) wire transfer to Port Link GP LTD at Noor Bank from Banco De ORO UniBank Inc in the Philippines through the intermediary CITI Bank, New York, USA as per the instructions issued by BDO Trust and Investment Group and their relation to the ongoing investigations over there regarding the cases filed against KGLI, the Port Fund, Saeed Ismail Ali Dashti, Maria Lazareva and others.

2- The evidence confirming that relationship implicating their collusion,

5

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ،دبي ،ص.ب: ۷۷۹٤، ۲۲۸۳٦۷۸ ، فاكس : ۲۲ .ع.م ،أ

Mob.: 050-6284563         Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com




involvement or connection to those transferred amounts as mentioned above and the accusations filed against them or other individuals, as well as the update on the investigations, and in case there were legal proceedings, the Kuwaiti authorities are kindly requested to provide the latest developments in that regard.

Finally, the Public Prosecution of Dubai would like to take this opportunity to express its utmost respect and appreciation to the competent authorities in the State of Kuwait.

Best Regards;
Counselor/ Ismail Ali Madani, the Advocate-General (signed & stamped) Head of the International Judicial Cooperation Unit

For inquiries please contact:
Counselor Ismail Ali Madani, the Advocate-General Office Phone Number: +97142 - 78316
Email: imandani@dxbpp.gov.ae

Attachments:          1)Articles of applicable laws
                      2)The joint technical report



6







## Annex containing applicable laws

### Federal Law No. (4) of 2002

### Regarding the Criminalization of Money Laundering and Combating Terrorism Financing

#### as amended by Federal Law No.(9) of 2014

### Article (1)

In the application of the provisions of this law, the following words and phrases shall have the meanings, respectively, ascribed thereto unless the context otherwise requires:

**The State:** United Arab Emirates.

**The Ministry:** Ministry of Finance.

**The Minister:** Minister of Finance.

**The Central Bank:** The Central Bank of the UAE.

**The Authority:** Securities and Commodities Authority (SCA).

**The Governor:** Governor of the Central Bank.

**The Committee:** National Committee for Anti-Money Laundering and Counter-Terrorism Financing.

**Funds:** Any assets whatsoever the nature thereof, whether material or immaterial, moveable or immoveable; including national currency, foreign currencies, documents and instruments proving acquisition of these assets or any right related thereto; whether in electronic or digital form.

**The Function:** Financial Intelligence Function for Combating Money Laundering and Suspicious Transactions, established at the Central Bank by virtue of Article (7) herein.

**Supervisory Authorities:** Federal and local authorities responsible for licensing or supervising financial, commercial and economic institutions, by virtue of the laws and regulations in force.

**Money Laundering:** Any of the acts specified in Article (2) herein.

**Proceeds:** Any funds derived, directly or indirectly, from an offence or misdemeanor.

7





**Suspicious Transactions**: Any transactions involving reasonable grounds for suspicion; in term of being derived from an offence or misdemeanor, or related to terrorism or terrorist organizations financing; whether executed or planned to be executed.

**Illegitimate Organizations**: Any organization that the establishment of the same or the finance of any activities thereof are hereby criminalized.

**Freezing or Seizure**: Temporary prohibition of the transfer, conversion, disposition or movement of any funds by virtue of an order issued by the Competent Authority.

**Forfeiture**: Permanent dispossession of funds by virtue of an order issued by a competent court.

**Instruments**: Any item used or intended to be used, in any way, in the commission of an offence or misdemeanor.

**Financial Institutions**: Any bank, finance company, money-exchange establishment, financial and cash broker or any other financial institution licensed by the Central Bank or the Authority; whether publicly or privately owned.

**Other Financial, Commercial and Economic Establishments**: Establishments licensed and supervised by departments other than the Central Bank or the Authority.

**Terrorism Financing**: Providing, collecting, securing or transferring funds via any means, directly or indirectly, to any association, authority, organization, center, group, gang or individuals fall under the provisions of Federal Law No. (7) of 2014 concerning Combating Terrorism Crimes.

**Illegitimate Organizations Financing**: Each physical or legal act seeks to provide money to an illegal organization, the activities thereof or the affiliates of the same.

## Article (2)

1.    Whoever commits any of the following acts, despite being fully aware that such funds are derived from an offence or misdemeanor, shall be deemed as a perpetrator of money laundering crime:

a.    If converts, transfers, deposits, saves, invests, exchanges or manages any proceeds, with intent to conceal or disguise the illicit origin thereof.

b.    If conceals or disguises the true nature, origin, location, way of disposition, movement, rights related to any proceeds or the ownership

8

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ،ع.م.أ ،دبي، ٧٧٩٤ :ب.ص، ٢٢٨٣٦٧٨ :فاكس، ٢٢
Mob.: 050-6284563          Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com





thereof.

c.      If acquires, possesses or uses such proceeds.

2.      A money laundering offence shall be deemed as an independent crime. The punishment of the person who has committed a predicate offence shall not prevent the penalty for money laundering crime.

3.      A conviction with a predicate offence shall not be deemed as a condition to prove the illicit source of the proceeds.

## Article (3)

Without prejudice to administrative penalties stated in the law, Financial Institutions and Other Financial, Commercial and Economic establishments operating in the State shall be criminally liable for the offence of Money Laundering if intentionally committed in their respective names or for their account.

