# EXHIBIT 14
# Part 5

**The Port Fund Limited Partnership**
**Cayman Islands**

**Statement of financial position**
As at 31 December 2016

|  | Notes | 2016 US$ | 2015 US$ |
|---|---|---|---|
| **Assets** |  |  |  |
| Bank balances |  | 2,058,885 | 813,102 |
| Financial assets at fair value through profit or loss | 6 | 407,560,192 | 468,621,429 |
| Due from related parties | 7 | 2,161,632 | 3,551,979 |
| **Total assets** |  | 411,780,709 | 472,986,510 |
|  |  |  |  |
| **Liabilities** |  |  |  |
| Other payables and accrued expenses | 8 | 1,088,457 | 4,137,159 |
| Due to related parties | 7 | - | 24,238,011 |
| Due to Investment Manager | 7 | 50,508,050 | 51,291,868 |
| **Total liabilities** |  | 51,596,507 | 79,667,038 |
| **Net assets attributable to limited partners** |  | 360,184,202 | 393,319,472 |
|  |  |  |  |
| **Represented by:** |  |  |  |
| Fund capital | 9 | 158,152,000 | 188,152,000 |
| Retained earnings |  | 202,032,202 | 205,167,472 |
| **Net assets** |  | 360,184,202 | 393,319,472 |

*Investment Manager*

The accompanying notes on pages 8 to 21 form an integral part of these financial statements.

4

**The Port Fund Limited Partnership**
**Cayman Islands**

**Statement of profit or loss and other comprehensive income**
For the year ended 31 December 2016

|  | Notes | 2016 US$ | 2015 US$ |
|---|---|---|---|
| **Income** |  |  |  |
| Unrealised (loss)/gain on financial assets at fair value through profit or loss |  | (11,168,828) | 4,246,550 |
| Realised gain on sale of financial assets at fair value through profit or loss | 6 | 9,486,615 | - |
| Interest income |  | - | 329,727 |
| Other income |  | 506,805 | - |
|  |  | (1,175,408) | 4,576,277 |
|  |  |  |  |
| **Expenses** |  |  |  |
| General and administrative expenses | 10 | (2,743,178) | (2,488,611) |
| Foreign exchange losses |  | (502) | (14,101) |
|  |  | (2,743,680) | (2,502,712) |
| **(Loss)/profit for the year** |  | (3,919,088) | 2,073,565 |
| Other comprehensive income |  | - | - |
| **Total comprehensive (loss)/income for the year** |  | (3,919,088) | 2,073,565 |
|  |  |  |  |
| Attributable to Investment Manager * | 7 | (783,818) | 414,713 |
| Attributable to Limited Partners | 9 | (3,135,270) | 1,658,852 |
|  |  | (3,919,088) | 2,073,565 |

\* The profit allocation to the Investment Manager is as per S 4.2c of the Limited Partnership Agreement.

The accompanying notes on pages 8 to 21 form an integral part of these financial statements.

5

**The Port Fund Limited Partnership**
**Cayman Islands**

**Statement of changes in Net assets attributable to limited partners**
For the year ended 31 December 2016

| | Fund capital | Retained earnings | Net Assets attributable to limited partners |
|---|---|---|---|
| | US$ | US$ | US$ |
| **Balance at 1 January 2015** | 188,152,000 | 203,508,620 | 391,660,620 |
| Total comprehensive income for the year attributable to limited partners | - | 1,658,852 | 1,658,852 |
| **Balance at 31 December 2015** | 188,152,000 | 205,167,472 | 393,319,472 |
| Total comprehensive income for the year attributable to limited partners | - | (3,135,270) | (3,135,270) |
| Distribution of capital during the year (Note 9) | (30,000,000) | - | (30,000,000) |
| **Balance at 31 December 2016** | 158,152,000 | 202,032,202 | 360,184,202 |

The accompanying notes on pages 8 to 21 form an integral part of these financial statements.

6

**The Port Fund Limited Partnership**
**Cayman Islands**

**Statement of cash flows**
For the year ended 31 December 2016

| | Note | 2016 US$ | 2015 US$ |
|---|---|---|---|
| **OPERATING ACTIVITIES** | | | |
| (Loss)/profit for the year | | (3,919,088) | 2,073,565 |
| *Adjustments for:* | | | |
| Unrealised loss/(gain) on financial assets at fair value through profit or loss | | 11,168,828 | (4,246,550) |
| Realised gain on financial assets at fair value through profit or loss | | (9,486,615) | - |
| Interest income | | - | (329,727) |
| | | (2,236,875) | (2,502,712) |
| *Changes in working capital:* | | | |
| Financial assets at fair value through profit or loss | | 59,379,024 | (90,000) |
| Due from / to related parties – net | | (22,847,664) | 5,589,723 |
| Other payables and accrued expenses | | (3,048,702) | (2,971,831) |
| **Net cash from operating activities** | | 31,245,783 | 25,180 |
| **INVESTING ACTIVITIES** | | | |
| Interest income received | | - | 79 |
| **Net cash from investing activities** | | - | 79 |
| **FINANCING ACTIVITES** | | | |
| Distribution of capital | 9 | (30,000,000) | - |
| **Net cash used in financing activities** | | (30,000,000) | - |
| **Net increase in bank balances** | | 1,245,783 | 25,259 |
| Bank balances at the beginning of the year | | 813,102 | 787,843 |
| **Bank balances at the end of the year** | | 2,058,885 | 813,102 |

The accompanying notes on pages 8 to 21 form an integral part of these financial statements.

7

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

1. **GENERAL INFORMATION**

The Port Fund Limited Partnership, ("the Fund") was established on 21 March 2007 and is registered as an exempt limited partnership in the Cayman Islands under the exempted Law (2003 Revision) of the Cayman Islands. The first closing acceptance of committed contributions was on 15 July 2007 and the final closing occurred on 31 December 2012.

The Fund offers select sophisticated investors the opportunity to participate in the growth and consolidation of the port management industry and related sectors through selected private equity investments in high potential companies on a world wide basis.

The Port Link GP Limited ("General Partner") has appointed KGL Investment Cayman Limited ("Investment Manager") who is responsible for the preparation of the financial statements for each financial period in accordance with the Limited Partnership Agreement.

TMF Mauritius Limited (formerly Equity Trust (Mauritius) Limited) are the Administrators of the Fund. The Administrator carries out services related to the administration of the Fund including maintaining proper books and records of the Fund and preparing financial statements of the Fund.

The term of the Fund ended on 31 December 2012, and by a resolution of the General Partner on 28 July 2012, the term of the Fund was extended for another period of two years till 31 December 2014.

The registered office of the Fund is at Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman, KY1-9008, Cayman Islands.

These financial statements of the Fund for the year ended 31 December 2016 were authorized for issue by the General Partner and the Investment Manager on 15 May 2017.

2. **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs)**

a) **New standards, interpretations and amendments effective from 1 January 2016**

The accounting policies applied by the Fund are consistent with those used in the previous year except for the changes due to implementation of the following new and amended International Financial Reporting Standards:

- Annual Improvements to IFRSs – 2012 – 2014 Cycle:

These amendments became effective on 1 January 2016. The adoption of these amendments did not have any material impact on the current period or any prior period and is not likely to affect future periods.

b) **Standards and interpretations issued but not effective**

The following new and amended IASB Standards have been issued but are not yet effective, and have not been adopted by the Fund:

8

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

2.   **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs) (Continued)**

b)   **Standards and interpretations issued but not effective (continued)**

*IFRS 9 - Financial Instruments*
The standard, effective for annual periods beginning on or after 1 January 2018, replaces the existing guidance in IAS 39 Financial Instruments: Recognition and Measurement. IFRS 9 specifies how an entity should classify and measure its financial instruments and includes a new expected credit loss model for calculating impairment of financial assets and the new general hedge accounting requirements. It also carries forward the guidance on recognition and derecognition of financial instruments from IAS 39.

The Directors of the Fund anticipate that the application of IFRS 9 in the future may not have a material impact on amounts reported in respect of the Fund's financial assets and financial liabilities. However, it is not practicable to provide a reasonable estimate of the effect of IFRS 9 until the Fund undertakes a detailed review.

*IFRS 15 - Revenue from contracts with customers*
The standard, effective for annual periods beginning on or after 1 January 2018, establishes a comprehensive framework for determining whether, how much and when revenue is recognized. It replaces the following existing standards and interpretations upon its effective date:
- IAS 18 – Revenue,
- IAS 11 – Construction Contracts,
- IFRIC 13 – Customer Loyalty Programs,
- IFRIC 15 – Agreements for the Construction of Real Estate,
- IFRIC 18 – Transfers of Assets from Customers, and,
- SIC 31 – Revenue-Barter Transactions Involving Advertising Services

The Fund is currently assessing the impact of IFRS 15 and plans to adopt the new standard on the required effective date.

*IFRS 16 - Leases*
This standard will be effective for annual periods beginning on or after 1 January 2019. This standard will be replacing IAS 17 "Leases" and will require lessees to account for all leases under a single on-balance sheet model in a similar way to finance leases under IAS 17 with limited exceptions for low-value assets and short term leases. At the commencement date of a lease, a lessee will recognize a liability to make lease payments and an asset representing the right to use the underlying asset during the lease term.

These amendments are not expected to have any material impact to the Fund.

*Amendments to IAS 12 – Recognition of Deferred Tax Assets for Unrealized Losses*
The amendments to this standard which are effective retrospectively for annual periods beginning on or after 1 January 2017 clarify that an entity needs to consider whether tax law restricts the sources of taxable profits against which it may make deductions on the reversal of that deductible temporary difference. Furthermore, the amendments provide guidance on how an entity should determine future taxable profits and explain the circumstances in which taxable profit may include the recovery of some assets for more than their carrying amount.

These amendments are not expected to have any material impact to the Fund.

9

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

2.   **APPLICATION OF NEW AND REVISED INTERNATIONAL FINANCIAL REPORTING STANDARDS (IFRSs) (Continued)**

b)   **Standards and interpretations issued but not effective (continued)**

*Amendment to IAS 7 – Disclosure Initiative*
The amendment to this standard which is effective prospectively for annual periods beginning on or after 1 January 2017 require an entity to provide disclosures that enable users of financial statements to evaluate changes in liability arising from financing activities, including both changes arising from cash flows and non-cash changes, early application of this amendment is permitted.

These amendments are not expected to have any material impact to the Fund.

*Amendments to IFRS 2 - Classification and Measurement of Share-based Payment Transactions*
This standard will be effective for annual periods beginning on or after 1 January 2018, The amendments
address three main areas:
- The effects of vesting conditions on the measurement of a cash-settled share-based payment transaction
- The classification of a share-based payment transaction with net settlement features for withholding tax obligations
- The accounting where a modification to the terms and conditions of a share-based payment transaction changes its classification from cash-settled to equity-settled.

These amendments are not expected to have any material impact to the Fund.

3.   **GOING CONCERN ASSUMPTION**

These financial statements have been prepared on net realisable basis as the Fund's term ended on 31 December 2014 and the Investment Manager is exiting the Fund's investments and winding up all its operations during 2017.

4.   **SIGNIFICANT ACCOUNTING POLICIES**

4.1   **Statement of compliance**

The financial statements of the Fund have been prepared in accordance with the International Financial Reporting Standards ("IFRSs") as issued by the International Accounting Standards Board ("IASB"), IFRIC interpretations as issued by the International Financial Reporting Interpretations Committee ("IFRIC").

The preparation of financial statements in compliance with adopted IFRS requires the use of certain critical accounting estimates. It also requires the Fund's management to exercise judgment in applying the Fund's accounting policies. The areas of significant judgments and estimates made in preparing the financial statements and their effect are disclosed in Note 5.

4.2   **Basis of preparation**

The financial statements have been prepared under liquidation basis (Note 3), accordingly the assets and liabilities have been measured at their estimated net realisable values and estimated settlement amounts, respectively.

These financial statements have been presented in United States Dollar (US$) which is the functional and presentation currency of the Fund.

10

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

## 4.    SIGNIFICANT ACCOUNTING POLICIES (Continued)

### 4.3    Financial assets

*Classification, initial recognition and measurement*
Financial assets within the scope of IAS 39 are classified as "loans and receivables", "financial assets at fair value through profit or loss" ("FVTPL"), "Held-to-maturity investments", "financial assets available for sale" ("AFS"). The classification depends on the purpose for which financial assets were acquired and it is determined at initial recognition.

Investments are initially recognised at fair value plus transaction costs for all financial assets not carried at fair value through profit or loss. Financial assets carried at fair value through profit or loss are initially recognised at fair value, and transaction costs are expensed in the statement of profit or loss.

A "regular way" purchase of financial assets is recognised using the trade date accounting. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame generally established by regulations or conventions in the market place.

The Fund's financial assets include bank balances, financial assets at fair value through profit or loss and due from related parties

The Fund has not classified any of its financial assets as financial assets available for sale  or held to maturity.

*Subsequent measurement*
The subsequent measurement of financial assets depends on their classification as follows:

*Bank balances*
Bank balances included in the statement of financial position and the statement of cash flows consist of current accounts in banks.

*Financial assets at fair value through profit or loss (FVTPL)*
Investments are classified as FVTPL where the financial asset is either held for trading or it is designated as FVTPL.

A financial asset is classified as held for trading if: (i) it has been acquired principally for the purpose of selling in the near future; or (ii) it is a part of an identified portfolio of financial instruments that the Fund manages together and has a recent actual pattern of short-term profit-taking; or (iii) it is a derivative that is not designated and effective as a hedging instrument.

A financial asset other than a financial asset held for trading may be designated as FVTPL upon initial recognition if: (i) such designation eliminates or significantly reduces a measurement or recognition inconsistency that would otherwise arise; or (ii) the financial asset forms part of a group of financial assets or financial liabilities or both, which is managed and its performance is evaluated on a fair value basis, in accordance with the Fund's documented risk management or investment strategy, and information about the grouping is provided internally on that basis; or (iii) it forms part of a contract containing one or more embedded derivatives, and IAS 39 Financial Instruments: Recognition and Measurement permits the entire combined contract (asset or liability) to be designated as at FVTPL.

Financial assets at FVTPL are stated at net realisable value, with any resultant gain or loss recognised in the statement of profit or loss and other comprehensive income. The net gain or loss recognised in the statement of profit or loss and other comprehensive income incorporates any dividend or interest earned on the financial asset.

11

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

## 4.   SIGNIFICANT ACCOUNTING POLICIES (Continued)

### 4.3   Financial assets (continued)

#### *Subsequent measurement (continued)*

*Loans and receivables*
These are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. Loans and receivables are measured at net realisable value.  Loans and receivables include bank balances and due from a related party.

#### *Impairment of financial assets*
Financial assets, other than those at FVTPL, are assessed for indicators of impairment at end of each reporting period. Financial assets are considered to be impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the financial asset have been impacted.

For financial assets classified as financial assets available for sale, a significant or prolonged decline in the fair value of the security below its cost is considered to be objective evidence of impairment.

For financial assets carried at amortised cost, the amount of the impairment is the difference between the asset's carrying amount and the present value of estimated future cash flows, discounted at the financial asset's original effective interest rate. The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets.

When a financial asset available for sale is considered to be impaired, cumulative gains or losses previously recognised in other comprehensive income are reclassified to profit or loss in the period.

#### *Derecognition of financial assets*
The Fund derecognises a financial asset only when the contractual rights to the cash flows from the asset expire; or it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another entity. If the Fund neither transfers nor retains substantially all the risks and rewards of ownership and continues to control the transferred asset, the Fund recognises its retained interest in the asset and an associated liability for amounts it may have to pay. If the Fund retains substantially all the risks and rewards of ownership of a transferred financial asset, the Fund continues to recognise the financial asset and also recognises a collateralised borrowing for the proceeds received.

### 4.4   Financial Liabilities

Financial liabilities are classified as "other than at fair value through profit or loss". The Fund's financial liabilities consist of other payables and accrued expenses, due to related parties and due to Investment Manager and are stated at estimated settlement amounts.

#### *Other payables and accrued expenses*
Other payables and accrued expenses are recognised for amounts to be paid in the future for goods or services received, whether billed by the supplier or not.

12

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

### 4.    SIGNIFICANT ACCOUNTING POLICIES (Continued)

**4.4    Financial Liabilities (continued)**

*Derecognition of financial liabilities*
A financial liability is derecognised when the obligation under the liability is discharged or cancelled or expired. When an existing financial liability is replaced by another from the same lender on substantially different terms or the terms of an existing liability are substantially modified, such an exchange or modification is treated as a derecognition of the original liability and the recognition of a new liability, and the difference in the respective carrying amounts is recognised in the statement of profit or loss and other comprehensive income.

**4.5    Offsetting**

Financial assets and financial liabilities are offset and the net amount reported in the statement of financial position if, and only if, there is a currently enforceable legal right to offset the recognised amounts and there is an intention to settle on a net basis, or to realise the assets and settle the liabilities simultaneously.

**4.6    Provisions**

A provision is recognised in the statement of financial position when the Fund has a legal or constructive obligation as a result of a past event, it is probable that an outflow of economic benefits will be required to settle the obligation and a reliable estimate can be made of the amount of the obligation. If the effect is material, provisions are determined by discounting the expected future cash flows that reflects current market assessments of the time value of money and, where appropriate, the risks specific to the liability.

**4.7    Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Fund and the revenue can be reliably measured regardless of when the payment is being made. Revenue is measured at the fair value of the consideration received or receivable, taking into account contractually defined term of payment and excluding tax or duty.

Interest income is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount.

**4.8    Foreign currency translation**

*Functional and presentation currency*
The financial statements are presented in United States Dollar ("USD") which is the functional and presentation currency of the Fund. The Fund determines its own functional currency and items included in the financial statements are measured using that functional currency.

*Foreign currency transactions and balances*
Foreign currency transactions are translated into the functional currency of the respective Fund, using the exchange rates prevailing at the dates of the transactions (spot exchange rate). Foreign exchange gains and losses resulting from the settlement of such transactions and from the remeasurement of monetary items denominated in foreign currency at year-end exchange rates are recognised in statement of profit or loss and other comprehensive income. Non-monetary items are not retranslated at year-end and are measured at historical cost (translated using the exchange rates at the transaction date), except for non-monetary items measured at fair value which are translated using the exchange rates at the date when fair value was determined.

13

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

5.  **SIGNIFICANT ACCOUNTING JUDGMENTS AND ESTIMATION UNCERTAINTY**

In the application of the Fund's accounting policies, which are described in Note 4, the Investment Manager is required to make judgments, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and associated assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period or in the period of the revision and future periods if the revision affects both current and future periods.

The following are the critical judgments, apart from those involving estimations (see below), that Investment Manager has made in the process of applying the Fund's accounting policies and that have the most significant effect on the amounts recognised in the financial statements.

*Classification of investments*
The classification of investments depends on the nature and purpose of the financial assets and is determined at the time of initial recognition. The Fund classifies all its investments at financial assets at FVTPL.

**Key sources of estimation uncertainty**
The key assumptions concerning the future and other key sources of estimation uncertainty at the financial position date, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below:

*Impairment of financial assets*
The Investment Manager reviews periodically items classified as loans and receivables to assess whether a provision for impairment should be recorded in the statement of profit or loss and other comprehensive income. The Investment Manager estimates the amount and timing of future cash flows when determining the level of provisions required. Such estimates are necessarily based on assumptions about several factors involving varying degrees of judgment and uncertainty.

*Valuation of unquoted equity investments*
Valuation of unquoted equity investments is normally based on one of the following:
- recent arm's length market transactions;
- current fair value of another instrument that is substantially the same;
- the expected cash flows discounted at current rates applicable for items with similar terms and risk characteristics; or
- Other valuation models.

The determination of the cash flows and discount factors for unquoted investments requires significant estimation.

14

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

6. **FINANCIAL ASSETS AT FAIR VALUE THROUGH PROFIT OR LOSS**

|  | 2016 | 2015 |
|---|---|---|
|  | US$ | US$ |
| **Unquoted investments:** |  |  |
| Negros Navigation Corporation Inc. (NENACO) | - | 102,602,217 |
| Sabah Al-Ahmad Global Gateway Logistics City | 407,560,192 | 366,019,212 |
|  | 407,560,192 | 468,621,429 |

During the year, the Fund sold its investment in Negros Navigation Corporation Inc. (NENACO) and realised a gain of USD 9,486,615 for the year ended 31 December 2016.

The investment in Sabah Al-Ahmad Global Gateway Logistics City (SAGGLC) is carried at net realizable value based on the expected sales price less estimated costs to sell. The expected sales price was determined by management based on ongoing negotiations and proposals obtained from the potential buyers.

7. **RELATED PARTY BALANCES AND TRANSACTIONS**

Related parties are General Partner, Limited Partners, Investment Manager, Directors, key management personnel and entities controlled, jointly controlled or significantly influenced by such parties. All related party transactions are carried out in the normal course of business and with the approval of the management.

The related party balances and transactions included in the financial statements are as follows:

|  | 2016 | 2015 |
|---|---|---|
| **Statement of financial position** | US$ | US$ |
| **Due from related parties** |  |  |
| - KGL Investment Company K.S.C.C. |  |  |
|   - Outstanding capital commitments | - | 690,785 |
|   - Accrued interest on prior outstanding commitments | 2,161,632 | 2,861,194 |
|  | 2,161,632 | 3,551,979 |
|  |  |  |
| Due to related parties | - | 24,238,011 |
| Due to Investment Manager | 50,508,050 | 51,291,868 |

|  | 2016 | 2015 |
|---|---|---|
|  | US$ | US$ |
| **Statement of profit or loss and other comprehensive income** |  |  |
| **Income** |  |  |
| • Interest income | - | 329,727 |
| • Contingent liabilities (Note 14) | - | 45,000,000 |

15

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

7.     **RELATED PARTY BALANCES AND TRANSACTIONS (Continued)**

In accordance with the Limited Partnership Agreement, the Fund manager is not entitled to management fees after Fund's life time period. No management fees were charged during 2016 and 2015.

In accordance with the Limited Partnership Agreement, 20% of the (loss)/profit for the year has been allocated to the Investment Manager KGL Investments Cayman Limited as performance fees.

Amounts due to Investment Manager are payable upon the exits of investments and the liquidation of the Fund. Amounts due from related parties are receivable on demand.

Amounts due from/to related parties are free of interest.

8.     **OTHER PAYABLES AND ACCRUED EXPENSES**

|                        | 2016      | 2015      |
|------------------------|-----------|-----------|
|                        | US$       | US$       |
| Payable to MPC - GMO   | -         | 3,226,315 |
| Accrued expenses       | 1,088,457 | 910,844   |
|                        | 1,088,457 | 4,137,159 |

During the year the Fund settled the MPL GMO liabilities in full.

