fUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re Application of                                  :
                                                      :
**KUWAIT PORTS AUTHORITY,**                           :
                                                      :     Case No.: 20-mc-00046(ALC)
**Petitioner for an Order Pursuant to**               :
**28 U.S.C. § 1782 to Conduct Discovery for**         :
**Use in a Foreign Proceeding**                       :
------------------------------------------------------------x

## SUPPLEMENTAL DECLARATION OF JENNIFER FOX

Jennifer Fox, declares under penalty of perjury pursuant to 29 U.S.C. § 1746, as follows:

1. I am the same Jennifer Fox of Ogier who submitted a declaration on January 27, 2020 in support of the *ex parte* application of the Kuwait Ports Authority ("***KPA***")[1] for an order under 28 U.S.C. § 1782 ("***Section 1782***") permitting KPA to take discovery (the "***Section 1782 Discovery***") from (a) Citibank, N.A. ("***Citibank***"); and (b) E*Trade Financial Corporation ("***E*Trade***" and together with Citibank, the "***Banks***") in the Southern District of New York (the "***KPA 1782 Application***").

2. I represent KPA, one of the limited partners ("***LPs***") in The Port Fund L.P. (the "***Port Fund***") in connection with contemplated proceedings in the Grand Court of the Cayman Islands to bring a petition to wind up the Port Fund on "just and equitable" grounds, as well as other claims arising from the apparent mismanagement by the directors and advisors of the Port Fund's general partner, Port Link GP Ltd (the "***GP***", and together with the Port Fund, the "***Port Fund Entities***"). The "just and equitable" winding up petition and the other claims are hereinafter referred to as the "***Impending Cayman Litigation***".

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms as in my original Declaration (the "***First Declaration***") [ECF No. 6] submitted in support of the KPA 1782 Application.

1

3. I also represent KPA in connection with ongoing proceedings in the Cayman Islands in which KPA seeks information from the Port Fund Entities pursuant to section 22 of the Cayman Islands Exempted Limited Partnership Law (2018 Revision) (the "***ELP Law***") (the "***Section 22 Proceedings***"). A relevant excerpt of the ELP Law is exhibited hereto at **Exhibit A**.

4. I submit this supplemental declaration, first, in further support of the KPA 1782 Application; secondly, in order to address certain assertions of Cayman Islands law made by Barnaby Gowrie ("***Gowrie***") in his May 28, 2020 declaration [ECF No. 22] (the "***Gowrie Declaration***") submitted in support of the Port Fund's consolidated motion to intervene and opposition to the KPA 1782 Application [ECF No. 20]; and, thirdly, to provide the court with an overview of the Section 22 Proceedings and to explain that there is no overlap between those proceedings and this Application.

5. As Cayman counsel for KPA in this matter, I am familiar with the information set forth in this declaration from (a) my review of the declaration of Yousef Al Sabah [ECF 7] (the "***Sabah Declaration***") setting forth the facts underlying the KPA 1782 Application; (b) my personal knowledge; (c) information and documents provided to me by KPA and its English and US counsel, Baker McKenzie; and (d) documents that I have prepared and/or reviewed. Because I submit this supplemental declaration specifically in support of the KPA 1782 Application, it does not contain each and every fact within my knowledge regarding the topics discussed herein.

**A. The use of the Section 1782 Discovery in the Impending Cayman Litigation**

6. As set out in my First Declaration, KPA reasonably contemplates bringing a petition to wind up the Port Fund on "just and equitable" grounds. The Gowrie Declaration accepts that the Cayman court has the discretion to wind up an exempted limited partnership ("***ELP***") if

2

the court is of the opinion that it is "just and equitable" to do so.[2] The Gowrie Declaration also correctly notes that the meaning of "just and equitable" is not defined in statute, and that the circumstances in which it will be deemed to be just and equitable to wind up an exempted company or an ELP are derived from case law. Although, as the Gowrie Declaration accepts, the circumstances "***tend to*** *fall witihin certain well-defined categories*,"[3] the court is entitled to make a winding-up order in any circumstance, if it considers that is the just and equitable result.

