**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

CAUSE NO. FSD        OF 2020 (        )

**B E T W E E N**

**(1)  KUWAIT PORTS AUTHORITY**

**(2)  THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**

<u>Plaintiffs</u>

**and**

**PORT LINK GP LTD.**

<u>Defendant</u>

---

**WRIT OF SUMMONS**

---

**TO**:      Port Link GP Ltd, Walkers Corporate Limited, Cayman Corporate Centre, 27. Hospital Road, George Town,. Grand Cayman KY1-9008

**THIS WRIT OF SUMMONS** has been issued against you by the above-named Plaintiffs of 89 Nexus Way, Camana Bay, Grand Cayman, Cayman Islands, KY1-9009 in respect of the claim set out on the next page.

Within 14 days after the service of this Writ on you, counting the day of service, you must either satisfy the claim or return to the Court Office, PO Box 495 GT, George Town, Grand Cayman, the accompanying Acknowledgment of Service stating therein whether you intend to contest these proceedings.

If you fail to satisfy the claim or to return the Acknowledgment of Service within the time stated, or if you return the Acknowledgment of Service without stating therein an intention to contest the proceedings, the Plaintiffs may proceed with the action and judgment may be entered against you forthwith without further notice.

Issued this 14th day of October, 2020

_Ogier_

_____

**OGIER**
Attorneys for the Plaintiffs

1

-10905424-1

**NOTE** – This Writ may not be served later than 4 calendar months (or, if leave is required to effect service out of the jurisdiction, 6 months) beginning with the date of issue unless renewed by Order of the Court.

## IMPORTANT

Directions for Acknowledgment of Service are given with the accompanying form.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

---

### STATEMENT OF CLAIM

---

1   This claim arises from the deliberate, serial and systematic unlawful conduct of the Defendant ("**Port Link**") in relation to the assets and affairs of The Port Fund L.P. ("**TPF**"), the exempted limited partnership of which Port Link is and at all material times has been general partner. Pending discovery and the administration of interrogatories, the Plaintiffs estimate that Port Link's unlawful conduct has caused TPF loss well in excess of USD 100 million.

2   The Plaintiffs between them invested a total of USD 125 million in TPF, amounting to in excess of 60% of the total limited partner investment in TPF.

3   TPF made only four known investments, two of which Port Link has written off as complete losses. By far the most substantial investment was in a project to build an "aerotropolis" in the Philippines known as Global Gateway Logistics City ("**Clark City**"). As to that investment (the "**Clark Asset**"):

   (a)   The company that purchased the Clark Asset from TPF reported in its regulatory filings that it had paid TPF a price of approximately USD 1 billion. The same price was widely reported in the media;

   (b)   Port Link denies that the purchaser paid USD 1 billion for the Clark Asset. At different times it has put forward a variety of figures in relation to the sale of the Clark Asset ranging from around USD 380 million to USD 655 million before alighting (at least for the time being) on the position that the net sale proceeds were USD 496 million;

   (c)   Remarkably, Port Link has refused to disclose any evidence as to the true sale price of the Clark Asset;

   (d)   Taking Port Link's (latest) unsubstantiated assertion as to the sale price at face value, less than 62% of the supposed net sale proceeds were distributed to TPF's limited partners; the balance (some USD 191 million) was distributed to third parties. As to such distributions:

      (i)   USD 36.2 million was paid to a Hong Kong company, Apache Asia Limited ("**Apache**"), and an undisclosed nominee of Apache purportedly by way of fees for "advisory services". Apache was incorporated on 7 February 2013; it had no track record when Port Link engaged it and does not appear to have been involved in any transactions apart from transactions relating to TPF. Despite this, Apache's purported fees approximated to between 450% and 700% of the market rate charged by leading established investment banks for advisory services. Port Link has sought to justify Apache's purported fees on the ground that Apache identified the purchaser of the Clark Asset, omitting to mention or

3

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

acknowledge the fact that the parent of the purchaser had itself already purchased the only other asset that Port Link managed to sell;

(ii)     USD 60 million was paid to an undisclosed nominee of TPF's Investment Manager after Port Link admitted a claim brought by the Investment Manager in the DIFC that was in numerous obvious respects bad in law and grossly overstated;

(iii)    USD 2.72 million was paid by way of secret commission to a director of the parent company of the purchaser of the Clark Asset, purportedly to incentivise him to achieve the highest sale price for the seller;

(iv)    Over USD 16 million was apparently paid to undisclosed recipients in Kuwait for purposes that Port Link has failed properly to explain, let alone evidence.

4      All attempts by TPF's limited partners to obtain contemporaneous documents and/or independently verifiable information to enable them to understand Port Link's dealings with TPF's assets – including by means of proceedings before this Court and in New York – have been met by Port Link with obfuscation, prevarication and/or the staunchest refusal.

5      That is the context for this claim: Port Link continues to compound and exacerbate its (massive) wrongdoing by denying its fundamental obligations to TPF's limited partners.

**The parties**

6      The Plaintiffs are the Kuwait Ports Authority ("**KPA**") and the Public Institution for Social Security ("**PIFSS**").  KPA and PIFFS are limited partners in TPF.

7      TPF is an exempted limited partnership, registered on 21 March 2007 in the Cayman Islands under the Exempted Limited Partnership Law (2003 Revision) (together with previous and subsequent revisions, the "**ELP Law**"). It was incorporated as a vehicle for investments in port-related assets around the world.

8      The Defendant, Port Link GP Ltd. ("**Port Link**"), is an exempted limited company, incorporated on 8 March 2007 in the Cayman Islands under the Companies Law with registration number 183434. The entire issued share capital of Port Link is currently held by Port Link Holdings USA Inc. ("**Port Link Holdings**"), a Delaware company that was incorporated on 29 May 2018 with registration number 6908085.

9      On 21 March 2007 Port Link entered into a limited partnership agreement with the original limited partners in TPF (the "**LPA**"). The LPA was amended and restated on 24 July 2008. By the LPA, Port Link was constituted as the general partner of TPF, as it has been at all material times and remains.

-10905424-1

10    PIFSS was a first seed investor of TPF. It invested a total of USD 40 million in TPF by means of a single transfer on or around 5 June 2007. PIFSS signed the LPA on 21 March 2007.

11    KPA invested a total of USD 85 million in TPF (giving it at least a 41% interest in TPF) by means of two transfers of (a) USD 50 million in July 2010, and (b) USD 35 million in April 2013. KPA signed the LPA on 14 July 2010.

**Other key persons and entities**

12    The Sponsor, Placement Agent and Administrator of TPF is KGL Investment Company K.S.C.C. ("**KGLI**"), a Kuwaiti company that was incorporated on 6 November 2006. KGLI was appointed as Placement Agent pursuant to a placement agreement dated April 2007. At all material times until 29 May 2018 KGLI was the 100% owner of Port Link. KGLI is also a limited partner in TPF.

13    At all material times the Investment Manager of TPF was a Cayman Islands exempted limited company that since late June / early July 2018 has been called Emerging Markets PE Management Ltd ("**EMPEML**"). Until its name was changed in late June / early July 2018, EMPEML was called KGL Investment Cayman Ltd. It is referred to as EMPEML throughout this Statement of Claim.

14    EMPEML was appointed Investment Manager by an agreement between EMPEML and Port Link dated 28 June 2007 (the "**IMA**").

15    Saeed Dashti ("**Mr Dashti**"), a Kuwait national, was at all material times the Chairman of KGLI and the group of companies to which it belongs (the "**KGL Group**"). Between 16 April 2007 and 24 May 2018 Mr Dashti was a director of Port Link.

16    Mr Dashti is a convicted criminal and a proven fraudster:

(a)    On 11 November 2019 Mr Dashti was convicted by the Kuwait Court of First Instance in the Kuwait Criminal Circuit (the "**Kuwait Court of First Instance**") in the proceedings numbered 1496/2012 of embezzling or facilitating the embezzlement of public funds and money laundering when acting as a director of Port Link and sentenced to a term of imprisonment of 15 years;

(b)    On 6 May 2018 Mr Dashti was convicted by the Kuwait Court of First Instance in the proceedings numbered 1942/2015 of facilitating the embezzlement of public funds belonging to KPA in the context of a purported advisory services contract between KPA and KGLI and sentenced to a term of imprisonment of 15 years;

(c)    Mr Dashti appealed against the convictions referred to in the two subparagraphs immediately above (the appeal proceedings were designated case number 3065/2019 and case number 1596/2018, respectively). The convictions were upheld by the Kuwait Court of Appeal (although Mr Dashti's prison sentence in the latter proceedings was

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

reduced to 10 years); Mr Dashti then appealed to the Kuwait Court of Cassation; that appeal is pending. Mr Dashti is currently serving his prison sentence in Kuwait.

17    To the extent necessary, the Plaintiffs will rely on the convictions referred to in the paragraph immediately above as evidence that Mr Dashti is serially dishonest, including in particular in (a) his dealings with KPA, (b) purporting to carry out his roles within the KGL Group, and (c) in relation to TPF.

18    Maria Lazareva, also known as Marsha Lazareva, ("**Ms Lazareva**") is the Vice Chairman and CEO of KGLI. Between 8 March 2007 and 24 May 2018 Ms Lazareva was a director of Port Link; between 8 March 2007 and 4 February 2019 she was a director of EMPEML (and was EMPEML's sole director during that period other than between 28 August 2007 and 8 February 2009 when Kevin Krucik was also a director); until an unknown date in 2018 she was a shareholder of EMPEML.

19    Like Mr Dashti, Ms Lazareva is a convicted criminal and a proven fraudster:

(a)    On 11 November 2019 Ms Lazareva was convicted by the Kuwait Court of First Instance in the proceedings numbered 1496/2012 of embezzling or facilitating the embezzlement of public funds and money laundering when acting as a director of Port Link and sentenced to a term of imprisonment of 15 years;

(b)    On 6 May 2018 Ms Lazareva was convicted by the Kuwait Court of First Instance in the proceedings numbered 1942/2015 of facilitating the embezzlement of public funds belonging to KPA in the context of a purported advisory services contract between KPA and KGLI and sentenced to a term of imprisonment of 10 years;

(c)    Ms Lazareva appealed against the convictions referred to in the two subparagraphs immediately above (case number 3065/2019 and case number 1596/2018, respectively). The convictions were upheld by the Kuwait Court of Appeal; Ms Lazareva then appealed to the Kuwait Court of Cassation; that appeal is pending;

(d)    Further, on 12 October 2020, Ms Lazareva was convicted by the Kuwait Court of First Instance of money laundering in respect of funds obtained from the embezzlement of Kuwaiti public funds and sentenced to a term of imprisonment of 7 years.