## Article (13)

1.      Whoever commits or attempts to commit any of the acts set forth in Clause (1) of Article (2) herein, shall be punished by imprisonment for a term not exceeding ten years, or by a fine not less than AED (100.000) "one hundred thousand dirhams" and not more than AED (500.000) "five hundred thousand dirhams", or by either of both penalties.

2.      In case of terrorism financing, the penalties should be subject to Federal Law No. (7) of 2014 concerning Combating Terrorism Crimes.

3.      In case of a crime multiple perpetrators, the court may decide to exempt from the penalties, set forth in Clause (1) of this Article, the perpetrator who informs competent authorities of any information relating to such crime and the perpetrators thereof before detection of the same, provided that such information leads to the detection of the other perpetrators and the funds, subject of the crime.

## Article (14)

Any institution commits a crime of money laundering, terrorism or illegal organizations financing shall be punished by a fine not less than AED (300.000) "three hundred thousand dirhams" and not more than AED (1.000.000) "one million dirhams".

9

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. .ع.م.أ ، دبي ، ٧٧٩٤ .ب.ص ، ٢٢٨٣٦٧٨ : فاكس ، ٢٢
Mob.: 050-6284563          Email : mahmoudsubhi@hotmail.com / diyar-translation@hotmail.com



## Article (15)

The chairmen, directors, managers and employees of the Financial Institutions or Other Financial, Commercial and Economic Establishments who are aware of any offence, occurred within the establishments thereof; relating to money laundering, terrorism and terrorist organizations financing, yet refrain from informing the Financial Intelligence Function, shall be punished by imprisonment and by a fine not less than AED (50.000) "fifty thousand dirhams" and not more than AED (300.000) "three hundred thousand dirhams", or by either of them.

## Article (18)

Whoever intentionally refrains from disclosing or providing further information upon request, or deliberately conceals information necessary to be disclosed, or submits false information, in violation to the provisions of Article (6) hereof, shall be punished by imprisonment and fine or by one of either penalties.



10

Page 47



**GOVERNMENT OF DUBAI**

مكتب النائب العام
ATTORNEY GENERAL OFFICE



النيابة العامة
PUBLIC PROSECUTION

التاريـــــخ: 2018/06/07
رقم المرجـــع: 2018/131 - 47

الموقــــر

سعـادة الأخ الفاضـــل / ضـــرار علـــي الـعـسـعــوسـي
النائب العام لدولة الكويت ..

السلام عليكم ورحمة الله وبركاته ،،،

يســـعدني أن أرفــع إلــيكم أطيـــب التحيـــات متمنيــاً لكـــم دوام التوفيــق
ويمناسبة قرب عيد الفطر المبارك أتقدم إليكم بأرق التهاني والتبريكات .

وبالإشارة إلى كتابكم رقم : م ن ع / 370 س / 2018 المؤرخ 09 / 05 / 2018م
المرفق به طلب المسـاعدة القضائية المقـدم مـن النيابة العامة بدولة الكويت المقيـد
برقــــم 127 لسنــــة 2018 نيابـــــة شــــؤون التفيــــذ الجنـــائي والتعـــاون الدولـــي
أتشــرف بأن أرسـل إليكـم رد النيابة العامة لإمارة دبي على الطلب المشار إليه .

وتفضلوا بقبول فائق الاحترام والتقدير ،،،

المستشار / عصـام عيسى الحميدان
النائـب العـام لإمـارة دبـي







**DUBAI**

رؤيتنـــا: سيادة القـانون بـأداء متميــز عـالمـيـا
هاتف: 3366001 4 971+ 3342184 4 971+ – فاكس: 3342184 4 971+ – ص.ب: 2383، دبي – إ.ع.م
Tel. : +971 4 3366001 - Fox : +971 4 3342184 - P.O. Box 2383 Dubai - U.A.E.
www.dxbpp.gov.ae

المعيار الدولي للخدمة المتميزة
THE INTERNATIONAL

حكومة دبي
GOVERNMENT OF DUBAI

مكتب النائب العام
ATTORNEY GENERAL OFFICE

النيابة العامة
PUBLIC PROSECUTION

مذكرة بشأن الرد على طلب المساعدة القضائية المقدم من النيابة العامة بدولة الكويت المقيد برقم ١٢٧ لسنة ٢٠١٨

يتقدم النائب العام لإمارة دبي – دولة الإمارات العربية المتحدة المستشار / عصام عيسى الحميدان بأطيب التحيات إلى سعادة المستشار / ضرار علي العسعوسي النائب العام بدولة الكويت ويؤكد على علاقة الود والتعاون البناء لإرساء العدالة وإعلاء كلمة القانون من أجل البلدين الشقيقين .

وقد تلقت النيابة العامة بدبي طلب مساعدة قضائية من النيابة العامة بدولة الكويت عنون تحت اسم إنابة قضائية تطلب فيه بعض أوجه المساعدة المتعلقة بما تجريه النيابة العامة الكويتية من تحقيقات بشأن القضية رقم ١٤٩٦ لسنة ٢٠١٢ حصر أموال عامة المنضمة لها القضيتين رقمي ٥٤٧ لسنة ٢٠١٣ و ١٧١٩ لسنة ٢٠١٤ حصر أموال عامة للارتباط ، والمتهم فيها كلاً من :

١) سعيد إسماعيل علي دشتي – كويتي الجنسية .
٢) لازاريفا ماريا بتهمة الاستيلاء بغير حق على المال العام وتسهيل الاستيلاء عليه للغير والإضرار عمداً بالمال العام وغسل الأموال .