16

The Port Fund Limited Partnership
Cayman Islands

Notes to the financial statements
For the year ended 31 December 2016

9.  CAPITAL

| Limited Partners | Ownership % | Total commitments (Fund capital) US$ | Capital accounts at 31 December 2015 US$ | Distribution of capital during 2016 US$ | Loss for the year 2016 US$ | Capital accounts at 31 December 2016 US$ |
|---|---|---|---|---|---|---|
| General Retirement and Social Insurance Authority, Qatar | 5.86 | 9,852,000 | 24,818,250 | (1,892,984) | (183,727) | 22,741,539 |
| Gulf Investment Corporation | 9.28 | 20,000,000 | 37,134,653 | (2,832,404) | (290,953) | 34,011,296 |
| Behbehani Investment Company | 0.69 | 1,300,000 | 2,889,038 | (220,358) | (21,633) | 2,647,047 |
| The Public Institution For Social Security | 23.77 | 40,000,000 | 100,748,187 | (7,684,455) | (745,254) | 92,318,478 |
| Yaqoub Behbehani | 0.59 | 1,000,000 | 2,519,474 | (192,170) | (18,498) | 2,308,806 |
| Petro Link Holding Company K.S.C.C | 1.78 | 3,000,000 | 7,556,614 | (576,372) | (55,808) | 6,924,434 |
| Kuwait Reinsurance Company K.S.C.C | 1.19 | 2,000,000 | 5,037,138 | (384,202) | (37,310) | 4,615,626 |
| Al Ahlia Insurance Company | 1.78 | 3,000,000 | 7,556,613 | (576,372) | (55,808) | 6,924,433 |
| Mohammed Ali Al-Naki | 1.78 | 3,000,000 | 7,556,613 | (576,372) | (55,808) | 6,924,433 |
| KGL Investment Company K.S.C.C | 11.89 | 20,000,000 | 50,373,187 | (3,842,158) | (372,783) | 46,158,246 |
| Kuwait Ports Authority | 41.39 | 85,000,000 | 147,129,705 | (11,222,153) | (1,297,688) | 134,609,864 |
| | 100.00 | 188,152,000 | 393,319,472 | (30,000,000) | (3,135,270) | 360,184,202 |

17

The Port Fund Limited Partnership
Cayman Islands

Notes to the financial statements
For the year ended 31 December 2016

## 10. GENERAL AND ADMINISTRATIVE EXPENSES

| | 2016 | 2015 |
|---|---|---|
| | US$ | US$ |
| Consultancy and legal fees | 2,525,789 | 1,640,635 |
| Fund administration expenses | 54,000 | 40,000 |
| Finance charges for MPC - GMO obligation | 17,714 | 774,452 |
| Others | 145,675 | 33,524 |
| | 2,743,178 | 2,488,611 |

## 11. TAXATION

As per the Limited Partnership Agreement any tax liability arising from the activities of the Fund will be borne by Partners.

## 12. FINANCIAL RISK AND CAPITAL MANAGEMENT

The Fund primarily invests in equity related investments in port management companies that operate ports in the fastest growing regions of the world which are the developing markets of the Asia, Africa and the Middle East. The objective of the Fund is to achieve long term capital appreciation through investments in entrepreneurial companies demonstrating the potential for significant growth derived from products and services with international market appeal and demonstrate and sustainable competitive advantages.

The Fund's activities expose it to variety of financial risks: e.g. market risk (i.e. foreign currency risk and interest rate risk), credit risk and liquidity risk. The Fund policies for reducing each of the risks are discussed below. The Fund does not use derivative financial instruments based on future speculations.

**Significant accounting policies**
Details of the significant accounting policies and methods adopted, including the criteria for recognition, the basis of measurement and the basis on which income and expenses are recognised, in respect of each class of financial asset and financial liability are disclosed in Note 4 to the financial statements.

### a. Market risk

*Foreign currency risk*
Foreign currency risk is the risk that the value of a financial instrument will fluctuate due to changes in foreign currency rates. The Fund undertakes certain transactions denominated in foreign currencies. Hence, exposures to currency rate fluctuations arise. The management monitors the positions on a daily basis to ensure positions are maintained within established limits. The Fund has no significant exposure to foreign currency risk from its non-financial assets.

The carrying amounts of the Fund's major foreign currency denominated financial assets at the financial position date are as follows:

| | 2016 | 2015 |
|---|---|---|
| | US$ (equivalent) | US$ (equivalent) |
| Foreign currencies | 267,519 | 293,001 |

18

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

## 12.  FINANCIAL RISK AND CAPITAL MANAGEMENT (Continued)

### b.  Market risk (Continued)

*Foreign currency risk (Continued)*
The table below indicates the Fund''s foreign exchange exposure as at 31 December, as a result of its financial assets. The analysis calculates the effect of a reasonably possible movement of the US$ currency rate against the foreign currencies, with all other variables held constant, on the profit for the year and equity (due to the fair value of currency sensitive financial assets).

|  | Change in currency rate % | Effect on profit for the year and equity | |
|---|---|---|---|
|  |  | **2016** | **2015** |
|  |  | US$ | US$ |
| Foreign currencies | +5% | 13,376 | 14,650 |

The effect of decrease in currency rate is expected to be equal and opposite to the effect of the increases shown above.

*Interest rate risk*
Interest rate risk is the risk that the fair value or future cash flows of a financial instrument will fluctuate because of changes in market interest rates. The Fund is not exposed to interest rate risk as it does not have any floating interest bearing assets or liabilities.

### c.  Credit risk

Credit risk is the risk that one party to a financial instrument will cause a financial loss for the other party by failing to discharge an obligation and arises principally from outstanding trade receivables, bank balances and committed transactions. The Fund seeks to limit its credit risk with respect to receivables by setting credit limits for individual customers and monitoring outstanding receivables on a regular basis. Normal credit terms for customers range up to one month. The Fund seeks to limit its credit risk with respect to bank balances by dealing with reputable banks and financial institutions.

*Exposure to credit risk*
The carrying amount of financial assets represents the maximum credit exposure. The maximum net exposure to credit risk by class of assets at the reporting date is as follows:

|  | **2016** | **2015** |
|---|---|---|
|  | US$ | US$ |
| Bank balances | 2,058,885 | 813,102 |
| Due from related parties | 2,161,632 | 3,551,979 |
|  | 4,220,517 | 4,365,081 |

19

**The Port Fund Limited Partnership**
**Cayman Islands**

**Notes to the financial statements**
For the year ended 31 December 2016

## 12.  FINANCIAL RISK AND CAPITAL MANAGEMENT (Continued)

### d.  Liquidity risk

Liquidity risk is the risk that the Fund will encounter difficulty in meeting commitments associated with financial liabilities, arises because of the possibility (which may often be remote) that the entity could be required to pay its liabilities earlier than expected.

Ultimate responsibility for liquidity risk management rests with the Board of Directors, which has built an appropriate liquidity risk management framework for the management of the Fund's short, medium and long-term funding and liquidity management requirements. The Fund manages liquidity risk by maintaining adequate reserves, and by continuously monitoring forecast and actual cash flows and matching the maturity profiles of financial assets and liabilities.

The maturity profile of the Fund's undiscounted financial liabilities at 31 December based on contractual undiscounted repayment obligations. Undiscounted cash flows in respect of balances due within 12 months equal their carrying amounts in the statement of financial position.

| 31 December 2016 | On demand | 3-6 months | 6-12 months | Total |
|---|---|---|---|---|
| | US$ | US$ | US$ | US$ |
| Other payables and accrued expenses | - | 388,457 | 700,000 | 1,088,457 |
| Due to related parties | - | - | - | - |
| Due to Investment Manager | - | - | 50,508,050 | 50,508,050 |
| | - | 388,457 | 51,208,050 | 51,596,507 |

| 31 December 2015 | On demand | 3-6 months | 6-12 months | Total |
|---|---|---|---|---|
| | US$ | US$ | US$ | US$ |
| Other payables and accrued expenses | - | 910,841 | 3,226,318 | 4,137,159 |
| Due to related parties | - | 24,238,011 | - | 24,238,011 |
| Due to Investment Manager | - | - | 51,291,868 | 51,291,868 |
| | - | 25,148,852 | 54,518,186 | 79,667,038 |

### e.  Capital risk management

The Fund's objectives when managing capital are to safeguard the Fund's ability to continue as a going concern, so that it can continue to provide returns for Limited Partners.

The Fund sets the amount of capital in proportion to risk. The Fund manages the capital structure and makes adjustments to it in the light of changes in economic conditions and the characteristics of the underlying assets. The Fund Manager is in the process of winding up the Fund and return capital to Limited Partners.

20

The Port Fund Limited Partnership
Cayman Islands

**Notes to the financial statements**
For the year ended 31 December 2016

13.   **FAIR VALUE OF FINANCIAL INSTRUMENTS**

The fair value represents the price that would be received to sell an asset or paid to transfer a liability in an ordinary transaction between market participants at the measurement date.

The following table provides an analysis of financial instruments that are measured subsequent to initial recognition at fair value, grouped into Levels 1 to 3 based on the degree to which the fair value is observable.

- Level 1:   quoted prices (unadjusted) in active markets for identical assets or liabilities;
- Level 2:   inputs other than quoted market prices included within Level 1 that are observable for the asset or liability; either directly (i.e. as prices) or indirectly (i.e. derived from prices); and
- Level 3:   inputs for the asset of liability that are not based on observable market data (unobservable inputs).

The level within which the financial asset is classified is determined based on the lowest level of significant input to the fair value measurement.

The financial assets measured at fair value in the statement of financial position are grouped into the fair value hierarchy as follows:

| **31 December 2016** | **Level 2** | **Total** |
|---|---|---|
| | US$ | US$ |
| Financial assets at fair value through profit or loss | 407,560,192 | 407,560,192 |

| **31 December 2015** | **Level 2** | **Total** |
|---|---|---|
| | US$ | US$ |
| Financial assets at fair value through profit or loss | 468,621,429 | 468,621,429 |

The fair value of financial instruments that are not traded in an active market is determined by using valuation techniques. These valuation techniques maximise the use of observable market data where it is available and rely as little as possible on entity specific estimates. If all significant inputs required to fair value an instrument are observable, the instrument is included in level 2.

14.   **CONTINGENT LIABILITIES**

The Fund has provided a guarantee for a term loan facility of USD Nil (2015: USD 45,000,000) obtained by one of its investee companies.

21



Dear CLARK GATEWAY INVESTMENT GROUP LP NR OFFSHORE,

You have initiated a Funds Transfer to KUWAIT PORT AUTHORITY from your account 019100065133 number on  16/11/2016 05:11:33.

Please find the details of the transaction below:

| | |
|---|---|
| Sender | BOMLAEADAXXX |
| Receiver | MSHQUS33XXXX |
| | /KW85COMB0000010302690100414013 |
| | KUWAIT PORT AUTHORITY |
| | 0101102140 |
| 20 | Sender Reference |
| | 033EDFR163210064 |
| 23B | Bank Operation Code |
| | CRED |
| 32A | ValueDate/Currency/Interbank Settled Amount |
| | Date  :  16-Nov-2016 |
| | Currency  :  USD |
| | Amount  :  11,222,152.64 |
| 50K | Ordering Customer Name and Address |
| | /AE950330000019100065133 |
| | CLARK GATEWAY INVESTMENT GROUP LP N |
| | MUBARAK AL KABEER BLDG, FLOOR NO 10 |
| | SHARQ AREA, OPP BANKING COMPLEX, PO |
| 52A | Ordering Institution |
| | BOMLAEADXXX |
| 57A | Account With Institution |
| | COMBKWKW |
| 59 | Beneficiary Customer |
| | /KW85COMB0000010302690100414013 |
| | KUWAIT PORT AUTHORITY |
| | 0101102140 |
| 70 | Remittance Information |
| | PARTIAL REPAYMENT OF CAPITAL |
| 71A | Details of charges |
| | SHA |

Your transaction is currently under processing. You can check your Transaction Queue on MashreqOnline to check the status of your money transfer.

Regards,
Customer Services
Mashreqbank, UAE
Phone +9714 424 444

# PORT LINK GP LIMITED

Walkers Corporate Limited, Cayman Corporate Centre,
27 Hospital Road, George Town, Grand Cayman KYl-9008, Cayman Islands

Date:  February 02, 2019

Noor Bank
Noor Trade Branch -- DMCC
Dubai
UAE

**Dear Sir,**

Kindly arrange to transfer the amount of **USD 125,000,000/-** (US Dollar One Hundred
Twenty Five Million Only) to the following account details:-

| | | |
|---|---|---|
| Beneficiary Name | : | Kuwait Port Authority |
| Beneficiary Address | : | P.O. Box 3874, Safat 13039, Kuwait |
| Bank Name | : | Commercial Bank of Kuwait |
| Bank Address | : | Kuwait City, Kuwait |
| Account Number | : | 0101102140 |
| IBAN No. | : | KW85 COMB 0000 0103 0269 0100 4140 13 |
| Swift Code | : | COMBKWKW |
| Reference | : | 2nd Distribution – Balance Capital & Accumulated Profit to date |

Kindly debit our USD account No. 02410890280039 with you.

**Thanking you & Best Regards,**

**Port Link GP Limited**

**Authorized Signatory**



PORT LINK GP LTD
PO BOX NO 903
AREA SAARQ
KUWAIT
NO 10 TH BLDG MUBARAK AL KABEER
KWT

Dear Customer,
Transaction Date:  05-Feb-2019
Transaction Ref:    000OGCU190360097

We hereby confirm that your payment has been processed, details of which are as follows:

**Remitter Details**

| | |
|---|---|
| Debit Account Title | PORT LINK GP LTD |
| Debit Account Number | 02410890280039 |
| IBAN | AE430520002410890280039 |

**Beneficiary Details**

| | |
|---|---|
| Beneficiary Name | KUWAIT PORT AUTHORITY |
| Beneficiary Account Number | KW85COMB0000010302690100414013 |
| Beneficiary Bank | Commercial Bank of Kuwait |
| Beneficiary Country | Kuwait |

**Payment Details**

| | |
|---|---|
| Debit Amount | USD 125,000,000.00 |
| Credit Amount | USD 125,000,000.00 |
| Exchange Rate | 1.0000 |
| Value Date | 05-Feb-2019 |
| Charge Code | SHA |
| Purpose of Payment | |
| Details of Payment | 2ND DISTRIBUTION BALANCE CAPITAL AND ACCUMULATED PROFIT TO DATE |

THIS IS A SYSTEM GENERATED COMMUNICATION AND DOES NOT REQUIRE ANY SIGNATURES



Transaction Date:  05-Feb-2019
Beneficiary Name  KUWAIT PORT AUTHORITY
Credit Amount      USD 125,000,000.00

The corresponding swift/UAE FTS transfer message text is provided below for reference:

```
{1:F01NISLAEADAXXX1111111111}
{2:I103CITIUS33XXXXN}
{3:{108:000MSOG1903601U6}{121:a14fb1f9-0c9f-4304-98f7-9c22a493e4df}}
{4:
:20:000OGCU190360097
:23B:CRED
:32A:190205USD125000000,
:33B:USD125000000,
:50F:/AE430520002410890280039
1/PORT LINK GP LTD
2/PO BOX NO 903,KUWAIT,AREA SAARQ,N
3/KW/KUWAIT
:57A:COMBKWKW
:59:/KW85COMB0000010302690100414013
KUWAIT PORT AUTHORITY
:70:2ND DISTRIBUTION BALANCE CAPITAL
AND ACCUMULATED PROFIT TO DATE
:71A:SHA
:77B:/ORDERRES/AE//PRR/
-}
```

NOTE
This transfer advice is not a confirmation that funds have reached the intended beneficiary. The transfer may be subject to regulatory clearances and other restrictions or charges imposed by the intermediary/receiving bank.

THIS IS A SYSTEM GENERATED COMMUNICATION AND DOES NOT REQUIRE ANY SIGNATURES



the **PORT FUND**

**February 07, 2019**

**His Excellency Khalid Naser Al-Rodan**
**Minister of Commerce and Industry and Minister of State For Service Affairs**
**Ministry of Commerce and Industry**
**Chairman of Kuwait Ports Authority (KPA)**

Your Excellency,

The Port Fund is pleased to announce that UAE and Kuwait authorities have finally approved to release the $496 Million belonging to The Port Fund that has been frozen at Noor Bank in Dubai, allowing the Fund to immediately distribute its investors the sale proceeds of Sabah Al-Ahmad Global Gateway Logistics City (GGDC) exit in November 2017, after a 15-months battle with extraordinary circumstances and governments' actions beyond the Fund's control.

We are happy that both Kuwait and Dubai have finally recognized the lawful nature of our successful management of The Port Fund considering that it nearly doubled our investors original capital before the money was frozen, ranking it in the top quartile of private equity funds started before the global recession.

Please be informed that KPA's share of GGDC sale proceeds was wired to **Kuwait Port Authority** bank account on February 05, 2019 with an amount of USD 125,000,000 (SWIFT attached), and we would like to remind you that during October 2016, you received an amount of USD 11,222,153 representing the sale proceeds of 2GO Group exit, with this, the total amount of distributions which you have received from The Port Fund's exit is USD 136,222,153.

Consequently, The Port Fund's administrators and auditors started preparing the latest Financial Statements of the Fund, and we target to send it to you within the next 60 days.

We thank you for your patience and trust in The Port Fund's management team.

**Sincerely,**

**The Directors**
**The Port Fund L.P.**

The Port Fund L.P., Walkers Corporate Ltd, Cayman Corporate Centre, 27 Hospital Road, George Town, Grand Cayman KY1-9008, Cayman Islands
Email info@portfund.com
www.portfund.com



Clyde & Co LLP
Rolex Tower
15th Floor
Sheikh Zayed Road
Dubai
United Arab Emirates
PO Box 7001
Telephone: + 971 4 384 4000
Facsimile: + 971 4 384 4004
www.clydeco.com

Port Link GP, Ltd.
c/o Walkers Corporate Limited
27 Hospital Road
George Town
Grand Cayman KY1-9008
Cayman Islands
Email: corporate@walkersglobal.com
Fax: +1 345 949 7886

The Port Fund L.P.
c/o Walkers Corporate Limited
27 Hospital Road
George Town
Grand Cayman KY1-9008
Cayman Islands
Email: corporate@walkersglobal.com
Fax: +1 345 949 7886

| Our Ref | Your Ref | Date |
|---|---|---|
| KXH/10119802/25989797.1 | | 7 July 2018 |

Dear Sirs

**Investment Management Agreement dated 28 June 2007**

We are instructed by Emerging Markets PE Management Limited, formerly KGL Investment Cayman Ltd. (our **Client,** or **EMPEML**). We write further to our Client's letter of demand dated 16 June 2018, to which our Client has received no substantive response.

**EMPEML as Investment Manager**

As you are aware, Port Link GP Ltd (**PLGP**) is the general partner of the Port Fund L.P. (the **Partnership**). On 21 March 2007, the Partnership entered into the Limited Partnership Agreement with PLGP (as amended and restated on 14 July 2008) (the **LPA**), under which it was agreed that PLGP would act as the general partner of the Partnership, organized for the purpose of investing funds in securities, other instruments and assets.

On 28 June 2007, EMPEML entered into an Investment Management Agreement (the **IMA**) with PLGP (as the general partner of the Partnership) to carry out investment management of the Partnership.

EMPEML has complied with all, or substantially all, of its obligations under the IMA.

**Breaches of the IMA: Failure to pay Carry**

Upon exiting fund investments the LPA and the IMA require PLGP, amongst other things, to distribute 80% of the proceeds of the exited fund investments to the Partnership (according to an

Clyde & Co LLP is a limited liability partnership registered in England and Wales under number OC326539. A list of members is available for inspection at its registered office The St Botolph Building, 138 Houndsditch, London EC3A 7AR. Clyde & Co LLP uses the word "partner" to refer to a member of the LLP, or an employee or consultant with equivalent standing and qualifications. Authorised and regulated by the Solicitors Regulation Authority. The Dubai branch is licensed by the Department of Economic Development with licence number 120128.

كلايد آند كو إل إل بي هي شركة تضامن ذات مسئولية محدودة مسجلة في إنجلترا وويلز تحت رقم OC326539، ومقرها المسجل الكائن في مبنى ذا ست بوتولف،138هاوندسديتش، لندن EC3A 7AR. تستخدم كلايد آند كو إل إل بي كلمة "شريك" للإشارة إلى أي من أعضاء الشركة أو موظف أو استشاري بنفس الدرجة والمؤهلات. وفرع دبي مرخص من قبل دائرة التنمية الاقتصادية بموجب الرخصة رقم 120128.



agreed 'waterfall' of distributions) and the remaining 20% to EMPEML in its capacity as investment manager of the Partnership.

Section 5.2(d)(iv) of the IMA specifies that:

"*Distributions may be made to the Limited Partner in the General Partner's sole discretion. The General Partner will make distributions from the Fund Investments to the Investment Manager and Limited Partners within 60 calendar days from receipt of the proceeds from each Exited Fund Investment, in the following amounts and in order of priority:*

*. . .*

*(iv) 80% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment and 20% to the Investment Manager (the "Carry").*"

Furthermore, and correspondingly, section 4.3(b)(iv) of the LPA specifies that:

"*Distributions from exited Fund Investments shall be distributed to the Partners in accordance with the following provisions: . . . 80% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment and 20% to the Investment Manager (the "Carry").*"

The Partnership exited all Fund Investments in late 2017.

On 14 November 2017, as a result of the Partnership exiting the Fund Investments, EMPEML understands that BDO Unibank wired the proceeds, being USD 496,429,777, to PLGP's account held with Noor Bank in Dubai, United Arab Emirates, of which USD 45,462,000 was to be used to pay to EMPEML the Carry in accordance with the IMA and LPA, as set out above.

The debt owed to EMPEML in respect of the Carry is not disputed. EMPEML was informed by the Partnership that payment of the Carry would be wired to EMPEML's Cayman Islands bank account; however, no such payment has been received to date by EMPEML.

On 16 June 2018, EMPEML sent a notice to PLGP demanding payment of the Carry of USD 45,462,000, as per section 4.3(b)(iv) of the LPA, and correspondingly due to EMPEML pursuant to section 5.2(d)(iv) of the IMA.