7. If KPA successfully petitions to wind up the Port Fund, the court will appoint insolvency practitioners as official liquidators, who will then take control of the Port Fund and will have extensive powers under Part V of the Companies Law (2020 Revision) (the "**Companies Law**"), and the Companies Winding Up Rules, 2018 to investigate the Port Fund's business and affairs, and bring claims on behalf of the ELP. Excerpts of the Companies Law and the Companies Winding Up Rules, 2018 are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

8. When deciding whether to wind up a company on just and equitable grounds, the court will consider, in the widest possible terms, what justice and equity require. When bringing its petition, KPA is entitled to rely on any circumstances of justice or equity which affect its relationship with the Port Fund, the GP or the other LPs. This encompasses the whole commercial context surrounding the Port Fund including, for example, any findings of mismanagement in relation to other companies within the Port Fund's wider group.

9. In addition, it is important to note that the Port Fund is already effectively in voluntary liquidation: its term has expired, it has exited its investments and it has been in soft wind down for a number of years. This is also relevant to the exercise of the court's discretion, because

---

[2] Pursuant to section 92(e) of the Companies Law and section 36 of the ELP Law. See paragraph 28 of the Gowrie Declaration.
[3] *See* paragraph 30 of the Gowrie Declaration (emphasis added).

making a winding-up order in this case is a less drastic remedy than it would be if the Port Fund were still a going concern.

10.     I have read Gowrie's supplemental declaration dated 26 June 2020, made in support of the Port Fund Entities' motion to intervene and opposition to GIC's application for an order under Section 1782 (the "***GIC Gowrie Declaration***").[4] The GIC Gowrie Declaration alleges, at paragraph 17, that my First Declaration "*confirmed*" that KPA currently has insufficient evidence to bring a winding up petition on the just and equitable ground. This is inaccurate and mischaracterizes my evidence.

11.     There is no requirement for KPA to prove any wrong doing in order to successfully obtain a winding-up order on either of these grounds. Provided that it is supported by cogent evidence, a suspicion of wrongdoing may suffice if it leads to a justified lack of confidence in the way the company is being run. Equally, a suspicion of wrongdoing may also suggest that there is a need for an independent investigation to be conducted into the company's affairs.

12.     In my view, KPA had sufficient evidence at the time of commencing the KPA 1782 Application to bring a just and equitable winding up petition against the Port Fund on the grounds of: (1) a justifiable loss in confidence in the management of the Port Fund; and/or (2) the need for an independent investigation to be undertaken by court appointed office holders into the Port Fund's affairs.

13.     KPA could seek to rely on each of the above-mentioned grounds for a winding up petition, both together and in the alternative. I consider that there are a number of suspicious issues and activities on which KPA could rely to support its just and equitable petition (whether individually or a combination of the same). These include, but are not limited to: (i) discrepancies

---

[4] A copy of the GIC Gowrie Declaration is attached hereto as **Exhibit D**.

4

between the figures provided by the Port Fund to LPs and reported in other sources as to the sale price of the Port Fund's assets and the distribution received by the Port Fund; (ii) substantial payments being made by the Port Fund to third parties without any apparent legitimate business purpose; (iii) failing to segregate the Port Fund's assets (which are trust assets)[5] from those of the GP's assets in the GP's accounts; (iv) the failure of the Port Fund to provide audited accounts; (v) the ongoing criminal proceedings and convictions of former directors of the GP and the Port Fund's related parties in respect of crimes of dishonesty and fraud; (vi) various suspicious dealings with the Port Fund's assets, including (but not limited to) a failure to defend a multi-million dollar lawsuit brought by the former investment manager and closely related party of the Port Fund in Dubai; (vii) the lack of probity of those in control of or closely associated with the Port Fund; (viii) the favorable treatment given to the Port Fund's sponsor and placement agent under a loan agreement; (ix) the apparent "kickback" scheme organized by those in control of the Port Fund; and (x) the intransigent and unreasonable refusal by the GP to answer questions put to it by KPA (whether in a meaningful way or at all) regarding these matters and about the Port Fund's capital accounts and drawn down capital commitments.

14.     It is anticipated that Section 1782 Discovery will support KPA's case for just and equitable winding up by revealing further evidence relating to the suspicious matters and activities detailed above. The Citibank documents should assist in demonstrating that independent investigation is required into the amount that was received for the Clark Asset and how it has subsequently been disbursed to the LPs and other parties. Citibank will be able to supply this

---

[5] Pursuant to section 16 of the ELP Law which states "*Any rights or property of every description of the exempted limited partnership….shall be held or deemed to be held by the general partner and if more than one then by the general partners jointly, upon trust as an asset of the exempted limited partnership in accordance with the terms of the partnership agreement*".

information because it is the correspondent bank for the bank used by the Philippine purchaser of the Clark Asset.