20    Ms Lazareva is a fugitive from justice. In or around November 2019, Ms Lazareva violated her bail conditions and absconded to the Embassy of the Russian Federation in Kuwait. To the extent necessary, the Plaintiffs will rely on the convictions referred to in the paragraph immediately above as evidence that Ms Lazareva is serially dishonest, including in particular in (a) her dealings with KPA, (b) purporting to carry out her roles within the KGL Group, and (c) in relation to TPF.

21    Ms Lazareva maintains that she is innocent of the criminal offences of which she has been convicted. Since 2018, Ms Lazareva has been the subject of an international lobbying

-10905424-1

campaign in furtherance of which a number of law, public relations and lobbying firms have been engaged, and several high profile private individuals mobilised (the "**Lazareva Lobbying Campaign**"). As set out below, Port Link has unlawfully caused TPF to pay unknown amounts in support of the Lazareva Lobbying Campaign.

22      The criminal proceedings in Kuwait against Mr Dashti and Ms Lazareva referred to in paragraphs 16 to 21 above are referred to as the "**Kuwaiti Criminal Proceedings**" herein.

23      At all material times Mark Williams ("**Mr Williams**") was the Director of Investments for TPF, the Investment Director of KGLI and CEO of KGL Investment Company Asia ("**KGLI Asia**", a subsidiary of KGLI) and until an unknown date in 2018 he was a shareholder of EMPEML. Further, Mr Williams was the Sole Incorporator of Port Link Holdings (on 29 May 2018), Port Link's parent company, and has since its incorporation been its sole director and shareholder.

**Basis of claims**

24      The Plaintiffs' primary case is that they are entitled to bring the claims set out in this Statement of Claim against Port Link on their own behalf by reason of the statutory, equitable, common law and contractual duties that Port Link owes the Plaintiffs as Limited Partners.

25      In the alternative, if and to the extent that the claims set out in this Statement of Claim (or any of them) are properly regarded as and/or must be brought as derivative claims on behalf of TPF, the Plaintiffs will contend that Port Link has without cause failed to initiate proceedings on behalf of TPF against itself (and there is no real prospect of it doing so) such that the requirements of section 33(3) of the Exempted Limited Partnership Law (2020 Revision) are satisfied, such that the Plaintiffs should be permitted to prosecute the relevant claims on behalf of and in the name of TPF.

26      Pending full discovery and/or the administration of interrogatories in these proceedings and/or further disclosure in the proceedings under Cause No. FSD 13 of 2020 (which proceedings are addressed below), the Plaintiffs only advance such claims against Port Link as they consider to be properly maintainable based upon the very limited information available to them. The Plaintiffs reserve the entitlement to amend this Statement of Claim by (without limitation) adding additional claims against Port Link as further documentation and information comes to light.

**Summary of claims**

27      The Plaintiffs' claims principally relate to breaches of trust, further or alternatively breaches of statutory, common law, contractual and equitable duties owed by Port Link as General Partner.

28      The relevant breaches caused very substantial loss to TPF. Because Port Link has wrongfully failed to disclose to the Plaintiffs (and other Limited Partners) information to which they are entitled, the Plaintiffs are not presently able to provide an accurate estimate of that loss; that being said, they expect, subject to further inquiry and discovery, TPF's losses to exceed USD 100 million.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

29      Port Link's breaches of trust and/or breaches of duty involved:

(a)     Causing USD 45,850,000 of TPF monies to be paid to Apache and "*a payee designated by Apache Asia*" purportedly in respect of fees for "*advisory services*" in relation to the Clark Asset and a further unknown sum of TPF monies (possibly as much as USD 6,480,024) to be paid to Apache purportedly in respect of fees in relation to the sale of the only other asset that TPF sold. Apache was incorporated on 7 February 2013; it had no track record when it was engaged by Port Link, and it does not appear to have been involved in any completed transactions other than transactions that relate to TPF. As explained below, the Plaintiffs have uncovered significant links between Apache and the KGL Group/EMPEML. It is inferred and alleged that the KGL Group and/or EMPEML obtained undisclosed benefits from the payments purportedly made in respect of Apache's fees; but further and in any event (a) Apache's purported fees were extraordinary and excessive (approximating to somewhere between 450% and 700% of the market rate charged by leading established investment banks), and (b) no reasonably competent and rational person in the position of Port Link could have concluded that Apache was a suitable and appropriate advisor alternatively the optimal advisor for TPF in relation to the matters in respect of which it is said to have provided services;

(b)     Paying USD 2.72 million of TPF monies purportedly by way of "*advisor fees*" to Wilfredo Placino ("**Mr Placino**"), a director of the parent company of the SPV purchaser of the most substantial asset that TPF sold during its term (the Clark Asset) in connection with the sale. Remarkably, Port Link has sought to justify such payment on the ground that Mr Placino was incentivised by way of a success fee to obtain "*the highest possible sale price*"; that is to say, Port Link incentivised Mr Placino to breach the duties that he owed as a director of the purchaser's parent company;

(c)     Using TPF monies in undisclosed but substantial amounts to fund directly or indirectly (a) the Lazareva Lobbying Campaign and (b) the defence of the Kuwaiti Criminal Proceedings in circumstances where neither the Lazareva Lobbying Campaign nor the defence of the Kuwaiti Criminal Proceedings was in the Limited Partners' or TPF's interests and for the avoidance of doubt the defence of the Kuwaiti Criminal Proceedings did not engage the indemnity under clause 5.4 of the LPA;

(d)     Paying a total of USD 16,095,767.12 of TPF monies between 10 February 2019 and 14 March 2019 to unidentified "*Kuwaiti based service providers*" (the "**Undisclosed Kuwaiti Recipients**") but refusing to disclose the identities of the Undisclosed Kuwaiti Recipients or to provide a proper explanation of what the payments related to. It is inferred and alleged that the payments to the Undisclosed Kuwaiti Recipients or a substantial proportion thereof (1) were made for illegitimate purposes and/or (2) involved a direct or indirect benefit to one or more of the KGL Group, EMPEML, Mr Dashti and Ms Lazareva, and/or (3) were unreasonable and/or excessive in amount and/or not commensurate with any services provided and could not have been

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

considered by Port Link in good faith to represent transactions that were no less favourable to TPF than equivalent transactions with unaffiliated third parties and/or (4) were otherwise not in the interests of the Limited Partners or TPF;

(e)    In proceedings brought by EMPEML against Port Link and TPF in the DIFC under claim number CFI-050-2018 (the "**DIFC Proceedings**") (a) submitting to the jurisdiction of the DIFC Court, (b) admitting liability in respect of EMPEML's claim in the sum of USD 56,808,005 within two days of the claim being issued, and (c) paying USD 59,990,461.30 to a payee designated by EMPEML in satisfaction of the judgment entered in the DIFC Proceedings. Port Link did so in circumstances where (a) the agreement to which the DIFC Proceedings related contained a jurisdiction clause conferring jurisdiction on the courts of the Cayman Islands and there is no known connection between EMPEML's claim and the DIFC, and (b) EMPEML's claim was (at least) grossly overstated and in a number of respects bad in law.

30    The Plaintiffs claim equitable compensation, alternatively damages payable by Port Link to them directly, alternatively by Port Link to TPF, reflecting the loss that the breaches referred to in the paragraph immediately above caused TPF.

31    Based upon the facts and matters pleaded herein the Plaintiffs also claim an account on the footing of wilful default alternatively a common account as to:

(a)    The payments that Port Link made directly or indirectly, procured to be made or diverted to EMPEML and members of the KGL Group; further or alternatively

(b)    Port Link's dealings in relation to the Clark Asset.

**Duties of Port Link**

32    At all material times, Port Link held all rights and property of TPF of every description upon trust as an asset of all the partners of TPF. Port Link did so as a matter of statute from 2 July 2014 when section 16(1) of the ELP Law came into force pursuant to the revisions made to the ELP Law in 2014 (the "**ELP Law (2014 Revision)**"); prior to that date it did so in equity and/or at common law.

33    Port Link therefore has an equitable obligation to account to each and every limited partner of TPF (the "**Limited Partners**") in respect of its dealings in relation to TPF's property (the "**Duty to Account**"). This Duty to Account is independent of the duties referred to in the two paragraphs immediately below.

34    Further or alternatively, at all material times Port Link owed (and continues to owe) the following duties to each and every one of the Limited Partners, further or alternatively to TPF:

(a)    An equitable further or alternatively common law further or alternatively implied contractual duty to preserve the assets of TPF;

-10905424-1

(b)     A duty pursuant to section 4(3) of the ELP Law as originally enacted in 1991 and subsequently section 19(1) of the ELP Law (2014 Revision) and all subsequent revisions of the ELP Law to act at all times in good faith and in the interests of TPF (there being no agreement to the contrary);

(c)     An equitable, further or alternatively common law, further or alternatively implied contractual, duty to display complete good faith towards the Limited Partners in all dealings and transactions of TPF;

(d)     An equitable, further or alternatively common law, duty not to make a profit (whether directly or indirectly) at the expense of the Limited Partners without their full knowledge and consent, alternatively an equitable, further or alternatively common law, further or in the further alternative a contractual, duty not to make such a profit from transactions absent a rational and good faith belief that the terms and conditions of such transactions were no less favourable than those that could have been obtained for comparable products or services from an unaffiliated third party with similar (or better) expertise and experience;

(e)     An equitable, further or alternatively common law, duty to manage TPF rationally;

(f)     An equitable, further or alternatively common law, duty to disclose to the Limited Partners any breach of duty or other misconduct by it or any person or entity engaged or employed by TPF (the "**Duty to Speak**");

(g)     An implied contractual duty under the LPA, further or alternatively a common law duty, to exercise reasonable care and skill in performing its role.