وقد تضمن الطلب بصفة أساسية :

١) اتخاذ الإجراءات اللازمة نحو تحويل مبلغ أربعمائة مليون دولار امريكي المودع في الحسابات المصرفية بدولة الإمارات العربية المتحدة إلى المؤسسة العامة للتأمينات الاجتماعية والمؤسسة العامة للموانئ بدولة الكويت .
٢) الكشف عن أية حسابات بنكية أو أموال تسفر التحريات عن أنها مودعة في حسابات المتهمين سالفي الذكر أو شركاتها لدى البنوك بدولة الإمارات العربية المتحدة .

وقد استند طلب المساعدة إلى أحكام اتفاقية تنفيذ الأحكام والإنابات والإعلانات القضائية بدول مجلس التعاون لدول الخليج العربية واتفاقية الأمم المتحدة لمكافحة الجريمة غير الوطنية كأساس قانوني لتنفيذ المساعدة .

ALDIYAR LEGAL TRANSLATION

المعيار الدولي للخدمة المتميزة
THE INTERNATIONAL STANDARD FOR SERVICE

**Government of Dubai**

**Public Prosecution**

Attorney General Office

Date: 7/6/2018

Ref.: 47 – 131 / 2018

To:   The Honorable Dherar Al-Asousi
      The Attorney General of State of Kuwait

I would like to extend my best greetings, wishing you the best for a blessed Eid Al-Fitr.

Reference to your letter number ع ن م/370س/2018 dated 09/05/2018 with which a request is enclosed for judicial assistance by Kuwait's Public Prosecution on Case No. 127/2018 – Criminal Execution Affairs and International Cooperation, please find attached the response issued by Dubai's Public Prosecution to that request.

Best Regards;

Counselor Essam Essa Al Humaidan

Attorney General of Dubai

(signed & stamped)



Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E
Mob. 050-6284553      Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

Page 51

  

## A Memo Regarding Reply to Judicial Assistance Request Number 127 of 2018 Submitted by Kuwait's Public Prosecution

Counselor Essam Essa Al Humaidan, the Attorney General of Dubai is pleased to extend his best regards to Counselor Dherar Al-Asousi, the Attorney General, Kuwait and would like to affirm the friendly relationship and constructive cooperation to establish and uphold law and justice between the two brotherly nations.

The Public Prosecution in Dubai received a judicial assistance request from the Public Prosecution in Kuwait titled Rogatory Judicial Request, requesting certain form of assistance regarding the investigations conducted by the Kuwaiti Public Prosecution in case no. 1496/2012 Public Funds Prosecutions, affiliated with cases 547/2013 and 1719/2014, in which the following defendants are charged:

1) Saeed Ismail Ali Dashti – Kuwaiti National
2) Lazareva Maria, of the embezzlement of public funds, facilitating the embezzlement of public funds to others, deliberately inflecting damages to the public funds and committing money laundering crimes.

The request mainly included the following:

1) Take the necessary action to transfer USD 400 million deposited at UAE bank accounts to PIFSS and KPA in Kuwait.
2) Declare any bank accounts revealed during investigations or monies deposited in the above mentioned defendants' bank accounts in the UAE or in the bank accounts belonging to their partners.

That request was submitted pursuant to the GCC Convention for the Execution of Judgments, Delegations and Judicial Notifications and the United Nations Convention against Transnational Organized Crime as basis for the request.

Tel. : 2222722 / 2221557, Fax  22836/8, P.O.Box  7794, Dubai · U.A.E   ص.ب: ٧٧٩٤،دبـي، أ.ع.م    ٢٢٨٣٦/٨، ص.ب.: ٢٢٨٣٧ ، فاكس: ٢٢٢١٥٥٧/ ٢٢٢٢٧٢٢ :هاتف
Mob. 050 6284563                        Email  mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com            ٠٥٠ ٦٢٨٤٥٦٣ :متحرك





In order to fulfill that request, after reviewing the documents enclosed with the request, and pursuant to the relevant convention and UAE Federal Law number 39 of 2006 regarding International Judicial Cooperation on Criminal Matters, please be advised that you are required to submit the following documents:

1) A court order issued by the competent court to confiscate or freeze the amount requested to be transferred.
2) Indicate the connection, relationship or association between the cases involving defendants Saeed Ismail Dashti and Lazareva Maria to the amount requested to be transferred to PIFSS and KPA in Kuwait.

## Therefore

We hereby stress our keenness on continually supporting the mutual judicial assistance between our nations, fighting crimes in general and transitional and money laundry crimes in particular. We hope to receive the above required documents at the earliest in order to be able to take a decision regarding that matter.