From 14 November 2017 until date, being 5 July 2018, in breach of its obligations under the IMA, PLGP and/or the Partnership has failed to pay EMPEML the Carry. Significantly more than sixty (60) calendar days have now passed since the Fund Investments were exited, and accordingly the Carry is due and outstanding to EMPEML. The Partnership is in breach of contract by failing to pay EMPEML pursuant to section 5.2(d) of the IMA.

Compound interest is accruing on the Carry on account of its non-payment from 1 January 2018 at a rate of 8% per annum. At the date of this letter total accrued interest stands at USD 1,698,897. Interest in the unpaid Carry continues to accrue until the debt is paid in full.

**Breaches of the IMA: Failure to pay Management Fee**

Further, section 5.1 of the IMA specifies that

"*In consideration of the provision of discretionary investment management services in accordance with this* [IMA]*, the Investment Manager shall be entitled to receive, and the Fund shall pay the following management fees in USD to the Investment Manager (the "**Management Fee**")…*

10119802 25989797.1                                                                                                    **2**



*(b) from 1 January following the fifth anniversary of the Initial Closing Date, until the termination of the Fund for any subsequent period, an annual management fee equal to 1.5% of the Fund's aggregate Capital Commitments.*

*The Management Fee shall be payable quarterly in advance, commencing on the Initial Closing Date and thereafter on the first day of each calendar quarter. The Management Fee shall at all times be borne by the Limited Partners pro rata to their Capital Commitments, and appropriate adjustments shall be made to their Capital Accounts."*

The Partnership and PLGP have not paid the Management Fee to EMPEML since 1 January 2015. The Management Fee is calculated in accordance with the calculations at Appendix A to this letter. The Management Fee of USD 8,106,386 is due and outstanding to EMPEML.

Compound interest is accruing on the Management Fee at a rate of 8% per annum on account of its non-payment and now stands at USD 1,516,771. Interest continues to accrue on the unpaid Management Fee until it is paid in full.

**Termination of the IMA for material breach**

Pursuant to section 12.2(a) of the IMA

*"The Investment Manager may terminate this* [IMA]…

*(c) at any time by notice in writing to the Fund if the Fund shall commit any material breach of its obligations under this* [IMA]."

The Fund has committed material and fundamental breaches of its obligations under the IMA by: (1) failing to pay the Carry of USD 45,462,000 for 60 calendar days since the Fund Investments were exited in breach of section 5.2(d)(iv); and (2) failing to pay the Management Fee of USD 8,106,386 since 1 January 2015 in breach of section 5.1.

Accordingly, this letter constitutes notice to PLGP and the Partnership under section 12.2(a) of the IMA that the IMA is terminated with immediate effect.

In accordance with section 12.5 of the IMA, upon termination of the agreement the Investment Manager shall be entitled to receive immediately all fees and other expenses and monies accrued but not yet paid up to the date of such termination.

In addition, for the avoidance of doubt, we remind you that pursuant to section 12.7 of the IMA, the *"liability and indemnity provisions [in the IMA] shall survive the termination of this Agreement"* and *nothing in this letter shall be construed as a waiver of EMPEML's right to claim indemnities under the terms of the Agreement.*

**Notice of Demand**

Therefore, we demand the following:

1. Payment of the Carry in the sum of USD 45,462,000, plus accrued interest in the sum of USD 1,698,897; and

2. Payment of the Management Fee in the sum of USD 8,106,386, plus accrued interest in the sum of USD 1,516,771.

In total, the sum of USD 56,784,054 is due and outstanding to EMPEML (the **Outstanding Debt**).

We hereby demand on behalf of our Client that PLGP make payment of the Outstanding Debt forthwith.



Payment should be made directly to EMPEML to the following bank account:

| | |
|---|---|
| Beneficiary: | Weir & Associates |
| Bank: | The Hongkong & Shanghai Banking Corporation Limited |
| Multi-Currency | |
| Account No: | 062-9-614611 (Foreign Currency Savings) |
| Bank Address: | No. 1 Queen's Road, Central, Hong Kong |
| Swift: | HSBCHKHHHKH |

Please note that, in the event that payment of the Outstanding Debt is not received in cleared funds within 48 hours of this letter, EMPEML reserves the right to take all available measures and recourse to recover the Outstanding Debt and to protect and preserve its rights against PLGP and/or the Partnership for the Outstanding Debt, including further late payment interest (which continues to accrue on a daily basis on the Outstanding Debt until full payment is made) and any legal costs incurred, including court fees and lawyer's fees, as well as the right to claim damages, whether in contract or otherwise, and the right to claim indemnity from PLGP and/or the Partnership for any claims as may be asserted against EMPEML by any third party.

All our Client's rights are reserved.

Yours faithfully

**Clyde & Co LLP**


**||| WALKERS**

**BY EMAIL**

6 February 2020                                                                Our Ref: BG/MT/1T5138.D08984

**KGL International for Ports, Warehousing and
Transport K.C.S.C.**
Industrial Shuwaikh
Area 3, Building 66
Block 9, Kuwait

Dear Sir/Madam

We act as Cayman Islands legal counsel to The Port Fund L.P. (the "**Fund**") and Port Link
GP Ltd. (the "**GP**") and write in relation to the convertible loan agreement entered into by
the Fund and KGL International for Ports, Warehousing and Transport K.C.S.C. ("**KGL
Ports**") dated 22 August 2007 (the "**Convertible Loan Agreement**").

Certain limited partners of the Fund, namely Gulf Investment Corporation ("**GIC**") and the
Kuwait Ports Authority (the "**KPA**"), have recently issued letters to the Fund and the GP
seeking the disclosure of documentation and information relating to the business and affairs
of the Fund. Of particular relevance for the purposes of this letter, the KPA and GIC have
sought to obtain a copy of the Convertible Loan Agreement and further information with
respect to the arrangements entered into between the Fund and KGL Ports. The Fund and
the GP have, to date, resisted such attempts on the basis that the Convertible Loan
Agreement contains a strict confidentiality clause prohibiting the Fund from providing any
details relating to the Convertible Loan Agreement and the arrangements between the
parties.

Following such correspondence between GIC, the KPA and the Fund, GIC and the KPA
commenced legal proceedings in the Cayman Islands seeking the disclosure of
documentation and information from the Fund and the GP pursuant to section 22 of the
Exempted Limited Partnership Law (as amended) in Cause No. FSD 13 of 2020 and Cause
No. FSD 235 of 2019 respectively (the "**Cayman Proceedings**"). In the Cayman
Proceedings, GIC and the KPA are seeking the disclosure of documentation and
information relating to, *inter alia*, the Convertible Loan Agreement and the commercial
arrangements between the Fund and KGL Ports. GIC and the KPA have also each filed an
*ex parte* Application for an Order to Conduct Discovery for Use in Foreign Proceedings
Pursuant to 28 U.S.C. § 1782 in the United States District Court for the Southern District of
New York (the "**US Proceedings**" and together with the Cayman Proceedings, the "**Legal
Proceedings**").

**Walkers**

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100 F +1 345 949 7886 www.walkersglobal.com

**WALKERS**                                                                           Page 2

In connection with the Legal Proceedings, the Fund and the GP are seeking KGL Ports' consent to disclose the Convertible Loan Agreement and details of the arrangements between the parties to the limited partners of the Fund on such terms that are acceptable to KGL Ports in order to avoid lengthy and costly litigation between the parties. Please note that, absent an agreement between the parties to the Legal Proceedings as to the terms and conditions of any such disclosure, it is possible that the Cayman Court or the NY Court could order the disclosure of the Convertible Loan Agreement and related information without any confidentiality restrictions and the Fund and the GP would be bound by the terms of such orders.

In the circumstances, we would welcome the opportunity to meet with the legal team of KGL Ports to discuss this matter further. In circumstances where the Legal Proceedings are on foot, we would be grateful for a response as soon as possible and, in any event, by Friday 7th February 2020.

Yours faithfully

*Walkers*

**WALKERS**

KGL PORTS INTERNATIONAL

Received
9/2/2020

9626461.2T5138.D08984

12 February 2020

Walkers
190 Elgin Avenue, George Town
Grand Cayman, KY1-9001, Cayman Islands

Re: Legal Proceedings Seeking KGLPI Confidential Information

We are responding to your 6 February 2020 letter advising KGL International for Ports, Warehousing and Transport KSCC ("KGLPI") of certain legal proceedings filed by the Gulf Investment Corporation ("GIC") and the Kuwait Port Authority ("KPA") in the Cayman Islands and the Southern District of New York seeking a copy of the Convertible Loan Agreement between KGLPI and The Port Fund L.P. ("Fund") as well seeking other information with respect to arrangements entered into between KGLPI and the Fund. KGLPI expects the Fund to fully comply with the confidentiality obligation under the Convertible Loan Agreement and any other applicable confidentiality obligation.

KGLPI is open to discussing sufficient confidentiality protections that would allow disclosure of certain information under the close supervision of an independent court to ensure that the information sought in those proceedings is relevant, needed for a proper purpose, and will not be misused. Unfortunately, the KGL group of companies are familiar with the tactic of KPA's current leadership of filing legal actions containing highly inflammatory and false allegations, misrepresenting facts to the courts, intimidating witnesses, threatening defense counsel with crimes against the State of Kuwait, and arbitrarily using its government authority to advance private, non-governmental agendas.

In addition, a former in-house lawyer of one of KGL's main competitors in Kuwait has been representing GIC in these matters and, in fact, engaged in non-privileged communications with our competitor's CEO as part of a plan to encourage one or more of the Fund's limited partners to file a legal action in the Cayman Islands even though the competitor has no financial interest or legal standing in the matter. The same former in-house lawyer of our competitor has engaged in multiple lawsuits and complaints against KGL Logistics (one of the KGL group of companies and a major shareholder in KGLPI) with the Kuwait Capital Market Authorities. In addition, the KPA and our competitor maintain an unusually close relationship, including illegally terminating KGL's ability to work at the Kuwait Ports and transferring the work to our competitor. Given this track record, we are concerned that the KPA will use the confidential information for an improper purpose in Kuwait.

KGLPI will therefore require robust restrictions on the disclosure of confidential information and other protections that will prevent misuse of the confidential information by the KPA, our main competitor, and the lawyers with close ties to our competitor.

Sincerely,

KGL International for Ports, Warehousing and Transport KSCC

رأس المال المدفوع Paid up Capital KD 10,690,226    رأس المال المصرح به Authorized Capital KD 15,000,000

P.O.Box: 42438 Shuwaikh 70655 Kuwait, Tel.: +965 2224 5155, Fax: +965 2224 5166    www.kglpi.com

KGL International for Ports Warehousing & Transport K.S.C.(Closed) - C.R. 102318    شركة كي جي إل الدولية للموانىء والتخزين والنقل ش.م.ك. (مقفلة) - س.ت. 102318

Page 280

محمد أحمد الرشيد — عبدالعزيز رشيد الرشيد
محامون ومستشارون قانونيون
Attorneys & Legal Consultants

الأخير باكرول للإعلان بالارشاد

جلسة ١/١١/٢٠١٦
تجارى كلى/٢٢ ٢٠٨٦/٧٥٢٢
ع/ أمين سر ١٤/

تجارى كلى/٢٢

## ۞ صحيفة دعوى ۞

انه في يوم          الموافق   /  2016– الساعة

**الموضوع**

بنـاء علـى طلـب **السـيد /الممثـل القـانونى لصندوق المـوانئ (شـركة**
**محـدودة) ومقرهـا فى جـزر الكايمـان،** ومحلـه المختـار مكتـب

**دعوى ندب خبير**
**لتصفية الحساب بين**
**طرفي الدعوى**

المحاميـن/محمـد أحمـد الرشـيد وعبـد العزيـز رشـيد الرشـيد – الكـائن
بالكويـت– الشـرق– شـارع احمـد الجـابر– البحـر تـاور–
الدور السابع عشر.

انا                    مندوب الاعـلان بـإدارة التفيـذ بـوزا

انتقلت فى تاريخه وساعته اعلاه الى حيث أعلنت:

المحكمـة الكليـة
رقـم الكليـة : 16/6582
تجـارى كلى/22
رقم الاعلان : 16/32336
تـ-الابـداع : 2016-07-18
تاريخ الجلسة : 2016-10-04
الدور : 04   الغرفة : 28
JDPF65

**السـيد/ فاضـل البغلـى الممثـل القـانونى لشـركة كـ**
**الدوليـة للمـوانئ والتخـزين والنقـل (ش.م.ك.م) وبص**
**رئيس مجلس الإدارة.**

ويعلـن فى : **الشويخ الصناعية** ٣ ـ قطعـه ٢ ـ شارع ٨٥
مخاطبـاً مـع : ..................... ٦٨ – الرقـم الالى ٩.١٥١٩٦٨

|||||||||||| 162260010



**حيث سلمته نسخة من هذه الصحيفة وأعلنته بالآتي:**

## ۞ الموضوع ۞

**أولاً :** بتـاريخ 8/26: 2007 تعاقـدت شـركة كـى جـى إل الدوليـة
للمـوانئ والتخـزين (ش.م.ك.م) المعلـن إليهـا مـع صندوق المـوانئ
الطالـب لمـنح المعلـن إليهـا قـرض بمبـلغ عشـرين مليـون دولار
أمريكـي مـع حـق الصنـدوق فى تحويـل القـرض إلى أثنـين مليـون
سـهم مـن أسـهم شـركة كـي جـي إل الدوليـة (المعلـن إليهـا) فى
شـركة دميـاط الدوليـة للمـوانئ – شـركة مسـاهمة مصرية

محمد أحمد الرشيد    عبدالعزيز رشيد الرشيد
محـامـــون ومستشـــارون قـانونيـــون
Attorneys & Legal Consultants

مقفلة-  وهـي الشـركة صـاحبه الامتيـاز لعقـد انتفـاع مدتـه أربعـين سـنة تم توقيعـه مـع هيئـة مينـاء دميـاط بتـاريخ 2006/5/8 لإنشـاء وإدارة وتشغيل محطة الحاويات الجديدة في مدينة دمياط بجمهورية مصر العربية.

1-  نـص البنـد رقـم (3- 2) بعنـوان "معـدل الفائـدة علـى القـرض " وحيـث ورد الـنص علـى فائـدة سـنوية تغطـي فتـرة القـرض البالغـة خمـس سـنوات وبمعدل 28٪.

2-  ولمـا كـان ذلـك، وكـان الطالـب قـد أوفـى بكامـل التزاماتـه تجـاه المعلـن إليـه، فـي حـين أن المعلـن إليهـا قـد أخلـت بالتزاماتهـا الـواردة في اتفاقيـة قـرض للتحويـل المبرمـة بينـه وبـين الطالـب فـإن ذلـك فـي حـد ذاتـه خطـأ عقـدي يوجـب التزامـه بتعـويض الطالـب عمـا لحقـه مـن خسـارة ومـا فاته من كسب وفقاً لما تقضي به المادة (230) من القانوني المدني.

-  **فقضت محكمة التمييز بأن:**

**«ولئـن كـان مـن المقـرر أن عـدم تنفيـذ المـدين لالتزامـه التعاقـدي يعتبـر في ذاتـه خطـا يرتـب مسـئوليته التـي لا يـدرأها عنـه إلا إذا أثبـت أن عـدم التنفيـذ يرجـع إلى قـوة قـاهرة أو بسـبب أجنبـي لا يـد لـه فيـه، أو خطـأ المتعاقـد الآخـر، إلا أن اسـتخلاص الخطـأ وتقـدير إخـلال المتعاقـد بالتزاماتـه الموجـب لمسـئوليته العقديـة مـن عدمـه مـن مسـائل الواقـع التـي تسـتقل بهـا محكمـة الموضـوع مـادام اسـتخلاص سائغا ومستنداً إلى ما هو ثابت بالأوراق».**

(الطعن رقم 160 لسنة 1986 تمييز تجاري - جلسة 1987/4/22)

**ثانياً، إنـه لمـا كـان ذلـك**، وكـان المعلـن إليهـا لم تقـم بسـداد أيـة مبـالغ للطالـب سـواء مـن أصـل رأس المـال (القـرض) أو مـن الأربـاح أو ريـع



محمـد أحمـد الرشيد   عبدالعزيز رشيد الرشيد
متحامـون ومستشـارون قـانونيون
A t t o r n e y s   &   L e g a l   C o n s u l t a n t s

ٱلأسـهم، وذلـك علـى الـرغم مـن المطالبـات المتكـررة فإنـه قـد اضطـر إلى
رفع هذه الدعوى لتصفية الحساب بينهما.

- ولمـا كـان البنـد رقـم (10) مـن الاتفاقيـة قـد نـص أنهـا خاضعـة
لأحكـام قـوانين دولـة الكويـت والمحـاكم الكويتيـة ﻲﻓ حالـة نشـوب
أي نـزاع بـين طرفيهـا فـإن الطالـب يرفـع هـذه الدعـوى أمـام القضـاء
الكويتي ليفصل له ﻲﻓ طلباته الواردة ﻲﻓ ختام هذه الصحيفة.

### ☙ بنـاء عليـه ❧

أنـا منـدوب الإعـلان سـالف الـذكر قـد انتقلـت ﻲﻓ سـاعته وتاريخـه أعـلاه، إلى
حيـث المعلـن إليـه وسـلمت نسـخة مـن هـذه الصحيفـة للعلـم بمـا ورد بهـا وكلفتـه
الحضـور أمـام محكمـة المحكمـة الكليـة بقصـر العـدل، بأمـام الـدائرة
............ بجلسـتها التـي سـتنعقد علنـاً ﻲﻓ تمـام السـاعة الثامنـة والنصـف ومـا
بعـدها مـن صبـاح يـوم ............ الموافـق ............ /............ /2016، لسـماع
الحكم:

**بنـدب خبيـر للاطـلاع علـى ملـف الدعـوى ومـا يقدمـه الطرفـان مـن مسـتندات وذلـك لاحتسـاب
مسـتحقات الطالـب لـدى المعلـن إليـه وذلـك عـن قيمـة القـرض الـذي اقترضـه المعلـن إليـه مـن
الطالـب وقـدره عشـرون مليـون دولار أمريكـي فضـلاً عـن الفوائـد الاتفاقيـة وقدرهـا 28٪ في السـنة
وبحـد أقصـى خمـس سـنوات ومـا يسـتحق مـن فوائـد قانونيـة وتعويضـات ومـا لحـق بالطالـب مـن
خسـارة أو فاتـه مـن ربـح وذلـك توصـلاً للقضـاء بإلـزام المعلـن إليـه بـأن يـؤدي للطالـب مـا قـد يسـفر
عنـه تقريـر الخبيـر وتصفيـة الحسـاب بينهمـا نهائيـاً فيمـا يتعلـق بأصـل المبلـغ المقتـرض وفوائـده
خـلال مـدة خمـس سـنوات وحتـى تاريـخ السـداد والتعويضـات ومـا فاتـه مـن ربـح ومـا لحقـه مـن
خسـارة.**

ولأجل العلم ....



الكويت - الشرق - شارع أحمد الجابر - البحر ناور - الدور السابع عشر - بدالة - 22490203/22490204 - فاكس - 22490205

  

ALDIYAR LEGAL TRANSLATION
Legal Translator/ Mahmood Subhi Nassar

الـديـار
للـتـرجـمـة الـقـانـونـيـة
الـمـترجم القانوني / محمودصبحي نصار

**Mohammed Ahmed Al Rasheed and Abdelaziz Rasheed Alrasheed**

Attorneys & Legal Consultants

## Statement of Claim

**On    (Day) corresponding to / / 2016 – (Hour),**
At the request of the Legal Attorney of the Port Fund (limited company), headquartered in Cayman Islands, with chosen domicile being at the Office of Advocates/ **Mohammed Ahmed Al Rasheed and Abdelaziz Rasheed Alrasheed** – Kuwait, Sharq – Ahmed Al Jaber St., Al Bahar Tower – 17th floor

I,      , Process Server of the Ministry of Justice's Execution Department, have moved at the time above where I served this notice on:
**Mr. / Fadel Al Baghli, Legal Representative of KGL International for Ports, Warehousing & Transport K.S.C.C. in his capacity as Vice Chairman**
**To be served at: Shuwaikh Industrial Zone – Plot (3) – Bldg. (66) – Block (9)**
Addressed together with: ...........

> **Subject**
> **A Lawsuit for Expert Appointment to Set off Account between Parties to Lawsuit**
>
> **Applicant's Attorneys /**
> **Mohammed Ahmed Al Rasheed and Abdelaziz Rasheed Alrasheed**

**Where I delivered a copy of this Statement of Claim and served on him the following notice:**

### Subject

**First**: On 26/8/2007, KGL International for Ports, Warehousing & Transport K.S.C.C. ("**KGLIP**"), the Notified Party, concluded a contract with the Port Fund, the Applicant, for being granted by the latter a convertible loan of USD twenty million with a right being given to the Fund to convert this loan into two million shares of KGLIP shares in Damietta International Port Company SAE, which is the concession owner of a usufruct agreement extending to forty years signed with Damietta Port Authority on 8/5/2006 to build, manage and operate the new container terminal in Damietta, Arab Republic of Egypt.

> //Stamp affixed in the first page reads as follows:
>
> Court of First Instance
> Ref.: 16/6582
> Commercial Full Jurisdiction/22
> Notice Ref.: 16/32336
> Lodging Date: 18-07-2016
> Hearing Date: 04-10-2016
> Floor: 04 Hall: 28//

1- Clause No. (3-2) entitled "Interest Rate on Loan" stipulated that an annual interest in the rate of 28% shall be levied on the whole period of the loan extending to five years.
2- The Applicant has fulfilled the full obligations vis-à-vis the Notified Party. However, the Notified Party has violated its obligations as stated in the Convertible Loan Agreement concluded between it and the Applicant, which p...

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ،م.ع.أ ، دبـي ،٧٧٩٤:ب.ص ، ٢٢٨٣٦٧٨ : فاكس ، ٢٢٢١٥٥٧/٢٢٢٢٧٢٢
Mob.: 050-6284563    Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

  

se constitutes a contractual error requiring the Notified Party to pay compensation to the Applicant as per the provisions of Article (230) of the Civil Code for loss and missing profit the latter sustained.

- **The Court of Cassation ruled as follows:**

> (**It is established that the failure by the Debtor to perform its contractual obligation shall be per se deemed as an error requiring that the Debtor bears a liability that cannot be removed unless the failure to perform such contractual obligation is attributable to a force majeure event or an inevitable foreign reason or the error of the other contracting party. However, the conclusion of the error and the assessment of the contracting party's violation of its obligation requiring its contractual liability shall be a matter that is subject to the Trial Court as long as such conclusion is palatable and based on the facts established in the lawsuit papers.**)

**(Cassation No. 160 of Year 1986 Commercial Cassation – Hearing dated 22/4/1987)**

**Second**: Based on the foregoing, the Notified Party failed to pay any amounts to the Applicant either from the Principal Debt (Loan) or its interest, or from dividends of shares, despite of repeated claims. Hence, the Applicant had to file this lawsuit to set off the account between them.