15. In addition, and since it has been alleged by Gowrie that the E*Trade documents are irrelevant to a just and equitable winding up petition, I wanted to explain why the disclosure sought will likely assist the Impending Cayman Litigation. I consider that these documents should assist in demonstrating the apparent "kickback" scheme organized by those in control of the Port Fund (*i.e.* Lazareva and Dashti) whereby KD 1 million (~USD 3.3 million) was likely misappropriated on or around September 2010 via a related party (namely KGL Investment Company KSCC ("**KGLI**")) by those in control of the Port Fund (*i.e.* Lazareva and Dashti), and paid to an account held by Khalid Al Shamali (the brother of the disgraced former KPA Director of Finance, Abdullah Al Shamali), at E*Trade's Bank of New York account in New York.[6] Contrary to what Gowrie states in his Declaration, KPA could rely on the kickback scheme as an objective basis for the loss of confidence in the Port Fund's management and advisors to support a just and equitable winding up petition. In considering whether there has been an objective lack of probity by those in control of or closely associated with the Port Fund, as I note above, it is open to the Cayman court to take into account the whole commercial context surrounding the defendant entity, including, for example, any findings of wrongdoing in relation to companies within the defendant's wider group.

16. The Section 1782 Discovery will also likely assist the official liquidators appointed over the Port Fund in pursuing claims against the GP and its directors and advisors or related

---

[6] *See* Sabah Declaration. [ECF 7],¶¶ 15, 36-40. Lazareva's relationship with and control of the entities involved in the scheme (all of which are closely related to the Port Fund), can be relied on to assert a lack of probity in Lazareva's conduct justifying the lack of confidence in the board of the GP of the Port Fund.

LITI-10617326-2

parties involved in the apparent wrongdoing related to the Port Fund that led to the possible diversion of funds from the Fund and/or the LPs.

### B. Other Claims

17. KPA also reasonably contemplates bringing other claims against the GP and other managers and advisors of the Port Fund arising from the apparent mismanagement of the Port Fund.

18. At paragraph 34 of his Declaration, Gowrie incorrectly suggests that KPA cannot itself bring a claim for breach of fiduciary duty against the GP, since such claims "*vest in the limited partners of the Fund as a whole for the benefit of the Fund. See section 33(1) of the ELP Law*". However, KPA does indeed have the ability to bring a direct claim against the GP for breaches of its obligations under the limited partnership agreement and in equity.[7] KPA has its own direct contractual or fiduciary claim for its own loss. Further, Gowrie cannot derive support for his proposition from section 33(1) of the ELP Law since the section has nothing to do with the vesting of the benefit of claims against a GP, and it deals only with the point that claims brought or defended on behalf of the *ELP itself* must be brought or defended by a GP of an ELP. This is because an ELP has no separate legal personality. Section 33(1) states: "*Subject to subsection (3), legal proceedings by or against an exempted limited partnership may be instituted by or against any one or more of the general partners only, and a limited partner shall not be a party to or named in the proceedings*."

19. I should also mention for completeness that it is possible for the KPA (and any other LP) to bring a derivative claim on behalf of the Port Fund pursuant to section 33(3) of the

---

[7] *In Certain Limited Partners in Henderson PFI Secondary Fund II LLP (a firm) v Henderson PFI Secondary Fund II LP (a firm) & Others [2012] EWHC 3259 (Comm)*, a copy of which is attached hereto as **Exhibit E**.

LITI-10617326-2

ELP Law, in the event that the GP fails to bring or defend any legal claims. Section 33(3) provides: "*A limited partner may bring an action on behalf of an exempted limited partnership if any one or more of the general partners with authority to do so have, without cause, failed or refused to institute proceedings.*"

### C. The Section 22 Proceedings

20. KPA and Gulf Investment Corporation (the "**GIC**") each successfully brought applications against the Port Fund Entities pursuant to section 22 of the ELP Law (the "***KPA Section 22 Application***" and the "***GIC Section 22 Application***", respectively) to obtain information and documentation from the Port Fund Entities. Those applications were heard together in the Section 22 Proceedings. For the reasons given below, KPA's success in the Section 22 Proceedings does not mean that the KPA 1782 Application is now in any way moot.