35      Further or in the yet further alternative, at all material times Port Link owed (and continues to owe) the following duties to maintain and provide to the Limited Partners information relating to the business and affairs of TPF. Such duties are referred to collectively as Port Link's "**Information Obligations**" herein.

(a)     A duty pursuant to section 21 of the ELP Law to keep proper books of account including, where applicable, material underlying documentation, necessary to give a true and fair view of TPF's business and financial condition and to explain its transactions.

(b)     A duty pursuant to section 22 of the ELP Law to provide to the Limited Partners on demand true and full information regarding the state of the business and financial condition of TPF. For the avoidance of doubt, this statutory duty is not limited or otherwise modified by any express or implied term of the LPA.

(c)     A contractual duty pursuant to clause 7.1 of the LPA to keep appropriate records and books of account for TPF and provide to the Limited Partners (a) access to such records and books of account, and (b) copies of such records and books of account "*under such reasonable conditions and restrictions*" as it prescribed.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

    (d)    An equitable, further or alternatively common law, duty to render true accounts and full information of all things affecting TPF to any Limited Partner or his legal representatives.

36    For the avoidance of doubt, as a matter of law, Port Link's duties as trustee of the assets of TPF and the other fiduciary duties that Port Link owed to the Limited Partners, further or alternatively to TPF, were non delegable.

**Imputation of knowledge**

37    By reason of (inter alia) (a) Mr Dashti's and Ms Lazareva's directorships of Port Link and EMPEML, (b) KGLI's ownership of Port Link, and (c) Mr Dashti's and/or Ms Lazareva's and/or KGLI's interests in EMPEML, at all material times the knowledge of EMPEML in relation to TPF is to be imputed to Port Link.

**Overview of TPF's dealings**

38    TPF made a total of four known investments (subject to further enquiries and disclosure) during its seven-year term:

    (a)    In August 2007, an investment of USD 20 million by way of a convertible loan agreement with Damietta International Ports Company SAE ("**DIPCO**"), an Egyptian company. Port Link caused TPF to recognise a provisional loss of the entire investment in its financial statement for the year ended 31 December 2014. Port Link and EMPEML blamed the loss on the Arab Spring and difficulties between DIPCO and the Egyptian government;

    (b)    In November 2007, an investment of USD 20 million in Münchmeyer Petersen Capital Global Maritime Opportunities SA ("**MPC GMO**"). Port Link and EMPEML have stated that the entire investment in MPC GMO was lost, purportedly due to the global financial crisis;

    (c)    In January 2008, an investment of approximately USD 28.6 million in Negros Navigation Company Incorporated ("**NNC**"), a Filipino shipping and logistics company. In 2010, NNC purchased one of its competitors, a company called ATS Corporation. The business of ATS Corporation combined with elements of the pre-existing business of NNC was rebranded as 2GO Group Inc ("**2GO**"). In November 2016, TPF sold its interest in NNC to another Filipino company, Udenna Development Corporation ("**Udenna**"), apparently for USD 120 million;

    (d)    From April 2008 onwards, an investment in a total amount unknown to the Plaintiffs (said by Port Link to be USD 100,040,000) in Clark City. TPF's interest in Clark City was held through a Filipino special purpose vehicle, Global Gateway Development Corporation ("**GGDC**"). GGDC was granted a long lease over a 177 hectare parcel of land in Clark City for an initial period of 50 years on 16 July 2008. GGDC was ultimately

-10905424-1

owned by GGDC Holdings, a Cayman Islands company which was itself wholly owned by TPF. In or around November 2017, TPF sold its interest in GGDC Holdings to Clark Global City Corporation ("**CGCC**"), a Filipino company which was a wholly owned subsidiary of Udenna. The Plaintiffs do not know what price CGCC paid; Port Link currently maintains that the sale price was USD 655 million, of which in excess of USD 300 million was distributed to the Limited Partners. Port Link refers to TPF's interest in Clark City as the "Clark Asset". For convenience, the Plaintiffs have adopted this term in this Statement of Claim.

39    In November 2017, Udenna apparently transferred USD 496,429,767 in connection with the sale of the Clark Asset to Noor Bank PJSC ("**Noor**") for deposit into an account held with Noor by Port Link (the "**Noor Account**").

40    The UAE Central Bank and the Attorney General of Dubai instructed Noor to freeze the transfer referred to in the paragraph immediately above. The monies remained frozen until February 2019.

**The Section 22 Proceedings**

41    By an Originating Summons dated 29 January 2020 (Cause No. FSD 13 of 2020, the "**Section 22 Proceedings**"), KPA claimed against TPF and Port Link relief pursuant to section 22 of the ELP Law (2018 Revision) and/or pursuant to clause 7.1 of the LPA.

42    In the course of the Section 22 Proceedings:

(a)    Walkers sent the Plaintiffs a letter dated 6 March 2020 on behalf of Port Link (and purportedly on behalf of TPF) providing certain information regarding Port Link's dealings (the "**Disclosure Letter**");

(b)    Andrew Childe ("**Mr Childe**") of the current directors of Port Link has sworn two affidavits providing further information regarding Port Link's dealings (respectively "**Childe 1**" and "**Childe 2**").

43    Port Link has resisted the Section 22 Proceedings and related proceedings (under Cause No. FSD 235 of 2019) brought by two other Limited Partners, Gulf Investment Corporation and General Retirement and Social Insurance Authority.

44    By an order dated 28 August 2020 made in the Section 22 Proceedings and Cause No. FSD 235 of 2019 (the "**August 2020 Disclosure Order**"), the Honourable Mr Justice Parker required Port Link and TPF to provide extensive disclosure. Port Link (acting on its own behalf and purportedly on behalf of TPF) applied for a stay of execution of the August 2020 Disclosure Order and appealed against it.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

45      The Plaintiffs will say that Port Link's conduct in relation to the Section 22 Proceedings and Cause No. FSD 235 of 2019 involve serious and continuing breaches of its duties as General Partner of TPF including in particular the Duty to Account and the Information Obligations.

**Purported Apache fees**

46      Port Link apparently caused well in excess of USD 45,850,000, and potentially as much as USD 52,330,024, of TPF monies to be paid to Apache and "a payee designated by Apache Asia" (the "**Undisclosed Designated Payee**") purportedly by way of fees for advisory services provided in relation to the sales of TPF's interests in NNC and the Clark Asset.

*Ownership and control of Apache*

47      Apache was incorporated in Hong Kong on 7 February 2013. Upon incorporation, a single share in Apache was issued to Highnoon Limited ("**Highnoon**"), another Hong Kong company. Highnoon was appointed as a corporate director of Apache on the same date (7 February 2013).  No other shares in Apache were issued.

48      From at least July 2013 until 6 December 2018, the only (two) issued shares in Highnoon were owned by Granville Limited ("**Granville**"), a Hong Kong company. Throughout this same period (1) Granville was a corporate director of Highnoon, and (2) Shane Weir ("**Mr Weir**"), the founder of Weir & Associates, was a director of Granville.

49      On 6 December 2018, Granville transferred its shares in Highnoon to Cheonghar Wong ("**Ms Wong**"), who was appointed a director of Highnoon on the same date. Until 1 January 2019, Ms Wong was a partner at Weir & Associates.

50      On 15 February 2019, Highnoon transferred the sole share in Apache to Capital Corporation Limited ("**CCL**"), a further Hong Kong company. CCL replaced Highnoon as corporate director of Apache two days earlier, on 13 February 2019. The directors and registered shareholders of CCL are Ms Wong and Mr Weir.

51      The Plaintiffs do not know the identity of the past or present ultimate beneficial owner(s) of Apache.

52      The other directors of Apache are Bee Lin Ang ("**Ms Lin Ang**", who has been a director since 5 March 2014) and Ronald Henry Ayliffe ("**Mr Ayliffe**"), Apache's founder. Mr Ayliffe was a director of Apache from 1 April 2013 until 5 March 2014 (the date on which Ms Lin Ang was appointed). He was then reappointed on 15 April 2020. Apache has never had any directors other than Highnoon, CCL, Ms Lin Ang and Mr Ayliffe.

53      While Mr Ayliffe has experience in banking, having worked for Bank of America Merrill Lynch in Australia in small-cap advisory between mid 2010 and October 2012 and prior to that for Deutsche Bank in Hong Kong, Ms Lin Ang appears not to have any significant experience in banking or finance.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

*Apache's purported expertise and experience*

54      Apache describes itself on its website (http://apacheasia.com, the "**Apache Website**") as "a merchant bank targeting the Asia Pacific region … addressing the mid-cap market".

55      On the "Relevance" page of the Apache Website, it is stated that Apache "can help in situations where traditional investment banks believe a transaction is too small or too difficult" and that Apache "specialises in transactions that are considered too difficult for investment banks or outside their core area of expertise".

56      The "Transactions" page of the Apache Website gives details of only three transactions with which Apache claims to have been involved. It states that Apache:

(a)      "*acted for 2GO Group, the Philippines' largest logistics company, in the refinancing of its senior debt*" in a transaction said to be worth approximately USD 100 million in April 2013 (the "**2GO Transaction**");

(b)      "*structured and arranged an economic swap for its client [described on the Apache Website as an "Undisclosed Counterparty"] to monetise an equity position that had shareholder restrictions*" in October 2013 (the "**Undisclosed Client Transaction**"); and

(c)      "*arranged a US$45 million loan for the Port Fund, a fund sponsored by Kuwait-based KGLI*" in August 2013 (the "**TPF Loan**").

57      All three transactions referred to in the paragraph immediately above apparently relate to TPF:

(a)      As at the date of the 2GO Transaction, TPF had a substantial indirect interest in 2GO. 2GO was owned as to 88.31% by NNC which in turn was owned as to 59.59% by KGLI-NM Holdings, which was itself owned as to 80% by KGL Investment BV. Further, Mr Mark Williams was a director of 2GO;

(b)      Mr Ayliffe has stated that the "Undisclosed Client Transaction" related to 2GO;

(c)      The TPF Loan directly concerned TPF. The TPF Loan is referred to in the minutes of TPF's Investment Committee Meeting held on 9 October 2013, in which it is stated that TPF "*negotiated and obtained a loan from Goldman Sachs's entity Best Investments (Delaware, USA) for a purpose of capital infusion in Negros Navigation and GGDC*". The minutes make no reference to Apache having assisted in the arrangement of the TPF Loan; nor do the minutes or any other document that the Plaintiffs have seen refer to Apache having been paid fees in relation to the TPF Loan.