Best Regards;

Counselor Essam Essa Al Humaidan

Attorney General of Dubai

(signed & stamped)



Tel : 2222722 / 2221557, Fax : 2283878, P.O.Box : 7794, Dubai - U.A.E. ,م.ع.أ ,دبي ,٧٧٩٤:ب ص , ٢٢٨٣٨٧٨:فاكس ,٢٢٢٢٧٢٢ / ٢٢٢١٥٥٧:هاتف
Mob 050 6284563                     Email  mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com          ٠٥٠٦٢٨٤٥٦٣ :متحرك

State of Kuwait

الأخ الكريم صاحب السمو الشيخ محمد بن راشد آل مكتوم    حفظه الله
نائب رئيس الدولة رئيس مجلس الوزراء حاكم دبي
دولة الامارات العربية المتحدة الشقيقة

تحية طيبة وبعد،،،

أود في البداية أن أقدم لسموكم بأطيب الامنيات لكم بالصحة والسعادة
ولشعب الامارات الشقيق بدوام التقدم والازدهار .
كما أود أن أعرب لكم عن بالغ الارتياح لتطور علاقاتنا الأخوية مع بلدكم
الشقيق ولمستوى التنسيق والتشاور بيننا، وأشير هنا الى قضية الأموال المجمدة
لاحدى الشركات الكويتية و البالغة 496 مليوينت دولار (أربعمائة وستة
وتسعون مليوناً) لدى بنك نور الاسلامي والتى تم تحويلها متنا ما يزيد على
تسعة شهور ،وهى أموال ناجمة عن استثمار للشركة الكويتية ( KGL ) في
جمهورية الفلبين في إطار صندوق ساهم فيه عدد من الشركاء المستثمرين
منهم مؤسسة المواني الكويتية ومؤسسة التأمينات الاجتماعية وآخرون من
القطاع الخاص، وقد تم تسجيل قيمة هذا الاستثمار بناء على طلب الشركاء وقام
المسؤولون عن إدارة الصندوق بتحويل مبلغ الاستثمار الناتج عن ذلك
التسجيل الى بنك نور الاسلامى فى دبى، وذلك عن طريق ستى بنك فى
الولايات المتحدة ، الذى قام بدوره بتحويل المبلغ الى بنك نور الاسلامى بناء
على طلب مسؤولى الصندوق .



وقد أبلغت السلطات القضائية الإماراتية النائب العام في دولة الكويت بوجود المبلغ لدى بنك نور الإسلامي ، حيث طلب النائب العام الكويتي في حينه من السلطات القضائية الإماراتية عدم السماح بتحويل هذا المبلغ لأية جهة خارج دولة الكويت ، وذلك لتمكين المستثمرين من الحصول على أموالهم وخلال التسعة شهور التي استغرقها إيداع المبلغ كانت هناك مراسلات بين السلطات القضائية الاماراتية والنائب العام الكويتي تضمنت استفسارات تم الإجابة عليها من الجانب الكويتي ، وكان من ضمنها إفادة من النائب العام الاماراتي تشير إلى أن تحرياتهم أسفرت عن نظافة هذه الأموال وبعدها تواصلت مطالبات النائب العام الكويتي من السلطات القضائية الاماراتية بالإفراج عن الأموال وتحويلها الى دولة الكويت ، الا ان هذه المطالبات لم تصل الى نتيجة.

ونظرا الى أن هذه الأموال تخص جهات حكومية وباعتبارها أموالاً عامة وتخص أيضا مستثمرين من القطاع الخاص ، ونظرا لما يتسبب فيه استمرار تجميد هذه الأموال من أضرار بالغة بمؤسسات حكومية ومستثمرين آخرين ، فإننا نرجو من سموكم توجيه الجهات المعنية لديكم بسرعة الإفراج عن الأموال.

وتقبلوا سموكم خالص الود والتقدير ،،،

جابر المبارك أحمد الصباح
رئيس مجلس الوزراء
دولة الكويت

الكويت في 08 محرم 1440 هـ
الموافق 18 سبتمبر 2018 م





## The Prime Minister
State of Kuwait


His Highness Sheikh Mohammed Bin Rashid Al-Maktoum, may Allah protect him
The Vice President and the Prime Minister of the State and Ruler of Dubai
State of United Arab Emirates


*Dear Sir,*

First of all, I would like to extend to your Highness the best wishes of health and happiness
and for the brotherly people of the UAE for continuous progress and prosperity.

I would also like to express our deep satisfaction with the development of our fraternal
relations with your brotherly country and the coordination and consultation between us, and
I refer here to the issue of the frozen funds for one of the Kuwaiti companies amounting to
496 million US dollars (four hundred and ninety-six million) with Noor Islamic Bank that was
transferred for more than nine months ago. These funds constitute the return on investment
by Kuwait's (KGL) Company in the Republic of the Philippines in a Fund, where a number of
investors, including the Kuwait Port Authority, the Public Institution for Social Security and
other private players had shares. The value of this investment was liquidated at the request
of the investors, and the officials in charge of the Fund transferred the investment amount
resulting from the liquidation to Noor Islamic Bank in Dubai through Citibank in the United
States, which in turn transferred the amount to Noor Islamic Bank at the request of the
officials in charge of the Fund.