- Clause (10) of the agreement stipulated that it is subject to the provisions of the laws applicable in the State of Kuwait and to the Kuwaiti courts, in case any dispute arises between the parties thereto. Thus, the Applicant files this lawsuit before the Kuwaiti judiciary to decide on its petitions stated at the end of this Statement of Claim.

**Therefore,**

I, the Process Server above, have moved at the time above where the Notified Party exists and delivered the same a copy of this Statement of Claim for notification. Further, I ordered it to appear before the Court of First Instance, Palace of Justice, Circuit ...., at its Hearing to be publicly held at 8:30 AM on .... (Day) corresponding to .../...../ 2016 **to hear the judgment**:

**Appointing an expert to review the lawsuit file and the exhibits that may be submitted by both Parties to calculate the dues of the Applicant payable by the Notified Party for the loan granted to the Notified Party by the Applicant in the amount of USD twenty million along with the contractual interest in the rate of 28% per annum with a maximum of five years, plus the legal interest and compensation as well as the loss and missing profit sustained by the Applicant so that a judgment be ruled obliging the Notified Party to pay the Applicant the amount to be determined in the Expert Report and to conclusively set off the account between**

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E. ٢٢٢٧، فاكس : ٢٢٨٣٦٧ ، ص.ب.: ٧٧٩٤، دبي، أ.ع.م.
Mob.: 050-6284563        Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

  

Legal Translator/ Mahmood Subhi Nassar

المترجم القانوني / محمودصبحي نصار

them as to the principal debt and its respective interest through five years till the date of payment together with the compensation, missing profit and any loss sustained by the Applicant.



هاتف:٢٢٢١٥٥٧ / ٢٢٢٧٢٢، فاكس : ٢٢٨٣٦٧ ، ص.ب:٧٧٩٤، دبي- إ.ع.م.

Tel. : 2222722 / 2221557, Fax : 2283678, P.O.Box : 7794, Dubai - U.A.E.

Mob.: 050-6284563    Email : mahmoudsubhin@hotmail.com / diyar-translation@hotmail.com

متحرك : ٠٥٠-٦٢٨٤٥٦٣



**THE PORT FUND**

**PROJECT MASTER EXIT REPORT**

*November 2016*

*Strictly Private and Confidential*

*The Port Fund | Project Master Exit Report*

 

## Table of Contents

I.   Transaction and Company Overview .................................................................................. 1

  A.   Transaction Overview ...................................................................................................... 1

  B.   Company Overview and History ...................................................................................... 3

  C.   Environment, Social and Governance Initiatives (ESG) ................................................. 4

II.  Transaction Process and History ....................................................................................... 6

  A.   Deal Sourcing ................................................................................................................... 6

  B.   Transaction Evaluation ..................................................................................................... 7

  C.   Due Diligence ................................................................................................................... 7

  D.   Transaction Structure ........................................................................................................ 7

  E.   Transaction Development and Management ....................................................................... 9

    1.   *Original Capital Infusion: Revitalization and Stabilization* ........................................ 9

    2.   *Acquisition and Growth Strategy: Industry Consolidation* ........................................ 10

    3.   *Capital Raise and Rights Offer: Rapid Expansion Initiatives* .................................... 15

  F.   Exit Process ..................................................................................................................... 16

## Table of Figures

Figure 1. NNC-2GO Group Business Segments ....................................................................... 3

Figure 2. Company History ...................................................................................................... 3

Figure 3. Strategic Repositioning: Revenue Breakdown per Business Segment ....................... 4

Figure 4. Structure of TPF's investment in NNC ..................................................................... 8

Figure 5. NNC and KGLI-NM Ownership: Initial Equity Infusion .......................................... 9

Figure 6. Sources and Uses of TPF's Investment ................................................................... 10

Figure 7. Acquisition/Consolidation Transaction Highlights ................................................. 10

Figure 8. Financial Performance: 2008 – 2010, in USD millions ........................................... 11

Figure 9. Acquisition Due Diligence Package ........................................................................ 11

Figure 10. NNC Ownership Structure: CAF Equity Infusion ................................................. 12

Figure 11. 2GO Rebranding ................................................................................................... 13

Figure 12. 2GO Group Integration Process ............................................................................ 14

Figure 13. Financial Performance: 2011 – 2013, in USD millions .......................................... 15

Figure 14. Revenue Share per Business Segment ................................................................... 16

Figure 15. Financial Performance: 2014 – TTM Jun 2016, in USD millions ........................... 16

Figure 16. Exit Process Marketing Summary .......................................................................... 17

Figure 17. Investment Returns ............................................................................................... 19

the **PORT FUND**

*The Port Fund | Project Master Exit Report*  

## Definitions

| | |
|---|---|
| 2GO | 2GO Group, Inc. |
| Aboitiz Group | Aboitiz Equity Ventures and Aboitiz & Company, Inc. |
| AMCG | Asia Mezzanine Capital Group |
| ATSC | Aboitiz Transport System Corporation |
| BOD | Board of Directors |
| CAF | China-ASEAN Investment Cooperation Fund |
| CAGR | Compound annual growth rate |
| DOR | Deal Origination Report |
| Fund | The Port Fund |
| IC | Investment Committee |
| KGLI BV | KGL Investment B.V. |
| KGLI Coop | KGL Investment Cooperatief U.A. |
| KGLI-NM | KGLI-NM Holdings, Inc. |
| LCA | Logistics Consulting Asia |
| LED | Logistics, Express and Distribution |
| MPC | Metro Pacific Corporation |
| NHMC | Negros Holdings and Management Corporation |
| NNC | Negros Navigation Co., Inc. |
| SPA | Share Purchase Agreement |
| SPV | Special Purpose Vehicle |
| Team | The Port Fund Team |
| TPF | The Port Fund |
| TTM | Trailing Twelve Months |
| VAS | Value Added Services; includes cold chain transport and other ancillary businesses such as trucking, security and vessel repair, among others |

 
**I.**   **Transaction and Company Overview**

### A.   Transaction Overview

The Port Fund's entire ownership in Negros Navigation Co., Inc. was sold in August 2016 for net sale proceeds of USD91.9 million[1], formalizing the exit of USD28.5 million[2] invested equity. The transaction merited a multiple of 3.2x the investment and an IRR of 15.1% over the weighted average investment period of 7.8 years.



*\* Figures are inclusive of deal transaction costs and net out deal specific debt, costs and expenses that were incurred for the transaction*

The successful conclusion of this transaction was the direct result of TPF's strategy to transform what was once a pure shipping player operating a small flotilla of vessels into the largest shipping company and the dominant logistics and supply chain solutions provider in the Philippines.

- NNC operates a fleet of 24 vessels connecting 24 ports of call, over 80% of the entire Philippine port network, and established itself as the leading platform for the Supply Chain segment.
- Warehouse inventory has grown to over 100,000 sqm in 2015, supporting the growing cross docking service offering, distribution and marketing solutions, and warehousing.
- Express service store locations increased to over 1,200 branches and the company maintained partnerships with FedEx, UPS, e-commerce providers and Government agencies.
- The cold chain support service now holds a significant market share in the refrigerated and isotank container transport market.

Over the life of the investment period, NNC's revenues increased from USD42.0 million to USD354.7 million and EBITDA grew from USD8.1 million to USD65.8 million, representing CAGRs of 35.6% and 34.9%, respectively.

---

[1] *Figure is net of deal specific debt, costs and expenses related to the transaction.*
[2] *Inclusive of deal transaction costs and expenses.*

the **PORT FUND**

*The Port Fund | Project Master Exit Report*  **2GO**



\* TTM Jun16 results are based on management reports that do not account for intercompany eliminations. 2008 to 2015 figures are from the Company's audited financial statements

TPF was actively involved in business operations, strategic planning, budgeting, and capital raising activities. Key investment highlights are as follows:

| Transaction Phases | Detailed Investment Highlights |
| --- | --- |
| **Deal Sourcing and Initial Investment** | • Evaluated the potential opportunity to invest in NNC, as management contemplates the planned acquisition of ATSC<br>• Conducted a rigorous financial, tax, and legal due diligence<br>• Finalized investment agreement and funded USD28.5 million[1] in tranches between 2008 and 2009 via an SPV |
| **Pre-acquisition Enhancement** | • Worked with management to buy back debt<br>• Equity infusion and debt buyback puts NNC out of court mandated receivership<br>• Conducted a refleeting to improve capacity and introduced operational and back-office efficiencies |
| **Industry Consolidation** | • Successfully negotiated the acquisition of ATSC<br>• Conducted extensive financial, tax, and legal due diligence on the proposed acquisition of the market leader, ATSC<br>• Raised capital to support the acquisition, acquired ATSC in 2010 |
| **Integration** | • Immediately after acquisition, TPF worked with management to develop a detailed integration process to merge the operations and eliminate competing businesses<br>• Analyzed and executed an extensive route and vessel rationalization process; began another refleeting round to eliminate excess capacities and inefficient vessels<br>• Consolidated support and back office functions such as Human Resources, Finance, IT and ship management, among others |
| **Strategic Shift** | • Formed a centralized sales team to consolidate supply chain solutions offerings and allow cross-selling among segments<br>• Hired logistics and supply chain experts and consultants<br>• Infused additional equity, funded via a debt raise, to be used to grow and acquire additional assets for the supply chain business segments |
| **Exit** | • Initiated a sale process in the end of 2013 involving a potential secondary offering or sale to a strategic/financial buyer<br>• In 2014/2015, performed a competitive sales/marketing process which merited 4 interested parties<br>• With CAF unwilling to sell, in 2016, TPF began a sale process for its own shares (minority stake) and received offers from multiple entities<br>• Executed the sale of TPF's minority stake to a strategic buyer in August/September 2016 |

[1] Inclusive of deal transaction costs and expenses.


**thePORT FUND**

2

*The Port Fund | Project Master Exit Report*                     

### B.    Company Overview and History

Negros Navigation Co., Inc. is the largest supply chain enterprise and the only end-to-end solutions provider in the Philippines. The Company services all requirements in the value chain, from import and customs clearance, warehousing, trucking, nationwide shipping and inventory management to distribution and merchandising. In addition, the Company also provides retail express and courier services, sea travel, international logistics and specialized cargo handling via business segments under its corporate umbrella.

*Figure 1. NNC 2GO Group Business Segments*



Registered in 1932, NNC is one of the oldest domestic shipping companies in the Philippines. In 1994, NNC became the first shipping company to list on the Philippine Stock Exchange.

*Figure 2. Company History*

In 2006, NHMC, a corporation organized by the management of NNC, acquired majority ownership of NNC from the Metro Pacific Group.

In 2008, NHMC and KGLI BV executed an Investment Agreement to establish their strategic partnership with NNC. The parties organized KGLI-NM as their investment vehicle in NNC.

In 2010, KGLI-NM partnered with CAF with the intention of using NNC as a platform to acquire ATSC. At the time of the acquisition, ATSC was the largest shipping company with the widest port network in the country.


the**PORT FUND**

3

 

ATSC owned and managed shipping and passage operations under the brands SuperFerry, SuperCat and Cebu Ferries. Aside from these, the Aboitiz group had established operations in express and distribution. The acquisition of ATSC and its allied businesses propelled NNC to become the market leader in the shipping and passage industry, garnering 80% of the total market share in the domestic sea passenger segment and over 40% of the domestic sea cargo segment. Management launched a rigorous integration process to realize synergies between the two players.

Throughout the successfully completed integration process that began in 2011 and completed in mid-2013, the Group transitioned from a predominantly shipping and transport company to a full-service logistics and supply chain solutions provider. The NNC Group was positioned to address the needs of a growing Philippine economy that is driven by consumption and inter-island trade. The Company's growth is now being led by these logistics and value-added services, with the Group's shipping operations providing a stable platform and a sustainable competitive advantage.

*Figure 3. Strategic Repositioning: Revenue Breakdown per Business Segment*



C.  **Environment, Social and Governance Initiatives (ESG)**

TPF's investment in NNC and 2GO goes beyond capturing significant returns and capital appreciation. TPF always targeted to provide investors risk adjusted returns, as well as generate sustainable, positive impact. The Team strongly agrees with and adheres to the materiality of ESG factors and their long-term impact on investment performance and strives to implement these principles as it conducts its business activities.

Within this context, TPF believes ESG matters can have both positive and negative consequences on the financial performance of investments, as well as on the positive externalities the Team seeks to generate for societies in its target markets. The Team also recognizes that TPF's investment decisions and activities may have environmental and social consequences. As such, consistent with its fiduciary duty, TPF seeks to:

* Integrate ESG matters into investment practices.

* Require companies that TPF invests in, to ensure a preventive and precautionary approach with respect to environmental and social impacts. If negative environmental or social impacts are unavoidable, they must be appropriately mitigated or compensated for.

* Require companies that TPF invests in, at a minimum to comply with the legal and regulatory requirements in the jurisdictions where they operate, and beyond that work over time towards relevant international ESG norms and standards.

* Require companies that TPF invests in, to observe high standards of business integrity and governance.

* Encourage companies that TPF invests in, to establish an open dialogue with their

**the PORT FUND**

4



stakeholders on the environmental and social impacts of their activities.

- Seek continuous improvements in the management of ESG matters.

- Provide transparent and relevant information on ESG matters related to investment activities, while observing normal commercial confidentiality requirements.

Based on the above, TPF partnered with NNC Management in  initiating and executing many environmental, social and governance programs and projects that ultimately would affect and benefit the lives of people and society, directly and indirectly. Select examples of such activities and programs are mentioned below.

### Safety Management and Leadership

At the onset of the investment, TPF actively initiated a refleeting program to replace the then old and dilapidated vessels of NNC. Shipping vessels in the Philippines, industry wide, consist primarily of aged vessels that are prone to accidents at sea. As a result of the refleeting program, NNC boasts of the youngest shipping fleet in the and is updated with world class safety features, navigational aids, and communications equipment; such as Electronic Chart Display Information Systems, state-of-the-art radar equipment and an Automatic Identification System.

TPF and 2GO Management also hired consultants and experts in safety management, such as Det Norske Veritas, to assist in the preparation, training and implementation of the SPP based on the International Safety Management System. TPF and management ensured that the SPP is aligned and compliant with the requirements of regulatory authorities (i.e Maritime Industry Authority, Philippine Coast Guard) and international best practices such as the International Convention for the Safety of Life at Sea and International Safety Management Code.

With the initiatives set by TPF in partnership with management, NNC emerged as the safety management leader and gold standard in the local maritime industry. The initiatives set enhance further the already stellar safety record of NNC.

### Disaster Relief

In 2013, The Philippines experienced one of the worst natural disasters in recorded history. Typhoon Haiyan (local name Yolanda), a category five storm with wind speeds at landfall of up to 195 mph and gusts of up to 235 mph, devastated eastern parts of the archipelago, claiming over 2,000 lives and costing damage estimated to reach 5% of the country's GDP. As a result, over 8 million lives were affected, 2.5 million were in need of food, and 660,000 lost their homes.

Operation Hope was formed in light of these tragic circumstances. TPF, CAF, and NNC collectively made efforts to provide over 1,500 people with temporary shelter, over 6,000 hot meals a day, safe drinking water, medical supplies and relief care to thousands more in the affected areas.

The 2GO Group offered the use of one of its vessels, St. Peter the Apostle (SPA), to serve as temporary shelter for displaced or injured individuals. SPA is a 152 meter long, 25 meter wide passenger and freight vessel that has capacity for more than


the **PORT FUND**

5

 

1,500 passengers and 250 medical workers and a gross tonnage of more than 10,000 tons.

SPA used its cargo hold to transport much needed food, water, clothing and medical supplies. After discharging supplies, the cargo hold was converted to a medical facility, serving the needs of the population.

In the 90 day period following the disaster, 2GO was able to ship an average of 18,000 metric tons of aid and transport much needed equipment and personnel, daily.

**Other Environmental and Social Programs**

Over the years the 2GO Group has actively participated and partnered with various government agencies and non-government advocacy and charitable organizations in contributing to the environmental and societal impact of being among the largest corporate citizens in the Philippines. Regular annual activities include:

- Tree planting activities in various provinces of the Philippines and in partnership with government agencies such as the Community Environment & Natural Resource Office of the Department of Environment and Natural Resources
- Mangrove planting and coastal clean-up in partnership with the Philippine Ports Authority and Philippine Coast Guard.
- Brigada Eskwela (School Brigade) project under the Department of Labor and Employment which sought volunteers to assist in repair and maintenance of public school classrooms across the archipelago before classes resume.
- Partnered with the largest distributor of books and school supplies to distribute school materials to children located in the far flung areas of the Philippines.
- Participated with the Philippine Red Cross and Philippine Children's Medical Center in various blood donation programs.

## II.  Transaction Process and History

### A.  Deal Sourcing

The TPF Team first met with NNC management in mid-November 2007 and initial discussions determined that NNC represented a potential investment opportunity. Following a detailed presentation by key management, which included Jun Tagud and Jerry Cruzabra, the Team determined that the opportunity warranted additional due diligence and analysis. The Team prepared a Deal Origination Report for the Investment Committee that strongly recommended further due diligence on the investment opportunity. The Team's preliminary recommendation was an investment of approximately USD25.0 to 30.0 million, of which USD11.0 to 15.0 million would be used to purchase outstanding debt, and the remainder to acquire additional ships for expansion.

the **PORT FUND**

 

**B.     Transaction Evaluation**

After submission of the DOR, the Team began preliminary due diligence on NNC in November 2007. This included visits to the different port operations served by NNC, interviews with key company employees, financial analysis on the historical and projected financials and due diligence meetings with other industry groups and contacts familiar with the operation. The information resulting from the preliminary due diligence continued to indicate that NNC satisfied the targeted investment objectives of the Fund. As a result, the Team prepared a comprehensive Investment Recommendation Report that was presented to the IC in December 2007. The IC unanimously approved the transaction and formal negotiations and a more comprehensive due diligence process commenced.

**C.     Due Diligence**

The Team began comprehensive due diligence and engaged the following to perform detailed analyses on the transaction: Ernst & Young – Philippines conducted a detailed financial review and advised on the most efficient tax structure; Baker McKenzie – Philippines conducted a comprehensive legal review on the target; Grant Thornton – Philippines conducted a commercial study on the Philippine transportation and shipping industry. The Team also engaged a ship evaluation expert to inspect each vessel and to review key port operations, among others.

**D.     Transaction Structure**

Ernst & Young – Philippines recommended a Double Dutch investment structure for the NNC investment. This structure provides TPF multiple tax benefits, such as (i) exemption from Dutch corporation tax, (ii) exemption from dividend withholding tax for any distributions by the Dutch entities to TPF, and (iii) exemption from Dutch nonresident corporation tax for dividends and gains derived by TPF from the Dutch entities. The report further recommended engaging a Dutch trust management company to provide domiciliation and directorship services in order to avoid issues on residency.

*The Port Fund | Project Master Exit Report*   

Figure 4. Structure of TPF's investment in NNC



Based on the recommendations of local and international advisors, TPF set up three SPVs – KGL Investment Cooperatief U.A. and KGL Investment B.V. in the Netherlands, and KGLI-NM Holdings, Inc. in the Philippines.

KGLI BV initially subscribed to 116,325 Preferred A shares and 795 common shares for 80% economic and 32% voting interest in KGLI-NM. Under the Shareholders' Agreement, KGLI BV had the right to solely nominate two Directors (out of five Directors), and jointly nominate a fifth director. Further, the presence and affirmative vote of a KGLI BV nominated Director is required for a quorum and board resolution, respectively. Aside from BOD nomination rights, KGLI BV also had right of first refusal and assignable call options on NHMC's Preferred C shares.

thePORT FUND

8

 **2GO**

Figure 5. NNC and KGLI NM Ownership: Initial Equity Infusion

**NNC**

| Entity | Class | Entry into NN | % of Total |
|---|---|---|---|
| KGLI-NM | Common | 2,996,500,065 | 99.0% |
| Other | Common | 29,233,058 | 1.0% |
| **Total Common** | | **3,025,733,123** | **100.0%** |

**KGLI-NM**

| Entity | Class | Entry into NN | % of Total per Class |
|---|---|---|---|
| KGL Investment BV | Preferred A | 116,325 | 80.0% |
| NHMC | Preferred B | 29,081 | 20.0% |
| **Total Preferred A&B** | | **145,406** | **100.0%** |
| NHMC | Preferred C | 219,609 | 100.0% |
| **Total Preferred C** | | **219,609** | **100.0%** |
| KGL Investment BV | Common | 795 | 79.5% |
| NHMC | Common | 195 | 19.5% |
| Other | Common | 10 | 1.0% |
| **Total Common** | | **1,000** | **100.0%** |

| | Authorized and Paid-up Capital | | | |
|---|---|---|---|---|
| | No. of Shares | Par Value (PhP/share) | Amount (PhP) | % of Outstanding |
| Common | 1,000 | 10.00 | 10,000 | 0.2% |
| Preferred A | 116,325 | 10,000.00 | 1,163,250,000 | 26.7% |
| Preferred B | 29,081 | 10,000.00 | 290,810,000 | 6.7% |
| Preferred C | 219,609 | 1.00 | 219,609 | 50.4% |
| **Total** | **366,015** | | **1,454,289,609** | **100.0%** |

### E. Transaction Development and Management

#### 1. Original Capital Infusion: Revitalization and Stabilization

In the first half of 2008, the Team focused on finalizing the due diligence and negotiations on the terms of the transaction. On January 30, 2008, The Port Fund entered into a Memorandum of Agreement with NNC. In March 2008, the IC approved the transaction and authorized the Team to proceed with negotiations to close the deal. As part of the negotiations, NNC continued parallel discussions with the remaining equity holder, Metro Pacific Corporation. In late April, MPC confirmed their intent to sell.