#### 1. The Decision in the Section 22 Proceedings

21. The KPA Section 22 Application was filed on January 29, 2020 in the Grand Court of the Cayman Islands seeking information to which the KPA, as an LP of the Port Fund, is statutorily entitled pursuant to section 22 of the ELP Law ("***Section 22***").[8] The KPA Section 22 Application was opposed by the Port Fund Entities.

22. The hearing of the Section 22 Proceedings took place on May 5-6, 2020. Judgment in the Section 22 Proceedings was handed down on June 16, 2020 (the "***Section 22 Judgment***"). The Cayman court found in favour of KPA on each point of law in dispute, and the findings are summarized below.

---

[8] Section 22 is distinct from a general "disclosure" obligation that exists in the context of substantive proceedings, and simply reflects the right of a limited partner to access information of the partnership.

LITI-10617326-2

23. The court found that KPA's right to "*true and full information regarding the state of business and financial condition of the Port Fund*" pursuant to Section 22 was a free-standing, unqualified, statutory entitlement and the only way such entitlement could be restricted was by express terms in the Port Fund's Limited Partnership Agreement ("**LPA**"), which did not apply in the case.[9] The court held that an LP's entitlement under Section 22 will include (but is not limited to) all of the books and records maintained by the GP pursuant to the statutory obligation imposed by section 21 of the ELP Law.[10]

24. The Cayman court also rejected the Port Fund Entities' argument that the GP could impose upon KPA an undertaking or other restriction on the *use* of the information obtained pursuant to Section 22. The court found that the confidentiality obligations in Clause 7.3 of the LPA "*represent[ed] the extent of the [confidentiality] regime agreed by the [Port Fund's GP and LPs] as to the* use *of information once provided*"[11] and that the LPA did not provide the GP with a "*separate and distinct right to require the kind of condition that is sought in this case by way of an undertaking on* use".[12]

25. The Cayman court also rejected the Port Fund Entities' argument that, due to confidentiality obligations under contracts with third parties, they would need to obtain an order under section 4 of the Cayman Islands Confidential Information Disclosure Law (2016 Revision) ("**CIDL**") in order to disclose certain information to KPA. A relevant excerpt of CIDL is attached hereto as **Exhibit F.** The court held that the disclosure of confidential information pursuant to a

---

[9] The Grand Court followed and approved the decision of *Dorsey Ventures Limited v XIO GP Limited* (unreported, Grand Court, Mangatal J., 22 October 2018), which found that Section 22 is: a "*very wide unqualified provision … it requires information to be provided, not just documents, and the information needs to be 'true and full'. In re Gulf Investment Corporation et al v The Port Fund et al* (unreported, Grand Court, Parker J., 16 June 2020) at paragraphs 84-86. A copy of the Section 22 Judgment is attached hereto as **Exhibit G**.
[10] *Ibid*, at paragraph 86.
[11] *Ibid*, at paragraph 102
[12] *Ibid*, at paragraph 100.

court order attracts the protection of section (3)(1)(j) of CIDL (which provides that "*where a person owes a duty of confidence, the disclosure by that person of confidential information… in accordance with, or pursuant to… a duty created by any other* [Cayman] *Law or Regulation shall not constitute a breach of the duty of confidence*"). Accordingly, disclosure of confidential information under Section 22 does not constitute a breach of duty of confidence.

26. I note here the points put forward by the Port Fund in the GIC Gowrie Declaration as to the purported effects and uncertainty of the Section 22 Judgment.[13] I disagree with Gowrie's characterization of the Judgment. The Judgment deals comprehensively with the proper meaning, application and effect of Section 22.

27. As the Judgment makes clear,[14] the Judge intended to make a finding as to the applicable legal principles concerning the plaintiffs' entitlements following which the parties were to agree amongst themselves as to the application of those principles to the various categories of documents sought.

28. The parties have been unable to agree the form of the Order. Consequently the plaintiffs have requested that the Judge settle the terms of the Order to resolve the points which remain in dispute as regards the application of his decision that full disclosure be made.

29. Whilst it is correct that the precise terms of the order are to be settled by the Cayman court, the effects of the Section 22 Judgment are clear. There are not, as Gowrie states, "*substantial issues required to be agreed between the parties*" and the Section 22 Proceedings are not, as Gowrie describes "*very much active and on foot*". The issues to which Gowrie refers in his declaration were the very subject of the Section 22 Proceedings and have already been determined by the Cayman court, and every disputed point was determined in favour of KPA and GIC.