58      There is nothing on the Apache Website or any other material that the Plaintiffs have seen to suggest that Apache – as distinct from the unidentified individuals who apparently became Apache's "team" and are said to have been involved in historical deals in the Philippines and

14                                                                    -10905424-1

Mongolia – was involved in any completed transactions beyond the three transactions referred to in paragraph 56 above and the sales of TPF's interests in the Clark Asset and NNC.

59      The homepage of the Apache Website contains a statement that "apache has had a successful and profitable initial 18 months and is now in growth mode from a position of strength, with several blue-chip mandates under execution". It is suitable and appropriate to infer, and is inferred and alleged, that this statement was first made in or around September 2014 given the reference to Apache's "initial 18 months". The Apache Website was last updated on 2 March 2016.

60      In the premises of paragraphs 56 to 59 above, it is appropriate to infer, and is inferred and alleged, that:

(a)     As of April 2013, Apache had no track record, having only been established in February 2013;

(b)     During the period between April 2013 and November 2017, Apache was not involved in any completed transactions apart from those referred to in paragraph 56 above and the sales of TPF's interest in NNC and the Clark Asset. (For the avoidance of doubt, the Plaintiffs do not accept that Apache had any substantial and legitimate involvement in any of those transactions.)

*Links between Apache and the KGL Group/EMPEML*

61      The Apache Website domain name was registered in November 2012 (i.e., before Apache was incorporated) by KGLI. KGLI is, and at all material times has been, the Registrant Organisation for the Apache Website domain name.

62      At all material times, the Apache Website has been hosted on name servers managed by and/or registered to Matt Williams Consulting ("**MWC**"). The founder and president of MWC is Mr Williams' brother, Matthew Williams. MWC has also provided web services to KGLI and KGLI Asia (as well as to TPF).

63      From November 2012 until August 2018, Anas Matar ("**Mr Matar**") was named in the domain name records for the Apache Website. From September 2011 until March 2014, Mr Matar was employed by KGLI as an IT infrastructure manager.

64      As pleaded above, Apache is currently indirectly legally owned by Mr Weir and Ms Wong and was formerly indirectly legally owned by Ms Wong alone. EMPEML has used the services of Weir & Associates since at least July 2018.

65      When EMPEML was put into liquidation on 18 February 2020, Mr Ayliffe was appointed voluntary liquidator of EMPEML.

*The Plaintiffs' claims in relation to Apache*

-10905424-1

66      It is appropriate to infer, and is inferred and alleged, that Apache provided no, alternatively no substantial, legitimate services to TPF, or in the further alternative that the fees purportedly paid by TPF/Port Link to Apache far exceeded the market value of any legitimate services that Apache provided to TPF. The grounds for this inference are as follows:

     (a)      The facts and matters pleaded in paragraphs 47 to 65 above;

     (b)      As stated in paragraph 12.1 of the Disclosure Letter, Port Link's position is that Apache "*was first engaged by the Fund in April 2015*". On this basis – contrary to what is suggested on the Apache Website – Apache cannot have provided services to TPF in relation to the transactions referred to in paragraph 56 above, which transactions are said to have occurred between April and October 201<u>3</u>;

     (c)      As stated above, in November 2017, TPF sold the Clark Asset to CGCC, a wholly owned subsidiary of Udenna. CGCC was a special purpose vehicle, incorporated by Udenna only three months earlier for the purposes of acquiring the Clark Asset. Well before a sale to CGCC/Udenna was in contemplation, TPF/Port Link had a pre-existing relationship with Udenna by reason of Udenna's purchase in November 2016 of TPF's interest in NNC. Accordingly, at least as regards the Clark Asset, CGCC/Udenna was not a purchaser found, identified or introduced by Apache. The statement in paragraph 12.1 of the Disclosure Letter that "*Apache played a key role in identifying potential buyers of GGLC, including Udenna*" is therefore false: there was no possible need for Apache to "identify" Udenna as a potential purchaser of the Clark Asset;

     (d)      In discussing TPF's exit from the Clark Asset in her witness statement dated 30 September 2019 in ICSID Case No. UNCT/19/1 Ms Lazareva does not mention Apache, let alone suggest that it played a substantial role in facilitating that exit;

     (e)      The paucity of references in TPF's documents of record to Apache; and

     (f)      The paucity of other contemporaneous documents disclosed by Port Link evidencing the provision of services by Apache.

67      Further or alternatively, it is appropriate to infer, and is inferred and alleged, that:

     (a)      Port Link's engagement of Apache in relation to TPF's interests in NNC and the Clark Asset were not arm's length engagements;

     (b)      The terms of such engagements were commercially disadvantageous to TPF;

     (c)      Port Link failed to consider properly or at all whether Apache was the best possible advisor for TPF in relation to NNC and the Clark Asset;

     (d)      The KGL Group, further or alternatively EMPEML, further or in the further alternative Ms Lazareva and/or Mr Dashti and/or other persons unknown, improperly obtained

                                                             -10905424-1

direct or indirect benefits from the payments that Port Link made purportedly in respect of Apache's fees and/or otherwise from Port Link's engagement of Apache, contrary to the best interests of TPF;

(e)    Port Link's engagement of Apache and the payments that it made to Apache or payee(s) designated by Apache constituted transactions that Port Link entered into absent a rational and good faith belief that the terms and conditions of such transactions were no less favourable than those that could have been obtained for comparable products or services from an unaffiliated third party with similar (or better) expertise and experience.

68    The grounds for the inferences pleaded in the paragraph immediately above are as follows:

(a)    The facts and matters pleaded in paragraphs 47 to 66 above;

(b)    The sales of TPF's interests in the Clark Asset and NNC were not transactions that "*traditional investment banks*" would have considered "*too small or too difficult*" or "*outside their core area of expertise*". To the contrary, they were transactions in relation to which investment banks (and other suitable established financial entities) would have been eager to act to the extent that it was necessary and appropriate for Port Link and EMPEML to obtain external advice and assistance;

(c)    In the premises of the subparagraph immediately above and given Apache's lack of track record, experience and expertise, no reasonably competent and rational person in the position of Port Link could have concluded that Apache was an appropriate advisor, alternatively the optimal advisor, for TPF in relation to NNC and the Clark Asset;

(d)    The extraordinary and excessive level of fees that Port Link apparently caused to be paid to Apache and "*a payee designated by Apache*" (the "**Undisclosed Designated Payee**"), approximating to somewhere between 450% and 700% of the market rate charged by leading established investment banks;

(e)    The statement in paragraph 3.12 of the Disclosure Letter that a payment of USD 36.2 million was purportedly made around 9 February 2019 to "*Apache Asia and a payee designated by Apache Asia based on documented contractual obligations*", coupled with Port Link's failure to disclose the identity of the Undisclosed Designated Payee or the relevant "contractual obligations" entitling the Undisclosed Designated Payee to payment.

69    It was not in the interests of the Limited Partners or TPF for Port Link to engage Apache, further or alternatively for Port Link to use TPF's monies to pay purported fees to Apache and the Undisclosed Designated Payee; further or alternatively Port Link did not act in good faith in engaging Apache, further or alternatively so using TPF's monies; further or in the further alternative no reasonably competent general partner in the position of Port Link further or

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

alternatively no general partner acting rationally would have acted as Port Link did in relation to Apache.

70   In the premises, Port Link acted in wilful and/or intentional further or alternatively negligent breach of trust, further or alternatively in breach of the duties referred to in paragraph 34 above in engaging Apache, further or alternatively using TPF's monies to pay purported fees to Apache and the Undisclosed Designated Payee.

71   The Plaintiffs are therefore entitled to and claim equitable compensation, alternatively damages payable by Port Link to them direct, alternatively by Port Link to TPF reflecting the total payments purportedly made in respect of Apache's fees less the market value of any legitimate services provided by Apache to TPF.

72   Further or alternatively, Port Link is liable to account for and disgorge to TPF any indirect or direct benefit that it obtained from the payments that it made purportedly in respect of Apache's fees or otherwise from its engagement of Apache.

**The Placino Payment**

73   Port Link apparently caused USD 2.72 million to be paid from the Noor Account to Mr Placino, purportedly by way of "advisor fees" in connection with the sale of the Clark Asset (the "**Placino Payment**"). The Placino Payment was first disclosed to the Plaintiffs in line 23 of the table under paragraph 3.11 of the Disclosure Letter.

74   At the time of the payment, Mr Placino was a director of Udenna, the 100% owner of CGCC, the purchaser of the Clark Asset. As stated above, CGCC was an SPV, incorporated in August 2017 for the purposes of acquiring the Clark Asset. It is therefore inherently unlikely that CGCC and Udenna were under separate and independent control, and inherently likely that CGCC's and Udenna's interests in relation to the Clark Asset were closely aligned (if not substantively identical).

75   Accordingly, Mr Placino was by definition unfit to advise TPF in relation to the sale of the Clark Asset: Mr Placino could not lawfully or properly do so.

76   By reason of his directorship of Udenna, Mr Placino would have been under an insoluble conflict of interest as regards the sale to the extent that he purported to advise TPF. In his capacity as a director of Udenna, Mr Placino was obliged to seek to negotiate and agree the best possible terms for Udenna (including the lowest possible price), whereas TPF was interested in obtaining the best possible terms for it (including the highest possible price).

77   In paragraph 36 of Childe 2 Mr Childe stated:

"*I understand from speaking to representatives of the Fund that Mr Placino played a crucial role in facilitating the transaction with Udenna and facilitating the closing of the sale. Mr Placino was engaged by the Fund on a success fee structure and his fees were calculated as a*

-10905424-1

*percentage of the sale price of the Clark Asset in order to incentivise Mr Placino to achieve the highest possible sale price.*"

78      This constitutes an admission that Port Link incentivised Mr Placino to breach the duties that he owed as a director of Udenna, further or alternatively paid Mr Placino a secret commission.

79      It was not in the interests of the Limited Partners or TPF for Port Link to undertake to make the Placino Payment, further or alternatively to use TPF's monies to make the Placino Payment; further or alternatively Port Link did not act in good faith in so undertaking and using TPF's monies; further or in the further alternative no reasonably competent general partner in the position of Port Link, further or alternatively no general partner acting rationally, would have made the Placino Payment.