The judicial authorities in the UAE have informed the Attorney General of Kuwait that the
amount is available at Noor Islamic Bank, and the Kuwaiti Attorney General requested at that
time from the UAE judicial authorities not to allow the transfer of this amount to any entity
outside the State of Kuwait in order to enable investors to receive their money. During the
nine months and while the amount was deposited, there was correspondence between the
judicial authorities in the UAE and the Kuwaiti Attorney General, which contained inquiries
that were answered by the Kuwaiti side, including a statement by the Attorney General of the
UAE indicating that their investigations resulted that the funds are free from any illegitimate
activities, and after that, the Kuwaiti Attorney General continuously requested from the UAE
judicial authorities to release the funds and to transfer them to State of Kuwait, but these
requests were not answered.

Since these funds belong to government entities and are considered public funds and as well
belong to private investors, and since the continuous freezing of these funds is very damaging

Tel.  2222722 / 2221557, Fax . 2283678, P.O Box : 7794, Dubai - U.A.E. م.ع.أ - دبي ،٧٧٩٤: ب.ص ، ٢٢٨٣٦٧ : مقر ،٢٢٢١٥٥٧ / ٢٢٢٢٧٢٢
Mob. 050-6284563          Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com



to government entities and other investors, we ask your highness to direct your entities in-charge to release the funds quickly.

With our sincere appreciation to your highness,

Your Brother
Jaber Al-Mubarak Al-Hamad Al-Sabah
The Prime Minister
State of Kuwait
(Signature)

Kuwait, on 8 Muharram 1440 Hijri
Date: 18 September 2018



Tel.: 2222722 / 2221557, Fax : 2283678, P.O Box : 7794, Dubai - U.A.E   دبي - إ.ع.م، ص.ب:٧٧٩٤، ٢٢٨٣٦٧٨ ٢٢٨٣٦٧٨
Mob.: 050 6284563        Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

**STATE OF KUWAIT**

**PUBLIC PROSECUTION**

**The Attorney General Office**



دولـــة الكـويـــت

الفــيـــابـــة الـعـــامـــة

إدارة مكتب النـائب العام

الكويت في : ١٦ / ١٠ / ١٨ / ٢

الملف ــــق ـ

الرقم : ١٨ / ٦٦ / ٨١٠ / ٠٠

الموقر

سعادة الأخ الفاضل / عصام عيسى الحميدان

النائب العام لإمارة دبي – بدولة الإمارات العربية المتحدة

تحية طيبة مباركة وبعد ...

يطيب لـي أن أرفـع إليكم أسمى آيات التقدير والاعتزاز ، مـع تأكيد حرصنا الدائم علـى توطيد أواصر التعاون المثمر فـي خدمـة صرح العدالة وإعلاء كلمـة القانون فـي بلدينا الشقيقين .

وأنتهز هذه الفرصة لتوجيه الشكر الجزيل لشخصكم الكريم وللسادة الأفاضل أعضاء النيابة العامة بإمارة دبي الشقيقة ، لما نلقاه دائماً من تعاون مثمر وجهد مشكور واهتمام بالغ فـي سبيل تقديم يد العون للسلطات القضائية الكويتية بشكل عام والنيابة العامة بشكل خاص فـي شتى مناحي التعاون القضائي .

وفـى إطـار المكاتبات التـي تمت بيننا والجهـود التـي بذلتموها بشـأن طلب المسـاعدة القضائية المقدم مـن النيابـة العامـة بدولـة الكويت رقـم ١٢٧ لسنة ٢٠١٨ نيابـة شـئون التنفيـذ الجنـائي والتعـاون الـدولي ، يشـأن مبلـغ (٤٩٦,٤٢٩,٧٦٧ دولار أمريكـي) أربعمائـة وستة وتسـعون مليـون وأربعمائـة وتسعة وعشرون ألف وسبعمائة وسبعة وستون دولار أمريكـي المتحفظ عليـه والمودع بنك نور الإسلامي بدبي ، والعائد عن استثمار الشركة الكويتية (KGL) فـي الصندوق الاستثماري (PORT LINK G P) بجمهورية الفلبين الذي ساهمت فيـه كـلاً مـن مؤسسة الموانـئ الكويتيـة ومؤسسة التأمينـات الاجتماعيـة الكويتيـة وآخرين مواطنين كويتيين من القطاع الخاص وغيرهم .

g@moj.gov.kw ايميل الإدارة www.pp.moj.gov.kw الموقع الالكتروني   Fax : +965 - 22437659   Tel. : +965 - 22463233



**STATE OF KUWAIT**

**PUBLIC PROSECUTION**

**The Attorney General Office**

الرقم :

دولـــة الكويـــت
النـيـابـــة الـعـامـــة
إدارة مكتب النائب العام

الكويت في : _____
المواÙ�ـــق : _____

نأمــل معـاونتكم البنـاءة وإصدار توجيهـاتكم الكريمــة نحو رÙ�ـع التحÙ�ظ عن
المبلغ المشار إليه وتحويل مبلغ (١٢٥.٠٠٠.٠٠٠ دولار أمريكي) مائـة وخمسة
وعشـرون مليــون دولار أمريكـي إلـى حســاب مؤسســة المـوانئ الكويتيــة
ومبلغ (٧٩.٢٠٠.٠٠٠ دولار أمريكي) تسعة وسبعون مليون ومائتي ألÙ� دولار
أمريكي إلى حساب مؤسسة التأمينات الإجتماعية لدى البنوك الكويتية .