On May 13, 2008, the Team executed an Investment Agreement with NHMC, the parent company of NNC. The Investment Agreement provided for the creation of KGLI-NM, the primary vehicle for the respective interests and investments of both parties into NNC. It further outlined the terms of the transaction including the execution of a Shareholders' Agreement and the acquisition of MPC debt and equity, among others. On May 17, 2008, NHMC and TPF executed a Shareholders Agreement and other key agreements required to close the transaction. NNC and the Team finalized negotiations with MPC on the acquisition of its debt and equity and this resulted in an increase in the total equity owned by KGLI-NM to approximately 99.0%.

the**PORT FUND**

*The Port Fund | Project Master Exit Report*     

Figure 6  Sources and Uses of TPF's Investment in NNC

| Sources & Uses (USD mm) | | | |
|---|---|---|---|
| Direct Equity Infusion | 28.5 | Vessel Refleeting | 10.0 |
| | | Debt buyback | 13.5 |
| | | Buyout of MPC shares | 4.0 |
| | | Deal related costs & expenses | 1.0 |
| Total | 28.5 | | 28.5 |

The Port Fund's investment in NNC provided the necessary capital for the Company to exit the court approved rehabilitation program, buyout existing shareholders and implement its strategic refleeting plan.

The refleeting plan involved purchasing two freighters and two RoPax vessels, which required a total funding of USD10.0 million. Retirement of company debts to exit the rehabilitation program required USD13.5 million and purchasing existing shareholder's shares required USD4.0 million. Transaction costs related to the investment amounted to USD1.0 million.

2.      Acquisition and Growth Strategy: Industry Consolidation

Following the execution of the Shareholders' Agreement, KGLI-NM Management began evaluating a potential opportunity for NNC to acquire the market leader and its largest competitor, ATSC. Preliminary discussions with ATSC's major shareholders, the Aboitiz Group, indicated a high level of interest. In-depth discussions and negotiations followed and resulted in the signing of a Memorandum of Understanding in September 2008, with a target completion date of April 2009.

Figure 7  Acquisition/Consolidation Transaction Highlights



The initial strategy for the acquisition required a combination of debt and equity financing to fund the transaction. The Team approached several prospective lenders from both local financial institutions and foreign lenders.


the PORT FUND

10

 

Discussions progressed during the first quarter of 2009 and at the end of March, KGLI-NM informed the Aboitiz Group of its intent to proceed with the acquisition of their shareholdings in ATSC. The Team continued discussions with a number of well-known local and international banks and potential equity partners, but due to the escalating economic instability caused by the global financial crisis, it was decided to hold off on pursuing the transaction until the market stabilized.

During the financial crisis and the resulting global uncertainty, the Team focused on improving and expanding the Company's operations. Management aggressively evaluated ship acquisition opportunities and grew the business organically which resulted in the business significantly outperforming prior year results with a 38.3% increase in EBITDA in 2009. This financial success was largely the result of more efficient vessels that NNC bought as well as continued improvement in cost controls and trip routing efficiency.

*Figure 8 Financial Performance 2008 – 2010, in USD millions*



During the second half of 2009, the Team restarted discussions with the Aboitiz Group to acquire ATSC.

The Team focused on raising the necessary debt/equity capital for the acquisition. The Team held in-depth discussions and management presentations with potential capital providers such as Deutsche Bank, Standard Chartered, Macquarie and CLSA.

In December 2009, the Team was introduced to CAF for preliminary discussions. CAF was a newly formed USD1 billion fund backed by the Export-Import Bank of China and China Investment Corporation. During the preliminary discussion, CAF expressed interest participating in the transaction. During the first quarter of 2010, the Team and CAF proceeded with in-depth discussions regarding the transaction. Site visits and tours, along with additional due diligence discussions took place in the early weeks of April 2010. Successful discussions led to the execution of a term sheet in May 2010. Extensive due diligence, covering financial, legal and tax reviews, was performed from June to August 2010.

*Figure 9. Acquisition Due Diligence Package*

| Project Vasco Due Diligence Package | |
| --- | --- |
| **Report / Document** | **Consultant** |
| Shipping Industry Study | Grant Thornton - Philippines |
| Financial and Tax Due Diligence | Ernst & Young - Philippines |
| Structure Advisory | Ernst & Young - Netherlands |
| Vessel Appraisals | Eagle Marine - Philippines |
| Integration Plan | TPF Team/Management/Drewry - UK |



the PORT FUND



In August 2010, shortly following completion of the due diligence process, CAF initiated renegotiation of terms, specifically indicating a higher ownership percentage. Discussions with CAF continued throughout August but reached an impasse following certain events, and the Team decided that continuing discussions under the new terms proposed by CAF would not be beneficial to TPF. The Team proceeded then to pursue other avenues for financing, including discussions with Deutsche Bank and Credit Suisse, among others.

In October 2010, the Team received a letter from CAF which expressed their interest and willingness to resume negotiations under terms more closely aligned to the original term sheet. The Team agreed to continue negotiations on this basis and transaction documents, such as the Securities Purchase Agreement and Shareholders' Agreement, were drafted in coordination with KGLI-NM's and CAF's respective legal counsels.

The Team continued discussions with CAF in November 2010 and transaction documents were finalized in the latter part of the month. Under the revised agreements, CAF invested USD100.0 million in NNC for 40% voting and 60% economic interest in the Company. The funds were used to purchase the Aboitiz Group's entire shareholding interest in ATSC.

Figure 10. NNC Ownership Structure: CAF Equity Infusion



The Team also began internally developing a comprehensive Integration Plan. Key areas of focus included: Revenue Enhancement, Terminal Consolidation, Route Rationalization, Human Capital Management, Ship Management, and Corporate Communications. The Team worked extensively with NNC and ATS Managements, along with external consultants to finalize the Integration Plan.

On December 1, 2010, representatives from KGLI NM, NNC, CAF and the Aboitiz Group executed the Securities Purchase Agreements, Subscription Agreements and Shareholders' Agreement in Shanghai, China. In Manila, ATSC filed all the necessary disclosures with the Philippine Stock Exchange and Securities and Exchange Commission.

On December 28, 2010, the Aboitiz Group completed the sale of their entire shareholding interest (representing 93.2% outstanding common shares) in ATSC to

 

NNC for PHP4.28 billion. On December 29, 2010, NNC initiated a tender offer for the remaining 6.8% shares held by the public. The tender offer was completed in February 2011, increasing NNC's ownership interest in ATSC to 98.12%.

The integration process began in 2011 and was executed in two phases, with the initiatives grouped according to their complexity and magnitude.

The first phase involved the elimination of overlapping routes and redundant secondary terminals; with manpower complements rationalized per division. Support functions, such as finance, accounting, human resources, IT and legal were consolidated.

The second phase of the integration process focused on improving processes and operations to realize revenue synergies, further consolidation of primary terminals, optimizing vessel routes and the rebranding of the combined company as 2GO Group, Inc.

*Figure 11. 2GO Rebranding*



The Team led and closely monitored all aspects of the integration process, having organized regular progress meetings with NNC and ATSC managements and engaged consulting professionals.

Specific activities undertaken resulted in the following:

- Reduced terminal expenses as container yards at various ports across the country were consolidated;
- Enhanced asset utilization as duplicate routes were consolidated and excess capacities were spun-off;
- The development of a Central Sales Team that concentrates on selling fully integrated supply chain solutions;
- Eliminated intercompany competition;
- Rightsized support functions such as Human Resources, Finance, IT and legal teams;
- Enhancement of existing processes and identification of new channels with the assistance of industry specialists;

the **PORT FUND**

13

*The Port Fund | Project Master Exit Report*  

- Recruited logistics industry specialists to develop and lead the supply chain solutions strategy; and
- A consolidated master brand that offered full service end-to-end supply chain solutions.



*Figure 12. 2GO Group Integration Process*

The Team also led key initiatives such as the following:

- Raised PHP4.8 billion in senior financing to support the integration process, completed in February 2011;
- Engaged a consulting group specializing in the supply chain business, LCA, that identified key areas of improvement which significantly reduced warehouse inefficiencies and improved bad order management;
- Developed a routing and capacity planning tool designed to optimize vessel deployment parameters that reduced costs and improved asset utilization;
- Determined the Company's optimal asset base resulting in reduced vessel fleet size while maintaining capacity to serve the current and planned future growth;
- Hired the former head of DHL Indochina, who directly led the restructuring of all logistics businesses; and
- Identified and recruited a team of experienced supply chain and logistics professionals to lead the LED group.

As a result of the integration initiatives, revenues declined over the period 2011 – 2013 from USD325.7 million to USD288.3 million due to trip reductions as the Company streamlined its operations. EBITDA for the period, meanwhile, increased at a CAGR of 35.4% from USD20.1 million to USD36.8 million.

*The Port Fund | Project Master Exit Report*  **2GO**



*Figure 13  Financial Performance: 2011 – 2013, in USD millions*

3.    Capital Raise and Rights Offer: Rapid Expansion Initiatives

In 2012, concurrent with the integration process, the Team determined that the Company would require an additional capital infusion to realize its full potential as the Company repositioned 2GO from a pure play shipping company to a full service end-to-end supply chain provider. The capital infusion would provide funding for growth initiatives and strengthen the balance sheet.

Capital raising process underwent multiple phases. The Team first approached external financing providers, such as Jefferies & Company, Darby Mezzanine and AMCG. Several rounds of information requests were addressed, and term sheets were received from AMCG and Darby for USD25 million. The Company agreed to pursue in-depth discussions with AMCG in May 2012 and the due diligence process commenced thereafter.

In August 2012, due to delays, the shareholders opted to self-fund instead of commencing with external financing. The Port Fund's share was approximately USD14.3 million, which it raised via a loan facility from Goldman Sachs. The facility was refinanced in 2015 and was repaid in August 2016 using the proceeds from the sale of TPF's shares in the Company.

In line with the Company's strategic repositioning, the Company grew into the largest and most preferred logistics and supply chain provider in the country. 2GO's unique service offering, covering the entire spectrum of supply chain solutions, allowed the Company to capture a larger part of the logistics requirements of top consumer goods companies in the Philippines. The merged capabilities allowed business segments to cross-sell solutions among respective key clients and offer combined services. As a result, for the first time in 2013, the Company generated more revenues from supply chain and value-added services than from freight and passenger transportation combined. This marked the first year that 2GO demonstrated its successful business repositioning from a pure shipping company to an end-to-end supply chain solutions company.

the**PORT FUND**

15

*The Port Fund | Project Master Exit Report*     

*Figure 14. Revenue Share per Business Segment*



The Company experienced rapid growth in the succeeding years. NNC recognized revenues of USD313.1 million and USD354.7 million in 2014 and 2015, respectively. In 2014, revenues grew by 8.6% year-on-year and in 2015, revenues grew by a further 13.3%. The trailing twelve month performance as of June 2016 estimates full year revenues of USD452.8 million[4]. EBITDA, meanwhile, grew by 15.8% to USD42.6 million in 2014 and 54.5% to USD65.8 million in 2015.

*Figure 15. Financial Performance: 2014 – TTM Jun 2016, in USD millions*



* TTM Jun16 results are based on management reports that do not account for intercompany eliminations. 2014 and 2015 figures are from the Company's audited financial statements.

F.    **Exit Process**

The Port Fund began analyzing exit scenarios for the NNC investment in late 2013. In coordination with CAF, the Team evaluated options for either an outright sale of its interest in NNC or a secondary share offering in the public exchange.

The Team began to prepare for a potential public offering and initiated discussions with top investment groups, such as BDO, BPI, Metrobank and Security Bank. The Team also prepared a detailed and comprehensive investment memorandum that went out to a full offering of potential investors, including Texas Pacific Group, Metro Pacific Investments Corporation, Platinum Equity, Bain Capital, SC Lowy, Blackstone and others.

As the shareholders were going through the exit process, 2GO Management preempted with an offer to buy both CAF and TPF's shares with a proposed purchase price that would have resulted in net exit proceeds to TPF of USD66.1 million[5].

---

[4] TTM Jun16 results are based on management reports that do not account for intercompany eliminations. 2014 and 2015 figures are from the Company's audited financial statements.
[5] Figure is net of deal specific debt, costs and expenses related to the transaction.

*The Port Fund | Project Master Exit Report*  

During this time, CAF was especially keen to exit the investment expeditiously, and was exerting pressure on TPF to sell.

While the offer from 2GOManagement was a welcome development, the Team felt that the Company's positive historical performance and further growth prospects warranted an effort to explore other potential offers/transactions. Through discussions with CAF, the Team convinced them to agree to a proper competitive sales/marketing process. In September 2014, TPF has hired a Honk Kong IB/investment advisor firm - Apache Asia, to facilitate a proper competitive sales process of 2Go.

In October 2014, Apache Asia and The Team then identified and approached groups that: *1)* had a stated interest in the transportation, logistics or consumer goods industries, *2)* were actively seeking new transactions, and *3)* had a target investment bite size that is sufficient relevant to 2GO's contemplated sale price. Preliminary information, such as a Teaser and Executive Summary, were provided to 42 groups that fit the criteria. Of the 42 groups approached, seventeen (17) received the Information Memorandum, financial model and a preliminary due diligence package. Fourteen (14) groups expressed interest in further discussions and they received additional due diligence information following the receipt of Q&A and information requests. Six (6) groups traveled to the Philippines for additional due diligence, site visits and Management Presentations. The competitive sales process took six (6) months and by April 2015, four (4) finalists indicated a high level of interest in completing a transaction. These groups were Navis Capital Partners, Platinum Equity, ADV Partners and Metro Pacific Investments Corporation.

*Figure 16. Exit Process Marketing Summary*

**42** — Groups were approached and provided preliminary information (e.g. teaser, executive summary)

**17** — Groups were provided an information memorandum, a copy of the latest available financial model and a preliminary due diligence package

**14** — Groups were provided additional due diligence information following the receipt of Q&As and information requests

**6** — Groups joined site visits and management presentations

**4** — Deal negotiations

In May 2015, Navis's offer was accepted by TPF awaiting a final confirmation acceptance from CAF. Unfortunately, during this time, there was a change in CAF's Management which reversed the previous CAF's Management's decision to sell. The

 

Team then went through a whole new period of negotiations and discussions with CAF and Navis which led to a protracted delay in the sale process.

The Team then decided that the only option to exit was to pursue a separate minority stake (TPF's stake) sale process. Once receiving a final confirmation from CAF that CAF will not sell, Apache Asia and The Team proceeded to resume discussions with the interested buyers that were identified during the competitive sales process in addition to searching for other potential minority buyers.

During this time, 2GO Management came back with a revised upward offer that would have resulted in net exit proceeds of USD80.2 million[6] for TPF's shares. Considering that a quick exit was one of the Team's priorities, and given the long-standing relationship between TPF and 2GO Management, a term sheet was executed by both parties. However, 2GO Management could not raise the required capital in time and the term sheet expired.

Apache Asia and the Team then continued to work towards a private sale to get the deal completed at the earliest opportunity. Of the discussions with interested parties, the highest offer that was received was from Udenna Group, with gross exit proceeds of USD120 million, and hence, with net exit proceeds of USD91.9 million[6]. This was significantly better than the next highest offer from ADV Partners which would have resulted in net proceeds of USD82.3 million[6].

During the first two weeks of July 2016, the Team worked with the Buyer to finalize the Letter of Intent, which was executed on July 19, 2016, and which included a USD5.0 million upfront payment. In the following weeks, the Team prepared the necessary due diligence documents and coordinated with legal counsels to finalize the SPA, which was executed on July 28, 2016. Under the SPA, the Buyer had until August 22, 2016 to fund the remaining amount. The Buyer remitted the funds on August 16, 2016, a week before the mandated deadline. In the following days, the Team worked with the Buyer and respective legal counsels to wrap up all administrative items, including the transfer of all relevant shares, which was effected on August 19, 2016. Then, the Team and the Buyer worked on the final completion accounts to ensure the cash-and-debt-free state of the sold entity, KGLI BV, which was completed in September 2016.

Breakdown of net sales proceeds:

| Particulars | USD |
|---|---|
| Sales proceeds of Investment in 2 GO Group | 120,000,000 |
| **Less: Liabilities** | |
| Settlement of NNC transaction related liabilities | (1,431,145) |
| Settlement of loan for subscription in capital increase of 2 GO group | (20,148,203) |
| **Less: Cost to sell** | |
| Transaction advisory and professional fees | (6,480,024) |
| **Net Sales proceeds of 2 GO Group** | **91,940,628** |

*Figure is net of deal specific debt, costs and expenses related to the transaction*





The existing NN related loan facility and transaction and exit related expenses were paid from the sale proceeds, resulting in a net cash inflow to TPF of USD91.9 million. Given the TPFs total investment in NNC of USD28.5 million[7], TPF realized an investment multiple of 3.2x and a gross IRR of 15.1%.

*Figure 17. Investment Returns*



* Figures are inclusive of deal transaction costs and net out deal specific debt, costs and expenses that were incurred for the transaction

As The Port Fund is currently in its exit stage, the immediate liabilities of the Fund must be paid before any distributions. The total amount of USD 59,899,616 was utilized to cover TPFs related outstanding liabilities and USD 2,041,012 was retained by TPF to cover ongoing Fund exit related expenses.

Usage of the net sales proceeds:

| Particulars | USD |
|---|---|
| Net Sales proceeds of 2 GO Group | 91,940,628 |
| Less: Transfers for | |
| Final payment to MPC GMO | (3,200,000) |
| Loan paid on behalf of GGDC | (54,265,116) |
| Exit related expenses paid on behalf of GGDC | (2,434,500) |
| Distribution to LPs (first tranche payment) | (30,000,000) |
| Retained by The Port Fund | 2,041,012 |

Hence, a net amount of USD 30 million, the first tranche payment, was distributed to the LPs of the Fund. Each LP's pro rata share of this distribution was computed by the Administrators of the Fund based on the capital account balance as of 31 December 2015.

The remaining amount of USD 61,940,628 from the net proceeds of the 2GO Group exit will be distributed to the LPs upon receipt of sales proceeds from exit of TPF's investment in Global Gateway Development Corporation (Sabah Al Ahmed Global Gateway Logistics City).

---

[7] *Inclusive of deal transaction costs and expenses.*



19

نيجروز نافيجيشن

صندوق الموانئ
تقرير التخارج النهائي للمشروع

نوفمبر 2016

سري وخاص للغاية

جدول المحتويات

1. الصفقة ونبذة عامة عن الشركة ................................................................................... 4

أ. نبذة عامة عن الصفقة ........................................................................................ 4

ب. نبذة عن الشركة وتاريخها .................................................................................. 6

ت. المبادرات البيئية والاجتماعية والحوكمة ................................................................. 7

2- إجراءات الصفقة وتاريخها ..................................................................................... 10

أ. ايجاد الصفقة ................................................................................................ 10

ب. تقييم الصفقة ............................................................................................... 11

ت. الفحص النافي للجهالة ...................................................................................... 11

ث. هيكلة الصفقة ............................................................................................... 11

ج. تطور وإدارة الصفقة ...................................................................................... 13

(1 ضخ رأس المال الأساسي: الإنعاش والاستقرار ........................................................... 13

(2 استراتيجية الاستحواذ والنمو : دمج القطاع ............................................................... 14

(3 رفع رأس المال وحقوق الأولوية: مبادرة التوسع السريع ......... 19

ح. عملية التخارج .............................................................................................. 20

الشكل رقم 1 بوضح قطاعات الاعمال المختلفة لشركة نيجروز نافيجيشن

الشكل رقم 2 تاريخ الشركة

الشكل رقم 3 استراتيجية إعادة التموضع، توزيع مصادر الدخل وفقاً لقطاع الأعمال

الشكل رقم 4 هيكل استثمار صندوق الموانئ في شركة نيجروز نافيجيشن

الشكل رقم 5 ملكية كي جي إل القسمنت ان ام في شركة نيجروز نافيجيشن : الدفعة الأولية ن الاستثمار

الشكل رقم 6: مصادر واستخدامات استثمار صندوق الموانئ في نيجروز نافيجيشن

الشكل رقم 7: أهم معالم الاستحواذ/ الاندماج

الشكل رقم 8 : الأداء المالي للأعوام ما ين 2008 إلى 2010 (دولار أمريكي)

الشكل رقم 9 : اعمال الفحص النافي للجهالة

الشكل رقم 10: هيكل ملكية نيجروز نافيجيشن وضخ رأس المال من CAF

الشكل رقم 11: إعادة هيكلة العلامة التجارية لمجموعة GO2 جروب

الشكل رقم 12: عملية دمج اعمال مجموعة GO2 جروب

الشكل رقم 13: الأداء المالي ما بين الفترة الممتدة من 2011 إلى 2013 (مليون دولار أمريكي)

الشكل رقم 14: تقسيم الإيرادات وفقاً لقطاعات الأعمال

الشكل رقم 15: الأداء المالي : العام 2014 – الاثني عشر شهراً المتتالية يوليو 2016 (مليون دولار أمريكي)

الشكل رقم 16: ملخص تسويق عملية التخارج

الشكل رقم 17: عائدات الاستثمار

## 1. الصفقة ونبذة عامة عن الشركة

### أ. نبذة عامة عن الصفقة

تم بيع كامل ملكية صندوق الموانئ في شركة نيجروز نافيجيشن في أغسطس 2016 بصافي إيرادات بلغت 91.9 مليون دولار أمريكي[1]، ليتم بذلك التخارج رسمياً بالكامل من الاستثمار في رأس مال الشركة بقيمة 28.5 مليون دولار أمريكي. وتمثلت عائدات الصفقة بأرباح بمعدل 3.2 ضعف المبلغ المستثمر وعائد داخلي على الاستثمار بنسبة 15.1 في المائة على مدى المتوسط المرجح لفترة الاستثمار البالغة 7.8 أعوام.



وكان التخارج الناجح للصفقة نتاجاً مباشراً لاستراتيجية صندوق الموانئ التي اعتمدت على تحويل شركة شحن كانت في وقت ما تعمل على تشغيل السفن الصغيرة إلى شركة شحن عملاقة وأكبر شركة مهيمنة في القطاع اللوجستي ومزود لحلول سلاسل الامداد في الفلبين.

- حيث تقوم شركة نيجروز نافيجيشن بتشغيل 24 سفينة تربط ما بين 24 ميناء فيما يمثل أكثر من 80% من شبكة الموانئ الفلبينية. وقد عززت الشركة موقعها الريادي على مستوى قطاع سلاسل الامداد.
- كما نمت مساحات المخازن وتخطت اكثر من 100 ألف متر مربع في العام 2015 وساهمت في دعم نمو خدمات أرصفة الموانئ وحلول التوزيع والتسويق، بالإضافة إلى التخزين.
- وسجلت خدمات البريد السريع نمواً تخطى 1,200 فرعاً واحتفظت الشركة بشراكات مع الشركات الكبرى مثل فيديكس، يو بي اس، ومزودي خدمات التجارة الالكترونية والوكالات الحكومية.
  - كما تتميز خدمات التبريد بحصة سوقية كبيرة في قطاع نقل الحاويات المثلجة والمبردة.