---

[13] See paragraphs 8 - 13 of the GIC Gowrie Declaration.
[14] *Ibid*, at paragraph 76.

10

### 2. There is no overlap between the disclosure sought in the Section 22 Proceedings and the KPA 1782 Application

30. The KPA 1782 Application and the Section 22 Proceedings seek different documents and information from different parties. The KPA 1782 Application seeks discovery from the Banks, which are financial institutions based in and/or operating out of the Southern District of New York; whereas the KPA Section 22 Application seeks documents and information from the Port Fund Entities, which are entities resident in the Cayman Islands. The documents requested in each case are also materially different.[15] By way of example, the Section 22 requests seek, *inter alia*, the records of the Port Fund's Noor Bank account, and are focused on the funds ultimately deposited into (and subsequently transferred out of) the Noor Bank account. This will show the amounts received by the Port Fund Entities from the Clark Asset sale directly to their Noor Bank account, and how the Port Fund Entities subsequently transferred those amounts. Conversely, the Section 1782 requests are concerned with, *inter alia*, the total amount sent from the Philippine purchaser of the Clark Asset to Citibank following the sale of the Clark Asset, and the funds subsequently paid out of the Citibank account to not only the Port Fund Entities' Noor Bank account but to any other recipients. This information would not be available from the Noor Bank records sought in the Section 22 Proceedings.

### D. The Section 1782 Discovery could not be obtained in the course of proceedings in the Cayman Islands

31. Gowrie suggests that KPA could obtain the Section 1782 Discovery from the Port Fund Entities in the course of proceedings in the Cayman Islands (either via the Section 22 Proceedings or via discovery in the Impending Cayman Litigation). This is not correct.

---

[15] As noted in paragraph 28, the terms of the KPA Section 22 Application Order have yet to be determined. Accordingly, whilst the final list of documents is to be ascertained, in any event, any documents provided pursuant to the KPA Section 22 Application will not overlap with the documents sought in the KPA 1782 Application.

32.     In Cayman proceedings, KPA would only be able to obtain discovery of documents which are within a party's "*possession, custody or power*"; and (b) are "*relevant to any matter in question*" in the proceedings.[16]

33.     The Section 1782 Discovery would not be within the Port Fund Entities' "*possession*" or "*custody*" (both of which denote physical possession)[17] as the relevant documents are held by the Banks. Nor in my view would the Port Fund Entities have "*power*" over the documents, which would require having "*a presently enforceable legal right to obtain from whoever actually holds the document inspection of it without the need to obtain the consent of anyone else*".[18] This is because I am not aware of any direct legal relationship (such as an agent, or nominee, or otherwise) of the Port Fund or the GP with Citibank or E*Trade which would give either of the Port Fund Entities the right to require production of the documents, and therefore the "*power*" to call for the Section 1782 Discovery.

### E. The Cayman courts are receptive to discovery obtained pursuant to Section 1782

34.     The assertion in paragraph 39 of the Gowrie Declaration that the Cayman court "*may not consider it appropriate*" for a party to seek relief under Section 1782 where doing so would disrupt primary proceedings before the Cayman court "*and/or*" would be wholly unnecessary because the same information can be obtained from the Cayman court, is fundamentally flawed.

---

[16] Grand Court Rules (as amended), Order 24, Rule 3, a relevant excerpt of which is attached hereto as **Exhibit H.** It is not disputed that the Section 1782 Discovery would likely be "relevant" pursuant to GCR O.24 r.3 in respect of the Impending Cayman Litigation.
[17] The Supreme Court Practice 1999, para. 24/2/8, a relevant excerpt of which is attached hereto as **Exhibit I**.
[18] *Andre Visser v FFC Fund* (unreported, Grand Court, Parker J, 12 February 2018), applying *Lonrho v Shell* [1980] 1 WLR 627 (HL), a copy of which is attached hereto as **Exhibit J**.

35. As stated in my First Declaration, the Cayman court is generally receptive to evidence obtained under Section 1782. The Cayman court has held that "*prima facie a party who can invoke the jurisdiction of the US District Court under § 1782 may choose to do so.*"[19]

36. The only ways in which a Cayman litigant could potentially be prevented from using Section 1782 disclosure in a Cayman Islands proceeding are: first, being restrained from pursuing the relevant Section 1782 application by way of an anti-suit injunction; and, secondly, by restrictions subsequently being imposed by the Cayman court on the admissibility of the discovered materials in the Cayman proceedings.