80      In the premises, Port Link acted in wilful and/or intentional further or alternatively negligent breach of trust, further or alternatively in breach of the duties referred to in paragraph 34 above in making the Placino Payment, further or alternatively in using TPF's monies to make the Placino Payment.

81      The Plaintiffs are therefore entitled to and claim equitable compensation alternatively damages payable by Port Link to them direct alternatively by Port Link to TPF reflecting the Placino Payment.

**Lobbying and legal fees**

82      Under paragraph 3.11 of the Disclosure Letter, Walkers set out fees that were paid by Port Link using monies that were released from the Noor Account in February 2019. A substantial proportion of those payments (in number and value) were made to firms or entities that provide legal, public relations and/or lobbying services. In addition, a payment of USD 1,085,833.33 was made to Neil Bush, one of the brothers of President George W Bush and sons of President George Bush Senior, who has had extensive involvement with the Lazareva Lobbying Campaign.

83      The relevant payments are detailed in Annex 1 to this Statement of Claim, together with Walkers' purported explanation of what the fees related to. The payments total USD 7,312,436.32.

84      A large proportion of the Annex 1 payments are said to have been paid in respect of services to "assist with [TPF's] efforts to unfreeze the $496 million held by Noor". The descriptions provided by Walkers are neither accurate nor comprehensive, for the reasons set out below. In particular, the fees said to have been incurred in relation to the Noor Account were not or alternatively not all exclusively so incurred.

85      In paragraph 85 of Childe 1, Mr Childe stated:

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

"*Some of the firms engaged by the Fund [TPF] to assist with the unfreezing of the $496 million [the Noor Account funds]* **were also assisting the former directors of the GP in relation to ongoing criminal proceedings in Kuwait**" (emphasis added).

86   Mr Childe's reference to "*ongoing criminal proceedings in Kuwait*" is a reference to the Kuwaiti Criminal Proceedings. The statement in paragraph 85 of Childe 1 constitutes an admission that (1) Port Link applied TPF's monies to fund Mr Dashti's and Ms Lazareva's defence of the Kuwaiti Criminal Proceedings, and (2) the descriptions of the payments listed under paragraph 3.11 of the Disclosure Letter are neither accurate nor comprehensive. A statement to almost identical effect – constituting the same admissions – was made in paragraph 11.3 of the Disclosure Letter.

87   Further (without limitation):

(a)   The following sums are said to have been paid to Crowell & Moring LLP ("**Crowell & Moring**") purportedly "*for their legal fees and for disbursement on behalf of the Fund [TPF]*":

(i)    USD 7.5 million on 7 February 2019;

(ii)   USD 41.7 million on 12 February 2019; and

(iii)  USD 1.5 million on 30 March 2019.

(b)   Crowell & Moring represents Ms Lazareva personally (inter alia in ICSID Case No. UNCT/19/1) and KGLI in relation to public and media relations, and has been (and continues to be) heavily involved with the Lazareva Lobbying Campaign. In the table under paragraph 3.12 of the Disclosure Letter, it is stated that from the payments referred to in the subparagraph immediately above, Crowell & Moring retained USD 2,576,349.69 in respect of fees purportedly for "*legal and other services to the Fund and Port Link GP*";

(c)   In the same table under paragraph 3.12 of the Disclosure Letter, it is stated that Crowell and Moring made (inter alia) the following payments "*acting on the instructions of the board of directors of the Fund*":

(i)    A payment of USD 229,593.56 to Navigant Consulting Inc ("**Navigant Consulting**") purportedly in respect of "*services in support of legal advice to the Fund and the GP*". This description is not understood, but given the absence of any reference to the unfreezing of the Noor Account (which is referred to repeatedly elsewhere in the same table in relation to other entries) it is appropriate to infer, and is inferred and alleged, that the services provided by Navigant Consulting Inc did not relate to the Noor Account but rather to the Lazareva Lobbying Campaign and/or the Kuwaiti Criminal Proceedings;

-10905424-1

     (ii)      A payment of USD 260,795.18 to Marathon Strategies LLC ("**Marathon**") purportedly in respect of "*services to assist in the Fund's efforts to unfreeze $496 Million held by Noor **and protect the reputation of the Fund***" (emphasis added). It is appropriate to infer, and is inferred and alleged, that the services provided by Marathon (alternatively a substantial proportion of such services) related not to the unfreezing of the Noor Account but instead to the Lazareva Lobbying Campaign and/or the Kuwaiti Criminal Proceedings:

          (A)      Marathon was engaged by Crowell & Moring under an engagement letter dated 1 May 2019, nearly three months after the Noor Account was unfrozen;

          (B)      Marathon's filing in the United States under the Foreign Registration Act 1938 ("**FARA**") does not mention any work or assistance in relation to the unfreezing of the Noor Account;

          (C)      To the contrary, Marathon's FARA filing states that it "*will assist the foreign principal [defined as KGLI rather than TPF] in connection with public relations implications of the legal advice the firm, Crowell & Moring LLP provides to [KGLI]*";

     (iii)     Squire Patton Boggs, which received fees totalling USD 1,405,930.69 stated in its FARA filing that it was still being paid in Q2 2019 (1 April – 30 June 2019) for "*monitoring issues in relation to bank hold on funds*" despite the Noor Account having been unfrozen months earlier, in February 2019;

     (iv)     In paragraph 40 of Childe 2, Mr Childe stated: "*I understand from representatives of the Fund that once the release of the $496 million occurred, Marathon and Squire subsequently entered into new agreements with another third party. I also understand that this means that the Fund did not pay Marathon and Squire the amounts claimed in [the second affidavit of Yousef Al Sabah dated 24 April 2020 ("Al Sabah 2")]*". This statement is not understood: the payments to Marathon and Squire Patton Boggs referred to in Al Sabah 2 exactly reflect the payments to those firms identified in the Disclosure Letter. Further and in any event, the FARA filings of Squire Patton Boggs identify TPF as the client; the Plaintiffs are not aware of any FARA filings identifying any possibly relevant "third party" client of Squire Patton Boggs.

88     The Plaintiffs do not know the extent to which the payments set out in Annex 1 were paid in relation to the Lazareva Lobbying Campaign and/or the Kuwaiti Criminal Proceedings. However, given (1) the facts and matters pleaded in paragraphs 84 to 87 above, (2) the timings and amounts of the relevant payments, (3) the identity of the payees, and (4) the descriptions of the payments provided by Walkers in the Disclosure Letter, it is appropriate to infer, and is inferred and alleged, that such fees or alternatively a substantial proportion of such fees

-10905424-1

(including but not limited to at least a substantial proportion of the fees paid to Crowell & Moring, Navigant Consulting and Marathon) were paid in relation to the Lazareva Lobbying Campaign and/or the Kuwaiti Criminal Proceedings.

89      The table under paragraph 3.11 of the Disclosure Letter also refers to two payments to KGLI Asia in February 2019 totalling USD 1,948,976.32. Walkers stated that these payments were made in respect of fees "*for administrative and personnel services it provided to the Fund in 2018 – 2019 in respect of the sale of GGLC **and the subsequent release of the monies frozen at Noor**" (emphasis added).

90      In paragraph 40 of Childe 2 Mr Childe stated: "*representatives of KGLI Asia were involved on a daily basis in securing the release of the Fund monies at Noor bank.*" The Plaintiffs are entitled to and claim an account detailing the extent to which KGLI Asia or unidentified "representatives" thereof provided services in relation to the Lazareva Lobbying Campaign and/or the Kuwaiti Criminal Proceedings.

91      It was not in the interests of the Limited Partners or TPF for TPF's monies to be applied in support of the Lazareva Lobbying Campaign and/or the defence of the Kuwaiti Criminal Proceedings; further or alternatively Port Link did not act in good faith in so applying TPF's monies; further or in the further alternative no reasonably competent general partner in the position of Port Link, further or alternatively no general partner acting rationally, would have so applied TPF's monies.

92      Port Link therefore acted in wilful and/or intentional, further or alternatively negligent, breach of trust, further or alternatively in breach of the duties referred to in paragraph 34 above in applying TPF's monies in support of the Lazareva Lobbying Campaign and/or the defence of the Kuwaiti Criminal Proceedings.

93      In the premises of paragraphs 82 to 92 above, the Plaintiffs are entitled to and claim equitable compensation alternatively damages payable by Port Link to them direct alternatively by Port Link to TPF reflecting the total payments that Port Link made either directly or indirectly in relation to the Lazareva Lobbying Campaign and the Kuwait Criminal Proceedings using TPF's monies.

**Payments to undisclosed Kuwaiti recipients**

94      In paragraph 3.13 of the Disclosure Letter, Walkers stated that the tables under paragraphs 3.11 and 3.12 of that letter did not include payments out of the Noor Account to "*service providers to the Fund*" based in Kuwait, purportedly on the ground that the disclosure of their identities "*would, in all likelihood, lead to adverse and wholly unjust consequences for such parties*".

95      Port Link's position in this regard was criticised in paragraph 46 of Al Sabah 2. In response to such criticism, Mr Childe included under paragraph 49 of Childe 2 a table setting out five payments made out of the Noor Account between 10 February 2019 and 14 March 2019 to

22                                              -10905424-1

unidentified "*Kuwaiti based service providers*" (the "**Undisclosed Kuwaiti Recipients**") and a further payment (of USD 6,849.85) that was apparently made to EMPEML's lawyers in the Uncontested DIFC Proceedings (addressed below).

96      The payments to the Undisclosed Kuwaiti Recipients total USD 16,095,767.12. Under the heading "*Transaction Details*", Mr Childe purports to describe the services in respect of which such payments were made:

(a)     The first two payments (totalling USD 1,507,941.83) are said to have been made to a service provider or service providers "*engaged by the Fund on a joint mandate to provide assistance with (i) the Fund's effort to secure the release of the frozen funds in the Noor Account and (ii) the Kuwaiti Criminal Proceedings*";

(b)     The third and fourth payments (totalling USD 14,420,000) are said to have been made to a service provider or service providers "*engaged by the Fund to provide assistance with the Fund's effort to secure the release of the frozen funds in the Noor Account*", and that the third payment (in the sum of USD 14,070,000) "*accounted for the success fee*";

(c)     The sixth payment (on 14 March 2019 in the sum of USD 160,975.44) is said to have been made to a service provider "*engaged by the Fund to provide legal advice to the Fund in connection with the frozen funds in the Noor Account*".