كمــا نأمــل أيضــاً تحويــل الأمــوال لحســاب بــورت لينـــك جـــي بـــي
(PORT LINK G P) لدي بنك دبي الإسلامي ، شريطة أن يتم توزيعه علـى
الجهات الحكومية الكويتية المذكورة أعلاه والأطراÙ� المستحقة من المساهمين .

وإذ نشكر لكم مقدماً حسن تعاونكم الكريم .

تÙ�ضلوا بقبول واÙ�ر تحياتنا،،،

النائب العام



جبرأر علي الصعدواسي



  

**State of Kuwait**
**Public Prosecution**
**The Attorney General Office**
**Kuwait: 16 October 2018**
**Reference: ع ن م/س810/2018**

The Honorable Essam Eisa Al-Humaidan,
Attorney General of the Emirate of Dubai - United Arab Emirates

***Dear Sir,***

It is my pleasure to extend to you our highest esteem and pride, while reaffirming our constant commitment to establish fruitful cooperation in the service of the justice and the establishment of the rule of law in our both countries.

I would like to take this opportunity to extend my sincere thanks to your honorable person and to the distinguished members of the Public Prosecution in the Emirate of Dubai, for the continuous and fruitful cooperation, effort and great interest in helping the Kuwaiti judicial authorities in general and the Public Prosecution in particular across various aspects of judicial cooperation.

This is to refer to the correspondence between us and your efforts exerted for the Request of Legal Assistance No. 127 of 2018 – Prosecution of Criminal Enforcement and International Cooperation Affairs by Kuwait's Public Prosecution regarding the amount of (USD 496,439,767) Four Hundred Ninety Six Million and Four Hundred Thirty Nine Thousand and Seven Hundred Sixty seven US Dollar held and deposited with Noor Islamic Bank in Dubai, being the return of the investment of Kuwait's (KGL) in the Investment Fund (Port Link GP) in the Republic of the Philippines, in which both Kuwait Port Authority and Public Institution for Social Affairs, other Kuwaiti private persons and others have shares.

We hope for your constructive cooperation to instruct to remove the freezing ordered on the previously mentioned amount and transfer the amount of (USD 125,000,000) Hundred Twenty Five Million US Dollar to the account of the Kuwait Port Authority and (USD 79,200,000) Seventy Nine Million and Two Hundred Thousand to the account of the Public Institution for Social Security with Kuwaiti Banks.

We also hope to transfer the funds to the account of Port Link GP (Port Link GP) with Dubai Islamic Bank, provided that such funds be distributed among the Kuwaiti government entities mentioned above and eligible shareholders.

Tel 2222722 / 2221557, Fax 2283678, P.O.Box 7794, Dubai - U.A.E. Mob 050 6284563 Email mahmoudsubhin@hotmail.com / diyar.translation@hotmail.com

  

We thank you in advance for your kind cooperation,

Best regards,

Attorney general
Dherar Ali Al-Asousi
(Signature)
(Stamp - Ministry of Justice General Prosecution Department of the Office of Attorney General)

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ، ع م ، دبي ، ٧٧٩٤:ب.ص، ٢٢٨٣٦٧٨:فاكس ، ٢٢٢١٥٥٧ / ٢٢٢٢٧٢٢:هاتف
Mob : 050 6284561    Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

Page 61



Mohammed Bin Rashid Al Maktoum

Vice-President & Prime Minister of U.A.E., Ruler of Dubai

United Arab Emirates

التاريخ: 03 نوفمبر 2018

الأخ الكريم سمو الشيخ جابر المبارك الحمد الصباح    حفظه الله
رئيس مجلس الوزراء لدولة الكويت الشقيقة
السلام عليكم ورحمة الله وبركاته ...

يسعدني أن أعبر لسموكم عن صادق المودة وأطيب الأمنيات لشخصكم الكريم بموفور الصحة
وللسعادة، كما أرجى إلى دولة الكويت الشقيقة ولشعبها الأبي الكريم كل التحية وأخلص الأمنيات بدوام
الرفاهية والتقدم.

ولقد تلقيت بوافر السرور رسالتكم الكريمة المؤرخة 18 سبتمبر 2018 بشأن الأموال المجمدة لإحدى
الشركات، والتي كانت موضوعاً لتشاور مستمر بين السلطتين القضائيتين في بلدينا، والتي اتسم بكل
معاني التعاون والرغبة المشتركة للوصول إلى إقامة العدالة وحصول كل ذي حق على حقه، وكل ذلك
إنما يعبر ويؤكد على التعاون البناء في كافة المجالات بين بلدينا الشقيقين.

وإنني لعلى ثقة كاملة بأن الجهود المشتركة بين النيابة العامة في دولة الكويت، والنيابة العامة في
إمارة دبي لابد وأن تثمر عن حلول عادلة لهذه القضية وإعمال مقتضى القانون وبما يرفع الأضرار
عن أصحاب الحقوق.

انتهز هذه الفرصة لكي أؤكد لسموكم عن حرصنا التام على مزيد من التعاون بين بلدينا في كافة
مجالات بما يعود على شعبينا الشقيقين بكل الخير والازدهار.