وعلى مدى فترة الاستثمار، ارتفعت إيرادات شركة نيجروز نافيجيشن من42.0 مليون دولار إلى 354.7 مليون دولار وبلغ نمو الأرباح قبل خصم الفوائد والضرائب والاستهلاك من 8.1 مليون دولار إلى 65.8 مليون دولار بما يمثل نمو سنوي مركب بنسبة 35.6 % و 34.9% على التوالي.

---

[1] الرسم البياني يمثل صافي الديون والتكاليف والمصروفات المتعلقة بالصفقة

[2] يتضمن تكاليف ومصروفات الصفقة



\* TTM held assets are based on management reports that do not account for intercompany eliminations 2008 to 2013 figures are from the Company's audited financial statements

تمثل نتائج الاثني عشر شهراً المنتالية على تقارير الإدارة والتي لا تأخذ في اعتبارها التصفيات بين الشركات، الأعوام ما بين 2008 إلى 2015 تعتمد على بيانات الشركة المالية المدققة

وكان صندوق الموانئ مضطلع بنشاط في اعمال الشركة والتخطيط الاستراتيجي، ووضع الميزانيات، وأنشطة جمع الأموال. وفيما يلي ابرز النقاط المتعلقة بالاستثمار :

| مراحل الصفقة | ابرز تفاصيل الاستثمار |
|---|---|
| إيجاد الصفقات والاستثمار الأولي | • تقييم الفرص المحتملة للاستثمار في شركة نيجروز نافيجيشن واستكمال الإدارة لعملية الاستحواذ على شركة ATS<br>• اجراء فحص نافي للجهالة للجانب المالي، والضرائب والوضع القانوني.<br>• استكمال اتفاقية الاستثمار وتسديد 28.5 مليون دولار[3] على شرائح ما بين عامي 2008 و2009 من خلال شركة غرض خاص SPV. |
| تحسين الوضع قبل الاستحواذ | • العمل مع الإدارة لإعادة شراء الديون<br>• ضخ الأموال وشراء الديون انقذت الشركة من وضعها تحت الحراسة<br>• إعادة توزيع الاسطول لتحسين الكفاءة الاستيعابية وتحسين الكفاءات الإدارية والتشغيلية |
| اندماج القطاع | • التفاوض بنجاح للاستحواذ على شركة ATS<br>• القيام بإجراءات مستفيضة للفحص النافي للجهالة من الناحية المالية، والضرائب والجانب القانوني فيما يتعلق بالاستحواذ على شركة ATS<br>• جمع رأس المال لدعم عملية الاستحواذ وتم الفعل في العام 2010 الاستحواذ على شركة ATS |
| التكامل | • بعد الاستحواذ مباشرة، قام صندوق الموانئ بالعمل مع الإدارة لتطوير عملية التكامل بالتفصيل الدقيق بهدف دمج وتكامل العمليات والقضاء على المنافسة<br>• تحليل وتنفيذ طرق ملاحية مكثفة والتخلص من السعات الإضافية والسفن غير الفعالة<br>• دمج عمليات الدعم ووظائف المكاتب الخلفية مثل الموارد البشرية والحسابات وتكنولوجيا المعلومات وإدارة الشحن وغيرها |
| التحول الاستراتيجي | • تكوين فريق مبيعات مركزي لدمج عمليات حلول سلاسل التوريد والبيع المتقاطع بين القطاعات المختلفة<br>• تعيين خبراء واستشاريين متخصصين في المجال اللوجيستي وحلول سلاسل التوريد<br>• ضخ مزيداً من الأموال والتي تمت من خلال تسهيلات ائتمانية لتستخدم في عمليات النمو والاستحواذ على أصول إضافية لخدمة قطاع سلاسل التوريد |
| التخارج | • البدء في عملية بيع مبدئي بنهاية العام 2013 تتضمن عرض ثانوي او البيع لمستثمري استراتيجي / مالي.<br>• في العام 2015/2014 تم بيع تنافسي/ عملية تسويقية تتضمن 4 اطراف مهتمة بشراء الصفقة |

| | • مع اعتراض صندوق الصين- الآسيان للتعاون الاستثماري CAF الاشتراك في عملية  البيع، قام صندوق الموانئ ببيع الأسهم الخاصة به (حصة الأقلية) وتلقى العديد من العروض من جهات مختلفة |
|---|---|
| | • استكمل صندوق الموانئ عملية بيع حصة الأقلية لمستثمر استراتيجي في أغسطس / سبتمبر 2016. |

³ يتضمن تكاليف ومصروفات الصفقة

## ب. نبذة عن الشركة وتاريخها

شركة نيجروز نافيجيشن اكبر شركة لسلاسل التوريد ومزود حلول الخدمات من الباب إلى الباب في الفلبين. وتقوم الشركة بخدمة كافة متطلبات سلاسل القيمة من التوريد والتخليص الجمركي والتخزين والنقل بالشاحنات والشحن البحري على المستوى الوطني بالكامل بالإضافة إلى  ادارة المخازن والتوزيع والبضائع. كما تقوم الشركة بتزويد خدمات قطاع التجزئة وقطاع البريد السريع والنقل البحري والخدمات اللوجستية العالمية والتعامل مع الشحنات المتخصصة تحت مظلة الشركة.

### الشكل رقم 1 يوضح قطاعات الاعمال المختلفة لشركة نيجروز نافيجيشن



وبعود تاريخ تسجيل الشركة إلى العام 1932 وتعد بذلك أقدم شركة شحن محلية في الفلبين. وفي العام 1994 أصبحت شركة نيجروز نافيجيشن اكبر شركة شحن يتم ادراجها في سوق الأوراق المالية بالفلبين.

### الشكل رقم 2 تاريخ الشركة

في العام 2006، قامت شركة نيجروز القابضة، وهي شركة تم تنظيمها لادارة شركة نيجروز نافيجيشن، بالاستحواذ على حصة الأغلبية من شركة نيجروز نافيجيشن من مترو باسيفيك جروب.

في العام 2008 ، أقدمت نيجروز القابضة و كي جي إل انفسمنت بي في على تنفيذ اتفاقية الاستثمار لتأسيس شراكة استراتيجية مع نيجروز نافيجيشن. وكانت شركة كي دي إل انفسمنت ان ام هي الادارة الاستثمارية لشركة نيجروز نافيجيشن.

في العام 2010، قامت شركة كي دي إل انفسمنت ان ام بالدخول في شراكة مع صندوق الصين- الأسيان للتعاون الاستثماري CAF بنية استخدام نيجروز نافيجيشن كمنصة للاستحواذ على شركة ابويتيز ترانسبورت سيستمز كوربوريشن (ATS)، والتي كانت اكبر شركة وتتمتع بأوسع شبكة لتغطية الموانئ على مستوى الدولة.

وكانت شركة ATS تمتلك وتدير عمليات الشحن البحري والنقل التجاري والممرات تحت الأسماء التجارية سوبر فيري وسوبر كات وسيبو. بخلاف ذلك، كانت مجموعة ابويتيز قد أسست عمليات النقل السريع والتوزيع. وساهم الاستحواذ على ATS واعمالها التحالفية في الارتقاء بأعمال نيجروز نافيجيشن لتصبح بذلك الشركة الرائدة على مستوى قطاع الشحن لبحري والنقل التجاري حصة سوقية بلغت نسبتها 80% من اجمالي السوق المحلي للنقل البحري للأفراد واكثر من 40% من قطاع الشحن البحري للبضائع. وقامت الإدارة بتدشين عملية مكثفة لتكامل وتحقيق التجانس بين الشركتين.

ومن خلال تطبيق عملية التناغم بين اعمال الشركتين التي بدأت في العام 2011 واكتملت بمنتصف العام 2013، تمكنت المجموعة من الانتقال من التركيز بصفة أساسية على قطاع النقل البحري والشحن إلى شركة تقدم مجموعة متكاملة من الخدمات اللوجستية وسلاسل الامداد. وكانت شركة نيجروز نافيجيشن في وضع يسمح لها بخدمة الاقتصاد الفلبيني المتنامي المدفوع بقوى استهلاكية وتجارة متبادلة بين الجزر المختلفة. وتستمد الشركة نموها في الوقت الحالي من القطاع اللوجستي وخدمات القيمة المضافة مع توفير قطاع الشحن البحري التابع للمجموعة لمنصة ثابتة وميزة تنافسية سباقة.

الشكل رقم 3 استراتيجية إعادة التموضع، توزيع مصادر الدخل وفقاً لقطاع الأعمال



## ث.  المبادرات البيئية والاجتماعية والحوكمة

يتخطى استثمار صندوق الموانئ في نيجروز نافيجيشن ومجموعة 2GO Group مجرد الحصول على عوائد هائلة وارتفاع في رأس المال. حيث دأب صندوق الموانئ دائماً على توفير عوائد متوازنة مقابل المخاطر للمستثمرين بالإضافة إلى خلق تأثير مستدام وإيجابي. وتتوافق آراء الفريق بقوة ويجتمعوا على أهمية الالتزام القوي بالاعتبارات البيئية والاجتماعية والحوكمة وأثارها بعيدة المدى على أداء الاستثمار، ومن ثم العمل بجهد لتطبيق هذه المبادئ اثناء القيام بأنشطة الأعمال.

وفي اطار ذلك السياق، يؤمن صندوق الموانئ بأن الاعتبارات البيئية والاجتماعية والحوكمة لها اثراً إيجابيا وسلبياً على الأداء المالي للاستثمار وكذلك على العوامل الخارجية الإيجابية التي يسعى فريق العمل لارساء قواعدها في الأسواق المستهدفة. كما يدرك فريق العمل ايضاً ان القرارات الاستثمارية وانشطة صندوق الموانئ قد يكون لها اثراً على ما يترتب على البيئة والمجتمع، ومن ثم يسعى صندوق الموانئ إلى القيام بما يل:

- تطبيق المعايير البيئية والاجتماعية والحوكمة ضمن ممارساته الاستثمارية

- مطالبة الشركات التي يتعامل معها الصندوق من التأكد من استخدام توجه وقائي فيما يتعلق بالتأثير البيئي والاجتماعي. اذا لم يكن ممكناً تجنب الاثار السلبية على البيئة والمجتمع، يجب العمل على تقليلها او التعويض عن ذلك.

- مطالبة الشركات التي يتعامل معها الصندوق من تطبيق المتطلبات القانونية والتنظيمية التي تخضع لها مناطق عملها على اقل تقدير والعمل اضافياً على تطبيق المعايير الدولية المتعلقة بالبيئة والمجتمع والحوكمة.

- مطالبة الشركات التي يتعامل معها الصندوق من تطبيق اعلى المعايير الخاصة بأخلاقيات العمل والحوكمة

- تشجيع الشركات التي يتعامل معها الصندوق من إقامة حوار مفتوح مع أصحاب المصالح فيما يتعلق بالتأثير البيئي والمجتمعي لانشطتهم.

- الحرص دائما على التحسين المستمر فيما تعلق بإدارة الأنشطة البيئية والاجتماعية والحوكمة.

- توفير المعلومات ذات الصلة بالأنشطة البيئية والاجتماعية والحوكمة بشفافية فيما يتعلق بالانشطة الاستثمارية مع اتباع متطلبات السرية التجارية.

بناء على ما تقدم، قام صندوق الموان بإقامة شراكة مع نيجروز نافيجيشن للقيام بالمبادرة وتطبيق العديد من البرامج والمشاريع البيئية والمجتمعية والحوكمة بما يحقق النفع للأشخاص والمجتمع بصفة مباشرة وغير مباشرة. ويشمل الجزء التالي من التقرير بعض الأنشطة والبرامج المختارة.

## إدارة معايير الأمان والريادة

في بداية الدخول في الاستثمار قام صندوق الموانئ بالمبادرة بنشاط لاستبدال الاسطول القديم والمتهالك حينها بسفن جديدة. حيث تعتمد سفن الشحن في الفلبين على اساطيل قديمة والتي قد تكون معرضة للحوادث في البحر. وأدى هذا البرنامج في تعزيز أسطول السفن الجديدة لنيجروز نافيجيشن وتزويدها احدث معايير الأمان والمساندة البحرية وأجهزة التواصل مثل نظم المخططات الملاحية الالكترونية واحدث أنواع الرادار واجهز التعريف الالكترونية.

كما قام الصندوق بالتعاون مع نيجروز نافيجيشن بتعيين استشاريين وخبراء في إدارة نظم الأمان مثل ديت نوريسك فيرتاس للمساعدة في التحضير والتدريب والتطبيق لنظم ومعايير الأمان وفقاً لاعلى النظم العالمية. كما حرصت إدارة صندوق الموانئ على تطبيق تلك المعايير وفقاً للمتطلبات التنظيمية (مؤسسة قطاع الشحن البحري، وحرس السواحل الفلبيني) وافضل الممارسات العالمية مثل الاتفاقية الدولية لسلامة الحياة في البحر والمدونة الدولية لإدارة السلامة.

ومن خلال تلك المبادرة التي تعاون من نيجروز نافيجيشن مع الإدارة، برزت نيجروز نافيجيشن كشركة رائدة في إدارة معايير الأمان واعلى مستويات الأداء ضمن قطاع النقل البحري. وساهمت تلك المبادرة في تحسين سجل الأمان الجيد للشركة.

## جهود الإغاثة في حالات الكوارث

في العام 2013 تعرضت الفلبين لاحد أسوأ الكوارث الطبيعية في التاريخ. حيث ضرب اعصار هايان (اسمه المحلي يولاندا) والذي صنف من الدرجة الخامسة حيث بلغت سرعته 195 متر في الساعة وقوة رياح 235 متر في الساعة وعصف السواحل الشرقية للأرخبيل وتسبب في مقتل 2,000 شخص وبلغت خسائره 5% من الناتج المحلي الإجمالي. وتأثر بالاعصار اكثر من 8 آلاف شخص وكان 2.5 مليون شخص بحاجة إلى الغذاء و660,000 فقدوا منازلهم.

وتم تشكيل عملية الأمل operation hope في ضوء تلك النكبة الوطنية والظروف الصعبة التي تمر بها البلاد. وقام صندوق الموانئ بالتعاون مع CAF و نيجروز بجهود مشتركة لتوفير مأوى لاكثر من 1,500 شخص وتوفير اكثر من 6 آلاف وجبة ساخنة يومياً، وماء نظيف للشرب، والدواء، وأدوات الإغاثة للألاف ممن تأثروا بهذه النكبة.

وعرضت مجموعة 2GO استخدام سفنها سانت بيترذا ابوستول لتوفير خدمة مؤقته لايواء من فقدوا منازلهم او تعرضوا لاصابات شخصية. وتصل سعة تلك السفينة 152 متر وعرضها 52 متر لاستيعاب المسافرين والبضائع المشحونة ولها قدرة استيعابية

لاكثر من 1,500 مسافر و250 من افراد الطاقم الطبي بحمولة اجمالية 10,000 طن.

وقامت السفينة بتوفير منطقة الشحن بها لتخزين الامدادات الحيوية مثل الغذاء والماء والملابس ومستلزمات الرعاية الصحية. وبعد توزيع الامدادات تم تحويل منطقة التخزين إلى مركز رعاية صحية لخدمة ورعاية المتضررين.

وخلال فترة 90 يوماً بعد وقوع الكارثة، تمكنت 2GO من شحن حوالي 18 الف طن متري في التوسط من المساعدات ونقلت الامدادات والأشخاص المتأثرين بصفة يومية.

- وعلى مدار السنوات، ساهمت وشاركت مجموعة  GO2 بنشاط مع العديد من الجهات الحكومية وغير الحكومية الساعة لنشر الوعي بالإضافة للجمعيات الخيرية وساهمت في  احداث تأثير تجاه البيئة والمساهمات الاجتماعية كمؤسسة كبرى في الفلبين. وتضمنت الأنشطة السنوية التي شاركت الشركة بها ما يلي:
- أنشطة زراعة الأشجار في مقاطعات مختلفة في الفلبين بالشراكة مع الجهات الحكومية مثل مكتب البيئة الاجتماعية والموارد الطبيعية
- زراعة أشجار المانغروف وتنظيف الشواطئ بالشراكة مع هيئة الموانئ الفلبينية وحرس السواحل الفلبيني.
- المشاركة مع فريق تطوعي يخضع لاشراف وزارة العمل والتوظيف للتطوع في اصلاح وصيانة فصول المدارس الحكومية قبل بداية العام الدراسي.
- الشراكة مع اكبر جهة موزعة للكتب والمستلزمات المدرسية لتوزيع المواد الدراسية على الأطفال في المناطق النائية من الفلبين.
  - المشاركة في برامج التطوع بالدم مع الصليب الأحمر الفلبيني ومركز الرعاية الصحية للأطفال.

## 2- إجراءات الصفقة وتاريخها

### أ.  إيجاد الصفقة

قام فريق عمل صندوق الموانئ بالاجتماع مع إدارة نيجروز نافيجيشن في منتصف نوفمبر  2007 واسفرت المناقشات الأولية عن ادراك ان نيجروز نافيجيشن تمثل فرصة استثمارية. بعد قيام كبار مديري الشركة بتقديم عرض تقديمي مفصل من ضمنهم جون تاجود وجيري كروزبارة، قرر فريق عمل الصندوق القيام بإجراءات الفحص النافي للجهالة والتحليل. وقام فريق العمل بإعداد تقرير عن الصفقة (تقرير ترتيب الصفقة) للمجلس الاستشاري الذي الذي أوصى بشدة القيام المزيد من إجراءات الفحص النافي للجهالة لتلك الصفقة. وأوصى فريق العمل مبدئياً باستثمار ما بين 25 إلى 30 مليون دولار أمريكي يكون من ضمنها 11 إلى 15 مليون دولار لشراء ديون الشركة والمبلغ المتبقي لإجراء عمليات توسعية للسفن.

### ب. تقييم الصفقة

بعد تقديم فريق العمل تقرير ترتيب الصفقة بدأ  في نوفمبر 2017 العمل على إجراءات الفحص النافي للجهالة المبدئي لشركة نيجروز نافيجيشن . وقد تضمن ذلك القيام بعدد من الزيارات لموانئ متعددة تقوم الشركة بالعمل وتشغيل سفنها من خلالها وإجراءات مقابلات شخصية مع عدد من كبار المسؤولين في الشركة واجراء تحليلات مالية عن الأداء التاريخي للشركة والتوقعات المالية المستقبلية، هذا الى جانب بعقد اجتماعات الفحص النافي للجهالة مع الجماعات القطاعية المختلفة والجهات الملمة بالعمليات التشغيلية. وقد واصل الفحص النافي للجهالة المبدئي في إعطاء إشارات قوية ان شركة نيجروز نافيجيشن تستوفي الأهداف الاستثمارية  المستهدفة لصندوق الموانئ. ونتيجة لذلك، قام فريق العمل بإعداد  تقرير  التوصية الاستثمارية الذي تم تقديمه إلى لجنة الاستثمار في ديسمبر 2007. وقد وافقت لجنة الاستثمار  بالإجماع على الصفقة وبدأت المفاوضات الرسيمة وإجراءات الفحص النافي للجهالة المستفيضة.

### ت. الفحص النافي للجهالة

بدأ فريق العمل اجراء الفحص النافي للجهالة واشرك الجهات التالية لعمل تحليل مفصل عن الصفقة:  ايرنست أند يونج ― الفلبين قامت بعمل فحص مالي مفصلة وقدمت المشورة فيما يتعلق بأفضل هيكل ضريبي، بيكر ماكينزي ― الفلبين قامت بعمل فحص قانوني للصفقة المستهدفة، جرانت ثورتون ― الفلبين قامت بعمل دراسة تجارية عن قطاع النقل والشحن البحري. كما قام الفريق باستشارة خبير  متخصص في تقييم السفن لفحص كل سفينة ومراجعة عمليات الموانئ الرئيسية بالإضافة إلى العديد من الأعمال الأخرى.

### ث. هيكلة الصفقة

وأوصى مكتب ارنست أند يونج الفلبين اتباع هيكل استثماري مزدوج في هولندا فيما يتعلق باستثمار  شركة نيجروز نافيجيشن بما يتيح لصندوق الموانئ مزايا ضريبية متعددة مثل (1) الإعفاء من ضريبة الشركات الهولندية (2) الإعفاء من ضريبة استقطاع الأرباح عن أي توزيعات من الكيانات الهولندية إلى صندوق الموانئ (3) الإعفاء من ضريبة الشركات الهولندية غير المقيمة على التوزيعات النقدية والأرباح التي يحصل عليها صندوق الموانئ من الكيانات الهولندية. كما أوصى التقرير  بتعيين شركة هولندية لتقديم الخدمات المحلية والخدمات الإدارية لتجنب التعرض لاي أمور متعلقة بالاقامة.

الشكل رقم 4 هيكل استثمار صندوق الموانئ في شركة نيجروز نافيجيشن

وبناء على توصيات الاستشاريين المحليين والدوليين، قام صندوق الموانئ بتأسيس ثلاثة شركات ذات أغراض خاصة  وهي كي جي أل انفسمنت كوبريتيف يو ايه وكي جي إل انفسمنت بي في ومقرهما هولندا وشركة كي جي إل ان ام هولدنج ومقرها الفلبين

قامت شركة كي جي إلى انفسمنت بي في بالاكتتاب مبدئياً في 116,325 سهم ممتاز من الفئة أ و 795 سهم عادي مقابل حق حصة اقتصادية بنسبة 80% و32% حق التصويت في كي جي إل انفسمنت ان ام. ووفقاً لاتفاقية المساهمين، تمتلك شركة كي جي إل انفسمنت بي في الحق الحصري لترشيح (2) مديرين (من أصل خمسة) والاشتراك في التوصية بتعيين الخامس. بالإضافة إلى ذلك، فان حضور المدير المرشح من قبل  كي جي إل انفسمنت بي في وتصويته بالقبول يعد شرطاً لاكتمال النصاب وتمرير القرارات. إلى جانب حقوق ترشيح أعضاء مجلس الإدارة، يحق لشركة كي جي إل انفسمنت بي في في حق الأولوية (الرفض الأول) وحق شراء خيارات الأسهم المفضلة فئة (ج) لشركة نيجروز نافيجيشن.