37. An anti-suit injunction restraining a party from continuing proceedings seeking evidence or discovery abroad would only be granted in situations where there has been (i) an invasion, or a threat of invasion, of a party's legal or equitable rights; or (ii) where a party has behaved, or threatens to behave, in an "*unconscionable*" manner.[20] What amounts to "*unconscionable behaviour*" has been deliberately left undefined by the courts, but it would include conduct that is oppressive, vexatious, or is an abuse of the court's process.

38. Contrary to what Gowrie says, in his misplaced reliance on the *Nord Anglia*[21] decision, mere disruption to the primary proceedings is not sufficient; the disruption complained of must satisfy the test expressed in *South Carolina Insurance Co.*,[22] such that it would be "*unconscionable*" or "*abusive*" for the Section 1782 application to proceed, or for the materials to be deployed in a Cayman proceeding. I note that the central issue in *Nord Anglia* was the cost consequences of pursuing evidence via Section 1782 in parallel with the discovery processes of

---

[19] *Lyxor Asset Management SA v Phoenix Meridian Equity Limited* [2009 CILR 553], exhibited at Exhibit A to my First Declaration [ECF 6-1].
[20] *South Carolina Insurance Co. v Assurantie Maatshappij De Zeven Provincien* [1987] AC 24 (HL), a copy of which is attached hereto as **Exhibit K**; applied in the Cayman Islands Court of Appeal in *Lyxor, op cit.*.
[21] *In the Matter of Nord Anglia Education, Inc* (unreported, Grand Court, Kawaley J, 18 April 2019) (Costs ruling), a copy of which is attached hereto as **Exhibit L**.
[22] [1987] AC 24 (HL).

the Cayman court in a way that might have caused some interference with the latter, *and not* the Cayman courts' receptivity to Section 1782 materials.

39. In any event, Gowrie has not particularised what "*disruption*" the KPA 1782 Application (or the disclosure obtained) might actually cause to the Section 22 Proceedings (which have already been decided by the Cayman court), a winding up petition on the just and equitable basis, or any subsequent proceedings to be brought by the KPA or by liquidators of the Port Fund (*i.e.* the other claims).

40. Similarly, Gowrie's suggestion that the Cayman court may not be receptive to Section 1782 materials where the same information can be obtained from the Cayman court, is also flawed. First, the decision of *Lyxor Asset Management SA v Phoenix Meridian Equity Limited*[23] makes it clear that availability of the same discovery via Cayman proceedings is not determinative of whether a Section 1782 application is oppressive or abusive. Secondly, the information sought in the Section 1782 Discovery is not the same as the information sought in the Section 22 Proceedings.[24] Thirdly, the entities from whom the Section 1782 Discovery is sought are not subject to the jurisdiction of the Cayman court and would not be party to the Impending Cayman Litigation or any other proceedings which are or are likely to come before the Cayman court.[25]

41. Finally, in my view, it is telling that the Port Fund Entities have not sought injunctive relief to restrain KPA from pursuing this application nor, to my knowledge, have they

---

[23] *op cit*.

[24] *See* paragraphs 31-33 above in which I explain that the documents sought by KPA in the KPA 1782 Application are not available to it in proceedings against the Port Fund in the Cayman Islands.

[25] In *Nord Anglia,* as is the case here, the Section 1782 applications were brought against third parties. It is important to note that in *Nord Anglia*, in seeking to argue to argue that the party that pursued Section 1782 should be penalized in costs, the company did **not** contend that the Section 1782 applications against the third parties were wholly unnecessary and sought information which could have been obtained through applications against the company in the Cayman court.

articulated any basis on which they would be entitled to such relief. Had they grounds to believe that KPA seeking the Section 1782 Discovery would be considered abusive or inappropriate by the Cayman court one might have expected them to have taken that step.

42. Furthermore, even if the Cayman court did consider the Section 1782 Discovery to be abusive, it would be open to that court to restrict the use to which such discovery may be deployed in the proceedings before it. The Cayman court has ample power to address the issue of admissibility of evidence as and when the need arises.[26]

I declare under penalty of perjury under the laws of the United States of America pursuant to 29 U.S.C. § 1746 that the foregoing is true and correct.

Executed on July 3, 2020 in George Town the Cayman Islands.

*Jennifer Fox*

---

[26] *Lyxor, op cit.* at [48].