97      Port Link is in continuing breach of the Duty to Account, further or alternatively the Information Obligations, by withholding from the Limited Partners the identities of the Undisclosed Kuwaiti Recipients, further or alternatively by failing to disclose to the Limited Partners full details of such services as the Undisclosed Kuwaiti Recipients provided to TPF. There is no legitimate basis for Port Link to do so.

98      In the premises of paragraphs 94 to 97 above, it is appropriate to infer, and is inferred and alleged, that the payments to the Undisclosed Kuwaiti Recipients or a substantial proportion thereof (1) were made for illegitimate purposes and/or (2) involved a direct or indirect benefit to one or more of the KGL Group, EMPEML, Mr Dashti and Ms Lazareva, and/or (3) were otherwise not in the interests of the Limited Partners or TPF such that they were made by Port Link in wilful and/or intentional, further or alternatively negligent, breach of trust, further or alternatively in breach of the duties referred to in paragraph 34 above.

99      To the extent that the payments to Undisclosed Kuwaiti Recipients were made in respect of services provided in support of the Lazareva Lobbying Campaign and/or the defence of the Kuwaiti Criminal Proceedings, paragraphs 91 and 92 above are repeated.

100     The Plaintiffs are therefore entitled to and claim equitable compensation alternatively damages payable by Port Link to them direct alternatively by Port Link to TPF reflecting the payments made to the Undisclosed Kuwaiti Recipients but giving credit for the value of any legitimate services provided by the Undisclosed Kuwaiti Recipients to TPF in TPF's interests.

23                                                    -10905424-1

**The DIFC Proceedings**

101   By a claim form dated 9 July 2018 (the "**DIFC Claim Form**"), EMPEML commenced the DIFC Proceedings against Port Link and TPF in the DIFC under claim number CFI-050-2018. EMPEML claimed:

(a)   Allegedly unpaid Carry (as defined in clause 5.2(d)(iv) of the IMA) of USD 45,462,000.

(b)   Compound interest on the allegedly unpaid Carry of 8% per annum commencing on 1 January 2015.

(c)   Allegedly unpaid Management Fees (as defined in clause 5.1 of the IMA) of USD 8,106,386.

(d)   Compound interest on the allegedly unpaid Management Fees of 8% per annum.

102   The DIFC Claim Form stated that on 7 July 2018, EMPEML's legal representatives wrote to Port Link and TPF:

"*requesting their agreement that this dispute and any claims under the IMA and/or the LPA be heard in the DIFC Courts. On 8 July 2018, [Port Link and TPF] confirmed their express agreement in writing to the jurisdiction of the DIFC Courts. Accordingly, the parties have agreed to submit to the jurisdiction of the DIFC Courts in respect of disputes arising out of both the IMA and the LPA in specific, clear and express terms.*"

103   On 11 July 2018, Port Link filed an acknowledgement of service in the DIFC in response to the DIFC Claim Form (the "**DIFC Acknowledgment of Service**").

104   On or around 11 July 2018, Port Link filed an admission of the amount claimed in the DIFC Proceedings, admitting that they and TPF were jointly and severally liable for USD 56,808,005 (the "**Admitted Amount**"), and without requesting any time to pay the Admitted Amount.

105   The Admitted Amount represented the entire amount claimed in the DIFC Claim Form plus interest on that amount calculated to the date of filing the DIFC Claim Form.

106   On 12 July 2018, EMPEML filed a request for default judgment in the DIFC Proceedings for the Admitted Amount. Port Link did not take any steps to resist this request.

107   On 25 July 2018, the DIFC entered judgment against Port Link and TPF. This was reissued on 31 July 2018 (the "**DIFC Judgment**"). The DIFC Judgment included:

(a)   At paragraph 12, a statement that Port Link and TPF had "*agreed to submit to the jurisdiction of the DIFC Courts in specific, clear and express terms.*"

(b)   At paragraph 16, an order requiring TPF and Port Link to pay EMPEML USD 56,999,978, being the Admitted Amount plus interest on the Admitted Amount at the

-10905424-1

rate of 8% per annum on a compound basis from the date of the DIFC Claim Form until the date of judgment.

(c) At paragraph 17, an order requiring TPF and Port Link to pay EMPEML's costs, to be assessed if not agreed.

(d) At paragraph 18, an order requiring TPF and Port Link to pay EMPEML simple interest of 9% per annum on USD 56,999,978 from the date of judgment until the date of payment.

108  Port Link did not take any steps to appeal against or otherwise challenge the DIFC Judgment.

109  On 7 February 2019, Port Link apparently paid USD 59,990,461.30 in satisfaction of the DIFC Judgment to an undisclosed payee designated by EMPEML (the "**DIFC Payee**").

110  Further, on 14 February 2019, Port Link apparently paid USD 6,849.85 to an undisclosed "service provider of the Fund based in the United Arab Emirates" purportedly in respect of services that it had provided to EMPEML in connection with the DIFC Proceedings.

111  Port Link failed to disclose the DIFC Proceedings to the Limited Partners at any time prior to satisfying the DIFC Judgment. Nor has Port Link ever explained how the DIFC Proceedings arose.

112  Port Link acted in wilful and/or negligent breach of trust, further or alternatively in wilful and/or negligent breach of the duties referred to in paragraph 34 above in relation to the DIFC Proceedings, by (inter alia):

(a) Submitting to the jurisdiction of the DIFC Court;

(b) Failing to challenge EMPEML's claim in respect of Management Fees on the grounds that:

(i) EMPEML had assigned its rights to Management Fees under the IMA to KGLI and therefore had no entitlement to Management Fees;

(ii) No Management Fees accrued under the IMA from 1 January 2015 onwards;

(iii) There was no contractual or other entitlement to interest, let alone to compound interest at 8% per annum, on unpaid Management Fees;

(c) Failing to challenge EMPEML's claim in respect of allegedly unpaid Carry on the grounds that:

(i) The Carry was calculated on an incorrect basis and consequently overstated, as particularised below;

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

(ii)   There was no requirement under the IMA that EMPEML receive the allegedly unpaid Carry by 1 January 2018;

(iii)   The combined effect of clauses 4.3 and 4.4 of the LPA was that a Performance Fee (including any Carry element) only became due to EMPEML when a TPF investment was exited and was not payable until cash or the cash equivalent was received by TPF in respect of the exited investment;

(iv)   There was no contractual or other entitlement to interest, let alone to compound interest at 8% per annum, on unpaid Carry;

(d)   Admitting liability for the Admitted Amount; and

(e)   Failing to disclose the alleged legal advice that was apparently given to TPF, in whole or in part.

113   To the extent that further particulars of such breaches are required and can be provided by the Plaintiffs, they are set out below.

*Submission to the jurisdiction*

114   Pursuant to clause 18.2 of the IMA, Port Link and EMPEML irrevocably submitted to the jurisdiction of the courts of the Cayman Islands in relation to any action or proceeding arising out of or in connection with the IMA.

115   The purported dispute regarding EMPEML's fees had no known connection to the DIFC.

116   In the premises, it was not in TPF's interests for Port Link to submit to the jurisdiction of the DIFC Court, further or alternatively Port Link did not act in good faith in so submitting, further or in the further alternative no reasonably competent general partner in the position of Port Link, further or alternatively no general partner acting rationally, would have so acted.

*Alleged assignment of EMPEML's rights to Management Fees*

117   By a letter dated 2 September 2007, EMPEML notified Port Link that it wished to assign its rights to Management Fees under clause 5.1 of the IMA to KGLI.

118   Port Link consented to EMPEML's wish to assign its rights to Management Fees to KGLI in accordance with clause 16.1 of the IMA (which clause stipulated that prior written consent was required for an assignment of any interest under the IMA), further or alternatively Port Link waived its entitlement to rely on clause 16.1 in relation to the assignment, such that the assignment was effective on or around 2 September 2007 (the "**Assignment**").

119   In accordance with the Assignment, KGLI was paid a total of USD 22,125,341 in respect of the Management Fees under the IMA that apparently accrued until 31 December 2014. Of this

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

amount, USD 16,832,078 was paid by Port Link to KGLI by bank transfers between 25 July 2010 and 1 October 2014, as follows:

(a)     On 25 July 2010, a payment of USD 2,424,658;

(b)     On 25 July 2010, a payment of USD 2,142,780;

(c)     On 21 November 2010, a payment of USD 2,857,040;

(d)     On 17 April 2013, a payment of USD 3,563,040;

(e)     On 22 April 2013, a payment of USD 1,336,140;

(f)     On 15 August 2013, a payment of USD 980,570;

(g)     On 1 October 2013, a payment of USD 705,570;

(h)     On 5 January 2014, a payment of USD 705,570;

(i)     On 3 April 2014, a payment of USD 705,570;

(j)     On 1 July 2014, a payment of USD 705,570; and

(k)     On 1 October 2014, a payment of USD 705,570.

120     The remaining USD 5,293,263 was added to KGLI's Capital Commitment in TPF by Port Link between 15 July 2007 and 31 December 2014 purportedly on account of KGLI's entitlement to Management Fees.

121     No further transfers were made to KGLI in respect of Management Fees after 1 October 2014, and no further sums were added to KGLI's Capital Commitment in TPF in respect of Management Fees after 1 October 2014.

        *No entitlement to Management Fees after 1 January 2015 in any event*

122     The Initial Closing Date of TPF was 15 July 2007. On 28 July 2012, Port Link extended TPF's term by two consecutive additional one-year periods in accordance with clause 2.4 of the LPA, such that TPF's term expired on 31 December 2014.