محمد بن راشد آل مكتوم

  

Mohammed Bin Rashid Al Maktoum
Vice President & Prime Minister of UAE, Ruler of Dubai
United Arab Emirates

Date: 03 November 2018

**His Highness Shaikh Jaber Al-Mubarak Al-Hamad Al Sabah**
The Prime Minister of the State of Kuwait

Peace, mercy and blessings of God ,,,

I am pleased to express to your Highness the most sincere and best wishes to your honorable person for the health and happiness. I also convey to the brotherly State of Kuwait and to its noble people all greetings and best wishes for their well-being and progress.

I have gladly received your kind letter dated September 18, 2018 regarding the frozen funds for one of the companies, which was the subject of continuous consultation between the two judicial authorities in our countries. Such consultation was characterized by all the meanings of cooperation and common desire to establish justice and the right of every person for his right, and all this reflects and emphasizes constructive cooperation in all areas between our two brotherly countries.

I am fully confident that the joint efforts of the Kuwait's Public Prosecution and Dubai's Public Prosecution should yield fair solutions of this case to enforce the law in such a way to prevent stakeholders from being harmed.

I would like to take this opportunity to assure your Highness that we are fully committed to further cooperation between our both countries in all areas for the benefit of our both brotherly peoples to achieve goodness and prosperity.


Mohammed Bin Rahsid Al Maktoum
[Signed]



Tel. 2222722 / 2221557, Fax 2283678, P.O.Box 7794, Dubai U.A.E. ‎.م.ع.أ، دبي‎, ‎٧٧٩٤:ب.ص‎ ‎,٢٢٨٣٦٧٨:فاكس‎, ‎٢٢٢٢٧٢٢ / ٢٢٢١٥٥٧:هاتف‎
Mob. 050-6284563          Email mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com          ‎٠٥٠-٦٢٨٤٥٦٣ :متحرك‎



**STATE OF KUWAIT**
**PUBLIC PROSECUTION**
**The Attorney General Office**

دولـــة الـكـويـــت
النـيـابـــة الـعـامـــة
إدارة مكتب النـائب العام

الرقم : ـــــــــــــــــ

الكويت فـي : ـــ ـــــ
المـوافـــق : ـــــــ ـــ

نأمـل بإفادتنـا عمـا إذا كـان المبلـغ البـالغ قـدره (٤٩٦.٤٢٩.٧٦٧
دولار أمريكـي) أربعمائـة وسـتة وتسـعون مليـون وأربعمائـة وتسـعة وعشـرون
ألـف وسـبعمائة وسـبعة وسـتون دولار أمريكـي ، مـازال متحفظـاً عليـه مـن
عدمـه والجهـة التـي أمـرت بـالتحفظ ، ونتمنـى علـيكم المسـاعدة فـي رفـع
الـتحفظ عـن هـذا المبلـغ والمـودع لـدى بنـك نـور يـدبى فـي حسـاب شـركة
(بـورت لينـك-جـي بـي-أل تـي دي PORT LINK GP LTD) وتمكـين
الشـركة صـاحبة الحسـاب مـن تحويـل وتوزيـع المبلـغ المـذكور إلـى الجهـات
الحكوميـة الكويتيـة (مؤسسـة التأمينـات الاجتماعيـة الكويتيـة ومؤسسـة
الموانئ الكويتية ، والأطراف الأخرى المستحقة من المساهمين) .

**شاكرين لكم جهودكم واهتمامكم ،،،**

**وتفضلوا بقبول وافر تحياتنا ،،،**



النائب العام

ضرار علي المسعوسي

ag@moj.gov.kw ايميل الإدارة   www.pp.moj.gov.kw الموقع الإلكتروني   Fax : +965 - 22437659   Tel. : +965 - 22432243

  

**State of Kuwait**
**Public Prosecution**
**The Attorney General Office**
**Kuwait: 30 December 2018**
**Reference: ‏1063/2018س/م ن ع**

The Honorable, Essam Eisa Al-Humaidan,
Attorney General of the Emirate of Dubai - United Arab Emirates

*Dear Sir,*

It is my pleasure to extend to you our highest esteem and pride, while reaffirming our constant commitment to establish fruitful cooperation in the service of the justice and the establishment of the rule of law in our both countries.

I would like to take this opportunity to extend my sincere thanks to your honorable person and to the distinguished members of the Public Prosecution in the Emirate of Dubai, for the continuous and fruitful cooperation, effort and great interest in helping the Kuwaiti judicial authorities in general and the Public Prosecution in particular across various aspects of judicial cooperation.

This is to refer to your Letter Ref. 47-225-2018 dated 22 October 2018 and the correspondence between us and you, and your efforts exerted to the Request of Legal Assistance No. 127 of 2018 - Prosecution of Criminal Enforcement and International Cooperation Affairs by Kuwait's Public Prosecution regarding the money deposited at the company's account (Port Link-GP-LTD Port Link GP LTD) with Noor Islamic Bank which amounts to (USD 496,429,767) Four Hundred Ninety Six Million and Four Hundred Twenty Nine Thousand and Seven Hundred Sixty seven US Dollar.

We humbly request to be advised whether the amount of (USD 496,429,767) Four Hundred Ninety Six Million and Four Hundred Twenty Nine Thousand and Seven Hundred Sixty Seven USD Dollar is still frozen or not, and about the entity who ordered such freezing. Further, we seek your help to remove the freezing on this amount which is deposited with Noor Bank at the account of Port Link- GP-LTD Port Link GP LTD) and enable the account holder company to transfer the mentioned amount to the Kuwaiti government entities (Kuwait's Public Institution for Social Security and Kuwait Port Authority and to other eligible shareholders).