صندوق الموانئ   │ تقرير التخارج النهائي للمشروع

الشكل رقم 5 ملكية شركة نيجروز نافيجيشن كي جي إل انفسنت ان ام: الدفعة الأولية للاستثمار

| الجهة | نوع الأسهم | عدد الأسهم | النسبة من الإجمالي |
|---|---|---|---|
| شركة نيجروز نافيجيشن | | | |
| كي جي إل انفسنت ان ام | عادية | 2,996,500,065 | 99.0% |
| جهات اخرى | عادية | 29,233,058 | 1.0% |
| اجمالي الأسهم العادية | | 3,025,733,123 | 100% |

| الجهة | نوع الأسهم | عدد الأسهم | النسبة من الإجمالي |
|---|---|---|---|
| كي جي إل انفسنت – ان ام | | | |
| كي جي إل انفسنت بي في | اسهم ممتازة فئة أ | 116,325 | 80% |
| نيجروز هولندج أند مانيجمنت | اسهم ممتازة فئة ب | 29,081 | 20% |
| اجمالي الأسهم الممتازة أ و ب | | 145,406 | 100% |

| | | | |
|---|---|---|---|
| نيجروز هولندج أند مانيجمنت | الأسهم الممتازة فئة ج | 219,609 | 100% |
| اجمالي الأسهم الممتازة فئة ج | | 219,609 | 100% |

| | | | |
|---|---|---|---|
| كي جي ال انفسنت بي في | عادية | 795 | 79.5% |
| نيجروز هولندج أند مانيجمنت | عادية | 195 | 19.5% |
| جهات اخرى | عادية | 10 | 1.0% |

| | رأس المال المصرح به والمدفوع | | | |
|---|---|---|---|---|
| | عدد الأسهم | القيمة الأسهم (بيسو/ للسهم) | المبلغ ( بيسو) | النسبة من الإجمالي |
| الأسهم العادية | 1,000 | 10.00 | 10,000 | 0.2% |
| الأسهم الممتازة ا | 116,325 | 10,000.00 | 1,163,250.000 | 26.7% |
| الأسهم الممتازة ب | 29,081 | 10,000.00 | 290,810.000 | 6.7% |
| الأسهم الممتازة ج | 219,609 | 1.00 | 219,609 | 50.4% |
| الإجمالي | 366,015 | | 1,454,289,609 | 100.0% |

## ج. تطور وإدارة الصفقة

### 1) ضخ رأس المال الأساسي: الإنعاش والاستقرار

في الصنف الأول من العام 2008، ركز فريق العمل اهتمامه على استكمال الفحص النافي للجهالة والتفاوض على شروط الصفقة. وفي 30 يناير 2008، دخل صندوق الموانئ في مذكرة اتفاق مع نيجروز. وفي مارس 2008 اقرت لجنة الاستثمار الصفقة وصرحت لفريق العمل للمضي قدما في المفاوضات لاتمام الصفقة. وكجزء من المفاوضات، واصلت نيجروز التفاوض مع بقية حاملي الأسهم وهم مترو باسيفيك. وبنهاية أبريل، اكدت مترو باسيفيك عزمها على البيع.

وفي 13 مايو 2008، قام فريق العمل بتنفيذ اتفاقية الاستثمار مع نيجروز هولدنج اند مانيجمنت، الشركة الأم لنيجروز نافيجيشن. وهيأت اتفاقية الاستثمار تأسيس شركة كي جي إل انفسنت ان ام وهي الوعاء الرئيسي لتلقي الحصص والاستثمار لكلا الطرفين في نيجروز. كما وضحت الاتفاقية ايضاً شروط إتمام الصفقة بما في ذلك تنفيذ اتفاقية المساهمين والاستحواذ على ديون وحصة الملكية الخاصة بشركة مترو باسيفيك وغيرها من التفاصيل. وفي 17 مايو 2008، قامت نيجروز هولدنج اند مانيجمنت وصندوق الموانئ بتنفيذ اتفاقية المساهمين وغيرها من الاتفاقيات الأساسية اللازمة لاتمام الصفقة. واستكملت نيجروز نافيجيشن مع فريق عمل صندوق الموانئ المفاوضات مع مترو باسيفيك بخصوص الاستحواذ على ديونه وحصة ملكية الشركة وادى ذلك إلى زيادة اجمالي حصة ملكية كي جي إل انفسنت ان ام إلى حوالي 99.0%.

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

الشكل رقم 6: مصادر واستخدامات استثمار صندوق الموانئ في نيجروز نافيجيشن

| المصادر والاستخدامات (مليون دولار أمريكي) | | | |
|---|---|---|---|
| ضخ رأس المال المباشر | 28.5 | إعادة هيكلة الاسطول | 10.0 |
| | | شراء الديون | 13.5 |
| | | شراء اسهم مترو باسيفيك | 40 |
| | | تكاليف ونفقات الصفقة | 1.0 |
| الإجمالي | 28.5 | | 28.5 |

وقد وفر استثمار صندوق الموانئ في شركة نيجروز نافيجيشن رأس المال المطلوب للشركة حتى تخرج من برنامج التأهيل الذي فرضته عليها المحكمة، وشراء حصة المساهمين القائمين وتطبيق استراتيجية إعادة هيكلة الأسطول.

وتضمنت خطة إعادة هيكلة الاسطول شراء بارجتين واثنتين من العبارات من نوعية RoPax بما تطلب تمويل بقيمة 10 مليون دولار أمريكي. كما كلف شراء ديون الشركة للخروج من تحت طائلة برنامج التأهيل الذي فرضته المحكمة 13.5 مليون دولار امريكي وبلغت تكاليف شراء حصة المساهمين القائمين 4 مليون دولار أمريكي. أما تكاليف ونفقات الصفقة فقد بلغت 1.0 مليون دولار أمريكي.

### 2) استراتيجية الاستحواذ والنمو : دمج القطاع

في اعقاب تنفيذ اتفاقية المساهمين بدأت إدارة كي جي إل انفسمنت في ام في تقييم الفرص المرتقبة لاستحواذ نيجروز نافيجيشن على الشركة الرائدة وأكبر منافس لها في السوق وهي شركة ابويتز . وبدأت المباحثات مع كبار مساهمي أبويتز وابدو درجة كبيرة من الاهتمام. وتبع ذلك مفاوضات ومناقشات متعمقة نتج عنها توقيع مذكرة تفاهم في سبتمبر 2008 مع وضع تاريخ مستهدف لإتمام الصفقة بحلول ابريل 2009.

الشكل رقم 7: أهم معالم الاستحواذ/ الاندماج

| نيجروز | ابويتز | صندوق الموانئ | |
|---|---|---|---|
| قيمة مرتفعة للأصول والملكية | منصمة للاستقرار والنمو | مقومات لسوق قوي | مكانة ريادية في السوق |
| قيمة مرتفعة للأصول تتخطى اكثر من 120 مليون دولار امريكي | تغطي نيجروز وابيتوز مجتمعتان 831 من اجمالي ادارة الموانئ في الفلبين | تعد السفن هي الوسيلة الأولى للمواصلات ما بين الجزر الفلبينية نظراً لميزة السعر وما تتميز بها الطبيعة الجغرافية للفلبين(اكثر من 7 الاف جزيرة) | اكبر واكثر شركة على صعيد الربحية ضمن قطاع استراتيجي أساسي في الفلبين |
| سعر مغري للشراء لمثل هذا القطاع | تنفرج بتقديم شبكة الخدمات اللوجستية المتكاملة الوحيدة على مستوى الفلبين | قلة الكفاءة الاستيعابية للسفن بما يخلق طلب من المستهلك | [جدول: صندوق الموانئ 20%، نيجروز 30%، ابويتز 50% / صندوق الموانئ 17%، نيجروز 12%، ابويتز 25%] |
| توقيت ممتاز للاستحواذ الاستفادة من تباطؤ الاقتصاد قطاع اعمال لوجيستي سريع النمو تقليل سعة القطاع تناغم فوري | توفر منصة لتحسين النمو من خلال الكفاءة والتناغم وامكانيات التوسع | نمو قوي وتوقع مزيداً من النمو لقطاع الشحن على خلفية النمو القوي للناتج المحلي الإجمالي للفلبين | يجمع الاستحواذ اكبر ثلاث شركات ضمن القطاع |

وتطلبت الاستراتيجية المبدئية للاستحواذ والدمج ما بين الديون والملكية لتمويل الصفقة. وقام فريق العمل بالاتصال بعدد من المقرضين المحتملين من المؤسسات المالية المحلية والعالمية.

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

وتطورت المباحثات خلال الربع الأول من العام 2009 وبنهاية شهر مارس، قامت شركة كي جي إل للاستثمار أن ام KGLI NM بإعلان ابويتز جروب عن عزمها التقدم بعملية الاستحواذ على حصتها في ATSC. وواصل فريق العمل مناقشاته مع عدد من البنوك المحلية والأجنبية المعروفة وشركاء محتملين للملكية، إلا انه نظراً لتصاعد حالة عدم الاستقرار الاقتصادي بسبب الأزمة المالية العالمية، فتم اتخاذ القرار بعدم إتمام تلك الصفقة إلا ان تستقر أوضاع السوق.

وخلال الأزمة المالية العالمية وما نتج عنها من عدم استقرار على المستوى العالمي، وجه فريق العمل تركيزه على تحسين وتوسعة عمليات الشركة. ونشطت الشركة بتقييم فرص الاستحواذ على السفن وتنمية اعمال الشركة عضوياً بما نتج عنه نمواً قوياً في اعمال الشركة بالمقارنة بأداء السنوات السابقة وارتفاع الأرباح قبل الفوائد والضريبة والاستهلاك وإطفاء الدين بنسبة 38.3% في العام 2009. ويعزى هذا النجاح المالي الهائل في الأساس إلى كفاءة تشغيل سفن نيجروز نافيجيشن التي تم شرائها بالإضافة إلى التحسن المستمر في تحكم الشركة في التكاليف وكفاءة حركة الرحلات.

الشكل رقم 8 : الأداء المالي للأعوام ما بين 2008 إلى 2010 (دولار أمريكي)



وخلال النصف الثاني من العام 2009، استعاد فريق العمل مباحثاته مع ابويتز جروب للاستحواذ على ATSC.

وركز فريق العمل اهتمامه على تجميع تمويل رأس المال اللازم لعملية الاستحواذ سواء من خلال الديون/ الملكية. وعقد فريق العمل في مباحثات متعمقة وعروض تقديمية مع مزودي رأس المال مثل دويتشة بنك و ستاندرد تشارتر وكاوير و CLSA.

وفي ديسمبر 2009، تم تقديم فريق العمل للتعرف على صندوق الصين- الأسيان للتعاون الاستثماري CAF لبدء المباحثات المبدئية. وكان صندوق CAF حديث التأسيس برأس مال قدره 1 مليار دولار أمريكي يدعم من بنك الصين للتصدير والاستيراد ومؤسسة الصين للاستثمار. وخلال فترة المباحثات المبدئية ابدى صندوق CAF اهتمامه بالاشتراك في الصفقة. وخلال الربع الأول من العام 2010، قام فريق العمل وصندوق CAF باجراء في مباحثات متعمقة بخصوص الصفقة. بالإضافة إلى ذلك، تمت زيارة الموقع وترتيب العديد من إجراءات الفحص النافي للجهالة في بداية ابريل 2010. واسفرت المباحثات إلى التوصل إلى مذكرة الشروط الأساسية في مايو 2010. وتم تنفيذ اعمال الفحص النافي للجهالة باستفاضة لتغطية الجوانب المالية والقانونية والضريبية خلال الفترة الممتدة من يونيو إلى أغسطس 2010.

الشكل رقم 9 : اعمال الفحص النافي للجهالة

| حزمة اعمال الفحص النافي للجهالة | |
|---|---|
| المستند/ التقرير | الاستشاري |
| دراسة عن قطاع الشحن البحري | جرانت ثورتن – الفلبين |
| الفحص النافي للجهالة للجوانب المالية والضريبية | ارنست آند يونج – الفلبين |
| الفحص النافي للجهالة للجوانب المالية والضريبية | ارنست آند يونج – الفلبين |
| تقييم السفن | ايجل مارين – الفلبين |
| خطة الدمج | فريق عمل صندوق الموانئ /الإدارة/ درويري – المملكة المتحدة |

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

وفي أغسطس 2010، مباشرة بعد الانتهاء من اعمال الفحص للجهالة، قام صندوق CAF ببدء المناقشات الخاصة بالشروط وتحديداً فيما يخص الاستحواذ على حصة أكبر. واستمرت المحادثات بين الطرفين خلال شهر أغسطس، إلا انها تعثرت بعد وقوع بعد الاحداث، قرر فريق العمل ان استمرار المحادثات مع CAF لن يكون في صالح صندوق الموانئ. وبدأ فريق العمل حينذاك تتبع طرق أخرى للتمويل بما في ذلك التحدث مع دويتشة بنك وكريدي سويس وغيرها من الجهات.

وفي أكتوبر 2010، استلم فريق العمل كتاباً من CAF يعربوا فيه عن اهتمامهم ورغبتهم في مواصلة المحادثات مرة أخرى وفقاً لشروط مقاربة لمذكرة الشروط الأساسية. ووافق فريق العمل على مواصلة المفاوضات على هذا الأساس وتم تحضير المستندات الرئيسية للصفقة مثل اتفاقية شراء الأسهم واتفاقية المساهمين بالتعاون مع الممثلين القانونيين لشركة KGL NM و CAF .

**الشكل رقم 10: هيكل ملكية نيجروز نافيجيشن وضخ رأس المال من CAF**



كما بدأ فريق العمل ايضاً بتطوير خطة دمج شاملة على المستوى الداخلي. وتضمنت جهات التركيز الرئيسية: تحسين الإيرادات، دمج المحطات، وتحسين استغلال مسار الرحلات، وإدارة الثروة البشرية، وإدارة السفن، والاتصالات المؤسساتية. وواصل فريق العمل من جهة نيجروز نافيجيشن وابويتز بالتعاون مع الاستشاريين الخارجيين خطة الاندماج.

وفي 1 ديسمبر 2010، قام ممثلين عن KGLI NM ونيجروز نافيجيشن و CAF وابويتز بتنفيذ اتفاقية شراء الأسهم واتفاقية المساهمين في شنغهاي في الصين. وفي مانيلا، قامت ابويتز بتقديم كافة الافصاحات الازمة لسوق الأوراق المالية الفلبيني ولجنة الأوراق المالية والبورصات.

وفي 28 ديسمبر 2010، قامت مجموعة ابويتز باستكمال صفقة البيع لكامل حصتها (93.2% من الأسهم المصدرة) في شركة ابويتز

صندوق الموانئ   | تقرير التخارج النهائي للمشروع

إلى نيجروز نافيجيشن مقابل 4.28 مليار بيسو فلبيني. وفي 29 ديسمبر 2010، تقدمت نيجروز بعرض لشراء الحصة المتبقية بنسبة 6.8% المملوكة من قبل المساهمين. وتمت إجراءات هذا العرض في فبراير 2011، بما رفع مليكة نيجروز في ابويتز إلى 98.12%.

وبدأت عملية الدمج في بداية العام 2011 وتمت على مرحلتين، مع تجميع المبادرات وفقاً لصوبتها وحجمها.

وتضمنت المرحلة الأولى التخلص من المسارات المكررة والمحطات الثانوية الزائدة عن الحاجة وتحسين استخدام القوى البشرية لكل قطاع. وتم دمج الخدمات المساندة مثل الإدارة المالية، والحسابات، والموارد البشرية، وتكنولوجيا المعلومات، والإدارة القانونية.

وركزت المرحلة الثانية من عملية التكامل على تحسين العمليات والإجراءات لتحقيق تآزر الإيرادات وتحسين دمج اعمال المحطات الرئيسية، والحصول على أعلى مستويات الكفاءة في استخدام خطوط الرحلات وإعادة تعريف العلامة التجارية للكيان الجديد تحت اسم 2GO جروب.

الشكل رقم 11: إعادة هيكلة العلامة التجارية لمجموعة 2GO جروب



وقام فريق العمل بقيادة كافة جوانب عملية الدمج ومراقبتها عن كثب من خلال عقد اجتماعات دورية مع إدارة كلا من نيجروز نافيجيشن وابويتز والاستشاريين للوقوف على التقدم الذي تم احرازه.

وقد اسفرت الأنشطة المحددة التي تم اتباعها عما يلي:

- خفض تكلفة المحطات كمساحات حاويات في موانئ مختلفة على مستوى الدولة مع عملية الاندماج.
- تحسين استخدام الأصول نظراً لدمج المسارات المتكررة وفصل الطاقات الزائدة.
- تأسيس فريق مبيعات مركزي للتركيز على تقديم حلول سلسلة الخدمات المتكاملة .
- التخلص من المنافسة ما بين الشركتين.
- الوصول إلى حجم سليم للخدمات المساندة مثل الموارد البشرية والإدارة المالية وتكنولوجيا المعلومات والفريق القانوني.
- تحسين الإجراءات القائمة وتحديد قنوات جديدة بمساعدة متخصصين من داخل القطاع.

صندوق الموانئ   | تقرير التخارج النهائي للمشروع

- تعيين متخصصين في القطاع اللوجستي لتنمية وقيادة استراتيجيات حلول سلسلة الامداد.
- اسم كبير موحد لتوفير خدمات متكاملة وحلول سلاسل الامداد من الباب إلى الباب.

### الشكل رقم 12: عملية دمج اعمال مجموعة 2GO جروب



كما قام فريق العمل ايضاً بقيادة العديد من المبادرة كما يلي:

- الحصول على تسهيلات تمويلية من فئة الديون الممتازة بقيمة 4.8 مليار بيسو فلبيني لتعزيز عملية الدمج وتم استكمال ذلك في فبراير 2011.
- تعيين مجموعة استشارية متخصصة في اعمال سلاسل الامداد (LCA) لتحديد المناطق الرئيسية لإدخال التحسينات بما عمل على تقليص أوجه القصور في المخازن وتحسين إدارة الأوامر السيئة.
- تصميم أدوات للتخطيط المسارات والقدرات الاستيعابية لرفع كفاءة اطلاق السفن بما ساهم في تخفيض التكاليف وحسن استخدام الأصول.
- تحديد قاعدة الأصول المثلى للشركة لخدمة النمو الحالي والمستقبلي.
- تعيين المدير السابق لشركة دي اتش أل لمنطقة الهند الصينية، والذي قام بقيادة إعادة الهيكلة مباشرة فيما يتعلق بكافة الاعمال اللوجستية.
- تحديد وتعيين فريق عمل يتمتع بخبرة في مجال سلاسل الامداد وخبراء لوجستيين لريادة المجموعة.

وقد نتج عن مبادرات التكامل المذكورة أعلاه ان تراجعت الإيرادات في الفترة ما بين الأعوام 2011 – 2013 من 325.7 مليون دولار أمريكي إلى 288.3 مليون دولار أمريكي نتيجة لتقليص الرحلات على خلفية تأزر عمليات الشركة. في المقابل، ارتفعت الأرباح قبل خصم الفوائد والضرائب والاستهلاك لنفس الفترة بمعدل نمو سنوي مركب بلغت نسبته 35.4% مرتفعاً من 20.1 مليون دولار إلى 36.8 مليون دولار.

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

**الشكل رقم 13: الأداء المالي ما بين الفترة الممتدة من 2011 إلى 2013 (مليون دولار أمريكي)**



3) رفع رأس المال وحقوق الأولوية: مبادرة التوسع السريع

في العام 2012، بالتزامن مع عملية التكامل، قام فريق العمل بتحديد احتياج الشركة لمزيد من رأس المال حتى تبلغ اقصى امكانياتها حيث تم إعادة تموضع 2Go جروب من شركة متخصصة في الشحن إلى شركة حلول متكاملة توفر سلسلة كاملة من الخدمات من الباب للباب. وسوف يساهم ضخ رأس المال في توفير التمويل اللازم لمبادرات النمو وتعزيز موازنة الشركة.

وقد خضعت عملية رفع رأس مال الشركة إلى عدة مراحل. حيث قام فريق العمل في بادئ الأمر بالتطرق إلى المقرضين الخارجيين مثل جيفريز اند كومبني، وداربي ميزانين وام  ايه ام سي جي. وتم تلبية الدورات المختلفة من المعلومات المطلوبة  والحصول على الشروط المبدئية من ام  ايه ام سي جي و وداربي بقيمة 25 مليون دولار. ووافقت الشركة على التعمق في المباحثات مع  ام  ايه ام سي جي في مايو 2012 وبدأت إجراءات الفحص النافي للجهالة في اعقاب ذلك.

وفي أغسطس 2012، ونظراً للتأخير، قرر المساهمون ان يقدموا التمويل بأنفسهم عوضاً عن الحصول على التمويل الخارجي. وكان نصيب صندوق الموانئ 14.3 مليون دولار تم الحصول عليها في هيئة قرض من جولدمان ساكس. وتمت إعادة هيكلة القرض في العام 2015 وتسديد المبلغ في أغسطس 2016 باستخدام عائدات من بيع اسهم صندوق الموانئ في الشركة.

وفي اطار إعادة التموضع الاستراتيجي للشركة، تمكنت الشركة من تحقيق نموأ ملحوظاً واصبحت أكبر وافضل مزود للخدمات اللوجستية وسلاسل الامداد على مستوى الدولة. وساهمت الخدمات الفريدة التي تقدمها الشركة وتغطيتها لمدى واسع من حلول سلاسل الامداد في وضعها في مركز يؤهلها من الاستحواذ على أكبر حصة لتقديم الخدمات اللوجستية لأفضل شركات السلع الاستهلاكية في الفلبين.  وساعد تكامل ودمج عمليات وامكانيات الشركة قطاع الاعمال على تنفيذ عمليات البيع المتقاطع على صعيد العملاء الرئيسين  وتقديم خدمات مشتركة. ونتيجة لذلك، ولأول مرة في العام 2013، تمكنت الشركة من توليد إيرادات اعلى من قطاع سلاسل الامداد وخدمات القيمة المضافة بالمقارنة بخدمات الشحن البحري ونقل الركاب مجتمعين. وكانت تلك علامة فارقة لمجموعة 2GO حيث أكدت نجاح اعمالها وتموضعها من شركة شحن فقط إلى شركة تقدم خدمات حلول سلاسل الامداد المتكاملة من الباب إلى الباب.

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

**الشكل رقم 14: تقسيم الإيرادات وفقاً لقطاعات الأعمال**



وعاصرت الشركة نمواً سريعاً على مدار الأعوام التالية. وحققت نيجروز نافيجيشن إيرادات بقيمة 313.1 مليون دولار و354.7 مليون دولار في عامي 2014 و2015 على التوالي. وفي العام 2014 ارتفعت الإيرادات بنسبة 8.6% على أساس سنوي وفي العام 2015، سجلت الإيرادات مزيداً من النمو وبلغت 452.8 مليون دولار. أما بالنسبة للأرباح قبل خصم الفوائد والضرائب والاستهلاك، فقد ارتفعت بمعدل 15.8% من 42.6 مليون دولار في العام 2014 إلى 65.8 مليون دولار في العام 2015.