123     EMPEML's entitlement to Management Fees is prescribed by clause 5.1 of the IMA, which mirrors clause 3.7 of the LPA (to which EMPEML was not a party). Clause 5.1 of the IMA provides:

        "*In consideration of the provision of discretionary Investment management services in accordance with this Agreement, the Investment Manager shall be entitled to receive,*

27

-10905424-1

*and the Fund shall pay the following management fees in USD to the Investment Manager (the "**Management Fee**"):*

(a)     *from the Initial Closing Date until 31 December following the fifth anniversary of the Initial Closing Date, an annual management fee equal to 2% of the Fund's aggregate Capital Commitments; and*

(b)     *from 1 January following the fifth anniversary of the Initial Closing Date, until the termination of the Fund for any subsequent period, an annual management fee equal to 1.5% of the Fund's aggregate Capital Commitments.*

*The Management Fee shall be payable quarterly in advance, commencing on the Initial Closing Date and thereafter on the first day of each calendar quarter. The Management Fee shall at all times be borne by the Limited Partners pro rata to their Capital Commitments, and appropriate adjustments shall be made to their Capital Accounts."*

124     On the true construction of clause 5.1 of the IMA (alternatively a well arguable construction of that provision), TPF was not obliged to pay any Management Fees after "*the termination of the Fund*" on 31 December 2014.

125     It is apparent that Port Link construed clause 5.1 of the IMA in the way explained in the paragraph immediately above:

(a)     Note 7 to TPF's audited financial statements for the year ended 31 December 2015 states: "*in accordance with the Limited Partnership Agreement, [EMPEML] is not eligible for management fees after the Fund's life time period. No management fees were charged during 2015*";

(b)     Note 7 to TPF's audited financial statements for the year ended 31 December 2016 states: "*In accordance with the Limited Partnership Agreement, [EMPEML] is not entitled to management fees after the Fund's life time period. No management fees were charged during 2016 and 2015*".

*Allegedly Unpaid Carry*

126     Pursuant to clause 4.3 of the LPA:

"*(a) Distributions may be made to Limited Partners in the General Partner's sole discretion.*

*(b) Distributions from exited Fund Investments shall be distributed to the Partners in accordance with the following provisions:*

(i)     *100% to all Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that*

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

> *each Limited Partner receives an amount equal to its Capital Contribution employed in that particular Fund Investment; then*

> (ii)   *100% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment, until such time that each Limited Partner receives (pro rata on the basis of a 365 day year) a compounded 8% per annum return on its Capital Contribution employed in that particular Fund Investment; then*

> (iii)   *100% to the Investment Manager until such time that the Investment Manager receives 20% of the amount allocated to the Limited Partners pursuant to (ii) above; then*

> (iv)   *80% to the Limited Partners in proportion to their respective Capital Contributions employed in that Fund Investment and 20% to the Investment Manager (the "**Carry**").*

> *(c) Other Distributions shall be made 80% to all Limited Partners in proportion to their respective Capital Contributions and 20% to the Investment Manager.*

> *(d) Distributions paid to the Investment Manager in accordance with this section are referred to as the "**Performance Fee**."*

127   On the true construction of clause 4.3 of the LPA, a Performance Fee (including any "Carry" element) was only due to the Investment Manager when an investment of TPF was exited and a compound return of 8% on Capital Contributions had been distributed to the Limited Partners. Pursuant to clause 4.4 of the LPA the Performance Fee would then be payable within 90 days of the receipt by TPF of cash or cash equivalent from the exited investment.

128   Accordingly, EMPEML had no entitlement to Carry unless and until a TPF investment was exited, and until the Limited Partners had received a compound return of 8% on their Capital Contribution. TPF's audited financial statements for the period from 21 March 2007 to 31 December 2016 were therefore wrong to include a "*Performance Fee*" due to the Investment Manager on the basis that they did. Based upon the limited information available to the Plaintiffs, it appears that this threshold requirement had not been satisfied when the DIFC Claim Form was issued and indeed may not have been met at the date of this Statement of Claim.

129   Further or alternatively, the DIFC Claim Form grossly overstated the Carry due to EMPEML:

(a)   In a demand notice sent by EMPEML (then, KGL Investment Cayman Ltd.) dated 16 June 2018 demanding payment of the sums that were subsequently claimed in the DIFC Proceedings, it was stated that: "*under the LPA, the Carry is 20 percent of Distributions from exited Fund Investments*". A statement to like effect was made in the letter dated 7 July 2018 sent by Clyde & Co on behalf of EMPEML;

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

(b)     This is incorrect. The Performance Fees due to EMPEML from time to time should not have been calculated as a simple 20% allocation of TPF's profit (contrary to what is suggested in the "*Related Party Balances and Transactions*" note to TPF's audited financial statements), but in accordance with clause 4.3 of the LPA.

130     When the DIFC Proceedings were brought and the DIFC Judgment entered, the proceeds from the sale of the Clark Asset were frozen in the Noor Account and none of the Limited Partners had received any distributions in respect of TPF's exit from the Clark Asset. It was therefore not possible for EMPEML to calculate (or Port Link to verify) what Carry would be payable in respect of the Clark Asset.

131     Based upon the material presently available to them, the Plaintiffs are not able to calculate EMPEML's true Carry entitlement or the date(s) on which such entitlements arose.

*The Plaintiffs' Claims*

132     Absent the breaches of trust and breaches of duty in relation to the DIFC Proceedings set out above Port Link would have:

(a)     Successfully challenged the jurisdiction of the DIFC Court and thereby avoided any, or any significant, expenditure on legal costs in the DIFC (including EMPEML's legal costs in that jurisdiction);

(b)     Successfully resisted EMPEML's claim to Management Fees, further or alternatively its claim to Management Fees from 1 January 2015 onwards (alternatively would have compromised EMPEML's claim to Management Fees on the basis that the defences to it were at least well arguable);

(c)     Successfully resisted EMPEML's claims to compound (or any) interest on allegedly unpaid Management Fees and Carry;

(d)     Successfully resisted EMPEML's claim to Carry save to the extent that it reflected EMPEML's true Carry entitlement.

133     In the premises, the Plaintiffs are entitled to and claim equitable compensation alternatively damages payable by Port Link to them direct alternatively by Port Link to TPF reflecting the total payments made by Port Link in relation to the DIFC Proceedings and the DIFC Judgment less EMPEML's true entitlement to unpaid Management Fees and/or unpaid Carry as at 7 February 2019.

**Other payments to the KGL Group**

134     In the light of Port Link's overpayment of Management Fees and Performance Fees under the pretext of the DIFC Judgment, the Plaintiffs are entitled to and claim an account on the footing

-10905424-1

of wilful default, alternatively a common account as to the payments that Port Link made directly or indirectly, procured to be made or diverted to EMPEML and members of the KGL Group.

135     The Plaintiffs rely on the following additional facts and matters in support of their claims for such accounts:

(a)     The Management Fee of USD 4,281,697 in TPF's audited financial statements for the year ended 31 December 2009 appears to have been excessive and calculated on an incorrect basis: it reflects 3% of the total capital commitments of TPF in that year rather than the 2% prescribed by clause 5.1 of the IMA;

(b)     The report prepared by Baker Tilly dated 11 December 2008 (the "**Baker Tilly Report**") states (on page 36):

"*It was approved to include KPA to benefit from the Fund's profits for the period from Fund's profits for the period from 30 July 2007 until 31 December 2008, therefore, the Investment manager has retroactively approved the Management Fees for the past period (535 days) in the amount of USD 1,424,658, for that period (i.e., until the end of 2008) in addition to its 2% fees on the capital commitment for 2009*".

However:

(i)     TPF's audited financial statements for the year ended 31 December 2009 appear to indicate that KPA did not benefit from the profit of USD 28,305,461 attributable to TPF's Limited Partners for the period 30 July 2007 to 31 December 2008;

(ii)     Such audited financial statements also appear to indicate that KPA did not receive its full allocation of the profits attributable to Limited Partners for the year ended 31 December 2009;

(iii)     If – as appears from TPF's audited financial statements for the year ended 31 December 2009 – KPA did not benefit from TPF's profits on the basis that it was deemed to have made its capital contribution on 30 July 2007, the additional Management Fee of USD 1,424,658 was not properly payable and should not have been paid;

(c)     The Baker Tilly Report states on pages 32 to 33 that TPF made payments totalling USD 1,037,780 to KGLI in August 2007 relating to a "*Placement Fee*" equalling 3% of each Limited Partner's capital commitment at the time of subscription. However, TPF's audited financial statements for the period ended 31 December 2008 make no reference to such Placement Fees (or any Placement Fees);

(d)     Note 11 to TPF's audited financial statements for the year ended 31 December 2009 states that "*Marketing expenses*" of USD 2.5 million were incurred by TPF in 2009. For

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

the avoidance of doubt, the Plaintiffs do not accept that such alleged expenses were properly incurred or payable. In any event, the Baker Tilly Report states that two payments of USD 2.5 million were made by Port Link to KGLI in August 2010 purportedly in relation to "*Marketing expenses*":

(i)     A payment made from TPF's HSBC bank account on 11 August 2010 (referred to on page 34 of the Baker Tilly Report); and

(ii)    A payment made from TPF's Al Ahli bank account on 12 August 2010 (referred to on page 28 of the Baker Tilly Report).

The discrepancy between TPF's audited financial statements for the year ended 31 December 2009 and the statements in the Baker Tilly Report referred to immediately above demands explanation.

**Dealings in relation to the Clark Asset**

136     In the premises of paragraphs 46 to 133 above, the Plaintiffs are entitled to and claim an account on the footing of wilful default alternatively a common account as to Port Link's dealings in relation to the Clark Asset.