Thank you for your efforts and interest,,,

Best regards,
Attorney general
Dherar Ali Al-Asousi
(Signature)
(Stamped - Ministry of Justice, General Prosecution, Department of the Office of Attorney General)



Tel. : 2222722 / 2221557, Fax : 2283678, P.O Box   7794, Dubai - U.A.E.     Mob. 050 8284563     Email   mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com





GOVERNMENT OF DUBAI

النيابة العامة
PUBLIC PROSECUTION

التاريـــــخ: 2019 / 01 / 13
رقم المرجـع: 2018 / 05 - 47

سعـادة الأخ المستشــار الفاضــل / ضــرار علـــى العسعـــوسي          الموقــــر
النائب العام لدولة الكويت ..

السلام عليكم ورحمة الله وبركاته ،،،

يسعدنــي أن أرفــع لمقامكم الكريم أطيــب التحيــات وأشيد بالتعاون الدائم القائم
بيننا متمنياً لكم دوام التوفيق والنجاح ، وأننا إذ نعرب لكم عن عميق اعتزازنا بالعلاقات
الأخوية البناءة بين بلدينا راجين من المولى العلي القدير أن يحقق لكم وللزملاء الأشقاء كل الخير
ودوام الرفعـة ، وعطفاً علـى كتـاب سـعادتكم مرجـع رقـم م ن ع / 1063 س / 2018 المـؤرخ
في 20 / 12 / 2018م .

نود الإحاطة بأن النيابة العامة بدبي بتاريخ 21 / 11 / 2017م قررت التحفظ على المبلغ
المودع في حساب شركة ( بورت لينك – جي بي – ال تي دي PORT LINK GP LTD ) لدى
بنك نور الإسلامي بدبي والبالغ قدره ( 496,429,767 دولار أمريكـي ) أربعمائة وستة وتسعون
مليون وأربعمائة وتسعة وعشرون ألف وسبعمائة وسبعة وستون دولار أمريكـي بموجب تقرير
المعاملة المشبوهة وملف غسل الأموال رقم ( 4 / 2017 ) ، كما تم الإشارة إليه بموجب كتابنا
لسعادتكم رقم : م ف د / 52 / 7 / 2018 - 2 / 17657 المؤرخ في 22 / 03 / 2018م وتتم حالياً
دراسة الملف المشار إليه وتقرير اللجنة المختصة لاتخاذ قرار رفع الحجز خلال أسبوعين من تاريخه .

شاكرين ومقدرين تعاونكم الدائم ممتنا .

وتفضلوا بقبول وافر الاحترام وعظيم التقدير ،،،



المستشار / عصـام عيسـى الحميـدان
النائـب العـام لإمـارة دبــي

وبتنـــا ، سيـادة القـانـون بـأداء متميـز عـالمـيـاً
هاتـف : 4336001 4 971+ - فاكـس : 3342184 4 971+ - ص . ب : 2383 ، دبـي – ا . ع . م
Tel. : +971 4 3366001 - Fax : +971 4 3342184 - P.O. Box 2383 Dubai - U.A.E.
www.dxbpp.gov.ae

Page 68





**Public Prosecution**                                    **Government of Dubai**

Attorney General Office

Date: 13 January 2019
Ref: 47 – 05 / 2018

**The Honorable Dherar Ali Al-Asousi,**
Attorney General of the State of Kuwait

*Peace, mercy and blessings of God ,,,*

      I am pleased to extend to you my best regards and to command the ongoing cooperation between us and to wish you success, and we express to you our profound pride in the constructive brotherly relations between our both countries, hoping that the Almighty may achieve for you and your fellow brothers all the good and the fullness of prosperity.

      With reference to Your Excellency's letter Reference Number ع ن م / 1063 س/ 2018 dated 30 December 2018, kindly be informed that on 21 November 2017 Dubai Public Prosecution decided to freeze the amount deposited at the account of the company (Port Link - G P - L T D PORT LINK GP LTD) with Noor Islamic Bank in Dubai, which amounts to USD 496,429,767 (Four Hundred and Ninety Six Million and Four Hundred Twenty Nine Thousand and Seven Hundred Sixty Seven American Dollar) in accordance with the Suspicious Transaction Report and Money Laundry File No. (4/2017), as referred to it in our letter to Your Excellency Reference Number: M F D / 52 / 7 / 2018 - 2 / 1765 dated 22 March 2018. Currently, we are studying the File referred to and the competent committee report to take the decision to remove the freezing within two weeks from the date of this letter.

We thank you and appreciate your continuous cooperation,

Best regards,

**Essam Eisa Al-Humaidan,**
**Attorney General of the Emirate of Dubai**
**(Signature and Date)**
**(Stamp of Attorney General Office - Public Prosecution – Dubai)**

Tel : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E  ع م أ،دبي،٧٧٩٤:ب.ص، ٢٢٨٣٦٧٨:
Mob : 050-6284563                    Email : mahmoudsubhi@hotmail.com / diyar-translation@hotmail.com