**الشكل رقم 15: الأداء المالي : العام 2014 – الاثني عشر شهراً المتتالية يوليو 2016 (مليون دولار أمريكي)**



*تم احتساب نتائج الاثني عشر شهراً المتتالية بناء على تقارير الإدارة والتي لم تخضع حذف العمليات المشتركة بين الجهات المختلفة للشركة. أرقام عامي 2014 و 2015 وفقاً للبيانات المالية المدققة للشركة

### ح. عملية التخارج

بدأ صندوق الموانئ في تحليل سيناريوهات التخارج من نيجروز نافيجيشن في نهاية العام 2013. وبالتعاون مع صندوق CAF، قام الفريق بتقييم الخيارات سواء بقيام عملية بيع مباشرة لحصة الصندوق في نيجروز نافيجيشن او بيع ثانوي يطرح من خلال سوق الأوراق المالية.

وبدأ فريق العمل التحضير لعملية البيع الثانوي المحتمل وبدأ المباحثات مع اكبر الشركات الاستثمارية مثل بي دي أو و بي بي أي، ومتروبنك و سيكورتي بنك. كما قام فريق العمل أيضاً بتحضير مذكرة استثمار متكاملة ومفصلة والتي تم ارسالها للمستثمرين المرتقبين بما في ذلك تكساس باسيفيك جروب، ومترو باسيفيك انفسمنت كوربوريشن، وبلاتينام ايكويتين وبين كابيتال، واس سي لوين وبلاكستون وغيرهم.

وفي اثناء قيام المساهمين بعملية التخارج، قامت إدارة 2GO بالمبادرة بتقديم عرضاً لشراء حصة كل من CAF وصندوق الموانئ بسعر لا يتعدى صافي تخارج بقيمة 66.1 مليون دولار لصندوق الموانئ.

وفي تلك الاثناء، حرص صندوق CAF على التخارج من الاستثمار بسرعة ووضع ضغوطاً على صندوق الموانئ ليقوم بالبيع.

وكان عرض إدارة 2GO من التطورات الإيجابية، وشعر فريق العمل انه نظراً للأداء التاريخي الإيجابي للمجموعة وتوقعات تحقيقها لنمو اكبر تجدر بذل جهود لاستكشاف فرص لعروض/ صفقات أخرى. ومن خلال المباحثات مع CAF تمكن فريق العمل من اقناعهم بالموافقة على اجراء عملية بيع/تسويق تنافسية. وفي سبتمبر 2014، قام فريق عمل صندوق الموانئ بتعيين مكتب الاستشارات الاستثمارية بهونج كونج أباتشي اسيا لتسهيل عملية البيع التنافسي لمجموعة 2GO .

وفي أكتوبر 2014، قامت شركة أباتشي بالتعاون مع فريق عمل الصندوق بتحديد والاتصال بمجموعات1) أبدت اهتمامها بقطاعات النقل، واللوجستيات والسلع الاستهلاكية 2) تسعى للبحث بنشاط عن صفقات جديدة 3) لديها قدرة استثمارية تتناسب مع حجم سعر صفقة بيع 2GO . وتم اعداد المعلومات المبدئية مثل مخلص الصفقة والمخلص التنفيذي وتقديمها لعدد 42 مجموعة تتوافق مع المعايير الموضوعة. من ضمن هؤلاء، 14 مجموعة أبدت اهتمامها في اجراء مباحثات اعمق وحصلوا على معلومات إضافية بخصوص الفحص النافي للجهالة بعد الحصول على أسئلة واجوبة ومعلومات تم طلبها. ست مجموعات سافرت إلى الفلبين لإجراء مزيداً من اعمال الفحص النافي للجهالة وزيارة الموقع وحضور العروض التقديمية للإدارة. واستغرقت عملية البيع التنافسية ستة اشهر وفي ابريل 2015، أعربت 4 مجموعات عن اهتمام كير في استكمال الصفقة، وهم نافيس كابتال بارتنيرز و بلاتينام ايكويتي و ايه دي في بارتنرز و مترو باسيفيك انفسمنت كوربوريشن.

الشكل رقم 16: ملخص تسويق عملية التخارج



وفي مايو 2015، قام صندوق الموانئ بقبول العرض المقدم من شركة نافيس بشرط الحصول على موافقة CAF إلا انه للأسف خلال هذا الوقت عاصر CAF تغيراً في ادارته والتي قامت بإلغاء قرار الإدارة السابقة فيما يتعلق بعملية البيع التنافسية.

صندوق الموانئ   |   تقرير التخارج النهائي للمشروع

ودخل فريق العمل في مرحلة جديدة من المفاوضات والمناقشات مع CAF ونافيس بما أدى الى تأخير صفقة البيع.

وفي ذلك الحين اتخذ فريق العمل قراراً بان الخيار الوحيد للتخارج سيتمثل في الأفراد ببيع حصة الأقلية التي يمتلكها صندوق الموانئ. وبعد الحصول على التأكيدات النهائية من ان صندوق CAF لن يقوم ببيع حصته، واصل الصندوق وابتاشي المباحثات للعثور على مستثمر مهتم بشراء الصفقة وفقاً لما تم تحديده من قبل خلال عملية البيع التنافسية بالإضافة إلى العثور على جهات أخرى مهتمة بشراء حصة الأقلية.

وخلال تلك الفترة، عادت إدارة 2GO بمراجعة العرض المقدم منها ورفعت قيمته بحيث يصل نصيب التخارج الصافي لصندوق الموانئ 80.2 مليون دولار[6]. وباعتبار ان التخارج السريع كان من الأولويات التي حددها فريق العمل ونظراً لعلاقة العمل الطويلة التي جمعت بين صندوق الموانئ وإدارة 2GO تم وضع مذكرة الشروط الأساسية للطرفين. إلا ان إدارة 2GO لم تتمكن من توفير رأس المال اللازم لعملية الشراء في الوقت المقرر ومن ثم انتهت صلاحية مذكرة الشروط الأساسية.

وواصل فريق عمل الصندوق وابتشي أسيا العمل تجاه صفقة بيع خاصة لاستكمال صفقة البيع في أقرب فرصة. ومن ضمن المباحثات التي تمت مع اطراف مهتمة، جاء اعلى عرض من قبل اودينا جروب بقيمة اجمالية بلغت 120 مليون دولار، بما يصل إلى صافي بقيمة 91.9 مليون دولار. وكان هذا العرض افضل بكثير من عرض ايه دي في بارتنرز بقيمة صافية 82.3 مليون دولار.

وخلال الأسبوعين الأولين من يوليو 2016، عمل فريق العمل مع المشتري لانجاز خطاب النوايا والذي تم توقيعه في 19 يوليو 2016 وتضمن دفعة مقدمة بقيمة 5 مليون دولار. وعلى مدار الأسابيع التالية، قام فريق العمل بتحضير مستندات الفحص النافي للجهالة والتنسيق مع المستشارين القانونيين لإنهاء إجراءات اتفاقية صفقة شراء الأسهم التي تمت في 28 يوليو 2016. ووفقاً لاتفاقية شراء الأسهم تم إعطاء المشتري فترة حتى 22 أغسطس 2016 لتسديد المبلغ المتبقي من الصفقة. وقام المشتري بتحويل المبلغ المتبقي في 16 أغسطس 2016، قبل أسبوع من انتهاء المهلة. وفي اعقاب ذلك، عمل الفريق مع المشتري والمستشارين القانونيين على انجاز الأمور الادارية بما في ذلك تحويل الأسهم والتي تمت في 19 أغسطس 2016. بعد ذلك عمل فريق العمل والمشتري على استكمال الحسابات لضمان الموارد النقدية والديون للشركة البائعة كي جي بي في والتي تم استكمالها في سبتمبر 2016.

تقسيم صافي إيرادات البيع

| التفاصيل | دولار أمريكي |
|---|---|
| متحصلات بيع الاستثمار في 2GO | 120,000,000 |
| ناقص المطلوبات | |
| مطلوبات متعلقة بتسوية صفقة نيجروز نافيجيشن | (1,431,145) |
| تسوية القرض المستخدم لزيادة رأس مال 2GO | (20,148,203) |
| ناقص: تكاليف عملية البيع | |
| اتعاب المستشارين والمهنيين | (6,480,024) |
| صافي متحصلات عملية البيع | 91,940,628 |

الارقام صافية من دون السداد والتكاليف ونفقات المتعلقة بالصفقة

صندوق الموانئ    │ تقرير التخارج النهائي للمشروع

وتم تسديد التسهيلات الائتمانية وتكاليف عملية البيع من عائدات صفقة البيع وبلغ صافي التدفقات النقدية لصندوق الموانئ 91.9 مليون دولار. وباعتبار اجمالي استثمار الصندوق في نيجروز نافيجيشن كان بقيمة 28.5 مليون دولار، فيكون الصندوق بذلك قد حقق 3.2 اضعاف المبلغ المستثمر او ما يعادل اجمالي عائد داخلي على الاستثمار بنسبة 15.1%.

الشكل رقم 17: عائدات الاستثمار



وحالياً، يقوم صندوق الموانئ بالتخارج النهائي من استثماراته، وسوف يتم تسديد مطلوبات الصندوق قبل القيام باي توزيعات. وتم استخدام مبلغ بقيمة 59,899,616 دولار أمريكي لتغطية المطلوبات القائمة على صندوق الموانئ و الاحتفاظ بمبلغ قيمته 2,041,012 دولار لتغطية مصاريف وتكاليف تخارج الصندوق.

استخدام صافي عوائد صفقة البيع

| التفاصيل | دولار أمريكي |
|---|---|
| صافي عائدات صفقة بيع الاستثمار في 2GO | 91,940,628 |
| ناقص التحويل إلى: | |
| الدفعة النهائية إلى MPC – GMO | (3,200,000) |
| قرض جلوبل جيتواي | (54,265,116) |
| نفقات خاصة التخارج متعلقة بجلوبل جيتواي | (2,434,500) |
| توزيعات للشركاء المحدودين (الشريحة الأولى) | (30,000,000) |
| المبلغ المحتفظ به من قبل الصندوق | 2,041,012 |

وبذلك، تم توزيع الشريحة الأولى من التوزيعات على الشركاء المحدودين لصندوق الموانئ بقيمة 30 مليون دولار. وحصل كل شريك محدود على حصته وفقاً للنسبة والتناسب وفقاً لحسابات القائم على إدارة الصندوق لحسابات رأس المال كما في 31 ديسمبر 2015.

وسوف يتم توزيع المبلغ المتبقي من عائدات التخارج من استثمار 2GO جروب بقيمة 61,940,628 دولار للشركاء المحدودين بعد حصول الصندوق على عائدات التخارج من استثماره في مدينة جلوبل جيتواي اللوجستية العالمية (مدينة صباح الأحمد اللوجستية العالمية).

**EXECUTION VERSION**

**PAY-OFF LETTER**

To:    KGL Investment B.V. ("**you**")
Schiphol Boulevard 231
1118 BH Schiphol
The Netherlands

From:  Madison Pacific Trust Limited ("**we**" or "**Madison Pacific**")

Date: 18 August 2016

Dear Sirs,

1. We refer to a facility agreement dated 28 December 2015 between, among others, KGL Investment B.V. as borrower, The Port Fund L.P. as parent, the parties listed in schedule 1 thereto as lenders (the "**Lenders**") and Madison Pacific Trust Limited as agent and security agent (as varied, amended and/or restated from time to time, the "**Facility Agreement**").

2. Unless defined otherwise in this letter, any term defined in the Facility Agreement shall have the same meaning when used in this letter.

3. We are writing to you in our capacity as Agent, and to you in your capacity as Borrower under the Facility Agreement.

4. We received the waiver request letter dated 15 August 2016 (as amended on 18 August 2016 and from time to time) whereby you and the Guarantors seek the waivers set forth therein, and we understand that you intend to pay and/or repay all amounts outstanding under the Finance Documents on or before 23 August 2016, 18 August 2016 or 19 August 2016 (the "**Intended Settlement Date**") and you have given instructions to wire the funds for repayment of all outstanding amounts under the Finance Documents on or before 5:00PM (Hong Kong time) on 18 August 2016. The payment and/or repayment will be funded by a payment made by Clark Gateway Investment Group LP, acting as your agent (the "**Substitute Agent**"), pursuant to a facility agreement between you and certain lenders dated on or about the date hereof, to the following account:

| | |
|---|---|
| Correspondence Bank | JP Morgan Chase Bank |
| SWIFT | CHASUS33 |
| Beneficiary Bank: | DBS Bank (Hong Kong) Ltd, Hong Kong |
| SWIFT: | DHBKHKHH |
| Beneficiary Name: | Madison Pacific Trust Limited – Client Account |
| Beneficiary Account Number: | 478-788520700 |

57331721_5

Ref:                           KGL Investment Repayment 2016

5.     We confirm that the total aggregate amount required to repay and discharge in full all
       sums due or payable under the Finance Documents, including without limitation all
       principal, interest, fees, Break Costs, costs and expenses as at and including the
       Intended Settlement Date, is US$74,413,318.77 (the "**Settlement Amount**"). Please
       refer to Schedule 1 (*Settlement Amount Breakdown*) of this letter which sets out a
       detailed breakdown of the Settlement Amount as at the Intended Settlement Date.

6.     If repayment occurs after the Intended Settlement Date (the date of actual repayment
       being the "**Settlement Date**"), we will, as soon as reasonably practicable following a
       written request from you, inform you of the additional interest accrued or accruing
       and payable to Madison Pacific (for each Lender's account) by you for the period
       from the Intended Settlement Date to the anticipated Settlement Date ("**Additional
       Interest**").

7.     We will further, as soon as reasonably practicable following a written request from
       you, notify you of any break costs ("**Break Costs**"), fees ("**Fees**") and/or costs and
       expenses ("**Expenses**") incurred, accruing or owing up to and including the
       Settlement Date (the Settlement Amount, Additional Interest, Break Costs, Fees and
       Expenses together being, in aggregate, the "**Final Settlement Amount**"), and such
       amounts will be payable to Madison Pacific (for each Lender's account) within 3
       Business Days of notification of such amounts by Madison Pacific to you.

8.     Any amount received by Madison Pacific after 10:30AM (Hong Kong time) on any
       day will be treated for the purposes of this letter as having been received on the
       following Business Day. Any Additional Interest, Break Costs, Fees and/or Expenses
       accruing or incurred as a result of such deemed receipt shall be payable on the next
       Business Day.

9.     As soon as reasonably practicable following receipt by Madison Pacific of the Final
       Settlement Amount (if necessary, as adjusted in accordance with paragraph 6, 7 or 8
       above) and joint instructions from the Lenders to release any Security constituted by
       the Transaction Security Documents given under the Finance Documents, we agree
       to: (i) confirm such receipt to the Substitute Agent (the "**Funds Receipt
       Confirmation**") by email in substantially the form set out in Schedule 3 (*Form of
       Funds Receipt Confirmation*) and to the email addresses set out therein, and with a
       copy to the addressees set out therein, and (ii) send (1) by email to the addressees set
       out in Schedule 3 (*Form of Funds Receipt Confirmation*) the electronic copies of, and
       (2) by courier, or arrange to deliver by hand, the originals of, any duly executed
       release documents listed in Schedule 2 (*List of Release Documents*) to the offices of
       KGL Investment Company Asia, 17th Floor, Marajo Tower, 312, 26th Street West,
       Bonifacio Global City 1634; Taguig City, Philippines and marked for the attention of
       Mark Williams and (iii) make available any share certificates, transfer forms or any
       other documents ancillary to the existing Philippines share pledge dated 28 December
       2015 between you as pledgor and Madison Pacific as pledgee (including deeds of
       trust and irrevocable proxies) delivered to and held by Madison Pacific in relation to
       security held by it over the shares in KGLI-NM Holdings, Inc., to be retrieved at the
       offices of Madison Pacific in Hong Kong by a representative appointed by KGL
       Investment B.V.

57331721_5

10.  This letter may be executed in any number of counterparts and all of those counterparts taken together will be deemed to constitute one and the same instrument.

11.  This letter and any non-contractual obligations arising out of or in connection with it shall be governed by and construed in all respects in accordance with English law.

*[The remainder of this page has been intentionally left blank.]*

57331721_5

Yours faithfully,

**Madison Pacific Trust Limited**
as Agent

Acknowledged and agreed by:

**KGL Investment B.V.**
as Borrower

[Acknowledgment to the Pay-Off Letter]

**SCHEDULE 1**

**SETTLEMENT AMOUNT BREAKDOWN**

| | |
|---|---|
| Total Principal Outstanding: | 78,194,415.00 |
| Total Accrued Interest Outstanding (through and including 31 August): | 8,059,619.99 |
| *less* Debt Service Excess Amount: | (11,894,415.00) |
| Sub-Total: | 74,359,619.99 |
| Fees, costs and expenses: | 53,698.79 |
| **Settlement Amount:** | **74,413,318.77** |

57331721_5

**SCHEDULE 2**

**LIST OF RELEASE DOCUMENTS**

1. Global release deed to be executed upon the actual receipt by Madison Pacific of the Settlement Amount by KGL Investment B.V., as borrower, KGL Investment Coöperatief U.A., as the guarantor and Madison Pacific Trust Limited, as security agent, in respect of the release of all securities granted under the Facility Agreement for the benefit of Madison Pacific Trust Limited including, but not limited to, the release of the pledge over the shares of KGL Investment Coöperatief U.A. in KGL Investment B.V.

2. Philippines law release of pledge executed by Madison Pacific Trust Limited as pledgee (the "**Pledgee**") in favor of KGL Investment B.V. as pledgor (the "**Pledgor**") in respect of the pledge over the Pledgor's shares in KGLI-NM Holdings, Inc. as evidenced by a pledge agreement dated 28 December 2015 by and between the Pledgor and the Pledgee.

57331721_5

**SCHEDULE 3**

**FORM OF FUNDS RECEIPT CONFIRMATION**

To:         Clark Gateway Investment Group LP to the attention of Marsha Lazareva
            marsha@kglinvest.com

Copied to:  evan.mcbride@kglinvest.com; mark.williams@kglinvest.com;
            arnell.uychoco@apulaw.com; bart.wolters@hvglaw.nl;
            nick.van.dijk@hvglaw.nl; nikita.gommeren@hvglaw.nl;
            toroperations@torinvestment.com; spepper@torinvestment.com;
            s.houdijk@houthoff.com; e.schutte@houthoff.com; j.terpstra@houthoff.com;
            tjmendoza@picazolaw.com; daniel.anderson@ropesgray.com;
            andrew.bishop@ropesgray.com; andrew.wang@ropesgray.com;
            fof-ops@corbincapital.com; Kelvin_ong@pacificeagle.biz;
            vincy_yau@peagle.com.hk; ops@ssgasia.com; swu@ssgasia.com;

We refer to the letter dated [●] 2016 from Madison Pacific Trust Limited ("Madison Pacific")
as Agent to KGL Investment B.V. (the "**Pay-Off Letter**").

In its capacity as Agent under and as defined in the Pay-Off Letter, Madison Pacific confirms
that it has received the aggregate amount of US$[●] into the following account:

| | |
|---|---|
| Correspondence Bank | JP Morgan Chase Bank |
| SWIFT | CHASUS33 |
| Beneficiary Bank: | DBS Bank (Hong Kong) Ltd, Hong Kong |
| SWIFT: | DHBKHKHH |
| Beneficiary Name: | Madison Pacific Trust Limited – Client Account |
| Beneficiary Account Number: | 478-788520700 |
| Ref: | KGL Investment Repayment 2016 |

Madison Pacific confirms that this amount constitutes the Final Settlement Amount, under
and as defined in the Pay-Off Letter, and that this email constitutes a Funds Receipt
Confirmation (each term as defined in the Pay-Off Letter, unless otherwise defined in this
email).

**Madison Pacific Trust Limited**

_____

Managing Director

57331721_5



4 February 2020

Our Ref: BG/LP/T5138-D08984

His Excellency Khalid Naser Al-Rodan
Minister of Commerce and Industry and Minister of
State For Service Affairs
Chairman of Kuwait Ports Authority (KPA)
Ministries Complex
Abdullah Al Salem Street
Al Mirqab Area, Block 1 and 2
PO Box 2944
13030 Safat
Kuwait

His Excellency Khalid Naser Al-Rodan
Chairman of Kuwait Ports Authority (KPA)
Kuwait Ports Authority Building
Jamal Abdul Nasser Street
Shuwaikh Area
PO Box 3874
13039 Safat
Kuwait

Dear Sirs

**THE PORT FUND L.P. (THE "FUND")**

We continue to act as Cayman Islands legal counsel to the Fund and Port Link GP Ltd. (the
"**GP**") and write to provide investors of the Fund with an update regarding the recent
appointment of two independent directors to the board of directors of the GP (the "**Board**").

As noted in previous correspondence, the Fund has recently been the subject of a number
of unfounded and unsubstantiated allegations in connection with the management and
affairs of the Fund. The Board is acutely cognisant of its duty to act in the best interests of
the Fund and all of its investors and remains fully committed to addressing such allegations
in order to resolve any concerns that investors may have.

In light of the above, the GP has appointed Chris Rowland and Andrew Childe of FFP
(Cayman) Limited to the Board (the "**Independent Directors**"). The Independent Directors,
who now constitute a majority of the directors appointed to the Board, are highly respected
professionals who have a wealth of experience in providing independent directorships to
entities in the Cayman Islands. Importantly, they each have specific experience in dealing
with vehicles involved in litigation and contentious issues comparable to those currently
faced by the Fund. We hereby **enclose** copies of the professional bios for the Independent
Directors for your information only.

9626822.1T5138.D08984

Walkers (Dubai) LLP

Level 14, Burj Daman, Dubai International Financial Centre, Dubai, UAE, PO Box 506513

**T** +971 4 363 7999 **F** +971 4 363 7033 www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Dublin | Guernsey | Hong Kong | Jersey | London | Singapore

The Independent Directors are in the process of conducting a review of the affairs of the Fund in order to address the various issues that the Fund is facing and take such steps as they consider appropriate in the circumstances. A further update will be provided to all investors in due course.

In the meantime, please do not hesitate to contact Barnaby Gowrie at Barnaby.Gowrie@walkersglobal.com or Luke Petith at Luke.Petith@walkersglobal.com if you have any questions.

Yours faithfully

*Walkers*

**WALKERS (DUBAI) LLP**

ENC. (1)

9626822.1T5138.D08984