137     The Plaintiffs rely on the following additional facts and matters in support of their claims for such accounts:

(a)     There are (at least) grounds to suspect that (1) Port Link has failed to disclose the true consideration paid by CGCC for the Clark Asset, and (2) the market value of the Clark Asset substantially exceeded the consideration paid by CGCC:

(i)     Note 6 to CGCC's audited financial statements for the year ended 31 December 2017 states: "*In 2017, [CGCC] acquired all of the outstanding shares of stock of GGDH [i.e., the Clark Asset] for [Philippine Pesos, ("PP")] 50,179,400,000*";

(ii)    To like effect, note 35.3 to Udenna's audited financial statements for the year ended 31 December 2017 states the consideration paid by CGCC to purchase GGDH "*amounts to US$980.0 million (P50.2 billion)*";

(iii)   In contrast, Port Link currently maintains that the sale price for the Clark Asset was USD 655 million: see paragraph 25 of Childe 2;

(iv)    Note 9 to the financial statements for GGDC (Philippine Branch) for the years ended 31 December 2018 and 31 December 2017 states that the "*Fair value gain*" in respect of leasehold rights and completed building in the year ended 2018 was PP 61,679,997,039 (approximately equivalent to USD 1.175 billion in 2018). It then states:

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

"*The fair value of the investment properties and the land under operating lease (see Note 19.1) based on the latest valuation conducted by an independent appraiser **is higher than its carrying value as at December 31, 2018***" (emphasis added);

(b)     Port Link apparently paid a total of USD 109,939.77 from the Noor Account to Global Advocacy in Dubai purportedly for "*legal services provided to the Fund in respect of the DIFC Proceedings*" (according to paragraph 3.11 of the Disclosure Letter). Given that (as set out above) Port Link wrongly submitted to the jurisdiction of the DIFC Courts and then wrongly admitted the Admitted Amount, it is appropriate to infer, and it is inferred and alleged, that USD 109,939.77 far exceeded the fair value of any legal services provided by Global Advocacy to TPF in respect of the DIFC Proceedings;

(c)     Port Link apparently paid a total of USD 3,651,570 from the Noor Account to Jimeno Cope and David Law Offices ("**Jimeno Cope**"), a Filipino law firm. In paragraph 32 of Childe 2, it is stated that these payments were "*for legal services it provided to the Fund between January 2017 and 31 October 2017 in connection with matters regarding the sale of the Negros Navigation Asset and the sale of the Clark Asset and, in particular, the complex regulatory aspects of the Clark Asset transaction*". As to this purported explanation:

(i)      Since TPF sold its interest in NNC in November 2016, it is difficult to understand what possible legal services Jimeno Cope could have provided to TPF in relation to NNC during 2017;

(ii)     While Port Link has sought to justify the level of fees paid to Jimeno Cope by reference to the purported gross sale price for GGDC (see paragraph 34 of Childe 2), such justification is inadequate. The essential inquiry is as to the value of the legal services that Jimeno Cope provided in relation to the Clark Asset;

(d)     Port Link apparently paid USD 300,000 from the Noor Account to Michael V Russell ("**Mr Russell**") on 7 February 2019. This payment is described in paragraph 3.11 of the Disclosure Letter as a "*Payment by [TPF] to an employee retained to assist with the sale of GGLC*". At the time of the payment, Mr Russell was a Vice President of KGLI and the CFO of GGDC. The Plaintiffs do not know on what basis Mr Russell was personally entitled such payment.

## Interest

138     The Plaintiffs are entitled to and claim compound interest pursuant to the Court's equitable jurisdiction alternatively simple interest pursuant to section 34 of the Judicature Act (2017 Revision) and the Judgment Debts (Rates of Interest) Rules 2012 on such sums as are found

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

to be due to them and/or TPF at such rate(s) for such period(s) and with such rest(s) as to the Court seem fit.

AND THE PLAINTIFFS CLAIM:

(a)    Equitable compensation (to be assessed) payable to them direct alternatively to TPF;

(b)    Damages (to be assessed) payable to them direct alternatively to TPF;

(c)    Accounts in equity on the footing of wilful default alternatively common accounts as aforesaid;

(d)    Interest as aforesaid;

(e)    Costs;

(f)    Further or other relief.


Dated this 14th day of October 2020


*Ogier*

_____

**OGIER**
Attorneys for the Plaintiffs

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

**Annex 1**

| Recipient | Amount paid (USD) from the Noor Bank Account[1] | Description of work undertaken[2] |
|---|---|---|
| Squire Patton Boggs LLP | 1,405,930.69 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Navigant Consulting, Inc. | 229,593.56 | Engaged to provide services in support of legal advice to the Fund and the GP. |
| Brownstein Hyatt Farber Schreck LLP | 561,500.00 | Engaged to provide legal and other services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Marathon Strategies, LLC | 260,795.18 | Engaged to provide services to assist in Fund's efforts to unfreeze the $496 Million held by Noor and protect the reputation of the Fund. |
| diGenova & Toensing, LLP | 23,875.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Fahmy Hudome International LLC | 565,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Neil Bush | 1,085,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Triple Canopy Media LLC | 135,000.00 | Engaged to provide services to the Fund in support of the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Laktineh & Co Ltd | 231,650.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor and general advice on UAE law. |
| Uzma Sarfraz dba Aurora International LLC | 60,000.00 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor |
| American Continental Group | 80,833.33 | Engaged to provide services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |

---

[1] The Defendant has not provided the dates for these transactions

[2] Taken directly from the Disclosure Letter

-10905424-1

| | | |
|---|---|---|
| Covington & Burling LLP | 10,434.00 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| McCool Smith, A Professional Corporation | 85,641.54 | Engaged to provide legal services and assist with the Fund's efforts to unfreeze the $496 Million held by Noor. |
| Crowell & Moring | 2,576,349.69 | Engaged to provide legal and other services to the Fund and Port Link GP. |
| **Total** | **USD 7,312,436.32** | |

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL

## DIRECTIONS FOR ACKNOWLEDGMENT
## OF SERVICE OF WRIT OF SUMMONS

1    The accompanying form of Acknowledgment of Service should be completed by an Attorney acting on behalf of the Defendant or by the Defendant if acting in person.

    After completion it must be delivered or sent by post to the Law Courts, P.O. Box 495GT, George Town, Grand Cayman KY1-1106.

2    A Defendant who states in his Acknowledgment of Service that he intends to contest the proceedings must also serve a defence on the Attorney for the Plaintiff (or on the Plaintiff if acting in person).

    If a Statement of Claim is indorsed on the Writ (ie., the words "Statement of Claim" appear on the top of page 2), the Defence must be served within 14 days after the time for acknowledging service of the Writ, unless in the meantime a summons for judgment is served on the Defendant.

    If the Statement of Claim is not indorsed on the Writ, the Defence need not be served until 14 days after a Statement of Claim has been served on the Defendant.

    If the Defendant fails to serve his defence within the appropriate time, the Plaintiff may enter judgment against him without further notice.

3    A Stay of Execution against the Defendant's goods may be applied for where the Defendant is unable to pay the money for which any judgment is entered. If a Defendant to an action for a debt or liquidated demand (i.e., a fixed sum) who does not intend to contest the proceedings states, in answer to Question 3 in the Acknowledgment of Service, that he intends to apply for a stay, execution will be stayed for 14 days after his Acknowledgment, but he must, within that time, issue a Summons for a stay of execution, supported by an Affidavit of his means. The Affidavit should state any offer which the Defendant desires to make for payment of the money by instalments or otherwise.

**See over for notes for guidance**.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

Case 1:20-mc-00046-ALC   Document 28-1   Filed 10/15/20   Page 38 of 41

**Notes for Guidance**

1    Each Defendant (if there are more than one) is required to complete an Acknowledgment of Service and return it to the Courts Office.

2    For the purpose of calculating the period of 14 days for acknowledging service on the Defendant, a writ served on the Defendant personally is treated as having been served on the day it was delivered to him.

3    Where the Defendant is sued in a name different from his own, the form must be completed by him with the addition in paragraph 1 of the words "sued as (the name stated on the Writ of Summons)".

4    Where the Defendant is a FIRM and an attorney is not instructed, the form must be completed by a PARTNER by name, with the addition of paragraph 1 of the description "Partner in the firm of _____" after his name.

5    Where the Defendant is sued as an individual TRADING IN A NAME OTHER THAN HIS OWN, the form must be completed by him with the addition in paragraph 1 of the description "trading as _____" after his name.

6    Where the Defendant is a LIMITED COMPANY the form must be completed by an Attorney or by someone authorised to act on behalf of the Company, but the Company can take no further step in the proceedings without an Attorney acting on his behalf.

7    Where the Defendant is a MINOR or a MENTAL PATIENT, the form must be completed by an Attorney acting for a guardian ad litem.

8    A Defendant acting in person may obtain help in completing the form at the Courts Office.

-10905424-1

This Writ of Summons was filed by Ogier, attorneys-at-law for the Plaintiffs, whose address for service is: 89 Nexus Way, Camana Bay, KY1-9009 (Ref: 427021.00001/JJF/ASN/BYL)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO. FSD          OF 2020 (      )**

**B E T W E E N**

**(1)  KUWAIT PORTS AUTHORITY**

**(2)  THE PUBLIC INSTITUTION FOR SOCIAL SECURITY**

**Plaintiff**

**and**

**(1)  PORT LINK GP LTD.**

**Defendant**

---

**ACKNOWLEDGMENT OF SERVICE**
**OF WRIT OF SUMMONS**

---

If you intend to instruct an Attorney to act for you, give him this form IMMEDIATELY.

Important:  Read the accompanying directions and notes for guidance carefully before completing this form.  If any information required is omitted or given wrongly, THIS FORM MAY HAVE TO BE RETURNED.

Delay may result in judgment being entered against a Defendant whereby he may have to pay the costs of applying to set it aside.

---

1.     State the full name of the Defendant by whom or on whose behalf the service of the Writ is being acknowledged.

---

2.     State whether the Defendant intends to contest the proceedings (tick appropriate box)

☐ **yes**          ☐ **no**

---

3.     If the claim against the Defendant is for a debt or liquidated demand, AND he does not intend to contest the proceedings, state if the Defendant intends to apply for a stay of execution against any judgment entered by the Plaintiff (tick box).

☐ **yes**          ☐ **no**

---

-10905424-1

Service of the Writ of Summons is acknowledged accordingly.

_____

Attorneys-at-law for the Defendant

Address for service:

**Notes on address for service:**

Attorney: where the Defendant is represented by an attorney, state the attorney's place of business in the Cayman Islands.  A Defendant may not act by a foreign attorney.

Defendant in person: where the Defendant is acting in person, he must give his post office box number and the physical address of his residence or, if he does not reside in the Cayman Islands, he must give an address in Grand Cayman where communications for him should be sent.  In the case of a limited company, "residence" means its registered principal office.

Indorsement by Plaintiff's Attorney (or by Plaintiff if suing in person) of his name, address and reference, if any, in the box below.

Ogier
89 Nexus Way
Camana Bay
Grand Cayman  KY1-9009
Cayman Islands Ref
JJF/BYL/REF/427021.00001

Indorsement by Defendant's Attorneys (or by Defendant if defending in person) of his name, address and reference, if any, in the box below.

-10905424-1